Henry R. Kaufman, P.C.
Henry R. Kaufman (HK-7283)
60 East 42nd Street
New York, New York 10168
(212) 880-0842
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MONICA MORRISON, | ) | INDEX NO: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **COMPLAINT** |
| | ) | **FOR A** |
| v. | ) | **DECLARATORY** |
| | ) | **JUDGMENT** |
| ROBERT LANGRICK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Monica Morrison ("Plaintiff" or "Ms. Morrison"), by her attorney Henry R.

Kaufman, for her Complaint for a Declaratory Judgment against Defendant Robert Langrick

("Defendant" or "Mr. Langrick"), states and alleges the following:

## BACKGROUND

1.      This case presents one disturbing variation on the current themes of the #metoo

awakening.

2.      For all of the reasons stated herein, the case presents a live and concrete

controversy between the parties, amenable to resolution by this Court, for the protection and

preservation of Plaintiff's valuable rights, constitutional and financial.

3.      In May, 2005, Defendant Robert Langrick, some ten years her senior, assaulted Ms. Morrison, then still a teenager, who he had not previously known, sexually and in other disgusting ways, in the aftermath of a drunken fraternity party, in her own college room.

4.      Plaintiff reported the sexual assault to college authorities and, a few days later, to the local police department.

5.      A police investigation confirmed much that was disturbing and incriminating about Defendant's actions during the assaults, as set forth more fully below.

6.      However, in a far different legal and social climate, the police declined to prosecute Mr. Langrick for criminal sexual assault, for the questionable reasons described more fully below – reasons that were assuredly not exculpatory of Mr. Langrick.

7.      The 2005 incident of sexual assault had a grievous, long-term impact on Ms. Morrison, psychologically and otherwise, including a severely damaging effect on her inter-personal life and her career trajectory.

8.      On the other hand, whatever lasting feelings the incident may or may not have engendered in Mr. Langrick –  which are currently unknown –  those undisclosed feelings do not seem to have had a visible impact on his business and professional career, most recently as a top executive with a major company in New York City.

9.      Over the ensuing dozen years, Plaintiff largely kept her secret, except for revelations in therapy and privately to a small number of confidants.

10.     Plaintiff  thus effectively aligned herself with what we have all now come to learn is an army of other silent sufferers of sexual assault and abuse.

11.     Recently, inspired in part by the #metoo movement, Plaintiff finally chose to confront the perpetrator of the abuse she had suffered, albeit to the very minimal extent described below.

12.     Thus, after years of unsuccessfully trying to put her painful memories of those terrible events out of her mind, Plaintiff did some research about Defendant's current status, including, in this era of professional self-disclosure and promotion, his readily-available "LinkedIn" profile and other Internet sources.

13.     What her research revealed, among other things, was that Defendant's executive position required him to visit colleges and universities and to potentially interact with students on those campuses.

14.     With this as her concern and inspiration, on January 2, 2018, Plaintiff placed a single, brief, telephone call in which she truthfully alerted one person in Defendant's employer's Human Resources Department to the 2005 incident out of a concern for protecting further potential victims on college campuses.

15.     In sum, Plaintiff had been the victim, and is a survivor, of the 2005 incident of a drunken sexual assault by Defendant, who already at that time appears to have acted with a sense of impunity in the belief – even in his drunken state – that he was in a superior position of power in the physical and psychological dynamic between the two of them.

16.     Now, ever since that single telephone call to Defendant's employer, Plaintiff is being victimized once again, in a second attempted assault by Mr. Langrick, in the form of a

3

specific, open and outstanding threat of punitive legal action against her for having the temerity to begin speaking out truthfully about the 2005 incident.

17.     This time Defendant's assault has manifested itself in a months-long, ongoing campaign – with Mr. Langrick now represented by an attorney – to bully Plaintiff into silence about the original incident and – under the active threat of a slander action against her – to demand a non-disclosure agreement ("The NDA") whose purpose is to prevent Plaintiff from ever publicly speaking her truth about that debilitating incident, instigated by Mr. Langrick, for the rest of her life.

18.     And notably, in his new assault on Plaintiff, more than a dozen years after the original assault, in this year of the ascending #metoo movement, Mr. Langrick continues to count on what he evidently continues to believe is his inherent, indeed entitled power advantage over Plaintiff, once again expecting that he will have the power to intimidate Ms. Morrison into continuing her painful and debilitating silence.

**THIS DECLARATORY JUDGMENT ACTION**

19.     This is a civil action seeking a declaration of the rights of the parties, Ms. Morrison and Mr. Langrick, under the Declaratory Judgment Act, 28 U.S.C. §2201.

20.     The action presents an actual, live and concrete controversy affecting the valuable rights of both parties – economic, legal and constitutional.

21.     Plaintiff asks for three declarations from the Court.

(i)     Plaintiff seeks to resolve the claim of "slander" that Defendant is currently threatening to bring against her – and that he has persistently refused through his attorney to withdraw, despite several requests to do so. Specifically, she seeks a

4

declaration that any slander action against Ms. Morrison, based on her single telephone contact with Mr Langrick's employer, would be insufficient as a matter of law;

(ii)     Plaintiff seeks a declaration that the uniquely onerous NDA Mr. Langrick has been demanding from Ms. Morrison for more than six months now, is factually baseless, overreaching, unconscionable, against public policy and not legally enforceable;

(iii)    Plaintiff seeks a declaration that the past, present and future activities she is seeking to vouchsafe in this action are fully protected under the First Amendment and that Defendant's efforts to silence Ms. Morrison, and to deny her the ability to write and speak truthfully about her own life experiences – including the incident of sexual assault in May 2005 – are legal nullities; and,

(iv)    Finally, Plaintiff respectfully requests all further necessary and proper relief, as against Defendant – including injunctive relief, damages, attorney's fees, costs, and any other related remedies that the Court may deem just and proper, under 28 U.S.C. §2202.

## THE PARTIES

19.     Plaintiff, Monica Morrison, is now a 33-year old graduate of Dartmouth College, currently working as a freelance writer.

20.     Defendant, Robert Langrick, is now a 42-year old graduate of the Tuck Business School, and a Certified Financial Analyst. He was until very recently employed as Head of "Bloomberg for Education," a commercial division of Bloomberg L.P.  He is now Head of Practice Analysis at the CFA Institute, a unit of the CFA that has been co-venturing with Bloomberg in the development of a database, available on the Bloomberg Terminal, for advancing the undergraduate and graduate education of financial analysts.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to the Declaratory Judgment Act, 28 USC §§2201-2202 ("The DJA").

22.     This action presents an "actual controversy" between the parties because of Defendant's ongoing threat of a meritless slander action against Plaintiff, based on her single, truthful telephone call to the Bloomberg human resources department, and because of Defendant's simultaneous and ongoing demand for an overreaching and unenforceable NDA, in order to avoid such baseless litigation.

23.     And this Court's exercise of its discretion, under the DJA, to settle the legal rights of the parties under such circumstances, and to remove uncertainty and insecurity from their legal relationships, without awaiting a violation of those rights or a disturbance of those relationships, is appropriate as well because resolution of the current threatened slander action – based on a single statement about the 2005 sexual assault – is highly unlikely to avoid the continuing threat of further defamation action(s) by Defendant, any time that Plaintiff may publish further statements about the 2005 incident that Defendant might chose to contest.

24.     Or, in other words, in the absence of a declaratory judgment by this Court, determining the respective rights of the parties, Plaintiff would be subject to a potentially repetitive, unrelieved and chilling pall over the exercise of her First Amendment rights – and also over the potential financial benefits to Plaintiff of her freedom to write about and to publicly discuss her life experiences, including the long-term harms to her caused by Defendant's 2005 sexual assault.

6

25.     The Court has personal jurisdiction over the parties pursuant to its diversity jurisdiction, in that Plaintiff is a resident and citizen of New York State, while Defendant is a resident of the State of Connecticut. Also Defendant, originally an immigrant from the United Kingdom, is currently a legal resident of the United States.

26.     The matter in controversy has a value in excess of $75,000.

27.     Venue in this action is proper in the Eastern District of New York because Plaintiff resides in Queens County, New York.

## DEFENDANT'S FIRST ASSAULT ON PLAINTIFF (2005)

28.     Late on the evening May 7, 2005, and continuing into the overnight and dawn of May 8, at Dartmouth College, Defendant perpetrated a series of egregious assaults– sexual and in other ways –against Plaintiff and her roommates.

29.     The assaults occurred after Ms. Morrison and Mr. Langrick "met" at a drunken "frat party." In fact, Plaintiff and Defendant were total strangers to each other before the incident. And they were not ever formally introduced. Their only connection – shortly before the assaults – is that they were standing near each other at the party, in a group playing a drinking game known as "Pong." The central purpose of that game is apparently to render the players – or at least the "losing" players – inebriated.

30.     At the time of the incident, Ms. Morrison was a 19 year-old sophomore; Mr. Langrick was a 29-year-old graduate student, nearly ten years Ms. Morrison's senior.

31.     Both Plaintiff and Defendant had been drinking heavily and it is undisputed that both became extremely intoxicated. As the frat party was winding down, Mr. Langrick invited himself back to Plaintiff's room in an off-campus residence.

32.     As circumstances unfolded, and largely as a result of her inebriated condition, Ms. Morrison was essentially at the mercy of Mr. Langrick's desires and whims. And by all accounts, although he was very drunk, and says he remembers almost nothing, Langrick's uncontrolled whims were primarily sexual and assaultive in nature.

33.     Mr. Langrick later claimed to the authorities that he had unprotected, "consensual sex" with the dead drunk Morrison who, by the time of his most egregious sexual assaults, was unconscious in her bed.

34.     On its face – Defendant's claim of "consent" is incredible – indeed outrageous – for a man ten year's Plaintiff's senior, a stranger to her, who was also, he later claimed to the police, "more drunk than I have ever been in my life" – so drunk he claims he did not remember most of what happened in Plaintiff's room, except somehow to vehemently deny, evidently to this day, Plaintiff's charge of sexual assault.

35.     Based on the foregoing factors alone, it is more than fair to conclude, under New Hampshire law at the time, that due to her incapacitation – and later her unconscious state – it was not legally possible for Plaintiff to "consent" to Defendant's aggressive sexual activities and other attempted assaults.

36.     Plaintiff's recollection of Langrick's assaultive acts – that no person or authority has ever seriously contested – can be summarized as follows, as also largely documented in the

final "Incident Report" of the Hanover Police Department. (The HPD Incident Report, dated May 11 to May 27, 2005, is attached to this Complaint as Exhibit 1.)

37.     As noted, at a certain point after leaving the fraternity party with Langrick, and after she had already asked Mr. Langrick to leave her residence, Plaintiff had passed out in her off-campus room, in her own bed. Her roommate and her boyfriend, who were also complete strangers to Mr. Langrick, were asleep together in another bed, no more than 6 or 7 feet away.

38.     At some point, Ms. Morrison regained consciousness to find herself half naked, her panties having somehow been removed, with Mr. Langrick completely naked alongside her in her bed.

39.     What Plaintiff recalls, that has also never been seriously contested, is that when she was awoken out of her near-comatose state, she found Mr. Langrick attempting to penetrate her, both anally and vaginally.

40.     Because Mr. Langrick was in a semi-flaccid state, as Plaintiff recalls, his attempted sexual assaults were only partially achieved. However, according to Plaintiff's essentially undisputed recollection, Langrick's multiple attempts to penetrate her were at least partially successful, vaginally and anally.

41.     Later, Mr. Langrick admitted to the police, to having had full-on, unprotected, consummated, sexual intercourse with Ms. Morrison.

42.     Unfortunately, because Ms. Morrison was not aware that Mr. Langrick had ejaculated during his assault, only a partial rape kit was performed when she reported the assault to college health officials.

9

43.     Moreover, Plaintiff's recollection – once again essentially undisputed – is that Langrick was not silent during the sexual assault. Instead, Defendant was repeatedly proclaiming to her disgusting things like: "I want to f**k you up the a**." And also, "I want you to p**s in my mouth."

44.     If language alone can be an assault, that would be it.

45.     On information and belief, at some point during these sexually-assaultive attacks by Mr. Langrick, Plaintiff's roommate and her boyfriend were awakened to the sound of male sexual grunting in the adjacent bed, where Ms. Morrison had been passed out, still in her own inebriated state.

46.      And even after Plaintiff had extricated herself from Mr. Langrick's attacks, and was able to leave the room, Plaintiff's roommates that night both reported that Defendant continued his drunken, assaultive behavior.

47.     Indeed, at one point Defendant jumped into the bed of Plaintiff's roommate where her boyfriend had also been sleeping. Although at that point Plaintiff's roommate had left the room, Defendant, undeterred, attempted to "cuddle up," still completely naked, to the boyfriend.

48.     At another point in Defendant's late night rampage, and as Mr. Langrick later admitted, he did, for his own reasons, chose to urinate, still buck naked, in the corner of Plaintiff's room, and in full sight of Plaintiff's roommate and her boyfriend, befouling one of Ms. Morrison's sweaters in the process. (Mr. Langrick later "apologized" for his public urination in Plaintiff's room, as noted in the final police incident report, and offered to pay Plaintiff for a replacement sweater.)

10

49.     And as his assaultive rampage continued, Mr. Langrick, stumbling drunk, incoherently rambling, and still completely naked, continued to stagger around uncontrollably in Plaintiff's room.

50.     At a certain point, Defendant appeared to be coming at Plaintiff's roommate, causing her boyfriend to physically intervene.

51.     Eventually, on information and belief, another male resident from a nearby room had to be called in for further assistance. That other resident ultimately had to threaten to call the police before Mr. Langrick finally suspended his horror show, leaving the scene of his drunken, naked, out-of-control rampage and assaults.

52.     In sum, to tally up the carnage left in Mr. Langrick's wake: after having sexually assaulted a comatose Ms. Morrison; after having paraded naked and coming on to her roommate and boyfriend, in the other bed; after having urinated on and ruining Plaintiff's sweater; after having to be threatened with a call to the police in order to induce his departure from the scene; Langrick also left behind: the cocaine he had been using and carrying that night, some cash, his camera (with photos still on it evidencing his use of that cocaine), along with a general and shocking mess, including Ms. Morrison's urine-soaked sweater and, on information and belief, his no-longer-wearable, feces-laden underpants.

53.     Whatever actions the police did or did not ultimately take, as far as their decision not to prosecute Mr. Langrick for the crime of sexual assault, it is clear that the reasons for their non-action were unrelated to any serious dispute over the scope of the havoc wreaked by Defendant on that night, including the sexual and other assaults on Ms. Morrison.

54.     Indeed, based on the foregoing facts, Plaintiff – and anyone else who had witnessed Defendant's out of control behavior on the night of May 7-8, 2005, and the carnage he had left behind – would surely be more than fairly justified in expressing the view (an "opinion" based on essentially undisputed facts, in the parlance of the law of defamation) that they had all been "assaulted" by Mr. Langrick, including Plaintiff's  roommate, the roommate's boyfriend and another neighbor in the residence, sexually and in many other ways.

55.     And those witnesses would surely also find insupportable – indeed unrecognizable – Defendant's current claim that he was "conclusively determined" to have been guilty of "no wrongdoing" by the Hanover Police Department.

56.     Nevertheless, as previously noted, Mr. Langrick has in 2018 given Plaintiff every reason to believe that he remains deadly serious in threatening to sue her for "slander," apparently for calling his rampage a "sexual assault," and that he is also credible in refusing on numerous occasions – up until the present – to withdraw his baseless demands for a Draconian NDA, with "liquidated damages" of $500,000 for each and every "violation" thereof.

57.     Thus the need for this declaratory judgment action.

## THE HANOVER POLICE INVESTIGATION AND ITS FINDINGS

58.     Unlike too many other victims who have swallowed the pain of sexual assaults, while never reporting them to the authorities, shortly after the incident Plaintiff – defying the overwhelming statistic pattern of silence – made her brave and fateful choice to report Defendant's assault to the authorities.

12

59.     As previously noted, Plaintiff had initially reported the incident only to a college

peer advisor.

60.     But then, on May 11, 2005, three days after the incident, and at the suggestion of

college authorities, Plaintiff made her fateful decision to also report the assault to the local police

in Hanover, New Hampshire.

61.     Today, more than thirteen years after the incident, Defendant presses his

threatened slander claim, and demand for a stringent NDA, on the alleged basis that he was

"conclusively determined" to have committed "no wrongdoing" in the incident by the Hanover

Police Department.

62.     Nothing could be further from the truth.

63.     Here are the facts.

64.     The investigation that ensued was led by three police officers – all three of them

men.

65.     Bizarrely, although Ms. Morrison's complaint to the police was for criminal

sexual assault, the attention of the three officers soon took a U-turn toward Plaintiff's – yes

*Plaintiff's!* – handling of the drugs and cash Mr. Langrick had left behind after his drunken

rampage.

66.     Ultimately, in a time of far different attitudes toward such incidents, the Hanover

Police Department declined to charge Defendant with respect to the sexual assault. (See

generally Exhibit 1.)

13

67.     The "reasoning" of the police in arriving at this decision is telling. The incident was complicated – according to the police – by the presence of drugs, the handling of some cash Defendant left behind after the assault in Plaintiff's room, and other seemingly *extraneous matters largely involving Ms. Morrison and not Mr. Langrick*.

68.     As detailed below, and amazingly, the final police incident report even blamed *Plaintiff's* "heavy impairment due to alcohol," and *her* confusion about what exactly had happened to her – while *she* was passed out in her bed – that were among the "weaknesses of [the] case" – *against Mr. Langrick!*

69.     Here is the verbatim "analysis" of those "weaknesses," as recorded in the police report:

> "I advised Miss Morrison of some of the weaknesses of this case. I briefed her on the *various laws that she appeared to have violated* including theft of [Defendant's] lost money, *her* possession and distribution of [his] cocaine. The issue of her heavy impairment due to alcohol, and [*her*] conduct during and after the incident were discussed as they relate to the viability of a prosecution. I informed Miss Morrison that a sexual assault prosecution did not appear promising due to the total findings of this investigation. I advised Miss Morrison that a decision was still pending as to what, if any, charges would be pursued *against her* …" (emphasis added).

70.     And the foregoing conclusions were reached despite other incriminating findings contained in the Incident Report, including that Langrick, in a written email to the police, had "come[] the closest to …  admitting responsibility for what Morrison reported to us had happened. Although [he] never admits to assaulting Morrison, he discusses how 'humiliated' he is and that he had been 'feeling terrible *since learning what happened*'." (Exhibit 1, p.1; emphasis added)

14

71.     Suffice to say, the reasoning of the police investigators back in 2005 would be highly unlikely to pass muster in today's far more sensitive climate toward the rights of the sexually abused, and in light of our improving understanding of the power dynamics in connection with such assaults.

72.     In any event, the bottom line to be drawn from the final police report, was surely *not*, as he has recently been claiming, that Defendant was "conclusively" exonerated in the sexual assault investigation. Far from it. He admitted to (or did not dispute) many of his highly-questionable activities.

73.     In fact, when the Hanover Police decided not to prosecute him for the sexual assault, they appear in their written report to have made essentially no significant, exculpatory findings about what Langrick did or did not do in Plaintiff's room that night.

74.     In sum, even as to Ms. Morrison's most serious allegations, the very best that can possibly be said, on Mr Langrick's behalf, would be that he has never been in a position to meaningfully confirm or deny the details of his drunken sexual assaults, in Plaintiff's room, that evening in May of 2005.

75.     Finally, as far as their supposed "conclusive[] determin[ation]" of "no wrongdoing" by Mr. Langrick, in their final written report the Hanover Police Department announced their intention to arrest Defendant for his cocaine possession.

76.     Two days later Plaintiff, accompanied by her father, was advised by the same Captain of "the findings of this investigation:"

> "I reviewed the many questionable actions *by Miss Morrison* and
> [Defendant]. I informed them that no charges were being pursued against

15

Monica. I advised them that I intended to pursue a misdemeanor drug charge against [Defendant]. *** I will be seeking an arrest warrant for [Defendant] in the near future."

77.     In sum, the non-existent, "conclusive determination" of "no sexual assault" and "no wrongdoing" – a fantasy that has perhaps actually solidified itself in Defendant's mind over the years – would appear to boil down to little more than the fictive, but apparently also typical, misperception in these situations that the victim's silence amounts to the perpetrator's complete exoneration.

78.     For herself, thereafter, Plaintiff's memories of the incident with Mr. Langrick were never fully suppressed, only for the most part set aside into a dark but vivid corner of her consciousness. And, of course, there were witnesses, and the powerful fact that she had contemporaneously reported her life-changing encounter with Defendant to the authorities. So, in Plaintiff's case, there could never be any serious contention that a decade-old event was just some figment of a troubled woman's over-active imagination, or that she was confusing someone else with the person who actually assaulted her.

### #METOO AND PLAINTIFF'S REAWAKENING

79.     Nonetheless, for the next decade, Plaintiff largely kept her secret, thus joining the army of other silent sufferers of sexual assault and abuse.

80.     But Plaintiff is a writer. So in the past few years she has written a freelance article or two on the topic of #metoo. But she has not come close to fully revealing and exploring her own personal experience and torment.

16

81.   Also, in all of the years since the incident, Plaintiff had never sought to contact or to confront Defendant, even as she was unsuccessfully dealing with the emotional scars that the 2005 incident had left behind.

82.   As her consciousness of the #metoo movement continued to grow, Plaintiff for the first time began to progress from the occasional, free-floating speculation to seriously contemplating some kind of actual outreach to Defendant.

83.   In or around June of 2016, Plaintiff first learned that Defendant was a prominent executive with a unit of Bloomberg L.P. And on or about June 4, 2016, Plaintiff tried to call Defendant at Bloomberg. He did not answer his phone. But she was able to leave a message for him on his voicemail. Although Defendant later acknowledged that he had received Plaintiff's message, he never called her back.

84.   Then, after another eight months, in February of 2017, Plaintiff came across news coverage of allegations of sexual abuse – indeed of alleged rape – among certain executives (Not including Mr. Langrick) at Bloomberg. Plaintiff continued to follow such stories which – due to the association with Bloomberg – understandably triggered her memories of Defendant's sexual assault. From her research she also learned that Defendant's activities for Bloomberg included visits to college campuses.

85.   It was only in January of 2018, almost another year later, that Plaintiff resolved to reach out to Bloomberg in order to report her concern that Defendant's travel to college campuses might be putting him in a position to reenact the kind of out-of-control drinking, drugs

17

and sexual abuse that she had experienced back in 2005. She spoke to someone in the human resources department.

## DEFENDANT'S SECOND ASSAULT ON PLAINTIFF (2018)

86.     This declaratory judgment action specifically arises – not out of the original assault back in 2005 – but out of a new and different kind of assault by Defendant, an assault that Defendant launched soon after Plaintiff's call to the Bloomberg HR Department at the beginning of 2018.

87.     As detailed further below, in order to insulate himself from what he has been baselessly insisting is actionable "slander," Defendant has embarked on a crusade to assure that Ms. Morrison will speak no further about the 2005 incident of sexual assault at Dartmouth.

88.     And with the threat of a slander action as leverage, Defendant is insisting that Plaintiff enter into an overreaching and unconscionable "Settlement Agreement" that will require her to read from the undeniably fictional script of complete exoneration that Defendant has conjured up, based on the claim that he had been "conclusively determined" to have been guilty of "no wrongdoing" in the 2005 incident.  (The proposed draft NDA is attached to this Complaint as Exhibit 2.)

89.     According to Defendant's proposed NDA, Plaintiff must read from his phony script. For the rest of her life. And then say nothing more – ever – about an event that has severely scarred her over the more than 13-1/3 years since the incident.

90.     Finally, the demanded Settlement Agreement goes even further, purporting to impose a huge penalty on Ms. Morrison – of $500,000 in what the agreement itself refers to as a

18

"Liquidated Damages Award"– not once, but each and every time Ms. Morrison might say or write something that does not conform to Defendant's false narrative of the incident of sexual assault – also for the rest of her life.

91.     And this entire power play is said to be based on that one telephone call to the Bloomberg HR Department. The call was made in January, the threats began in February and have to date not been withdrawn, despite efforts over many months, first by Plaintiff and then by her counsel, to resolve the dispute.

92.     Thus, on May 18, 2018, Plaintiff's counsel wrote an email to Defendant's counsel, Dan Singer, outlining the reasons why Ms. Morrison was rejecting Mr. Langrick's threats and demands. In that email, Ms. Morrison stated, through her counsel, that she would "never trade away her right to truthfully recount the facts of her life" – including the facts regarding Mr. Langrick's sexual assault in May 2005. (A copy of Mr. Kaufman's May 18, 2018 email to Mr. Singer is attached to this Complaint as Exhibit 3.)

93.     Defendant's counsel did not reply to the May 18 email until August 1, 2018. In his ultimate response, however, Mr. Singer clearly indicated that nothing had changed as far as Mr. Langrick's threat of defamation litigation against Ms. Morrison, and his client's continuing demand that Plaintiff enter into the proposed NDA. The only "concession" was to offer that the NDA could be "mutual" in also restricting Mr. Langrick's ability to communicate publicly about the incident. Of course, such mutuality was no concession at all, as Mr. Langrick clearly has no intention of speaking publicly about his own assaultive actions on that night in Plaintiff's room

at Dartmouth in 2005. (A copy of Mr. Singer's email of August 1, 2018 is attached to this Complaint as Exhibit 4.)

94.    In his August 1 email, Mr. Singer set a deadline of September 10, 2018, for the filing of Defendant's threatened defamation action. Further exchanges between the parties' counsel resulted in brief extensions of that deadline. Finally, the most recent deadline threatened by Defendant through his counsel, for commencement of the slander action against Plaintiff, is November 16, 2018.

95.    As of the date of this complaint that is still essentially the status of this matter: Defendants threat of a slander action has never been withdrawn and looms over Plaintiff. And although his attorney has offered to "negotiate" the exact terms of the NDA, and Ms. Morrison has offered to sign a radically-modified NDA preserving all of her essential rights, Mr. Langrick has not yet communicated any intention of backing off from any of the key points of his previously stated demands.

**SUMMARY OF THE RELIEF PLAINTIFF SEEKSIN THIS ACTION**

96.    Under all of the foregoing circumstances, it is clear that Plaintiff's claim for declaratory relief from Defendant's current threats and demands, presents a very much live controversy in need of resolution by this Court.

97.    In this action, Plaintiff seeks a declaration that Defendant does not have a meritorious slander action against her, with respect to whatever she said in her one brief conversation with some third party at the Bloomberg HR Department and that his persistent threats of such an action are baseless – and indeed wrongful. (FIRST CLAIM FOR RELIEF)

20

98.     Plaintiff also seeks a declaration that the proposed "Settlement Agreement" Defendant has been demanding Plaintiff sign – or else he will sue her for "slander" – is unenforceable and indeed unconscionable. (SECOND CLAIM FOR RELIEF)

99.     Third, Plaintiff also seeks a declaration as to her rights going forward, in particular of her First Amendment right to speak and to write– uncensored – about her personal story of abuse as well as of her valuable right to publish her life story in any forum or manner that she sees fit. Thus, if Defendant's asserted "privacy" rights are said to have a value of $500,000, each and every time they are allegedly breached, then surely Plaintiff is here appropriately seeking to defend her equally valuable right to speak and publish her truth, including with regard to the May 2005 incident of sexual assault. (THIRD CLAIM FOR RELIEF)

100.    And finally, Plaintiff seeks injunctive relief, damages well in excess of $75,000, her attorney's fees and costs, and any other related relief deemed appropriate by the Court.

### PLAINTIFF'S FIRST CLAIM FOR RELIEF:
### A DECLARATION THAT DEFENDANT'S THREATENED SLANDER ACTION IS WITHOUT MERIT

101.    Plaintiff incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

102.    Plaintiff seeks a declaration by this Court that there is no legal or factual basis for Defendant's threatened claim of "slander" against her, arising out of her January 2018 call to the Bloomberg HR Department.

21

103.    Under New York law, the requisite elements of a slander claim can be briefly

summarized:

(i)      A precisely pleaded statement of the *exact* language of the allegedly slanderous
         statement;

(ii)     Proof that the allegedly slanderous words contained at least one false and
         defamatory statement of fact;

(iii)    Correlatively, proof that the allegedly slanderous statement was not one of
         constitutionally-protected "opinion;"

(iv)     Proof of the requisite degree of "fault" in publishing a false and defamatory
         statement of fact; and

(v)      Proof of damage to the slander plaintiff's "reputation."

109.    Moreover, under New York law, it is the slander plaintiff's burden to prove all of

the requisite elements of his slander claim.

110.    Yet it is clear that Plaintiff has been – and will be – unable to meet his burden of

proof, at the pleading stage, as to each of the key required elements of his slander claim.

111.    First, Defendant has never properly identified the exact language of the allegedly

slanderous statement Plaintiff is claimed to have made to Bloomberg during that single telephone

call in January 2018. Thus, Defendant's only attempt to recite Plaintiff's allegedly slanderous

statement to Bloomberg, appears in the proposed Settlement Agreement, Exhibit 2 at p. 1: "[O]n

or about January 2, 2018, Morrison contacted Langrick's employer, Bloomberg L.P. by

telephone purportedly to 'report' the Alleged Incident of Sexual Assault which Morrison alleged

occurred in May 2005 and, during such phone call, Morrison advised Bloomberg L.P. that

Morrison had reviewed Langrick's 'LinkedIn' page, saw that he was working with universities,

and was 'concerned' that such work might involve him having contact with college students, and that, as such, she had the responsibility to 'report' the 'incident' to Langrick's employer."

112.    Under well-established New York law, in a libel or slander case, the allegedly defamatory words must be recorded verbatim. This requirement is strictly enforced, and any paraphrasing or use of qualifying words renders the complaint defective. In short, as is apparent from his only presentation of the alleged slanders, Defendant will be unable to comply with New York's strict pleading requirements. And if this is all of the language he has to complain of, then, quite simply, he has no viable slander claim.

113.    In any event, as presented, Defendant will surely be unable to meet his burden of proving the falsity of any statement of fact made during the telephone call to Bloomberg: there *was* an alleged incident of sexual assault at Dartmouth in 2005; Mr. Langrick *was* involved in that alleged incident; Mr. Langrick's job *did* require him to travel to colleges and universities as a "Bloomberg Ambassador" and, evidently, to interact with students.

114.    And as far as Ms. Morrison's "concern" that Langrick might come into contact with college students, and her "responsibility" to "report the incident" to Mr. Langrick's employer, those are clearly non-actionable "opinions" under New York's very broad state-constitutional protection for statements of opinion. Indeed, as a matter of law, this court will readily conclude that Plaintiff's allegedly slanderous statement was, as a whole, one of protected opinion rather than actionable fact.

115.    Accordingly, on this score as well, Defendant will be unable to meet his burden of proving a false statement of fact.

23

116.    Even if he were held not to be a "public figure," Defendant will be unable to meet his burden of proving that the allegedly slanderous statement was made in a "grossly irresponsible" manner, as would be required in the circumstances of statements of public interest and concern, such as allegations of sexual abuse. And it simply cannot be grossly irresponsible to state a protected opinion based on undisputed facts.

117.    Finally, Defendant will be unable to meet his burden of proving that the allegedly slanderous statements caused damage to his reputation, over and above the damage already inflicted by Defendant on himself due to his undeniable assault on Plaintiff, back in May of 2005, and the uncontested drunken havoc he wreaked on, and the wreckage he left behind in, Plaintiff's room.

118.    Accordingly, on at least the foregoing multiple and overlapping bases, Plaintiff is entitled to a declaration that there is no legal or factual basis for Defendant's threatened slander claim based on Plaintiff's statements to Bloomberg on January 2, 2018, as alleged.

**PLAINTIFF'S SECOND CLAIM FOR RELIEF: A DECLARATION THAT THE PROPOSED NDA IS UNENFORCEABLE BECAUSE IT IS UNSUPPORTED BY THE FACTS, IS OVERREACHING AND IS AGAINST PUBLIC POLICY**

119.    Plaintiff incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

120.    Plaintiff asks this Court to declare that Defendant's proposed "Settlement Agreement" is unenforceable, not only because it is unsupported by the facts, but because it is also overreaching, unconscionable, extortionate and against public policy. Therefore, it should be held to be both improper and unenforceable, as a matter of law and of equity.

121.    First, it is a generally-accepted core principle of contract law that a valid contract cannot be based on a false or illusory premise.

122.    Moreover, the only proposed "consideration" for the demanded NDA, is Defendant's agreement not to sue Plaintiff for slander in connection with her telephone call to Bloomberg. But the threatened slander action has no merit.

123.    Yet even if there were any colorable basis for Defendant's slander claim, that would still not justify the many other overreaching and unconscionable elements of Defendant's proposed Settlement Agreement, chief among them:

(i)     The central factual premise of the Proposed Settlement agreement Defendant has been demanding is that "the Hanover Police Department conclusively determined that no wrongdoing had occurred" in connection with the events of that evening and morning in May, 2005. Because this is demonstrably not true, it follows that all of the other material provisions of the proposed settlement agreement, flowing from the allegedly slanderous statements about the incident, are also insupportable.

(ii)    Because there was never any "conclusive determin[ation] that no wrongdoing had occurred," it would be insupportable – indeed unconscionable – to approve or enforce any requirement that – for the rest of her life – Plaintiff must rigidly adhere to Defendant's false narrative of the experiences she lived through and specifically that she may not even suggest – to anyone, by any means of communication – that Defendant "committed sexual assault … and/or any other crime or misconduct (whether sexual or non-sexual)" in connection with the May 2005 incident.

(iii)   And, even beyond those false and overreaching demands, Defendant's proposed NDA would require Plaintiff to go still further. Thus, the Agreement also demands that Plaintiff never again "publish … any reference to the Alleged Incident of Sexual Assault," nor may she "disparage[] Langrick in any way" nor, indeed, may she ever again make any "reference to Langrick whether by name or description regardless of whether [the reference] is positive or negative;"

(iv)    And finally, pursuant to their Draconian and extortionate mechanisms to enforce the overbroad and overreaching proposed settlement, the NDA would permit

25

Defendant to commence litigation without notice, in response to any alleged violation of the Agreement, to recover any and all other damages Defendant may be awarded for "reputational injury," and, *in addition*, to impose against Plaintiff "liquidated damages in the amount of $500,000" plus all of Defendant's legal fees and costs.

125.    Accordingly, Plaintiff is entitled to a declaratory judgment holding that Defendant's proposed "Settlement Agreement" is unconscionable, unlawful and unenforceable.

### PLAINTIFF'S THIRD CLAIM FOR RELIEF: A DECLARATION AFFIRMING HER RIGHT TO FREELY EXPRESS AND PUBLISH TRUTHFUL FACTS AND OPINIONS ABOUT HER OWN LIFE, INCLUDING THE 2005 INCIDENT

126.    Plaintiff incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

127.    Defendant has been actively, albeit baselessly, asserting the right to censor and/or to punish Plaintiff's speech or writings on a subject of vital concern to her, for the rest of her life.

128.    And he has frivolously threatened to sue her for slander, although the threatened claim has no merit in fact or in law (First Claim for Relief, *supra*) and the NDA demanded to shut Plaintiff up, is unconscionable, unlawful and unenforceable (Second Claim for Relief, *supra*).

129.    Surely, the United States Supreme Court did not, more than fifty years ago, undertake to institute a revolution in the common law of defamation, in the landmark case of *New York Times Co. v. Sullivan* and its progeny, with the expressed goal of vigorously protecting First Amendment rights, simply in order to leave citizens to be threatened with meritless, retaliatory litigation – impeachable letter and the spirit of the *Sullivan* case – in an American court of law.

26

130.     Accordingly, it is just and proper that this Court should now protect Plaintiff with a declaration reaffirming both that Plaintiff has a constitutionally-protected right to recount the true facts of her life experiences, in any form and any medium. And, in particular, that Plaintiff must remain free to write, speak or publish truthfully about the 2005 incident, unimpeded by baseless, manipulative threats of litigation or other severe sanction.

131.     It should be self-evident that such free and uncensored exercise of Ms. Morrison's cherished constitutional right to express her opinions and to tell her own life story as she sees fit – a right that can only be subject to a good faith claim, having a substantial basis in fact and in law, that she is responsible for an unprivileged publication, of false and defamatory facts, of and concerning the Plaintiff.

132.     And it is thus also evident that the ever looming threat to Plaintiff's First Amendment rights, that could be imposed by a potentially unlimited series of defamation actions against her by Mr. Langrick, every time she wishes to speak about another aspect of her experiences and observations arising out of the May 2005 incident, is more than sufficient to warrant the protective, declaratory relief plaintiff seeks from this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

133.     For a declaration that there is no factual or legal basis for Defendant's threatened slander action against her arising out of her January 2, 2018 conversation with Bloomberg.

134.     For a declaration that the "Settlement Agreement" ("NDA") that Defendant has been demanding, is based on false premises, and that it is unlawful and unenforceable.

135.    For a declaration recognizing Plaintiff's broad and constitutionally-protected right to tell her own life story, in her own way, without the threat of costly and potentially repetitive litigation. Or, as in the current parlance: "to tell her truth."

136.    For injunctive relief, appropriate to enforce the court's declarations of rights, including at minimum:

(i)     A permanent injunction preventing Defendant from commencing the threatened meritless slander action in any other court; and

(ii)    An injunction barring Defendant from demanding from Plaintiff such an unconscionable and unenforceable NDA, including such extortionate "liquidated damages" for the violation of any such agreement.

136.    For her damages, according to proof, as a result of Defendant's baseless threat of a slander action; as a result of Defendant's undue and improper pressure on Plaintiff to enter into an extortionate and unconscionable "Settlement Agreement," not supported by any meritorious factual or legal claims, and that would violate her rights of free speech, on threat of extortionate "liquidated damages" and other Draconian penalties. And although it may be impossible to put a single dollar amount on the value of Plaintiff's life-affirming exercise of her First Amendment rights, and the likewise invaluable freedom she has lost over the years in suppressing her truth, this Court should take upon itself the obligation to place a value on her damages that will fully compensate Plaintiff for such a significant loss as well as for her threatened economic losses that would arise out of her uncensored ability to tell – and if she so wishes to sell or otherwise profit from – her truthful story about the May 2005 incident of sexual assault.

28

137.    For her costs, including her reasonable attorneys' fees incurred as a direct result of the foregoing wrongful acts; and

138.    For such other and further relief as the Court may deem just and proper.

Dated: November 1, 2018

_____/s/_____
Henry R. Kaufman (HK-7283)
HENRY R KAUFMAN, PC
Attorneys for Plaintiff
60 East 42nd Street, 47th Floor
New York, New York 10168
(212) 880-0842

29

# EXHIBIT 1

**Hanover Police Department**
**Incident Report**

Page: 1
04/20/2018

### Incident #: 05HAN-309-OF
### Call #: 05-7920

Date/Time Reported: 05/11/2005 1842
Report Date/Time: 05/11/2005 2125
Occurred Between: 05/08/2005 0500-05/08/2005 0700
Status: Incident Closed By Arrest

Involves: Sex Crimes
Reporting Officer: MPO Steven Read
Assisting Officer: Capt Francis Moran
Approving Officer: Records Coordinator Sheryl Tallman

Signature: _____
Additional Cases:

Signature: _____

| # | SUSPECT(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|

BODY: NOT AVAIL.                    COMPLEXION: NOT AVAIL.
DOB:                          PLACE OF BIRTH: NOT AVAIL.
LICENSE NUMBER: NOT AVAIL.            ETHNICITY: NOT HISPANIC

| ALIAS LAST NAME | FIRST NAME | MIDDLE NAME | SSN | DOB |
|---|---|---|---|---|
| | | | NOT AVAIL | |

EMPLOYER/SCHOOL:

OCCUPATION:

| # | OFFENSE(S) | ATTEMPTED | TYPE | CLASS |
|---|---|---|---|---|

LOCATION TYPE: School/College/University      Zone: Zone 1 – Downtown
PANARCHY
9 SCHOOL ST
HANOVER NH 03755

**1  SEXUAL ASSAULT - FORCIBLE FONDLING**                N            **Felony**      **A**
               632-A      4                    1      A
               OCCURRED: 05/08/2005   0600
       SUSPECTED OF USING: Alcohol, Drugs/Narcotics
       WEAPON/FORCED USED: Personal Weapons (Hands/Feet/Etc)

**2  ACTS PROHIBITED**                          N            **Misdemeanor**   **A**
               318-B      2                         A
               OCCURRED: 05/08/2005   0600
       SUSPECTED OF USING: Drugs/Narcotics
        CRIMINAL ACTIVITY: Possessing/Concealing

**Hanover Police Department**
**Incident Report**

Page: 2
04/20/2018

Incident #: 05HAN-309-OF
Call #: 05-7920

| # | VICTIM(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| 1 | MORRISON, MONICA C<br>2105 WOODCREST AVE<br>WINTER PARK FL 32789-5936 | F | W | 19 | | 407-353-6143 |

DOB: 09/03/1985
EMPLOYER: DARTMOUTH CLASS OF 2007
INJURIES: None
ETHNICITY: Not of Hispanic Origin
RESIDENT STATUS: Non Resident
VICTIM CONNECTED TO OFFENSE NUMBER(S): 1
RELATION TO:                              Stranger

# Hanover Police Department
## NARRATIVE FOR PATROL OFFICER STEVEN C READ
### Ref: 05HAN-309-OF

Entered: 05/11/2005 @ 2207    Entry ID: SCR
Modified: 05/17/2005 @ 1138    Modified ID: NJG

---

At 1842, 05/11/05, I was dispatched to Dartmouth Safety & Security (DSS) for a reported sexual assault. Upon arrival, I met with DSS Sgt      stated she had been contacted by the Dick's House Administrator,      and informed that a Monica Morrison was currently being seen at Dick's House and wanted to report a sexual assault.      informed me that Morrison was currently in her office talking with her parents on the phone.

After Morrison finished her phone call,      and I then interviewed her in the DSS Conference Room. Morrison stated that at about 2300, 05/07/05,      and her went to Bones Gate Fraternity where they were playing beer pong. Since Morrison did not have a partner, the brothers at Bones Gate teamed her up with a Tuck Business student identified as:

local address:

At about 0400, 05/08/05,      approached Morrison and informed her he wanted to leave and head back to Panarchy. Morrison said she was pretty intoxicated at this point, so she lost track of where      and      were.      then asked her where     (      ) was. Morrison assumed      was heading back to Panarchy with     , so she offered to walk with      to Panarchy so he could find

When they arrived back at Panarchy, they didn't find      and      asked Morrison if there was somewhere they could go to talk. They then went to Morrison's room on the third floor and discovered Morrison's roommate,      and her boyfriend,      were in the room. They then went out on the roof deck just outside of the window where they talked. Morrison said      started kissing her and she stated she was too drunk to object to this. He then asked her to "piss in his mouth" and this brought her somewhat out of her drunken state and she asked him to leave.      told Morrison that he was too drunk to leave and she told him he could sleep on a couch in the room while she passed out on her bed, fully clothed.

Sometime later in the morning (between 0500 and 0600), she woke up to find      in bed with her naked trying to have sex with her. Morrison said she thought he was trying to "hump her leg" when she first woke up.      then asked Morrison to let him "fuck her up the ass". She still had her shirt on but she did not have anything else on, "down below". Morrison said      penis was not erect but did slightly penetrate her vagina. Morrison also said      fingers also slightly penetrated her vagina. She further said his penis did contact her anus but there was no penetration. Morrison said her roommate,     , was under the impression that      was someone she "hooked up with" and later informed her that      was "moaning like a porn star" while Morrison was just laying there passed out.

Morrison said she then got up out of bed and walked to      room.      was asleep, so she knocked on the door and told him "some naked British guy is in my room who wants to fuck me up the ass."      then let Morrison sleep in his room. Some time after that,      came to      room and informed Morrison that

Hanover Police Department
NARRATIVE FOR PATROL OFFICER STEVEN C READ
Ref: **05HAN-309-OF**

Entered: 05/11/2005 @ 2207        Entry ID: SCR
Modified: 05/17/2005 @ 1138     Modified ID: NJG

had climbed into bed with her and                          and was playing "foostie" with her boyfriend
(                  ).

then went back to the room to help           and           kick           out of the room.  Upon returning to the room, they discovered           was urinating on Morrison's desk and one of her sweaters.           and           kept telling           that he had to leave, but           kept trying to get into bed and pull the covers over himself.  They kept pulling           covers off and           eventually agreed to leave.  During their efforts at removing           ,           and           noticed that           had defecated in his underwear.           did eventually leave.

Sometime later in the morning, Morrison discussed the incident with her friends and they decided to look around to see if           had left anything behind.  Outside on the deck they discovered a silver metal tube containing the residue of a white powdery substance they believed to be cocaine.  They also discovered a digital camera, a set of car keys and an ATM card.  They checked the pictures on the camera and discovered several of           and other unidentified people (presumably fellow Tuck students) running around in costumes, drinking, and snorting lines of cocaine.  Morrison said she put these items in a bag and put them in her desk except for his car keys, which she left out on a table.

At about 1600, 05/08/05, Morrison said she was in her room when           walked in.           stated he had been really drunk and blacked out.  He then asked Morrison what had happened and she said he had made an ass out of himself.           then asked if he had left anything behind and he picked up his car keys from the table.  He then left and asked her to let him know if she found anything else of his.

Morrison then said she grew more upset as she thought about this incident, so she sent a blitz to           describing exactly what he had done.           replied saying he was sorry and offered to send money.

Sometime on Monday (05/09/05) afternoon a guy came to Morrison's room told Morrison that "           wants you to have this," and gave her an envelope.  Morrison said she had no idea who this guy was, but assumes it was probably one of           classmates at Tuck.  The letter contained $200.00 and an apology letter.  Morrison said she tore up the letter, but deposited the $200.00 in her bank account.

Morrison stated she got in touch with her class dean who put her in contact with           Morrison said she did go to Dick's House with the sheets from her bed and a sexual assault kit was completed.  I asked Morrison what she wanted to see as a final outcome for this matter.  Morrison said she realizes she was pretty drunk, but she feels           should be charged in view of how he treated her that night and how he tried to buy her off with an apology letter and $200.00 delivered by a stranger.

Morrison then asked me to take custody of           property that he left in her room because she didn't want to be responsible for any illegal substances.  She gave me           ATM card which she had with her.  She also said she was concerned that she could be charged with underage possession of alcohol since she is still a minor and I replied that I would not be considering charging her in view of the overall circumstances.  Morrison said she wants to be completely honest about everything.  Morrison and I agreed it would probably not be best for a uniformed police officer to be searching around Panarchy, so she agreed to meet me outside with the items from her room.

**Hanover Police Department**
NARRATIVE FOR PATROL OFFICER STEVEN C READ
Ref: **05HAN-309-OF**

Entered: 05/11/2005 @ 2207        Entry ID: SCR
Modified: 05/17/2005 @ 1138       Modified ID: NJG

---

As we were leaving,                /RN approached me in the parking lot and turned over Morrison's sexual assault evidence collection kit.  I then followed Morrison to Panarchy where she brought down the metal container and the camera to me.   I then took the items and the collection kit to the Hanover Police Department and placed them into evidence.

Detective Captain Moran was briefed on this incident.  Capt Moran asked me to inquire as to how far Dartmouth expected to investigate this matter tonight.  I called DSS Investigator         and he informed me that Morrison's class dean and the Proctor had been notified of this incident, but it did not appear that anyone had plans to contact anyone from the the Tuck School Administration tonight.

**May 12th:**                              **Sexual Assault Investigation**

In furtherance of this investigation I prepared search warrants and affidavits based on Officer Read's paperwork The search warrants were for email records between the suspect,                    , and the victim, Monica Morrison, from May 7th - present, and for the search of the digital camera and metal container, (believed to be evidence of Acts Prohibited).  After reviewing the applications, Detective Bates presented them to Judge Cirone. (See Detective Bates' report for details.)

That morning I sent email to Monica Morrison requesting a follow-up interview, copies of any email communication between she and          a bank receipt for the deposit of the $200.00 that she had reportedly received from an associate of              and the original apology note from                   I arranged to pick up Miss Morrison outside of The Wrap that afternoon.

I met with Miss Morrison and a male identified as              outside The Wrap as agreed.  Miss Morrison advised that she did not have the receipt for the deposit of the $200.00 received from            .  She advised that she had deposited all but $8.00 of the money in her bank account at the Bank of America in Hanover on May 11th.  She agreed to take me to her bank to get a record of this deposit.  We went to the Bank of America in Hanover and received a print-out of activity on her account.  I noted a $192.00 deposit on May 11th.

I transported Miss Morrison to the Hanover PD.  I received her permission to audio tape record the interview that followed.  I began by asking Miss Morrison to view an eight person photo line-up which included the following photos:
1.
2.
3.
4.
5.
6.
7.
8.
(This line-up was prepared by Detective Ballard at my request.)

Miss Morrison viewed the line-up and ultimately identified the persons in photos #3 and #5 as looking like the suspect in this matter.  I asked Miss Morrison to initial below each photo and draw a line connecting them.  She did so.

I then interviewed Miss Morrison about the events of May 7th -8th and her involvement with            .  She provided a detailed statement.  She explained her contact with               and her possession of his property, including a container which is suspected of containing cocaine.  Miss Morrison confirmed that she was interested

Hanover Police Department                    Page: 2
NARRATIVE FOR CAPTAIN FRANCIS T MORAN
Ref: **05HAN-309-OF**

Entered: 05/13/2005 @ 1431        Entry ID: FTM
Modified: 05/31/2005 @ 1002    Modified ID: FTM

---

in pursuing a prosecution of

I received the torn up apology note that Miss Morrison had received with the $200.00 from an associate of
            The note stated:
"Dear Monica &
        Please accept this as a token of apology for Saturday night.          I hope you find a nice replacement
shirt for the one I ruined.
        I hope that we get together soon so I can apologize in person.

                                        Yours Apologetically,


Miss Morrison advised that she had sustained a minor injury to her right knee sometime during the night in
question.  She permitted me to view the injury.


I advised Miss Morrison that I was interested in viewing and photographing her bedroom and other areas at the
Panarchy house which here connected to this case.  She agreed to this, but had other commitments to attend to
that afternoon.  We agreed that this would be done sometime in the near future.  After the interview Miss
Morrison was driven back to campus.

At 16:00 Detective Ballard and I went to room          at              , Tuck School to attempt to make contact
with              He was not present at his room.  I noted a Superman and a Spiderman costume lying on the
floor outside of              room.  The door to the room was numbered,       , and had
posted on it.

**May 13th:**                                          **Follow-up**
Detective Ballard and I returned to              in an attempt to locate              .  He was not present.  At
my request Detective Ballard took photographs of              door, and of the Superman and Spiderman
costumes found on floor, in the hallway outside of the room.

Detective Ballard and I then went into the Tuck School in an effort to locate              In the course of this
effort we met with            , (Asst. Dean), and              (Asst. Dean).  In general terms we discussed
this investigation and our desire to interview              without warning.  They agreed to notify me if they
came in contact with

Later that day I unsuccessfully attempted to arrange a viewing of the Panarchy scene with Miss Morrison.

**May 16th:**                     **Attempt to Locate**          **/ Panarchy Viewing**
Detective Ballard and I went to room              in another attempt to locate              He was not
present.  It was decided that we would attempt this again the next day at an earlier time.

I arranged to meet with Miss Morrison at the Panarchy house.  There Detective Ballard and I viewed her
bedroom, the roof outside her bedroom, and the cupola where she and              had kissed on the morning

Hanover Police Department       Page: 3
NARRATIVE FOR CAPTAIN FRANCIS T MORAN
Ref: **05HAN-309-OF**

Entered: 05/13/2005 @ 1431      Entry ID: FTM
Modified: 05/31/2005 @ 1002    Modified ID: FTM

---

of May 8th.


**May 17th:**                        **Interview**
Detective Ballard and I went to           in another attempt to locate             was present and permitted us to enter his room.  I explained the nature of this investigation and asked to conduct an interview with him to get his side of the story.        agreed to this.  I received his permission to audio record the interview.  In the course of the interview that followed I learned the following:
-        confirmed his involvement with Monica Morrison.

-        reported that he and Miss Morrison had consensual sex in the cupola at the Panarchy house.

-        denied any recollection of the events thereafter in Miss Morrison' bedroom.

-        reported that he had a friend named       deliver an apology note and $200.00 cash to Miss Morrison.

-        initially denied owning the metal container, suspected of containing cocaine, but ultimately admitted that it was his property.

-        permitted me to inspect his emails to and from Miss Morrison and her friends.                            I noted that one of the emails was from a            It contained the following message:
"You should straighten up your room and the like.  You may get a visit from HPo with a warrant soon, thanks to your new friend Monica Morrison.  And if you write to her, be aware that eventually it might get read in some court or another.  watch out.                                and

-        forwarded to me an email that contained a photograph of him and his friends dressed up as super heroes on Saturday, May 7th.

Hanover Police Department    Page: 4
NARRATIVE FOR CAPTAIN FRANCIS T MORAN
Ref: 05HAN-309-OF

Entered: 05/13/2005 @ 1431        Entry ID: FTM
Modified: 05/31/2005 @ 1002      Modified ID: FTM

---

**May 19th:**                                 **Search Warrant #2**

At 09:18 Detective Bates and I executed a search warrant on the cylindrical metal container and the Sony digital camera received from Monica Morrison.  Detective Bates opened the container.  We noted that it had the presence of a white substance/residue along its inside wall, but nothing more.  We inspected the digital camera and found that its power supply was exhausted.

 At 13:45 Detective Ballard and I inspected the contents of the Sony camera's 512MB memory card we found that it   contained 97 digital images and 25 digital movies; three (3) of the digital images containing the following:
- Image DSC05387:  One (1) "line" of a white substance on a   dark surface.
- Image DSC05388:  One (1) male subject with light colored   hair appearing to be ingesting/"snorting" a white substance.
- Image DSC05389:  A desktop upon which various objects rest, to include a "line" of a white substance.

Digital photos were taken of the camera and the contents of the open metal container.

I delivered copies of this Search Warrant and Return, as well as the previous Search Warrant and Return for email records to the office of Attorney George Ostler.  I had conversed with Mr. Ostler earlier in the day and was aware that he would be representing                    in this matter.

**Hanover Police Department**
NARRATIVE FOR CAPTAIN FRANCIS T MORAN
Page: 5

Ref: **05HAN-309-OF**

Entered: 05/13/2005 @ 1431          Entry ID: FTM
Modified: 05/31/2005 @ 1002          Modified ID: FTM

---

**May 19th:**                                    **Interview**

I met with _____ at the Hanover Town Hall and interviewed him about this matter. _____ gave me consent to audio record the interview.   In the course of this interview _____ recalled that Miss Morrison had pulled a white item out of the metal cylindrical container that belonged to _____ (This item is believed to have contained the majority of _____ cocaine.  It is currently unaccounted for.)

NARRATIVE FOR CAPTAIN FRANCIS T MORAN
Ref: **05HAN-309-OF**

Entered: 05/13/2005 @ 1431        Entry ID: FTM
Modified: 05/31/2005 @ 1002      Modified ID: FTM

---

**May 20th:**                                    **Interview**

I met with                    at the Panarchy house and interviewed him about this matter.                    gave me consent to audio record the interview.  In the course of this interview                    relayed her observations of Monica Morrison in possession of                    metal container.  She reported that there was a small piece of paper inside the container which cradled a substance, (believed to be cocaine).

**May 24th:**                                    **Interview**

I met with                    at the Hanover PD and conducted an interview about this matter.                    gave me consent to audio record the interview.  In the course of the interview                    confirmed that she received $20.00 from Miss Morrison, that she believed belonged to                    She stated that the payment was to compensation for "pain and suffering", referring to being subjected to                    behavior on the morning in question.  She advised that she suspected that Miss Morrison's complaint of sexual assault is bogus.  At the conclusion of the interview I advised                    that her receipt of $20.00 is technically Theft of Lost or Mislaid Property.  She agreed to produce $20.00 to be forwarded to                    or his attorney.

**May 25th:**                                    **Interview**

I met with                    inside the Hanover Town Hall after receiving an email from him earlier in the week in which he requested another meeting.                    asked to talk with me without having the conversation audio recorded.  I agreed to this.                    then proceeded to advise that he had not been completely truthful about one issue in his first interview.  He explained that he was aware that the metal container that Miss Morrison had found with                    other property had in fact contained more than he had told me originally.  He stated that he observed a piece of paper inside the container, which contained a substance believed to be cocaine.  He stated that he did not inspect the item and only saw it from a distance.  He reported that he later learned from Monica Morrison that she had given this item to another person sometime before she filed a complaint with the Hanover Police.                    denied knowledge about the recipient of the suspected drug.  He stated that he did not ask, and Miss Morrison did not tell him.

I thanked                    for this information.  I received his permission to start the tape recorder and have him re-count this information.

**May 25th:**                                **Monica Morrison Interview #3**

I met with Monica Morrison outside of The Wrap on South Main Street by agreement.  I then transported her to the Hanover PD for a briefing and follow-up interview.  At the station I received her permission to audio tape the interview.  I then discussed with her the findings of this investigation.  I pointed out some of the conflicting information, and supporting evidence that I had received.  I advised her of                    statement, and admissions.

In the course of this interview I questioned Miss Morrison about the contents of                    metal container.

Hanover Police Department                                            Page:   7
NARRATIVE FOR CAPTAIN FRANCIS T MORAN
Ref: 05HAN-309-OF

Entered: 05/13/2005 @ 1431        Entry ID: FTM
Modified: 05/31/2005 @ 1002      Modified ID: FTM

---

She confirmed that the container originally had more inside of it.  She detailed how she was contacted via email by a guy in Panarchy who wanted to talk with her, and how she ended up giving this male the cocaine from                       container.  She explained that the male is a regular user of cocaine and had heard that she had it.  She reported that the male weighed the drugs and found that it was 1.5 grams.

After further discussion Miss Morrison identified this male as being                       She reported that                       was a member of the Dartmouth College Class of       , and that he has a girlfriend named                      who is a current Dartmouth student.  Miss Morrison reported that                       is living with his girlfriend in a room on                       floor of the Panarchy house.

I advised Miss Morrison of some of the weaknesses of this case.  I briefed her on the various laws that she appeared to have violated including theft of                       lost money, her possession and distribution of cocaine.  The issue of her heavy impairment due to alcohol, and conduct during and after the incident were discussed as they relate to the viability of a prosecution.  I informed Miss Morrison that a sexual assault prosecution did not appear promising due to the total findings of this investigatin.  I advised Miss Morrison that a decision was still pending as what, if any changes would be pursued against her,                       and I asked Miss Morrison not to discuss this interview with

**May 27th:**                            **Morrison Family Meeting**
I met with Monica Morrison and her father Robert Morrison on Friday, May 27th at 08:00 at the Hanover PD.  We discussed the findings of this investigation.  I reviewed the many questionable actions by Miss Morrison and              .  I informed them that no charges were being pursued against Monica.  I advised them that I intended to pursue a misdemeanor drug charge against

**Status:**
I will be seeking an arrest warrant for                       in the near future.

Hanover Police Department          Page: 1
NARRATIVE FOR DETECTIVE ERIC S BATES
Ref: **05HAN-309-OF**

```
Entered: 05/16/2005 @ 1348      Entry ID: ESB
Modified: 05/17/2005 @ 1512   Modified ID: ESB
```

**05/16/2005 1341**
**SEARCH WARRANT FOR BLITZ MAIL MESSAGES**

On May 12th, 2005 I presented a Search Warrant to Judge Albert Cirone, Jr. requesting permission to have the Blitz mail accounts of Monica Morrison and           searched for any correspondence between the two parties and for the messages to be preserved for review. I was granted the warrant and              of Dartmouth Computer Services was contacted with the particulars regarding the scope of the search.

On May 16th, 2005 I contacted        and learned that he had located several messages in one of the two accounts and had printed those messages off.        told me that the second account had been "cleaned out" and that there were not many messages that fell within the scope of my warrant left in the account.        could not recall which account had been emptied.

After having left           office I noted that all but two of the messages appear to be from Morrison's account. The printed messages are in reverse chronological order, which made them somewhat confusing to read initially, but after I learned that I needed to start at the back page and read forward it was easier to follow the sequence.

The initial message from Morrison, which was sent on 5-8-05 at 23:55 hours, reads as though she is angry. However, there is also sarcasm interwoven into the message so it is difficult to tell exactly what Morrison's feelings are about what she claimed happened. Morrison does make reference to having been a victim of "sexual assault" by        . Morrison also said that "her roommate, and her [roommate's] boyfriend" were sexually assaulted by        but does not offer what she meant by that.

The next message from Morrison, dated 5-9-05 at 10:10 hours, contains a quote from                about going easy on        and suggesting that        treat people to a dinner. The portion of that message that appears to have been written by Morrison suggests that she was trying to convey to        that she had not meant to sound so angry in her previous message, and that she had intended for the previous message to "be more funny than harsh". I did not find any type of response from        in between the first and second message.

The third message printed out, dated 5-9-05 at 10:24 hours, appears to be from        in response to Morrison's emails. This email comes the closest to        admitting responsibility for what Morrison reported to us had happened. Although        never admits to assaulting Morrison, he discusses how "humiliated" he is, and that he had been "feeling terrible since learning what happened".        went on to tell Morrison that he wanted to pay for her "shirt" (which I believe is meant to be her sweatshirt that she described having been

Hanover Police Department

NARRATIVE FOR DETECTIVE ERIC S BATES

Ref: **05HAN-309-OF**

Entered:  05/16/2005 @ 1348        Entry ID: ESB
Modified: 05/17/2005 @ 1512      Modified ID: ESB

ruined in an earlier message) and "cleaning up".          offered "$200" as compensation.

          message also refers to his agreement to take "you guys" out for dinner, and explains that he can get them "all properly hammered".  The closing sentence of          message asks Morrison for a mailing address so that he can send her the money and a written apology.

     Throughout the day on 5-9-05 Morrison and          apparently exchange emails.  At one point Morrison inquires what drugs          was on.          response was that he had been drinking since "10am that morning", and he immediately went on to say, "I have literally never been so drunk in my life."  Although          response also discusses feeling bad about what had happened, it does not give any particulars about what          feels bad about.

     The messages ultimately discuss          treating Morrison,          ,          , and          (it is unknown if          is included) to a dinner.  When          advises the group that he is busy and could not immediately take them out, I noted that          and          opted to interject their comments to          The tone of their comments make it appear as though they are extorting          for the agreed upon meal.  There are no direct responses by          to what          and          wrote to          included in the seized messages.  However, on 5-10-05,          sent Morrison a message stating that he had "cleared up [his] evenings today and tomorrow so would be free to meet [her] at 7pm tonight or 8pm tomorrow night for the apology dinner".

     Although the relevance of this is unknown at this time, it should be noted that I did discover an odd message from Morrison to          dated 5-9-05 at 1528 hours.  The previous emails leading up to this particular email discuss the possibility of          taking the group out to diner at Simon Pierce.  Included in the previous emails is a travel company's write up about the restaurant that includes the sentence, "The Vermont cheddar soup tastes almost magical when spooned from an exquisite bell-shaped celadon Pearce cup."

     In the message that I found odd Morrison writes the following: "but          the soup tastes 'magical.'  I mean, I know you gave us a little of your own magic on Saturday night, but when you get us all geared up like that with the magic and all, we become dependant on this magic for our livelihood."  My initial interpretation of this particular message was that the statement by Morrison contained some type of underlying meaning or innuendo that          would be able to interpret but someone ignorant to the nights activities would not.  This type of statement seemed almost consistent with what          and          had done that I referenced earlier in this narrative.  Without knowing for certain, I believe this statement refers to          Cocaine, and the possible use by everyone involved.

     I will be attempting to obtain a Search Warrant for          camera and metal container with Cocaine in it in the near future.

     This case is active.

**Hanover Police Department**
NARRATIVE FOR DETECTIVE ERIC S BATES
Ref: **05HAN-309-OF**

Entered: 05/16/2005 @ 1348      Entry ID: ESB
Modified: 05/17/2005 @ 1512    Modified ID: ESB

---

**05/17/2005 1502**
**DIGITAL CAMERA AND METAL CONTAINER SEARCH WARRANT**

On May 17th, 2005 I sought, and was granted, a Search Warrant to search                    digital camera and the metal container that is suspected to contain Cocaine.  (It should be noted that a similar Search Warrant was requested on 5-14-05 for these items, but it was denied based on lack of probable cause being found.  Follow up interviews were conducted with Melissa Morrison and            that supported the probable cause found for the second Affidavit.)

**Hanover Police Department** **Page: 1**
SUPPLEMENTAL NARRATIVE FOR DET ERIC S BATES
Ref: **05HAN-309-OF**

Entered: 05/09/2007 @ 1511     Entry ID: ESB
Modified: 05/09/2007 @ 1511     Modified ID: ESB

---

**ESB - 04/27/2007**

On April 27th, 2007 the tobacco, drugs or paraphernalia in this matter were destroyed pursuant to motion.

# EXHIBIT 2

# Settlement Agreement By and Between Robert Langrick ("Langrick") and Monica Candace Morrison ("Morrison") Dated As of April_____, 2018 (the "Agreement")

Whereas, in or about May 2005, Morrison filed a complaint with the police department in Hanover, New Hampshire (the "Hanover Police Department") alleging that Langrick had sexually assaulted her following a fraternity party which took place on or about May 7, 2005 (the "Alleged Incident of Sexual Assault");

Whereas, the Alleged Incident of Sexual Assault was heavily investigated by the Hanover Police Department in May 2005- which included, among other things, taped interviews with Morrison, Langrick, and multiple witnesses to the Alleged Incident of Sexual Assault- and the Hanover Police Department conclusively determined that no wrongdoing had occurred and no charges were ever filed;

WHEREAS, on or about June 4, 2016, Morrison left Langrick a voicemail at his place of business- Bloomberg L.P.- in which Morrison referenced the Alleged Incident of Sexual Assault and claimed that she was a writer for Business Insider and XO Jane and requested that Langrick call her to discuss a story she was going to run (the "June 2016 Phone Message");

WHEREAS, prior to the June 4, 2016 Phone Message, there had been no communication by and between Morrison and Langrick since May 2005;

WHEREAS, Langrick did not respond to the June 2016 Phone Message;

WHEREAS, on or about January 2, 2018, Morrison contacted Langrick's employer, Bloomberg L.P. by telephone purportedly to "report" the Alleged Incident of Sexual Assault which Morrison alleged occurred  in May 2005 and, during such phone call, Morrison advised Bloomberg L.P. that Morrison had reviewed Langrick's "LinkedIn" page, saw that he was working with universities, and was "concerned" that such work might involve him having

contact with college students, and that, as such, she had the responsibility to "report" the "incident" to Langrick's employer (the "Defamatory Phone Telephone Call");

WHEREAS, on or about February 12, 2018, The Law Offices of Daniel A. Singer PLLC, 630 Third Avenue, 18th Floor, New York, New York 10017 (the "Singer Law Office") corresponded with Morrison on behalf of Langrick regarding the Defamatory Telephone Call (the "February 12, 2018 Legal Letter");

WHEREAS, prior to the February 12, 2018 Legal Letter, no one had communicated with Morrison on behalf of Langrick since May 2005 and Langrick had not contacted Morrison since May 2005;

WHEREAS, Langrick is prepared to commence litigation against Morrison as a result of the Defamatory Telephone Call;

WHEREAS, Morrison and Langrick desire to resolve the issue of the Defamatory Telephone Call as well as any other matters as may be outstanding between them;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and promises contained therein, Morrison and Langrick agree as follows:

1. The foregoing recitals are incorporated herein by reference.

2. Morrison represents that other than the Defamatory Telephone Call, she has not published (whether orally or in writing) in any phone message, conversation (whether in person, by telephone, or otherwise), speech, report, lecture, ipod, video broadcast, videotape, radio broadcast, television broadcast, blog, newspaper or magazine article, social media, journal, newsletter, letter, email, text message and/or any other form of media or communication any of the following: i) any reference to the Alleged Incident of Sexual Assault; ii) any comment, assertion, allegation, reference and/or suggestion that Langrick committed sexual assault, rape,

and/or any other crime or misconduct (whether sexual or non-sexual ), regardless of whether the purported victim is Morrison or some other person; iii) any comment, assertion, allegation, reference, and/or suggestion to Langrick being in any way unsafe or dangerous; iv) any comment, assertion, allegation, reference and/or suggestion that disparages Langrick in any way; and/or v) any other reference to Langrick whether by name or description regardless of whether same is positive or negative.

3.   Morrison further represents that other than the June 4, 2016 Phone Message and the Defamatory Telephone Call, Morrison has had no communication (whether orally or in writing) with Bloomberg L.P. with respect to Langrick, regardless of whether such communication has identified Langrick by name or description.

4.   Morrison agrees that she will not at any time in the future publish (whether orally or in writing) in any phone message, conversation (whether in person, by telephone, or otherwise), speech, report, lecture, ipod, video broadcast, videotape, radio broadcast, television broadcast, blog, newspaper or magazine article, social media, journal, newsletter, letter, email, text message and/or any other form of media or communication any of the following: i) any reference to the Alleged Incident of Sexual Assault; ii) any comment, assertion, allegation, reference and/or suggestion that Langrick committed sexual assault, rape, and/or any other crime or misconduct (whether sexual or non-sexual ), regardless of whether the purported victim is Morrison or some other person; iii) any comment, assertion, allegation, reference, and/or suggestion to Langrick being in any way unsafe or dangerous; and/or iv) any comment, assertion, allegation and/or suggestion that disparages Langrick in any way; and/or any other reference to Langrick whether by name or description regardless of whether same is positive or negative.

5.   Morrison further agrees that she will not contact any past, present, or future employer of

Langrick (or any employee, officer, shareholder, partner, member, member of the board of directors, director, agent, manager and/or staff member of any past, present, or future employer of Langrick, whether Bloomberg L.P. or otherwise) to reference or discuss the Alleged Incident of Sexual Assault and/or Langrick in any manner, regardless of whether such reference or discussion identifies Langrick by name or by description.

6.   Morrison further agrees that she will not have any contact (whether orally or writing) with Langrick or any of his family members and/or business associates specifically agrees to stay away from Langrick's homes and places of business.

7.   In the instance that Morrison is approached by any person and/or entity regarding the Alleged Incident of Sexual Assault, Morrison will advise such person or entity that the Hanover Police Department conclusively determined in May 2005 that no sexual assault or other wrongdoing had occurred.

8.   Morrison admits that the Defamatory Telephone Call constituted slander under New York law and forever waives asserting any defense that same did not constitute slander under New York law.

9.   Based on the representations and admissions set forth in paragraphs 2, 3, 8, 10, and 11 of this Agreement and the promises set forth in paragraphs 4, 5, 6, and 7 of this Agreement, Langrick agrees not to commence litigation against Morrison for slander with respect to the Defamatory Telephone Call. In the instance Morrison violates any of the provisions set forth in paragraphs 4, 5, 6, or 7 above and/or it is discovered that any of the representations set forth in paragraphs 2, 3, 10, or 11 of this Agreement are not true, then Langrick may commence litigation against Morrison without further notice and Morrison shall be liable to Langrick for liquidated damages in the amount of $500,000.00 (the "Liquidated Damages Award"). The Liquidated

Damages Award shall be in addition to, and not at the exclusion of, any other relief which Plaintiff would be entitled to under the law including, without limitation, compensatory damages, special damages, presumed damages for reputational injury, punitive damages, and/or injunctive or other equitable relief. Moreover, Morrison shall be responsible for all legal fees and costs incurred by Langrick for obtaining the relief set forth herein and otherwise in this Agreement.

10. Morrison represents that other than the Hanover Police Report, she has not filed any report, complaint, and or charges with the police or any other law enforcement agency (hereinafter, collectively referred to as "Criminal Charges") with respect to the Alleged Incident of Sexual Assault and/or with respect to any other alleged wrongdoing by Langrick and she further represents that she has no intention of filing any such Criminal Charges. In the instance that it is discovered that Morrison has in fact filed such Criminal Charges prior to the execution of this Agreement and/or Defendant files such Criminal Charges following the execution of this Agreement then, in such instance, Morrison shall be liable to Langrick for the Liquidated Damages Award in addition to any other relief which Langrick is entitled to under the law as set forth in paragraph 9 above.

11. Morrison further represents that she has not commenced any action in any court, tribunal, and/or administrative body (including, without limitation, any Dartmouth College administrative body) anywhere in the world with respect to the Alleged Incident of Sexual Assault and/or with respect to any other alleged wrongdoing by Langrick and agrees that she will not commence any such action (hereinafter, the "Civil Action"). In the instance that it is discovered that Morrison has in fact commenced such a Civil Action prior to the execution of this Agreement and/or Langrick commences such a Civil Action following the execution of this Agreement then, in

such instance, Morrison shall be liable to Langrick for the Liquidated Damages Award in addition to any other relief which Langrick is entitled to under the law as set forth in paragraph 9 above.

12. Morrison releases Langrick, Langrick's heirs, executors, administrators, predecessors, successors, and assigns from all claims, obligations, and/or wrongdoing which have accrued from the beginning of time through the execution of this Agreement (the "General Release of Langrick"). It is expressly understood that the General Release of Langrick includes a release from any claims stemming from the Alleged Incident of Sexual Assault.

13.  Nothing in paragraph 9 shall be deemed to limit any action which Langrick may take against Morrison and/or limit the recovery which Langrick may obtain from Morrison i) with respect to the Defamatory Telephone Call in the instance that Morrison violates any of the provisions set forth in paragraphs 4, 5, 6, or 7 and/or it is discovered that any of the representations set forth in paragraphs 2, 3, 10, or 11 of this Agreement are not true; ii) for any violation of paragraphs 4, 5, 6, or 7 of this Agreement; iii) for any misrepresentations set forth 2, 3, 10, or 11 of this Agreement; or iv) for any other wrongdoing which may be committed by Morrison following the execution of this Agreement. Morrison shall be responsible for all legal fees and costs incurred by Langrick as a result of any wrongdoing committed by Morrison as set forth in i, ii, iii, and/or iv of this paragraph.

14. Morrison acknowledges that the Singer Law Office has adamantly urged her to obtain counsel with respect to this matter but Morrison has voluntarily chosen not to do so. Morrison further represents that she has had the time and opportunity to retain counsel prior to executing this Agreement. Morrison expressly waives the defense of absence of counsel with respect to any action brought with respect to the enforcement of the Agreement.

15. The parties agree that the State of New York shall have exclusive jurisdiction over the enforcement of this Agreement. Any matter relating to the enforcement of this Agreement shall be brought before a court of applicable jurisdiction in the State of New York, County of New York. The parties further agree that this Agreement will be interpreted and enforced in accordance with New York law.

16. The parties agree that the statute of limitations applicable to breach of contract actions in New York will apply to bringing any action for breach of this Agreement.

17. This Agreement constitutes the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes any prior agreement or understanding among the parties with respect to the subject matter hereof. No waiver, amendment or modification of the terms of this Agreement shall be valid unless agreed to in writing and signed by all parties to this Agreement.

18. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any provision of this Agreement, and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

19. This Agreement may be executed in counterpart and a fax or pdf copy shall be deemed an original.

Dated: New York, New York
      April_____, 2018

_____
Robert Langrick

_____
Monica Candace Morrison

# EXHIBIT 3

**From:** hrkaufman Kaufman
**Sent:** Friday, May 18, 2018 10:34 AM
**To:** dan@dasingerlaw.com
**Subject:** Monica Morrison/Robert Langrick - CONFIDENTIAL - FOR SETTLEMENT PURPOSES ONLY - WITHOUT PREJUDICE

Mr. Singer,

In this negotiation that your client initiated, and as to which he had himself purported to set stringent deadlines, I still have not heard from you with the preliminary information I requested more than a week ago – despite two subsequent reminders.

This delay is all the more troubling in that I had also asked you for a very simple confirmation – which you have also not provided – assuring that no adverse action of any kind would be taken (by either side) so long as we were in active, good faith communications.

Accordingly, I now feel I have no choice but to take action to protect my client's interests.


**Background**

As we know your client knows all too well, the terrible events of May 8, 2005, that have severely impacted my client – that night and for the dozen-plus years since – were not at all as you have represented them.

You have failed to come forward with proof of the claimed "conclusive determination that no wrongdoing had occurred" by the Hanover Police Department because there was no such determination. Indeed, for example, it is hard to see - actually it is impossible to see – how being arrested for cocaine possession could itself be consistent with "no wrongdoing."

But there is really no need right now to get into the very, very dirty weeds of the actual, tragic facts of my client's brutal, life-changing encounter with Mr. Langrick on that fateful evening and morning more than thirteen years ago.


**Suffice to briefly state our operative premises at this juncture**:

- Mr. Langrick threatens a slander action against my client. Simply stated, he has no viable claim for libel or slander which depends on his proof of the publication of false facts.

- Mr. Langrick demands my client's silence under Draconian terms. His wildly overreaching settlement proposal is untenable. Nothing like it will ever be accepted by my client.

- And, in the end, on what I must believe is the fair assumption that Mr. Langrick – in reliance on your professional advice – is not in the habit of suffering self-inflicted wounds, his baseless threats and demands also totally lack credibility.

**So here are our bottom lines at this juncture**:

- Now that she has been advised of her rights, my client will quite simply not be influenced by Mr. Langrick's  baseless attempts at intimidation;

- Your client will be well-advised to think long and hard about pursuing any frivolous legal action that would inevitably subject his past heinous acts to public attention and scrutiny;

- My client will never trade away her right to truthfully recount the facts of her life – including the facts of that night in May of 2005. Not based on attempted intimidation. Not even for a king's ransom.

- And the true facts of that night and its aftermath certainly do not include any determination, much less any "conclusive" determination, by the Hanover Police Department "that no sexual assault or other wrongdoing" had occurred. Ms. Morrison will never agree to parrot such lies. Period.

- My client will only be prepared to consider discussing – and only through my good offices – the possibility of providing an appropriate assurance – and only under scrupulously circumscribed conditions – that in discussing or writing about the relevant events she will make no claims unsupported by the true facts and the law.

- And finally, in that regard, her everlasting right to accurately state her own opinions and beliefs about her own life experiences must at all times be held inviolable.

 Yours,

Henry R. Kaufman
Attorney for Ms. Monica Morrison

Henry R. Kaufman, PC
60 East 42nd Street, 47th Floor
New York, NY 10165
hkaufman@hrkaufman.com
www.hrkaufman.com

# EXHIBIT 4

**From:** Dan Singer [mailto:dan@dasingerlaw.com]
**Sent:** Wednesday, August 1, 2018 10:28 PM
**To:** hrkaufman Kaufman
**Cc:** Dan Singer
**Subject:** morrison/langrick-for settlement purposes only

Mr. Kaufman,

I am writing to you in order to make one last effort to attempt to resolve this matter before my client commences litigation against Ms. Morrison as a result of her defamatory conduct.

While this may not be her intention, please be advised that your client's constant emphasis on her right to "free speech" as it relates to this matter merely translates to my client as a threat of continued harassment and defamation. Indeed, on at least three separate occasions, your client has threatened my client with public disparagement. The first time occurred in or about May 2005 when Ms. Morrison attempted (unsuccessfully) to extort money from Mr. Langrick in exchange for her withdrawing the complaint regarding the alleged incident and maintaining her silence regarding same.  This occurred again in 2005 when Ms. Morrison retained an attorney to threaten civil action against my client, demanding in correspondence that Mr. Langrick render payment to Ms. Morrison in settlement of such purported "claim" and threatening that if the matter was not resolved  with a financial settlement, Mr. Langrick's image and reputation would be publicly tarnished. In 2016, Ms. Morrison again "appeared" leaving a voicemail for Mr. Langrick claiming to be a reporter that wanted to write a piece regarding sexual assault based on what she characterized (albeit falsely) in such voicemail as her having been sexually assaulted by my client. Now, with her repeatedly expressed desire to maintain her "right" to "free speech" regarding the subject events, Ms. Morrison is again insinuating that she will continue to disparage my client.

I strongly urge you to remind your client that she faces negative publicity on several fronts as it relates to the underlying matter. In the first instance, it is indisputable that the claim that she filed for sexual assault in 2005 was false. As your client is well aware, there were multiple witnesses to the events of that evening, each and every one of whom unequivocally stated in recorded statements to police that no sexual assault occurred. Second, Ms. Morrison confessed- also in a recorded statement to the police- that not only used cocaine but that she was dealing it to other people. Moreover, as addressed above, Ms. Morrison attempted to extort money from Mr. Langrick. This attempt was captured on email. Moreover, Ms. Morrison admitted (again, all in recorded statements) that  she had wrongfully taken Mr. Langrick's digital camera, an action which the Hanover police advised your client constituted a crime. As she is well aware, such negative publicity will not only reflect badly on her but will also impact her friends and colleagues who were involved in events relating to the underlying matter.

Clearly, it is not in your client's interest to engage in a mutual "mud-slinging " contest regarding the events relating to the underlying matter. As a showing of good faith, my client would agree to making any restrictions regarding communication concerning said events to be mutual. To be clear, however, my client will not be placed in a situation where he will be exposed to continued harassment and disparagement by your client. As such, absent the execution of an agreement which provides my client with assurances that such harassment, disparagement, and defamation

will permanently cease, my client will be filing an action against Ms. Morrison by September 10, 2018. Upon strict instructions from my client, I will not be able to push back the deadline for commencing litigation any further.

It may be helpful at this juncture for you and I to have a telephone call regarding this. If you desire to do so, please advise so we can arrange a time for such a call.

The foregoing is set forth for settlement purposes only and is without prejudice to any of my client's rights, all of which are preserved.

Very truly yours,

Daniel A Singer

The Law Offices of Daniel A. Singer PLLC
630 3rd Avenue, 18th Floor
New York, New York 10017
Tel: (212) 569-7853
Fax: (212) 683-8332
dan@dasingerlaw.com
www.dasingerlaw.com

IRS Circular 230 Disclosure: To comply with requirements imposed by the IRS, we inform you that any tax advice contained herein, including attachments, is not intended or written to be used and cannot be used by a taxpayer to (i) avoid tax penalties or (ii) promote, market or recommend a transaction or matter to another person.

Any use, disclosure, copying or distribution of this e-mail or the attached files by anyone other than the intended recipient is strictly prohibited. If you have received this e-mail in error, please notify the sender by reply e-mail and delete this e-mail and attached files from your system. Thank you.