UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MONICA MORRISON,

                    Plaintiff,

          v.

ROBERT LANGRICK,

                    Defendant.

CASE NO. 1:18-cv-06127 (CBA)(RML)

**JURY TRIAL DEMANDED**

---

## DEFENDANT ROBERT LANGRICK'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Pursuant to Federal Rule of Civil Procedure 8, Defendant Robert Langrick ("Defendant" or "Mr. Langrick"), by and through his undersigned counsel, files this Answer to Plaintiff Monica Morrison's November 1, 2018 Complaint for a Declaratory Judgment [Dkt. 1]. To the extent any allegation in the Complaint is not specifically admitted, the allegation is denied. Defendant denies any allegation or characterization that may be implied or stated in any heading or subheading of the Complaint. For convenience only—and not as a reassertion, endorsement, or admission about the content thereof—the text of each paragraph in the Complaint is initially set forth herein in italicized text, followed by Defendant's answer. Defendant answers the corresponding numbered paragraphs of the Complaint as follows:

### *BACKGROUND*

*1.      This case presents one disturbing variation on the current themes of the #metoo awakening.*

1.      Defendant denies the allegations in Paragraph 1 of the Complaint. Defendant further states that it is Plaintiff's actions in making meritless allegations of sexual assault for self-aggrandizement and financial gain that represent a disturbing and unfortunate perversion of the otherwise laudable #metoo movement.

*2.      For all of the reasons stated herein, the case presents a live and concrete controversy between the parties, amenable to resolution by this Court, for the protection and preservation of Plaintiff's valuable rights, constitutional and financial.*

2.      Defendant denies the allegations in Paragraph 2 of the Complaint and denies that Plaintiff has stated valid, ripe, or justiciable causes of action.

*3.      In May, 2005, Defendant Robert Langrick, some ten years her senior, assaulted Ms. Morrison, then still a teenager, who he had not previously known, sexually and in other disgusting ways, in the aftermath of a drunken fraternity party, in her own college room.*

3.      Defendant admits that he met Ms. Morrison in May 2005 at a party, that she was legally an adult at the time, that he was some years older than her, and that he had not previously known Ms. Morrison.   Defendant denies the remaining allegations in Paragraph 3 of the Complaint.

*4.      Plaintiff reported the sexual assault to college authorities and, a few days later, to the local police department.*

4.      Defendant admits that Plaintiff made some kind of report to an employee of Dartmouth College and some time later made some kind of report to the local police.  Defendant denies that he sexually assaulted Plaintiff and therefore denies that there was any sexual assault to report.

*5.      A police investigation confirmed much that was disturbing and incriminating about Defendant's actions during the assaults, as set forth more fully below.*

5.      Defendant denies the allegations in Paragraph 5 of the Complaint.  In fact, a fulsome police investigation completely discredited Ms. Morrison's claims, absolved Mr. Langrick of any sexual assault, and found multiple instances of criminal behavior by Ms. Morrison, including theft and distribution of drugs.  Defendant further states that the file of the police investigation, of which Mr. Langrick has a full and complete copy, consists of written documents that speak for themselves and contradict Ms. Morrison's allegations.

6.     *However, in a far different legal and social climate, the police declined to prosecute Mr. Langrick for criminal sexual assault, for the questionable reasons described more fully below — reasons that were assuredly not exculpatory of Mr. Langrick.*

6.     Defendant admits that, after a comprehensive investigation, Mr. Langrick was not arrested, charged, or prosecuted with any offense relating to sexual assault or sexual misconduct. Defendant denies the remaining allegations in Paragraph 6 of the Complaint.

7.     *The 2005 incident of sexual assault had a grievous, long-term impact on Ms. Morrison, psychologically and otherwise, including a severely damaging effect on her inter-personal life and her career trajectory.*

7.     Defendant is without information and knowledge sufficient to form a belief as to the full picture of Ms. Morrison's psychological and mental state, and therefore denies the allegations in Paragraph 7 of the Complaint.  Defendant admits that Ms. Morrison appears to have serious mental health issues, but to the extent that Ms. Morrison has had the type of issues described in Paragraph 7, they cannot possibly be the result of a sexual assault that never occurred and for this reason also Defendant denies the allegations in Paragraph 7 of the Complaint.

8.     *On the other hand, whatever lasting feelings the incident may or may not have engendered in Mr. Langrick — which are currently unknown — those undisclosed feelings do not seem to have had a visible impact on his business and professional career, most recently as a top executive with a major company in New York City.*

8.     Defendant admits that he has been employed as an executive with a company in New York City, but lacks information or knowledge sufficient to form a belief as to which employment position Paragraph 8 of the Complaint refers to.  Defendant denies the remaining allegations in Paragraph 8 of the Complaint.

9.     *Over the ensuing dozen years, Plaintiff largely kept her secret, except for revelations in therapy and privately to a small number of confidants.*

9.     Defendant is without information or knowledge sufficient to form a belief as to what Plaintiff may have said to therapists or acquaintances, and therefore denies the allegations in

Paragraph 9.  Defendant further disputes the implication that there was a "secret" sexual assault to be revealed, and therefore denies the allegations in Paragraph 9 of the Complaint for this additional reason.

10.     *Plaintiff thus effectively aligned herself with what we have all now come to learn is an army of other silent sufferers of sexual assault and abuse.*

10.     Defendant denies the allegations in Paragraph 10 of the Complaint.

11.     *Recently, inspired in part by the #metoo movement, Plaintiff finally chose to confront the perpetrator of the abuse she had suffered, albeit to the very minimal extent described below.*

11.     Defendant denies the allegations in Paragraph 11 of the Complaint.

12.     *Thus, after years of unsuccessfully trying to put her painful memories of those terrible events out of her mind, Plaintiff did some research about Defendant's current status, including, in this era of professional self-disclosure and promotion, his readily-available "LinkedIn" profile and other Internet sources.*

12.     Defendant lacks information or knowledge sufficient to form a belief as to what "research" Plaintiff did or did not do and therefore denies that portion of the allegations in Paragraph 12.  Defendant denies the remaining allegations in Paragraph 12 of the Complaint.

13.     *What her research revealed, among other things, was that Defendant's executive position required him to visit colleges and universities to potentially interact with students on those campuses.*

13.     Defendant lacks information or knowledge sufficient to form a belief as to what research Plaintiff did or did not do and what it did or did not reveal, and therefore denies that portion of the allegations in Paragraph 13.  Defendant admits that as part of his duties at Bloomberg he did on occasion travel to college and university campuses and interact with students on those campuses.

14.     *With this as her concern and inspiration, on January 2, 2018, Plaintiff placed a single, brief telephone call in which she truthfully alerted one person in Defendant's employer's Human Resources Department to the 2005 incident out of a concern for protecting further potential victims on college campuses.*

14.     Defendant admits that Plaintiff made a phone call on January 2, 2018 and spoke

4

with a person in Defendant's employer's Human Resources Department. Defendant denies that Plaintiff made truthful statements during the course of that telephone call, and instead asserts that Plaintiff made false and defamatory statements concerning Defendant. Defendant denies the remaining allegations in Paragraph 14 of the Complaint.

*15.    In sum, Plaintiff had been the victim, and is a survivor, of the 2005 incident of a drunken sexual assault by Defendant, who already at that time appears to have acted with a sense of impunity in the belief — even in his drunken state — that he was in a superior position of power in the physical and psychological dynamic between the two of them.*

15.    Defendant denies the allegations in Paragraph 15 of the Complaint.

*16.    Now, ever since that single telephone call to Defendant's employer, Plaintiff is being victimized once again; in a second attempted assault by Mr. Langrick, in the form of a specific, open and outstanding threat of punitive legal action against her for having the temerity to begin speaking out truthfully about the 2005 incident.*

16.    Defendant denies the allegations in Paragraph 16 of the Complaint.

*17.    This time Defendant's assault has manifested itself in a months-long, ongoing campaign — with Mr. Langrick now represented by an attorney — to bully Plaintiff into silence about the original incident and — under the active threat of a slander action against her — to demand a non-disclosure agreement ("The NDA") whose purpose is to prevent Plaintiff from every publicly speaking her truth about that debilitating incident, instigated by Mr. Langrick, for the rest of her life.*

17.    Defendant admits that he is represented by counsel, just as Plaintiff is, and that Defendant's attorney informed Plaintiff's attorney that Plaintiff's actions in making false and damaging statements concerning Defendant constitute defamation. Defendant denies the remaining allegations in Paragraph 17 of the Complaint.

*18.    And notably, in his new assault on Plaintiff, more than a dozen years after the original assault, in this year of the ascending #metoo movement, Mr. Langrick continues to count on what he evidently continues to believe is his inherent, indeed entitled power advantage over Plaintiff, once again expecting that he will have the power to intimidate Ms. Morrison into continuing her painful and debilitating silence.*

18.    Defendant denies the allegations in Paragraph 18 of the Complaint.

### *THIS DECLARATORY JUDGMENT ACTION*

*19.      This is a civil action seeking a declaration of the rights of the parties, Ms. Morrison and Mr. Langrick, under the Declaratory Judgment Act, 28 U.S.C. § 2201.*

19.      Defendant admits that Plaintiff purports to bring claims under the Declaratory Judgment Act.  Defendant denies that Plaintiff has stated any valid cause of action and denies that Plaintiff's claims are justiciable or cognizable claims for declaratory judgment.

*20.      The action presents an actual, live and concrete controversy affecting the valuable rights of both parties — economic, legal and constitutional.*

20.      The allegations in Paragraph 20 constitute legal conclusions to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 20 of the Complaint.

*21.      Plaintiff asks for three declarations from the Court.*

*(i)      Plaintiff seeks to resolve the claim of "slander" that Defendant is currently threatening to bring against her — and that he has persistently refused through his attorney to withdraw, despite several requests to do so.  Specifically, she seeks a declaration that any slander action against Ms. Morrison, based on her single telephone contact with Mr. Langrick's employer, would be insufficient as a matter of law;*

*(ii)      Plaintiff seeks a declaration that the uniquely onerous NDA Mr. Langrick has been demanding from Ms. Morrison for more than six months now, is factually baseless, overreaching, unconscionable, against public policy and not legally enforceable;*

*(iii)      Plaintiff seeks a declaration that the past, present, and future activities she is seeking to vouchsafe in this action are fully protected under the First Amendment and that Defendant's efforts to silence Ms. Morrison, and to deny her the ability to write and speak truthfully about her own life experiences — including the incident of sexual assault in May 2005 — are legal nullities; and*

*(iv)      Finally, Plaintiff respectfully requests all further necessary and proper relief, as against Defendant — including injunctive relief, damages, attorney's fees, costs, and any other related remedies that the Court may deem just and proper, under 28 U.S.C. § 2202.*

21.      Defendant admits that Plaintiff appears to be seeking the relief stated in Paragraph 21 of the Complaint.  To the extent that Paragraph 21 contains any averments of fact, Defendant denies the allegations in Paragraph 21.  Defendant denies that Plaintiff is entitled to any of the relief that she seeks, denies that Plaintiff has stated valid claims, and denies that Plaintiff's claims are justiciable or cognizable claims for declaratory judgment.

### THE PARTIES

19.      *Plaintiff, Monica Morrison, is now a 33-year old graduate of Dartmouth College, currently working as a freelance writer.*

19.      Defendant admits that the Plaintiff is Monica Morison, that she is 33 years old, and that she appears to have graduated from Dartmouth.  Defendant lacks information or knowledge sufficient to form a belief as to the truth of the allegation concerning Plaintiff's employment status and therefore denies these allegations.[1]

20.      *Defendant, Robert Langrick, is now a 42-year old graduate of the Tuck Business School, and a Certified Financial Analyst.  He was until very recently employed as Head of "Bloomberg for Education," a commercial division of Bloomberg L.P.  He is now Head of Practice Analysis at the CFA Institute, a unit of the CFA that has been co-venturing with Bloomberg in the development of a database, available on the Bloomberg Terminal, for advancing the undergraduate and graduate education of financial analysts.*

20.      Defendant denies that he is a "Certified Financial Analyst."  Defendant admits the remaining allegations in Paragraph 20 of the Complaint.

### JURISDICTION AND VENUE

21.      *This Court has subject matter jurisdiction over Plaintiff's claims pursuant to the Declaratory Judgment Act, 28 USC §§2201-2202 ("The DJA").*

21.      The allegations in Paragraph 21 contain only legal conclusions to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 21 of the Complaint.

---

[1] Plaintiff's Complaint contains an error in the numbering of paragraphs in that the numbers 19-21 are repeated.  In order to avoid confusion Defendant has kept the numbering of the Answer paragraphs consistent with the erroneous numbering of the Complaint paragraphs.

22.     *This action presents an "actual controversy" between the parties because of Defendant's ongoing threat of a meritless slander lawsuit against Plaintiff, based on her single, truthful telephone call to the Bloomberg human resources department, and because of Defendant's simultaneous and ongoing demand for an overreaching and unenforceable NDA, in order to avoid such baseless litigation.*

22.     The allegations in Paragraph 22 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 22 of the Complaint.

23.     *And this Court's exercise of its discretion, under the DJA, to settle the legal rights of the parties under such circumstances, and to remove uncertainty and insecurity from their legal relationships, without awaiting a violation of those rights or a disturbance of those relationships, is appropriate as well because resolution of the current threatened slander action — based on a single statement about the 2005 assault — is highly unlikely to avoid the continuing threat of further defamation action(s) by Defendant, any time that Plaintiff may publish further statements about the 2005 incident that Defendant might chose [sic] to contest.*

23.     The allegations in Paragraph 23 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 23 of the Complaint.

24.     *Or, in other words, in the absence of a declaratory judgment by this Court, determining the respective rights of the parties, Plaintiff would be subject to a potentially repetitive, unrelieved and chilling pall over the exercise of her First Amendment rights — and also over the potential financial benefits to Plaintiff of her freedom to write about and to publicly discuss her life experiences, including the long-term harms to her caused by Defendant's 2005 sexual assault.*

24.     Defendant denies the allegations in Paragraph 24 of the Complaint.

25.     *The Court has personal jurisdiction over the parties pursuant to its diversity jurisdiction, in that Plaintiff is a resident and citizen of New York State, while Defendant is a resident of the State of Connecticut.  Also Defendant, originally an immigrant from the United Kingdom, is currently a legal resident of the United States.*

25.     Defendant admits the parties are diverse for the purpose of diversity jurisdiction, admits that Plaintiff is a resident and citizen of New York state, admits that he is originally from

the United Kingdom, and admits that he resides in Connecticut.   Defendant denies the characterization of him as a "legal resident of the United States" as he is, in fact, a citizen of the United States.

26.     *The matter in controversy has a value in excess of $75,000.*

26.     Defendant currently lacks information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 26 of the Complaint and therefore denies them.

27.     *Venue in this action is proper in the Eastern District of New York because Plaintiff resides in Queens County, New York.*

27.     The allegations in Paragraph 27 of the Complaint are legal conclusions to which no response is required.   To the extent that a response is required, Defendant does not dispute that venue is proper in the Eastern District of New York.

### DEFENDANTS' FIRST ASSAULT ON PLAINTIFF (2005)

28.     *Late on the evening May 7, 2005, and continuing into the overnight and dawn of May 8,  at Dartmouth College, Defendant perpetrated a series of egregious assaults — sexual and in other ways — against Plaintiff and her roommates.*

28.     Defendant denies the allegations in Paragraph 28 of the Complaint.

29.     *The assault occurred after Ms. Morrison and Mr. Langrick "met" at a drunken "frat party." In fact, Plaintiff and Defendant were total strangers to each other before the incident. And they were not ever formally introduced. Their only connection – shortly before the assaults – is that they were standing near each other at the party, in a group playing a drinking game known as "Pong." The central purpose of that game is apparently to render the players – or at least the "losing" players – inebriated.*

29.     Defendant admits that he first met Plaintiff at a college fraternity party in May 2005, and that he did not know Plaintiff before that.   Defendant denies the remaining allegations in Paragraph 29 of the Complaint.

30.     *At the time of the incident, Ms. Morrison was a 19 year-old sophomore; Mr. Langrick was a 29-year-old graduate student, nearly ten years Ms. Morrison's senior.*

30.     Defendant admits that in May 2005, he was a 29-year-old graduate student and

Plaintiff was an undergraduate student and legally an adult.  Defendant lacks information or knowledge sufficient to form a belief as to Plaintiff's precise age in May of 2005 and therefore denies this allegation.

31.     *Both Plaintiff and Defendant had been drinking heavily and it is undisputed that both became extremely intoxicated. As the frat party was winding down, Mr. Langrick invited himself back to Plaintiff's room in an off-campus residence.*

31.     Defendant admits that both he and Plaintiff were drinking.  Defendant denies the remaining allegations in Paragraph 31 of the Complaint.

32.     *As circumstances unfolded, and largely as a result of her inebriated condition, Ms. Morrison was essentially at the mercy of Mr. Langrick's desires and whims. And by all accounts, although he was very drunk, and says he remembers almost nothing, Langrick's uncontrolled whims were primarily sexual and assaultive in nature.*

32.     Defendant denies the allegations in Paragraph 32 of the Complaint.

33.     *Mr. Langrick later claimed to the authorities that he had unprotected, "consensual sex" with the dead drunk Morrison who, by the time of his most egregious sexual assaults, was unconscious in her bed.*

33.     Defendant admits that he told authorities he had unprotected consensual sex with Plaintiff in the cupola of the Panarchy House, because that is the truth.  Defendant denies the remaining allegations in Paragraph 33 of the Complaint.

34.     *On its face – Defendant's claim of "consent" is incredible – indeed outrageous – for a man ten year's Plaintiff's senior, a stranger to her, who was also, he later claimed to the police, "more drunk than I have ever been in my life" – so drunk he claims he did not remember most of what happened in Plaintiff's room, except somehow to vehemently deny, evidently to this day, Plaintiff's charge of sexual assault.*

34.     Defendant denies the allegations in Paragraph 34 of the Complaint.

35.     *Based on the foregoing factors alone, it is more than fair to conclude, under New Hampshire law at the time, that due to her incapacitation – and later her unconscious state – it was not legally possible for Plaintiff to "consent" to Defendant's aggressive sexual activities and other attempted assaults.*

35.     Defendant denies the allegations in Paragraph 35 of the Complaint.

*36.     Plaintiff's recollection of Langrick's assaultive acts – that no person or authority has ever seriously contested – can be summarized as follows, as also largely documented in the final "Incident Report" of the Hanover Police Department.  (The HPD Incident Report, dated May 11 to May 27, 2005, is attached to this Complaint as Exhibit 1.)*

36.     Defendant admits that Plaintiff has attached portions of an HPD Incident Report which, as a written document, speaks for itself.  Defendant further states that Plaintiff has only attached a small portion of the detailed and comprehensive report.  Defendant denies the remaining allegations in Paragraph 36 of the Complaint.

*37.     As noted, at a certain point after leaving the fraternity party with Langrick, and after she had already asked Mr. Langrick to leave her residence, Plaintiff had passed out in her off-campus room, in her own bed. Her roommate and her boyfriend, who were also complete strangers to Mr. Langrick, were asleep together in another bed, no more than 6 or 7 feet away.*

37.     Defendant admits that Plaintiff's roommate and the roommate's boyfriend were present in the bedroom at the time Plaintiff claims she was sexually assaulted.  Defendant further states that both of these percipient witnesses disputed Plaintiff's claim that she was sexually assaulted.  Defendant denies the remaining allegations in Paragraph 37 of the Complaint.

*38.     At some point, Ms. Morrison regained consciousness to find herself half naked, her panties having somehow been removed, with Mr. Langrick completely naked alongside her in her bed.*

36.     Defendant denies the allegations in Paragraph 38 of the Complaint.

*39.     What Plaintiff recalls, that has also never been seriously contested, is that when she was awoken out of her near-comatose state, she found Mr. Langrick attempting to penetrate her, both anally and vaginally.*

39.     Defendant denies the allegations in Paragraph 39 of the Complaint.

*40.     Because Mr. Langrick was in a semi-flaccid state, as Plaintiff recalls, his attempted sexual assaults were only partially achieved. However, according to Plaintiff's essentially undisputed recollection, Langrick's multiple attempts to penetrate her were at least partially successful, vaginally and anally.*

40.     Defendant denies the allegations in Paragraph 40 of the Complaint.

*41.    Later, Mr. Langrick admitted to the police, to having had full-on, unprotected, consummated, sexual intercourse with Ms. Morrison.*

41.    Defendant admits that he had consensual unprotected sexual intercourse with Plaintiff in the cupola of the Panarchy House and that he truthfully told police the same.

*42.    Unfortunately, because Ms. Morrison was not aware that Mr. Langrick had ejaculated during his assault, only a partial rape kit was performed when she reported the assault to college health officials.*

42.    Defendant denies that he assaulted Plaintiff and lacks knowledge or information sufficient to form a belief as to whether Plaintiff did a rape kit and whether it was "partial." Defendant therefore denies the allegations in Paragraph 42 of the Complaint.

*43.    Moreover, Plaintiff's recollection – once again essentially undisputed – is that Langrick was not silent during the sexual assault. Instead, Defendant was repeatedly proclaiming to her disgusting things like: "I want to f\*\*k you up the a\*\*." And also, "I want you to p\*\*s in my mouth."*

43.    Defendant denies the allegations in Paragraph 43 of the Complaint.

*44.    If language alone can be an assault, that would be it.*

44.    Paragraph 44 of the Complaint does not appear to contain any factual averment but rather only argument.   To the extent Paragraph 44 is deemed to assert a statement of fact, Defendant denies the allegations in Paragraph 44 of the Complaint.

*45.    On information and belief, at some point during these sexually-assaultive attacks by Mr. Langrick, Plaintiff's roommate and her boyfriend were awakened to the sound of male sexual grunting in the adjacent bed, where Ms. Morrison had been passed out, still in her own inebriated state.*

45.    Defendant admits that Plaintiff's roommate and the roommate's boyfriend were present and awake at the time Plaintiff claims she was sexually assaulted, and further states that both of these percipient witnesses disputed Plaintiff's claim that she was assaulted.   Defendant denies the remaining allegations in Paragraph 45 of the Complaint.

*46.    And even after Plaintiff had extricated herself from Mr. Langrick's attacks, and was able to leave the room, Plaintiff's roommates that night both reported that Defendant continued his drunken, assaultive behavior.*

46.    Defendant denies the allegations in Paragraph 46 of the Complaint.

47.     *Indeed, at one point Defendant jumped into the bed of Plaintiff's roommate where her boyfriend had also been sleeping. Although at that point Plaintiff's roommate had left the room, Defendant, undeterred, attempted to "cuddle up," still completely naked, to the boyfriend.*

47.     Defendant admits that he mistakenly attempted to get back into the wrong bed and that the roommate's boyfriend was occupying that bed.  Defendant denies the remaining allegations in Paragraph 47 of the Complaint.

48.     *At another point in Defendant's late night rampage, and as Mr. Langrick later admitted, he did, for his own reasons, chose to urinate, still buck naked, in the corner of Plaintiff's room, and in full sight of Plaintiff's roommate and her boyfriend, befouling one of Ms. Morrison's sweaters in the process. (Mr. Langrick later "apologized" for his public urination in Plaintiff's room, as noted in the final police incident report, and offered to pay Plaintiff for a replacement sweater.)*

48.     Defendant denies the characterization of his actions as a "rampage" and denies that they occurred at night.  Defendant is without information or knowledge sufficient to form a belief as to the truth of the allegation that he "befouled" one of Plaintiff's sweaters, as this claim comes from Ms. Morrison who is not a credible or truthful person.  Defendant admits that he did urinate in the room, admits that he apologized for it, and admits that he offered to replace Plaintiff's sweater after she claimed it had been ruined.

49.     *And as his assaultive rampage continued, Mr. Langrick, stumbling drunk, incoherently rambling, and still completely naked, continued to stagger around uncontrollably in Plaintiff's room.*

49.     Defendant denies the allegations in Paragraph 49 of the Complaint.

50.     *At a certain point, Defendant appeared to be coming at Plaintiff's roommate, causing her boyfriend to physically intervene.*

50.     Defendant denies the allegations in Paragraph 50 of the Complaint.

51.     *Eventually, on information and belief, another male resident from a nearby room had to be called in for further assistance. That other resident ultimately had to threaten to call the police before Mr. Langrick finally suspended his horror show, leaving the scene of his drunken, naked, out-of-control rampage and assaults.*

51.     Defendant admits that a male resident of the Panarchy house asked Defendant to

leave and that Defendant did so.  Defendant denies the remaining allegations in Paragraph 51 of the Complaint.

52. *In sum, to tally up the carnage left in Mr. Langrick's wake: after having sexually assaulted a comatose Ms. Morrison; after having paraded naked and coming on to her roommate and boyfriend, in the other bed; after having urinated on and ruining Plaintiff's sweater; after having to be threatened with a call to the police in order to induce his departure from the scene; Langrick also left behind: the cocaine he had been using and carrying that night, some cash, his camera (with photos still on it evidencing his use of that cocaine), along with a general and shocking mess, including Ms. Morrison's urine-soaked sweater and, on information and belief, his no-longer-wearable, feces-laden underpants.*

52. Defendant admits that he was naked; admits that he urinated in the room; admits that he was asked to leave the house and did; and admits that after he and Plaintiff removed their clothes and had consensual intercourse in the cupola, Defendant inadvertently left behind items of personal property in the cupola including an expensive digital camera, cash, his debit card, and a vial that, as Defendant fully admitted to the police, did contain cocaine.  Defendant further states that Plaintiff subsequently retrieved and stole these items, and that she distributed the cocaine to a person known to her to be a drug addict.  Defendant denies the remaining allegations in Paragraph 52 of the Complaint.

53. *Whatever actions the police did or did not ultimately take, as far as their decision not to prosecute Mr. Langrick for the crime of sexual assault, it is clear that the reasons for their non-action were unrelated to any serious dispute over the scope of the havoc wreaked by Defendant on that night, including the sexual and other assaults on Ms. Morrison.*

53. Defendant denies the allegations in Paragraph 53 of the Complaint.

*54.    Indeed, based on the foregoing facts, Plaintiff – and anyone else who had witnessed Defendant's out of control behavior on the night of May 7-8, 2005, and the carnage he had left behind – would surely be more than fairly justified in expressing the view (an "opinion" based on essentially undisputed facts, in the parlance of the law of defamation) that they had all been "assaulted" by Mr. Langrick, including Plaintiff's roommate, the roommate's boyfriend and another neighbor in the residence, sexually and in many other ways.*

54.    Defendant denies the allegations in Paragraph 54 of the Complaint.

*55.    And those witnesses would surely also find insupportable – indeed unrecognizable – Defendant's current claim that he was "conclusively determined" to have been guilty of "no wrongdoing" by the Hanover Police Department.*

55.    Defendant denies the allegations in Paragraph 55 of the Complaint.

*56.    Nevertheless, as previously noted, Mr. Langrick has in 2018 given Plaintiff every reason to believe that he remains deadly serious in threatening to sue her for "slander," apparently for calling his rampage a "sexual assault," and that he is also credible in refusing on numerous occasions – up until the present – to withdraw his baseless demands for a Draconian NDA, with "liquidated damages" of $500,000 for each and every "violation" thereof.*

56.    Defendant admits that he has been both slandered and libeled by Plaintiff, and for this reason is filing counterclaims against Plaintiff contemporaneously herewith.   Defendant admits that he proposed an agreement to Plaintiff in which he would forego his right to take action regarding her past defamatory statements if she agreed to cease defaming Defendant in the future. Defendant further states that Plaintiff and her counsel rejected this proposal and never entered into any such agreement.   Defendant denies the remaining allegations in Paragraph 56 of the Complaint.

*57.    Thus the need for this declaratory judgment action.*

57.    The allegations in Paragraph 57 of the Complaint constitute legal conclusions to which no response is required.   To the extent that a response is required, Defendant denies the allegations in Paragraph 57 of the Complaint, denies that Plaintiff has asserted any cognizable claim, and denies that Plaintiff is entitled to any of the relief she purports to seek.

### THE HANOVER POLICE INVESTIGATION AND ITS FINDINGS

*58.      Unlike too many other victims who have swallowed the pain of sexual assaults, while never reporting them to the authorities, shortly after the incident Plaintiff – defying the overwhelming statistic pattern of silence – made her brave and fateful choice to report Defendant's assault to the authorities.*

58.      Defendant denies the allegations and characterizations in Paragraph 58 of the Complaint.

*59.      As previously noted, Plaintiff had initially reported the incident only to a college peer advisor.*

59.      Defendant denies that there was any "incident" to report in the sense intended by Plaintiff and therefore denies the allegations in Paragraph 59 of the Complaint.

*60.      But then, on May 11, 2005, three days after the incident, and at the suggestion of college authorities, Plaintiff made her fateful decision to also report the assault to the local police in Hanover, New Hampshire.*

60.      Defendant denies the allegations and characterizations in Paragraph 60 of the Complaint.

*61.      Today, more than thirteen years after the incident, Defendant presses his threatened slander claim, and demand for a stringent NDA, on the alleged basis that he was "conclusively determined" to have committed "no wrongdoing" in the incident by the Hanover Police Department.*

61.      Defendant admits that he has been defamed by Plaintiff and that, through counsel, he offered to forego holding Plaintiff accountable for her false statements if she ceased making false and defamatory statements concerning Defendant.  Defendant further states that the "basis" for his defamation claims is that Plaintiff has made multiple provably false and highly damaging statements concerning Defendant.   Defendant denies the remaining allegations and characterizations in Paragraph 61 of the Complaint.

*62.      Nothing could be further from the truth.*

62.      Defendant denies the allegation in Paragraph 62 of the Complaint.

*63.      Here are the facts.*

63.      Defendant denies the allegations in Paragraph 63 of the Complaint.

64.     *The investigation that ensued was led by three police officers – all three of them men.*

64.     Defendant admits that the lead detective on the case was Captain Francis Moran of the Hanover Police Department and that he is a male, and that two other male officers were also involved in the investigation.  Defendant lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 64 of the Complaint and therefore denies them.

65.     *Bizarrely, although Ms. Morrison's complaint to the police was for criminal sexual assault, the attention of the three officers soon took a U-turn toward Plaintiff's – yes Plaintiff's! – handling of the drugs and cash Mr. Langrick had left behind after his drunken rampage.*

65.     Defendant admits that Plaintiff was investigated for stealing Mr. Langrick's cash and expensive digital camera, and that she was investigated for distribution of drugs.  Defendant denies the remaining allegations in Paragraph 65 of the Complaint and further states that the full police report, as a written document, speaks for itself.

66.     *Ultimately, in a time of far different attitudes toward such incidents, the Hanover Police Department declined to charge Defendant with respect to the sexual assault.  (See generally Exhibit 1).*

66.     Defendant admits that after a comprehensive investigation determined that Ms. Morrison was not credible and that multiple witnesses contradicted her statements, Mr. Langrick was not charged with any offense related to sexual assault.  Defendant denies the remaining allegations and characterizations in Paragraph 66 of the Complaint and further states that the full police report, as a written document, speaks for itself.

67.     *The "reasoning" of the police in arriving at this decision is telling. The incident was complicated – according to the police – by the presence of drugs, the handling of some cash Defendant left behind after the assault in Plaintiff's room, and other seemingly extraneous matters largely involving Ms. Morrison and <u>not</u> Mr. Langrick.*

67.     Defendant denies the allegations in Paragraph 67 and denies that this summation of the Hanover Police Department's purported "reasoning" is accurate.  The full police report, as a written document, speaks for itself.  Defendant further states that Plaintiff omits to mention her

17

theft of Defendant's digital camera.

*68.    As detailed below, and amazingly, the final police incident report even blamed Plaintiff's "heavy impairment due to alcohol," and her confusion about what exactly had happened to her – while she was passed out in her bed – that were among the "weaknesses of [the] case" – against Mr. Langrick!*

68.    Defendant admits only that the police incident report states, among many other things, that "The issue of [Plaintiff's] heavy impairment due to alcohol, and conduct during and after the incident were discussed [with Plaintiff] as they relate to the viability of a prosecution." Plaintiff denies that the allegations of Paragraph 68 are an accurate summation of the many reasons why the Hanover Police Department dismissed Plaintiff's false allegations and denies the remaining allegations and characterizations in Paragraph 68 of the Complaint.

*69.    Here is the verbatim "analysis" of those "weaknesses," as recorded in the police report:*

*"I advised Miss Morrison of some of the weaknesses of this case. I briefed her on the various laws that she appeared to have violated including theft of [Defendant's] lost money, her possession and distribution of [his] cocaine. The issue of her heavy impairment due to alcohol, and [her] conduct during and after the incident were discussed as they relate to the viability of a prosecution. I informed Miss Morrison that a sexual assault prosecution did not appear promising due to the total findings of this investigation. I advised Miss Morrison that a decision was still pending as to what, if any, charges would be pursued against her ..." [].*

69.    Defendant admits that the full police report contains the language quoted in Paragraph 69 of the Complaint.  Defendant denies that this single paragraph summarizes all of the myriad reasons within the several hundred-page police report as to why the Hanover Police Department found Plaintiff's false allegations to not be credible.

70.	*And the foregoing conclusions were reached despite other incriminating findings contained in the Incident Report, including that Langrick, in a written email to the police, had "come[] the closest to … admitting responsibility for what Morrison reported to us had happened. Although [he] never admits to assaulting Morrison, he discusses how 'humiliated' he is and that he had been 'feeling terrible since learning what happened'." (Exhibit 1, p.1[])[.] [2]*

70.	Defendant denies the allegations in Paragraph 70 of the Complaint.  The full police report is a written document which speaks for itself, and Plaintiff's characterizations of a small portion of a preliminary memorandum regarding a search warrant as the police's ultimate "findings" or as "incriminating" are absurd and wholly devoid of context — particularly as the referenced excerpt refers to Defendant apologizing for urinating in the house, not for a sexual assault he did not commit.  Plaintiff completely ignores the actual "findings" of the Hanover Police Department, which are devastating to Plaintiff's credibility and capacity for truthfulness.

71.	*Suffice to say, the reasoning of the police investigators back in 2005 would be highly unlikely to pass muster in today's far more sensitive climate toward the rights of the sexually abused, and in light of our improving understanding of the power dynamics in connection with such assaults.*

71.	Defendant denies the allegations in Paragraph 71 of the Complaint.

72.	*In any event, the bottom line to be drawn from the final police report, was surely not, as he has recently been claiming, that Defendant was "conclusively" exonerated in the sexual assault investigation. Far from it. He admitted to (or did not dispute) many of his highly questionable activities.*

72.	Defendant denies the allegations in Paragraph 72 of the Complaint.

73.	*In fact, when the Hanover Police decided not to prosecute him for the sexual assault, they appear in their written report to have made essentially no significant, exculpatory findings about what Langrick did or did not do in Plaintiff's room that night.*

73.	Defendant denies the allegations in Paragraph 73 of the Complaint.

---

[2] Plaintiff's citation to this this portion of Exhibit 1, the police incident report, is incorrect.  The correct citation is Exhibit 1, p. 13.

*74.    In sum, even as to Ms. Morrison's most serious allegations, the very best that can possibly be said, on Mr. Langrick's behalf, would be that he has never been in a position to meaningfully confirm or deny the details of his drunken sexual assaults, in Plaintiff's room, that evening in May of 2005.*

74.    Defendant denies the allegations in Paragraph 74 of the Complaint.

*75.    Finally, as far as their supposed "conclusive[] determin[ation]" of "no wrongdoing" by Mr. Langrick, in their final written report the Hanover Police Department announced their intention to arrest Defendant for his cocaine possession.*

75.    Defendant admits that the police report references an intention to arrest Defendant for cocaine possession.  Defendant denies the remaining allegations of Paragraph 75, and further states that Defendant was not arrested for or charged with committing any wrongdoing with respect to his involvement with Plaintiff.

*76.    Two days later Plaintiff, accompanied by her father, was advised by the same Captain of "the findings of this investigation:"*

*"I reviewed the many questionable actions by Miss Morrison and [Defendant]. I informed them that no charges were being pursued against Monica. I advised them that I intended to pursue a misdemeanor drug charge against [Defendant]. *** I will be seeking an arrest warrant for [Defendant] in the near future."*

76.    Defendant admits that the quoted portion appears in the police file which, as a written document, speaks for itself.  Defendant denies that this small snippet represents the "findings of [that] investigation," which findings are contained in the full document, and which for obvious reasons Plaintiff does not quote from or attach to her Complaint.

*77.    In sum, the non-existent, "conclusive determination" of "no sexual assault" and "no wrongdoing" – a fantasy that has perhaps actually solidified itself in Defendant's mind over the years – would appear to boil down to little more than the fictive, but apparently also typical, misperception in these situations that the victim's silence amounts to the perpetrator's complete exoneration.*

77.    Defendant denies the allegations in Paragraph 77 of the Complaint.

78.     *For herself, thereafter, Plaintiff's memories of the incident with Mr. Langrick were never fully suppressed, only for the most part set aside into a dark but vivid corner of her consciousness. And, of course, there were witnesses, and the powerful fact that she had contemporaneously reported her life-changing encounter with Defendant to the authorities. So, in Plaintiff's case, there could never be any serious contention that a decade-old event was just some figment of a troubled woman's over-active imagination, or that she was confusing someone else with the person who actually assaulted her.*

78.     Defendant admits that there were numerous witnesses and further states that they contradicted Plaintiff's false accusations.  Defendant denies the remaining allegations in Paragraph 78 of the Complaint.

### #METOO AND PLAINTIFF'S REAWAKENING

79.     *Nonetheless, for the next decade, Plaintiff largely kept her secret, thus joining the army of other silent sufferers of sexual assault and abuse.*

79.     Defendant denies the allegations in Paragraph 79 of the Complaint.

80.     *But Plaintiff is a writer. So in the past few years she has written a freelance article or two on the topic of #metoo. But she has not come close to fully revealing and exploring her own personal experience and torment.*

80.     Defendant admits that Plaintiff purports to characterize herself as a writer, but Defendant lacks knowledge or information sufficient to form a belief as to whether Plaintiff is actually gainfully employed in that profession.  Defendant admits that Plaintiff has written blog posts on the topic of #metoo.  Defendant denies the remaining allegations in Paragraph 80 of the Complaint.

81.     *Also, in all of the years since the incident, Plaintiff had never sought to contact or to confront Defendant, even as she was unsuccessfully dealing with the emotional scars that the 2005 incident had left behind.*

81.     Defendant denies the allegations in Paragraph 81 of the Complaint.

82.     *As her consciousness of the #metoo movement continued to grow, Plaintiff for the first time began to progress from the occasional, free-floating speculation to seriously contemplating some kind of actual outreach to Defendant.*

82.     Defendant denies the allegations in Paragraph 82 of the Complaint.   Defendant

further states that Plaintiff's allegations ignore Plaintiff's threat to sue him if in 2005 if he did not pay her to avoid publicity.

> 83.     In or around June of 2016, Plaintiff first learned that Defendant was a prominent executive with a unit of Bloomberg L.P. And on or about June 4, 2016, Plaintiff tried to call Defendant at Bloomberg. He did not answer his phone. But she was able to leave a message for him on his voicemail. Although Defendant later acknowledged that he had received Plaintiff's message, he never called her back.

83.     Defendant admits that Plaintiff left him a voicemail on his office line at 6:31 p.m. on Saturday, June 4, 2016, when he was not at the office, and that he did not respond to this voicemail.  Defendant is without knowledge or information sufficient to form a belief as to when Plaintiff learned of Defendant's employment and therefore denies the allegations in Paragraph 83 of the Complaint.

> 84.     Then, after another eight months, in February of 2017, Plaintiff came across news coverage of allegations of sexual abuse – indeed of alleged rape – among certain executives (Not including Mr. Langrick) at Bloomberg. Plaintiff continued to follow such stories which – due to the association with Bloomberg – understandably triggered her memories of Defendant's sexual assault. From her research she also learned that Defendant's activities for Bloomberg included visits to college campuses.

84.     Defendant lacks knowledge or information sufficient to form a belief as to what "research" Plaintiff did or did not do and what she did or did not learn from any research and lacks knowledge or information sufficient to form a belief as to what "news coverage" she did or did not see, and therefore Defendant denies those allegations.  Defendant denies the remaining allegations in Paragraph 84 of the Complaint.

> 85.     It was only in January of 2018, almost another year later, that Plaintiff resolved to reach out to Bloomberg in order to report her concern that Defendant's travel to college campuses might be putting him in a position to reenact the kind of out-of-control drinking, drugs and sexual abuse that she had experienced back in 2005. She spoke to someone in the human resources department.

85.     Defendant admits that Plaintiff placed a call to Bloomberg Human Resources on January 2, 2018, in which she falsely accused Defendant of sexual assault and attempted rape.

Defendant denies the remaining allegations in Paragraph 85 of the Complaint.

### *DEFENDANT'S SECOND ASSAULT ON PLAINTIFF (2018)*

86.     *This declaratory judgment action specifically arises – not out of the original assault back in 2005 – but out of a new and different kind of assault by Defendant, an assault that Defendant launched soon after Plaintiff's call to the Bloomberg HR Department at the beginning of 2018.*

86.     Defendant denies the allegations in Paragraph 86 of the Complaint.

87.     *As detailed further below, in order to insulate himself from what he has been baselessly insisting is actionable "slander," Defendant has embarked on a crusade to assure that Ms. Morrison will speak no further about the 2005 incident of sexual assault at Dartmouth.*

87.     Defendant denies the allegations in Paragraph 87 of the Complaint.

88.     *And with the threat of a slander action as leverage, Defendant is insisting that Plaintiff enter into an overreaching and unconscionable "Settlement Agreement" that will require her to read from the undeniably fictional script of complete exoneration that Defendant has conjured up, based on the claim that he had been "conclusively determined" to have been guilty of "no wrongdoing" in the 2005 incident. (The proposed draft NDA is attached to this Complaint as Exhibit 2.)*

88.     Defendant denies the allegations in Paragraph 88 of the Complaint.  Defendant further states that not only was this draft agreement never executed, but in its negotiation, Ms. Morrison was represented by Harvard-trained legal counsel, and Mr. Langrick's counsel in fact encouraged Ms. Morrison to retain counsel.  Defendant further states that the communications described (inaccurately) in Plaintiff's Complaint were for settlement purposes only and were conspicuously so designated.

89.     *According to Defendant's proposed NDA, Plaintiff must read from his phony script. For the rest of her life. And then say nothing more – ever – about an event that has severely scarred her over the more than 13-1/3 years since the incident.*

89.     Defendant denies the allegations in Paragraph 89 of the Complaint.

90.    *Finally, the demanded Settlement Agreement goes even further, purporting to impose a huge penalty on Ms. Morrison – of $500,000 in what the agreement itself refers to as a "Liquidated Damages Award" – not once, but each and every time Ms. Morrison might say or write something that does not conform to Defendant's false narrative of the incident of sexual assault – also for the rest of her life.*

90.    Defendant denies the allegations and characterizations in Paragraph 90 of the Complaint.   Defendant further states that the unexecuted, proposed draft agreement is a written document which speaks for itself.

91.    *And this entire power play is said to be based on that one telephone call to the Bloomberg HR Department. The call was made in January, the threats began in February and have to date not been withdrawn, despite efforts over many months, first by Plaintiff and then by her counsel, to resolve the dispute.*

91.    Defendant denies the allegations in Paragraph 91 of the Complaint.

92.    *Thus, on May 18, 2018, Plaintiff's counsel wrote an email to Defendant's counsel, Dan Singer, outlining the reasons why Ms. Morrison was rejecting Mr. Langrick's threats and demands. In that email, Ms. Morrison stated, through her counsel, that she would "never trade away her right to truthfully recount the facts of her life" – including the facts regarding Mr. Langrick's sexual assault in May 2005. (A copy of Mr. Kaufman's May 18, 2018 email to Mr. Singer is attached to this Complaint as Exhibit 3.)*

92.    Defendant admits that Plaintiff's counsel sent an email to Dan Singer on May 18, 2018 which contains the quoted language and, as a written document, speaks for itself.   Defendant denies the remaining allegations in Paragraph 92 of the Complaint.

93.    *Defendant's counsel did not reply to the May 18 email until August 1, 2018. In his ultimate response, however, Mr. Singer clearly indicated that nothing had changed as far as Mr. Langrick's threat of defamation litigation against Ms. Morrison, and his client's continuing demand that Plaintiff enter into the proposed NDA. The only "concession" was to offer that the NDA could be "mutual" in also restricting Mr. Langrick's ability to communicate publicly about the incident. Of course, such mutuality was no concession at all, as Mr. Langrick clearly has no intention of speaking publicly about his own assaultive actions on that night in Plaintiff's room at Dartmouth in 2005. (A copy of Mr. Singer's email of August 1, 2018 is attached to this Complaint as Exhibit 4.)*

93.    Defendant admits that his counsel, Mr. Singer, sent a settlement communication email to Plaintiff's counsel on August 1, 2018 which, as a written document, speaks for itself.

Defendant denies the remaining allegations in Paragraph 93 of the Complaint.

94.     *In his August 1 email, Mr. Singer set a deadline of September 10, 2018, for the filing of Defendant's threatened defamation action. Further exchanges between the parties' counsel resulted in brief extensions of that deadline. Finally, the most recent deadline threatened by Defendant through his counsel, for commencement of the slander action against Plaintiff, is November 16, 2018.*

94.     Defendant admits the allegations in Paragraph 94 of the Complaint.

95.     *As of the date of this complaint that is still essentially the status of this matter: Defendants threat of a slander action has never been withdrawn and looms over Plaintiff. And although his attorney has offered to "negotiate" the exact terms of the NDA, and Ms. Morrison has offered to sign a radically-modified NDA preserving all of her essential rights, Mr. Langrick has not yet communicated any intention of backing off from any of the key points of his previously stated demands.*

95.     To the extent Paragraph 95 of the Complaint alleges that Plaintiff has an "essential right" to defame Defendant with her false accusations of sexual assault, Defendant denies that allegation.  Defendant denies the characterization of his actionable claims against Plaintiff as a "threat."  Defendant denies that there is any open offer to negotiate the terms of any NDA and in fact Defendant has filed counterclaims against Plaintiff contemporaneously herewith, including a claim for slander, which action effectively retracts any such offer and moots Plaintiff's claim for a declaratory judgment.   Defendant denies the remaining allegations in Paragraph 95 of the Complaint.

### *SUMMARY OF THE RELIEF PLAINTIFF SEEKS IN THIS ACTION*

96.     *Under all of the foregoing circumstances, it is clear that Plaintiff's claim for declaratory relief from Defendant's current threats and demands, presents a very much live controversy in need of resolution by this Court.*

96.     The allegations in Paragraph 96 constitute legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 96 of the Complaint.

97.     *In this action, Plaintiff seeks a declaration that Defendant does not have a meritorious slander action against her, with respect to whatever she said in her one brief conversation with some third party at the Bloomberg HR Department and that his persistent threats of such an action are baseless – and indeed wrongful. (FIRST CLAIM FOR RELIEF)*

97.     Defendant admits that Plaintiff purports to seek a declaration regarding the merit of a slander action.  Defendant denies the remaining allegations in Paragraph 97 of the Complaint.

98.     *Plaintiff also seeks a declaration that the proposed "Settlement Agreement" Defendant has been demanding Plaintiff sign – or else he will sue her for "slander" – is unenforceable and indeed unconscionable. (SECOND CLAIM FOR RELIEF)*

98.     Defendant admits that Plaintiff purports to seek a declaratory judgment regarding a proposed, non-executed, first draft agreement.  Defendant denies that Plaintiff has stated a valid claim for relief.

99.     *Third, Plaintiff also seeks a declaration as to her rights going forward, in particular of her First Amendment right to speak and to write– uncensored – about her personal story of abuse as well as of her valuable right to publish her life story in any forum or manner that she sees fit. Thus, if Defendant's asserted "privacy" rights are said to have a value of $500,000, each and every time they are allegedly breached, then surely Plaintiff is here appropriately seeking to defend her equally valuable right to speak and publish her truth, including with regard to the May 2005 incident of sexual assault. (THIRD CLAIM FOR RELIEF)*

99.     Defendant admits that Plaintiff's third claim for relief purports to seek a declaratory judgment.  Defendant denies the remaining allegations in Paragraph 99 of the Complaint.

100.    *And finally, Plaintiff seeks injunctive relief, damages well in excess of $75,000, her attorney's fees and costs, and any other related relief deemed appropriate by the Court.*

100.    Defendant admits that Plaintiff purports to be seeking the relief stated in Paragraph 100 of the Complaint.  Defendant denies that Plaintiff has asserted any valid claims and denies that Plaintiff is entitled to any relief whatsoever.

### PLAINTIFF'S FIRST CLAIM FOR RELIEF:
### A DECLARATION THAT DEFENDANT'S THREATENED SLANDER ACTION IS WITHOUT MERIT

*101.    Plaintiff incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.*

101.    Defendant re-alleges his responses in the preceding paragraphs as if fully set forth herein.

*102.    Plaintiff seeks a declaration by this Court that there is no legal or factual basis for Defendant's threatened claim of "slander" against her, arising out of her January 2018 call to the Bloomberg HR Department.*

102.    Defendant admits that Plaintiff purports to seek such a declaration.   Defendant denies that Plaintiff's claim is a valid, justiciable, or cognizable claim for declaratory judgment.

*103.    Under New York law, the requisite elements of a slander claim can be briefly summarized:*

*(i)     A precisely pleaded statement of the exact language of the allegedly slanderous statement;*

*(ii)    Proof that the allegedly slanderous words contained at least one false and defamatory statement of fact;*

*iii)     Correlatively, proof that the allegedly slanderous statement was not one of constitutionally-protected "opinion;"*

*(iv)    Proof of the requisite degree of "fault" in publishing a false and defamatory statement of fact; and*

*(v)     Proof of damage to the slander plaintiff's "reputation."*

103.    The allegations in Paragraph 103 of the Complaint constitute legal conclusions to which no response is required.   To the extent that Paragraph 103 of the Complaint contains any averments of fact, Defendant denies those allegations.

*109.    Moreover, under New York law, it is the slander plaintiff's burden to prove all of the requisite elements of his slander claim.*

109.    The allegations in Paragraph 109[3] of the Complaint constitute legal conclusions to which no response is required.   To the extent that Paragraph 109 of the Complaint contains any

---

[3] Plaintiff's Complaint contains an error in the numbering of paragraphs in that the numbers 104-108 are missing.   In order to avoid confusion Defendant has kept numbering of the Answer paragraphs consistent with the erroneous numbering of the Complaint paragraphs.

averments of fact, Defendant denies those allegations.

*110.     Yet it is clear that Plaintiff has been – and will be – unable to meet his burden of proof, at the pleading stage, as to each of the key required elements of his slander claim.*

110.     The allegations in Paragraph 110 of the Complaint constitute legal conclusions to which no response is required.  To the extent that Paragraph 110 of the Complaint contains any averments of fact, Defendant denies those allegations.

*111.     First, Defendant has never properly identified the exact language of the allegedly slanderous statement Plaintiff is claimed to have made to Bloomberg during that single telephone call in January 2018. Thus, Defendant's only attempt to recite Plaintiff's allegedly slanderous statement to Bloomberg, appears in the proposed Settlement Agreement, Exhibit 2 at p. 1: "[O]n or about January 2, 2018, Morrison contacted Langrick's employer, Bloomberg L.P. by telephone purportedly to 'report' the Alleged Incident of Sexual Assault which Morrison alleged occurred in May 2005 and, during such phone call, Morrison advised Bloomberg L.P. that Morrison had reviewed Langrick's 'LinkedIn' page, saw that he was working with universities, and was 'concerned' that such work might involve him having contact with college students, and that, as such, she had the responsibility to 'report' the 'incident' to Langrick's employer."*

111.     Defendant denies the allegations in Paragraph 111 of the Complaint.  As to the language of Plaintiff's false and defamatory statements to Bloomberg, Defendant refers Plaintiff to his Counterclaims, filed contemporaneously herewith.

*112.     Under well-established New York law, in a libel or slander case, the allegedly defamatory words must be recorded verbatim. This requirement is strictly enforced, and any paraphrasing or use of qualifying words renders the complaint defective. In short, as is apparent from his only presentation of the alleged slanders, defendant will be unable to comply with New York's strict pleading requirements. And if this is all of the language he has to complain of, then, quite simply, he has no viable slander claim.*

112.     The allegations in Paragraph 112 of the Complaint set forth legal conclusions to which no response is required.  To the extent that Paragraph 112 of the Complaint contains any averments of fact, Defendant denies those allegations.

*113.     In any event, as presented, Defendant will surely be unable to meet his burden of proving the falsity of any statement of fact made during the telephone call to Bloomberg: there was an alleged incident of sexual assault at Dartmouth in 2005; Mr. Langrick was involved in that alleged incident; Mr. Langrick's job did require him to travel to colleges and universities as a "Bloomberg Ambassador" and, evidently, to interact with students.*

113.     Defendant admits that his position at Bloomberg required him to travel to colleges and universities and interact with students.  Defendant denies that he had the title "Bloomberg Ambassador."  Defendant denies the remaining allegations in Paragraph 113 of the Complaint.

*114.     And as far as Ms. Morrison's "concern" that Langrick might come into contact with college students, and her "responsibility" to "report the incident" to Mr. Langrick's employer, those are clearly non-actionable "opinions" under New York's very broad state-constitutional protection for statements of opinion. Indeed, as a matter of law, this court will readily conclude that Plaintiff's allegedly slanderous statement was, as a whole, one of protected opinion rather than actionable fact.*

114.     The allegations in Paragraph 114 of the Complaint constitute legal conclusions to which no response is required.  To the extent that Paragraph 114 contains any averments of fact, Defendant denies those allegations.

*115.     Accordingly, on this score as well, Defendant will be unable to meet his burden of proving a false statement of fact.*

115.     The allegations in Paragraph 115 of the Complaint constitute legal conclusions to which no response is required.  To the extent that Paragraph 115 of the Complaint contains any averments of fact, Defendant denies those allegations.

*116.     Even if he were held not to be a "public figure," Defendant will be unable to meet his burden of proving that the allegedly slanderous statement was made in a "grossly irresponsible" manner, as would be required in the circumstances of statements of public interest and concern, such as allegations of sexual abuse. And it simply cannot be grossly irresponsible to state a protected opinion based on undisputed facts.*

116.     The allegations in Paragraph 116 of the Complaint constitute legal conclusions to which no response is required.  To the extent that Paragraph 116 of the Complaint contains any averments of fact, Defendant denies those allegations.

117.    *Finally, Defendant will be unable to meet his burden of proving that the allegedly slanderous statements caused damage to his reputation, over and above the damage already inflicted by Defendant on himself due to his undeniable assault on Plaintiff, back in May of 2005, and the uncontested drunken havoc he wreaked on, and the wreckage he left behind in, Plaintiff's room.*

117.    The allegations in Paragraph 117 of the Complaint constitute legal conclusions to which no response is required.  To the extent that Paragraph 117 of the Complaint contains any averments of fact, Defendant denies those allegations.

118.    *Accordingly, on at least the foregoing multiple and overlapping bases, Plaintiff is entitled to a declaration that there is no legal or factual basis for Defendant's threatened slander claim based on Plaintiff's statements to Bloomberg on January 2, 2018, as alleged.*

118.    Defendant denies the allegations in Paragraph 118 of the Complaint.

**PLAINTIFF'S SECOND CLAIM FOR RELIEF: A DECLARATION THAT THE PROPOSED NDA IS UNENFORCEABLE BECAUSE IT IS UNSUPPORTED BY THE FACTS, IS OVERREACHING AND IS AGAINST PUBLIC POLICY**

119.    *Plaintiff incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.*

119.    Defendant realleges his responses in the preceding paragraphs as if fully set forth herein.

120.    *Plaintiff asks this Court to declare that Defendant's proposed "Settlement Agreement" is unenforceable, not only because it is unsupported by the facts, but because it is also overreaching, unconscionable, extortionate and against public policy. Therefore, it should be held to be both improper and unenforceable, as a matter of law and of equity.*

120.    Defendant admits that Plaintiff purports to seek such a declaration.  Defendant denies that Plaintiff's claim is a valid, justiciable, or cognizable claim for declaratory judgment.

121.    *First, it is a generally-accepted core principle of contract law that a valid contract cannot be based on a false or illusory premise.*

121.    The allegations in Paragraph 121 of the Complaint constitute legal conclusions to which no response is required.  To the extent Paragraph 121 contains any averments of fact,

Defendant denies the allegations in Paragraph 121 of the Complaint and denies that there is any contract at issue for the Court to interpret.

122. *Moreover, the only proposed "consideration" for the demanded NDA, is Defendant's agreement not to sue Plaintiff for slander in connection with her telephone call to Bloomberg. But the threatened slander action has no merit.*

122. The allegations in Paragraph 122 of the Complaint constitute legal conclusions to which no response is required. To the extent that Paragraph 122 of the Complaint contains any averments of fact, Defendant denies those allegations.

123. *Yet even if there were any colorable basis for Defendant's slander claim, that would still not justify the many other overreaching and unconscionable elements of Defendant's proposed Settlement Agreement, chief among them:*

(i) *The central factual premise of the Proposed Settlement agreement Defendant has been demanding is that "the Hanover Police Department conclusively determined that no wrongdoing had occurred" in connection with the events of that evening and morning in May, 2005. Because this is demonstrably not true, it follows that all of the other material provisions of the proposed settlement agreement, flowing from the allegedly slanderous statements about the incident, are also insupportable.*

(ii) *Because there was never any "conclusive determin[ation] that no wrongdoing had occurred," it would be insupportable – indeed unconscionable – to approve or enforce any requirement that – for the rest of her life – Plaintiff must rigidly adhere to Defendant's false narrative of the experiences she lived through and specifically that she may not even suggest – to anyone, by any means of communication – that Defendant "committed sexual assault ... and/or any other crime or misconduct (whether sexual or non-sexual)" in connection with the May 2005 incident.*

(iii) *And, even beyond those false and overreaching demands, Defendant's proposed NDA would require Plaintiff to go still further. Thus, the Agreement also demands that Plaintiff never again "publish ... any reference to the Alleged Incident of Sexual Assault," nor may she "disparage[] Langrick in any way" nor, indeed, may she ever again make any "reference to Langrick whether by name or description regardless of whether [the reference] is positive or negative;"*

(iv) *And finally, pursuant to their Draconian and extortionate mechanisms to enforce the overbroad and overreaching proposed settlement, the NDA would permit Defendant to commence litigation without notice, in response to any alleged violation of the Agreement, to recover any and all other damages Defendant may be awarded for "reputational injury," and, in addition, to impose against Plaintiff "liquidated damages in the amount of $500,000" plus all of Defendant's legal fees and costs.*

123. To the extent that Paragraph 123 of the Complaint sets forth legal conclusions, no response is required. To the extent that Paragraph 123 of the Complaint contains any averments of fact, Defendant denies those allegations. Defendant further states that Plaintiff is referring to a

proposed, first draft document which has never been executed by any party and which, as a written document, speaks for itself.

*125.    Accordingly, Plaintiff is entitled to a declaratory judgment holding that Defendant's proposed "Settlement Agreement" is unconscionable, unlawful and unenforceable.*

125.    The allegations in Paragraph 125[4] of the Complaint constitute legal conclusions to which no response is required.  To the extent that Paragraph 125 of the Complaint contains any averments of fact, Defendant denies those allegations.  Defendant denies that Plaintiff is entitled to the relief she seeks, denies that Plaintiff has stated a valid claim, and denies that Plaintiff's claim is a justiciable or cognizable claim for declaratory judgment.

### PLAINTIFF'S THIRD CLAIM FOR RELIEF: A DECLARATION AFFIRMING HER RIGHT TO FREELY EXPRESS AND PUBLISH TRUTHFUL FACTS AND OPINIONS ABOUT HER OWN LIFE, INCLUDING THE 2005 INCIDENT

*126.    Plaintiff incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.*

126.    Defendant realleges his responses in in the preceding paragraphs as if fully set forth herein.

*127.    Defendant has been actively, albeit baselessly, asserting the right to censor and/or to punish Plaintiff's speech or writings on a subject of vital concern to her, for the rest of her life.*

127.    Defendant admits that he has a legal right to seek relief for false and defamatory statements Plaintiff has made about him.  Defendant denies the remaining allegations in Paragraph 127 of the Complaint.

---

[4] Plaintiff's Complaint contains an error in the numbering of paragraphs in that the number 124 is missing.  In order to avoid confusion Defendant has kept the numbering of the Answer paragraphs consistent with the erroneous numbering of the Complaint paragraphs.

*128.     And he has frivolously threatened to sue her for slander, although the threatened claim has no merit in fact or in law (First Claim for Relief, supra) and the NDA demanded to shut Plaintiff up, is unconscionable, unlawful and unenforceable (Second Claim for Relief, supra).*

128.     To the extent that Paragraph 128 of the Complaint sets forth legal conclusions, no response is required.  To the extent that Paragraph 128 of the Complaint contains any averments of fact, Defendant denies those allegations.

*129.     Surely, the United States Supreme Court did not, more than fifty years ago, undertake to institute a revolution in the common law of defamation, in the landmark case of New York Times Co. v. Sullivan and its progeny, with the expressed goal of vigorously protecting First Amendment rights, simply in order to leave citizens to be threatened with meritless, retaliatory litigation – impeachable letter and the spirit of the Sullivan case – in an American court of law.*

129.     To the extent that Paragraph 122 of the Complaint sets forth legal conclusions, no response is required.  To the extent that Paragraph 122 of the Complaint contains any averments of fact, Defendant denies the allegations.

*130.     Accordingly, it is just and proper that this Court should now protect Plaintiff with a declaration reaffirming both that Plaintiff has a constitutionally-protected right to recount the true facts of her life experiences, in any form and any medium. And, in particular, that Plaintiff must remain free to write, speak or publish truthfully about the 2005 incident, unimpeded by baseless, manipulative threats of litigation or other severe sanction.*

130.     The allegations in Paragraph 130 of the Complaint constitute legal conclusions to which no response is required.  To the extent that Paragraph 130 of the Complaint contains any averments of fact, Defendant denies the allegations.  Defendant also denies that Plaintiff is entitled to the relief she seeks, denies that Plaintiff has stated a valid claim, and denies that Plaintiff's claim is a justiciable or cognizable claim for declaratory judgment.

*131.     It should be self-evident that such free and uncensored exercise of Ms. Morrison's cherished constitutional right to express her opinions and to tell her own life story as she sees fit – a right that can only be subject to a good faith claim, having a substantial basis in fact and in law, that she is responsible for an unprivileged publication, of false and defamatory facts, of and concerning the Plaintiff.*

131.     The allegations in Paragraph 131 of the Complaint constitute legal conclusions to which no response is required.  To the extent that Paragraph 131 of the Complaint contains any averments of fact, Defendant denies those allegations.

*132.     And it is thus also evident that the ever looming threat to Plaintiff's First Amendment rights, that could be imposed by a potentially unlimited series of defamation actions against her by Mr. Langrick, every time she wishes to speak about another aspect of her experiences and observations arising out of the May 2005 incident, is more than sufficient to warrant the protective, declaratory relief plaintiff seeks from this Court.*

132.     The allegations in Paragraph 132 of the Complaint constitute legal conclusions to which no response is required.  To the extent that Paragraph 132 of the Complaint contains any averments of fact, Defendant denies those allegations.  Defendant denies that Plaintiff is entitled to the relief she seeks in Paragraph 132 of the Complaint, denies that Plaintiff has stated a valid claim, and denies that Plaintiff's claim is a justiciable or cognizable claim for declaratory judgment.

### *PRAYER FOR RELIEF*

*WHEREFORE, Plaintiff prays for judgment against Defendant as follows:*

*133.     For a declaration that there is no factual or legal basis for Defendant's threatened slander action against her arising out of her January 2, 2018 conversation with Bloomberg.*

133.     Defendant denies that Plaintiff is entitled to the relief she seeks in Paragraph 133 of the Complaint, denies that Plaintiff has stated a valid claim, and denies that Plaintiff's claim is a justiciable or cognizable claim for declaratory judgment.

*134.     For a declaration that the "Settlement Agreement" ("NDA") that Defendant has been demanding, is based on false premises, and that it is unlawful and unenforceable.*

134.     Defendant denies that Plaintiff is entitled to the relief she seeks in Paragraph 134

of the Complaint, denies that Plaintiff has stated a valid claim, and denies that Plaintiff's claim is a justiciable or cognizable claim for declaratory judgment.

135.     *For a declaration recognizing Plaintiff's broad and constitutionally-protected right to tell her own life story, in her own way, without the threat of costly and potentially repetitive litigation. Or, as in the current parlance: "to tell her truth."*

135.     Defendant denies that Plaintiff is entitled to the relief she seeks in Paragraph 135 of the Complaint, denies that Plaintiff has stated a valid claim, and denies that Plaintiff's claim is a justiciable or cognizable claim for declaratory judgment.

136.     *For injunctive relief, appropriate to enforce the court's declarations of rights, including at minimum:*

> (i)     *A permanent injunction preventing Defendant from commencing the threatened meritless slander action in any other court; and*
>
> (ii)    *An injunction barring Defendant from demanding from Plaintiff such an unconscionable and unenforceable NDA, including such extortionate "liquidated damages" for the violation of any such agreement.*

136.     Defendant denies that Plaintiff is entitled to the relief she seeks in Paragraph 136 of the Complaint, denies that Plaintiff has stated valid claims, and denies that Plaintiff's claims are justiciable or cognizable claims for declaratory judgment or injunctive relief.

*136.      For her damages, according to proof, as a result of Defendant's baseless threat of a slander action; as a result of Defendant's undue and improper pressure on Plaintiff to enter into an extortionate and unconscionable "Settlement Agreement," not supported by any meritorious factual or legal claims, and that would violate her rights of free speech, on threat of extortionate "liquidated damages" and other Draconian penalties. And although it may be impossible to put a single dollar amount on the value of Plaintiff's life-affirming exercise of her First Amendment rights, and the likewise invaluable freedom she has lost over the years in suppressing her truth, this Court should take upon itself the obligation to place a value on her damages that will fully compensate Plaintiff for such a significant loss as well as for her threatened economic losses that would arise out of her uncensored ability to tell – and if she so wishes to sell or otherwise profit from – her truthful story about the May 2005 incident of sexual assault.[5]*

136.      Defendant denies that Plaintiff is entitled to the relief she seeks in Paragraph 136 of the Complaint.

*137.      For her costs, including her reasonable attorneys' fees incurred as a direct result of the foregoing wrongful acts; and*

137.      Defendant denies that Plaintiff is entitled to the relief she seeks in Paragraph 137 of the Complaint.

*138.      For such other and further relief as the Court may deem just and proper.*

138.      Defendant denies that Plaintiff is entitled to any relief.

---

[5] Plaintiff's Complaint contains an error in the numbering of paragraphs in that the number 136 is repeated.  In order to avoid confusion Defendant has kept the numbering of the Answer paragraphs consistent with the erroneous numbering of the Complaint paragraphs.

## AFFIRMATIVE AND OTHER DEFENSES

Defendant asserts the following affirmative and other defenses.  In doing so, Defendant does not assume any burden of proof on any issue that is Plaintiff's burden as a matter of law:

### First Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### Second Defense

Plaintiff lacks standing to assert the claims contained in the Complaint.

### Third Defense

Plaintiff's alleged claim for damages is barred, in whole or in part, to the extent that Plaintiff has suffered no damages, and because Plaintiff asserts no causes of action that permit such relief.

### Fourth Defense

Plaintiff's claims for declaratory judgment are not justiciable claims.

### Fifth Defense

Plaintiff's claims for declaratory judgment seek improper advisory opinions.

### Sixth Defense

Plaintiff's claims purporting to sound in contract are barred due to Plaintiff's failure to allege the existence of any valid, binding contract.

### Reservation of Rights

Defendant reserves his right to assert and rely upon such other and further defenses as may become available or apparent during pre-trial proceedings in this case and hereby reserves his right to amend his answer and assert additional defenses.

## COUNTERCLAIMS

Pursuant to Federal Rules of Civil Procedure 8 and 13, Defendant Robert Langrick ("Mr. Langrick"), by and through his undersigned counsel, hereby asserts the following counterclaims against Plaintiff Monica Morrison ("Ms. Morrison").

## NATURE OF THE COUNTERCLAIMS

1.      These defamation counterclaims arise out of a long-running effort by Monica Morrison to enrich herself by falsely smearing Robert Langrick as a rapist following a completely consensual sexual encounter that occurred when the two were students at Dartmouth College in 2005.

2.      Mr. Langrick met Ms. Morrison for the first time at a college fraternity party in the early morning hours of Sunday, May 8, 2005.  After talking and flirting at the party, Ms. Morrison invited Mr. Langrick back to her residence — a shared house near the Dartmouth campus that Mr. Langrick had never been to before — to "hook up."

3.      Upon arriving at the house at approximately 6:00 a.m., Ms. Morrison led Mr. Langrick directly to her bedroom, but she was surprised to discover that her roommate and the roommate's boyfriend — who often stayed elsewhere — were already in the room.  So, Ms. Morrison then led Mr. Langrick out onto, across, and up the unfenced, sloped roof of the house, and into a "cupola" that the house residents regularly used as a place to have romantic encounters.

4.      The two spent upwards of an hour together naked in the cupola, engaging in foreplay and sexual intercourse in which Ms. Morrison was an active, willing, and enthusiastic participant.  Ms. Morrison then led Mr. Langrick back out across the roof and through a window into her bedroom, where they got into her bed together at around 7:00 a.m.

5.      Mr. Langrick, who admittedly had been drinking the prior evening, arose shortly after at around 7:15 a.m. needing to use the bathroom and, disoriented from alcohol consumption,

sleep deprivation, and the preceding hour of vigorous sexual activity, proceeded to act in a boorish way that quite understandably angered Ms. Morrison's roommate and housemates. Specifically, and to his great embarrassment, Mr. Langrick urinated on the floor of the bedroom. Ms. Morrison's housemates then asked him to leave the house, and he did.

6.      In a strange exchange of emails initiated by Ms. Morrison that Sunday evening (the same day), she and her housemates poked fun at the extremely contrite Mr. Langrick. Though they were less than pleased about him urinating on the floor of the house, they considered it a funny college story and no harm had been done. Mr. Langrick apologized profusely to Ms. Morrison and her housemates for making a mess.

7.      Ms. Morrison was annoyed that Mr. Langrick had embarrassed her in front of her housemates, but this was initially tempered by the fact that her housemates seemed to generally consider the incident to be amusing. Ms. Morrison placated herself by vindictively stealing the money and personal property that Mr. Langrick inadvertently left behind at the house — and falsely claiming to Mr. Langrick, when he directly asked her, that nobody had seen his things at the house. She also lied to her housemates and claimed that she had not had sex with Mr. Langrick.

8.      But things took a dark turn on Monday, May 9, 2005, when Ms. Morrison realized that her female roommate was still angry about the episode, and specifically that the roommate was unhappy with *Ms. Morrison*. The roommate made it clear that she didn't appreciate Ms. Morrison bringing strangers to their bedroom for drunken one-night stands and didn't appreciate her and her boyfriend, who had stayed in that evening, being repeatedly awoken and disturbed at odd hours. The roommate also began to very conspicuously avoid interacting with Ms. Morrison which further underscored her disapproval of Ms. Morrison's behavior.

9.      Ms. Morrison, who on information and belief has long struggled with mental illness, depression, and feelings of insecurity and inadequacy, was panicked at the thought of her

roommate — with whom she wanted to be friends — holding anger and contempt towards her. Ms. Morrison blamed Mr. Langrick for endangering her relationship with her roommate and housemates, and she decided that he needed to be punished.

10.     In order to make Mr. Langrick pay for embarrassing her, to save face in front of her would-be friends, and to deflect attention from her own crimes — including theft, extortion, and distribution of narcotics — Ms. Morrison decided to paint herself as a helpless victim and make up a story about Mr. Langrick following her home on a pretense and attempting to rape her in her bed.

11.     Ms. Morrison's plan fell apart, however, when the Hanover Police Department did the right thing and aggressively investigated her allegations.  The comprehensive investigation produced a police file running to hundreds of pages.  It includes notes, summaries, relevant email correspondence obtained from search warrants, and transcripts of interviews with numerous eyewitnesses — including Ms. Morrison's own friends and housemates.

12.     The evidence gathered by Hanover PD detectives conclusively disproved Ms. Morrison's allegations and revealed that virtually everything she said about her involvement with Mr. Langrick was a lie.  Given the contents of the full report, it is no surprise that Ms. Morrison and her counsel chose to attach only brief, cherry-picked snippets of this large file to her Complaint.

13.     For example, Ms. Morrison claimed that she did not invite Mr. Langrick back to the house to "hook up" but rather that he came there of his own accord to meet another resident. This was easily disproven when both Mr. Langrick and that other individual told police they did not know each other and had no plans to meet.

14.     Ms. Morrison's claim that Mr. Langrick surreptitiously and predatorily followed her to her bedroom after arriving at the house was easily disproven when Ms. Morrison's roommate

and the roommate's boyfriend told police that they were in the bedroom and awake when Ms. Morrison burst in with Mr. Langrick in tow, clearly intending to engage in sexual relations with him.  They heard and saw Ms. Morrison check to see if the bedroom was occupied, explain to Mr. Langrick that it was, and relay to him that they would need to find someplace else private to go. They then witnessed Ms. Morrison take Mr. Langrick out onto the roof of the house.

15.     In fact, multiple witnesses heard and saw Ms. Morrison lead Mr. Langrick — who had never been to the house before and had no knowledge of its layout — out onto and across the sloped, unfenced roof of the house to the small cupola room that house residents used for sexual encounters.

16.     Ms. Morrison's claim that she did not have consensual sex with Mr. Langrick in the cupola was easily disproven when the resident who lived directly underneath this cupola told police she clearly heard Ms. Morrison lead Mr. Langrick to the cupola and very vocally and enthusiastically engage in foreplay and intercourse with him for nearly an hour.

17.     This witness's statement completely corroborated Mr. Langrick's statements to police.  Mr. Langrick was able to describe the location and layout of the cupola, and detail the sexual encounter that took place there, down to intimate and exculpatory details such as identifying features of Ms. Morrison's anatomy and distinctive characteristics of the orgasm that she had during foreplay in the cupola.

18.     The housemates heard and saw Ms. Morrison and Mr. Langrick return from their sexual encounter in the cupola, crawl back through the window into the bedroom, and get into bed together.  None of these witnesses saw or heard Ms. Morrison order Mr. Langrick to sleep on the couch, as she would later claim; and more importantly, none saw or heard Mr. Langrick sexually assault Ms. Morrison during the brief ten or so minutes that they were in the bed together.

19.     In fact, Ms. Morrison's own roommate, who was *in the room, awake, and just feet*

41

*away* when Ms. Morrison claimed that Mr. Langrick sexually assaulted her, was asked point blank by Hanover PD detectives whether Ms. Morrison was in fact sexually assaulted in that room.  She responded, "No."  The police file further notes that the roommate — who, again, was a percipient witness to the events in the bedroom — considered Ms. Morrison's allegations to be "bogus."

20.     Ms. Morrison's own friends and roommates also described to police Ms. Morrison's concerning conduct in the following days, including falsely denying that she had sex with Mr. Langrick, and gloating about stealing money and property he accidentally left behind in the house while expressing that she considered it justified because he deserved to be punished for embarrassing her.

21.     Ms. Morrison's own friends and housemates would also later describe her as a "professional victim" who made "bogus" claims and "faked being raped."

22.     In fact, Ms. Morrison's housemates were so concerned about her sudden talk of bringing false rape charges against Mr. Langrick that they took the extraordinary step of going behind her back to contact Mr. Langrick — who they had no prior relationship with — and warning him to "watch out" for "your new friend Monica Morrison."

23.     Ultimately, after weeks of investigating, the detectives told Ms. Morrison that because her claims were so thoroughly contradicted, and her credibility so tarnished, there could be no charges against Mr. Langrick for sexual assault or attempted sexual assault.

24.     As noted, Ms. Morrison and her counsel notably attached only a few cherry-picked excerpts from the summary portion of this long police file to their Complaint, which action in and of itself betrays a knowledge that the full police file is absolutely devastating to Ms. Morrison's veracity and credibility.

25.     Mr. Langrick possesses a full copy of the file, including transcripts of police interviews with Ms. Morrison and many of her friends and acquaintances who were present at the

time Ms. Morrison claims she was sexually assaulted.  The picture these interviews paint of Ms. Morrison demonstrates very clearly why she and her counsel did not want to attach the full file to their Complaint.

26.    In the following years, Ms. Morrison, who is a struggling aspiring writer with a history of mental health issues, made multiple attempts to use the threat of publicizing this fabricated assault claim to obtain money from Mr. Langrick.  Mr. Langrick did not accede to these threats because he did not sexually assault Ms. Morrison and a fulsome, well-documented police investigation fully supports his innocence.

27.    When Mr. Langrick refused to give into her demands, Ms. Morrison lashed out and followed through on her threats to publicly accuse him of rape.  Ms. Morrison proceeded to try and get Mr. Langrick fired by calling his employer, Bloomberg LP, and falsely claiming that he sexually assaulted her.  She made similar false and defamatory statements in several subsequent online postings in which she identified Mr. Langrick by name and claimed that he raped her.  But Mr. Langrick still refused to pay her a dime.

28.    Finally, Ms. Morrison, who has bounced from one short-lived employment position to another for the last decade, decided that this old false allegation would be useful for her to serve another, financially-motivated purpose: to advance her foundering writing career and obtain what she calls "Sacred Wealth" and "sweet rape money" by usurping the #metoo movement and portraying herself as a courageous survivor of sexual assault.

29.    In fact, Ms. Morrison has in the past admitted that she "idolized" other women who she saw become well-known figures in the #metoo movement after writing about their experiences and publicly confronting their abusers.  Ms. Morrison has noted that some of these women had become public figures with "viral articles and television appearances" and "six figure memoir" deals.  Ms. Morrison believed that if she went public with her accusations against Mr. Langrick,

she too could become a famous and well-known writer.

      30.    Ms. Morrison thus recently set in motion her plan to build a lucrative personal brand by creating a Facebook profile, blog, and website where she calls herself "Ms. Universe" and describes herself thusly:

# Who is Ms. Universe?

 MS. UNIVERSE · FRIDAY, SEPTEMBER 28, 2018

Ms. Universe is everything and nothing. She has seen a glorious parallel universe and wishes to bring the gifts of that place back to our own universe. She is a fellow priestess of the Void, of the sisterhood of shadow work and Goddess worship. She rides dragons. She breathes under water. She works well under pressure, until she explodes like a supernova.

Like most humans she contains multitudes. She believes in witches and mermaids and the ancestors and aliens. She is a confessionalist. She is a sacred prostitute. She will show you exactly what that means as her story unfolds.

She has chosen to explore the concept of Radical Faith, executing the vision of embodying the physical foil to the paradigm we now experience. Rather than an infantilized pageant display, an animalistic clawing to the title "Miss Universe," Ms. Universe seeks to provide an open forum for self-empowerment, sovereignty reclamation, and spiritual growth where people can work together to achieve these aims.

Look for weekly dispatches from the Universe, with questions answered and friendly chats. Also look for the forthcoming chat group, Queens of the Universe. Ms. Universe will be coming to a city near you, for glass ceiling initiations for the good of country and the good of humanity. Stay tuned.

      31.    In between posts about her interest in witchcraft spells, "mermaids," "ether dragons," "alchemy," "shadow work," and "metaphysical forensics" — she also began to write about her supposed journey from quiet victim of sexual assault to outspoken advocate.

32.     She also wrote about her plans to amass "Sacred Wealth" off of her advocacy and hinted about a new "economic justice" project she plans to unveil in early 2019 called "Rape on the Blockchain." She has invited interested media members and "venture capitalists" to contact her about funding this new project.  She also bragged, in a blog post directed at Mr. Langrick — which she later deleted — about the "mighty treasure" she had coming, and demanded that Mr. Langrick pay her:

> And I promised theives I lived with
> That I wouldn't be a snitch
> That we were in this shit together
> Cause cops was busting in it
>
> Can you see the dragons?
> Ether dragons for a bitch
> Ether dragons for a witch
> Ether dragons rich
>
> And there are dragons in the ether
> They all guard a mighty treasure
> And they all reign within the depths
> You're not willing to measure
>
> While you bother while you posture
> As you bluffin', as you front
> As you hide you're getting swallowed
> By my GODDESS of a cunt
>
> Putting trauma on the blockchain
> Sayin' bitch.pay.me, yess
> Turning testing into blessing
> Cleaning up that filthy mess
>
> And when you wanna stop
> And say it hurts too bad
> I'll say, "Good, bitch.
> Cause you're the worst I ever had."

33.     The next step in Ms. Morrison's plan was to file a completely meritless, false complaint asserting plainly unripe and legally deficient declaratory judgment claims.  Her purpose in doing so was to seek media attention for her false rape allegations while also cloaking herself in the litigation privilege that exempts false statements in a court filing from defamation liability.

34.     This scheme has already been successful, as the false allegations in Ms. Morrison's Complaint were predictably picked up and republished by a credulous media, causing further, irreparable harm to Mr. Langrick's reputation.

35.     Mr. Langrick is a loving family man who abhors the very notion of sexual assault and supports the laudable goal of the #metoo movement to bring attention to sexual violence and gender discrimination.  Mr. Langrick has never in his 20+ year career had any workplace sexual harassment, sexual violence, or gender discrimination complaints made about him with any employer, and he has never been accused of any crimes bar Ms. Morrison's false allegations and a misdemeanor drug possession charge when he was a university student, which resulted in no criminal conviction.

36.     But Mr. Langrick also knows that he is innocent of Ms. Morrison's accusations, and he cannot sit back and allow a very disturbed person to falsely tar him as a rapist in front of the entire world.

37.     Mr. Langrick did not initiate this fight or this litigation, but he will not shrink in the face of these vicious, damaging lies.  The truth must be told, and Mr. Langrick absolutely intends to tell it.

38.     Mr. Langrick brings these counterclaims to vindicate his rights under civil law, to restore his once-sterling personal and professional reputations, and to establish Ms. Morrison's liability for the irreparable harm that she has caused to his reputation by the publication of

numerous false and defamatory statements.  Mr. Langrick seeks an award of compensatory damages for the reputational and economic harm caused by Ms. Morrison's defamatory statements, and, given the willful and malicious nature of Ms. Morrison's conduct in knowingly making and publishing defamatory falsehoods about him, Mr. Langrick also seeks an award of punitive damages in an amount to be determined at trial.

## THE PARTIES

39.     Robert Joseph Langrick, 42 years old, is originally from the United Kingdom but has resided in the United States for many years.  He became a naturalized U.S. citizen in 2016. Mr. Langrick earned an MBA from the Dartmouth College Tuck School of Business in 2006.  He works in New York City and lives in Connecticut with his wife of almost a decade and his two small children.

40.     Monica Morrison, 33 years old, is originally from Orlando, Florida.  She graduated from Dartmouth College in 2007 and is currently a self-described "freelance writer" living in New York City.

## JURISDICTION AND VENUE

41.     Mr. Langrick's counterclaims in this action are compulsory counterclaims under Federal Rule of Civil Procedure 13(a) because these counterclaims arise out of the same transaction or occurrence that is the subject matter of Ms. Morrison's claims.

42.     Mr. Langrick is a citizen of the State of Connecticut and Ms. Morrison is a citizen of the State of New York.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

43.     This Court has personal jurisdiction over Ms. Morrison because she is a resident and citizen of the State of New York and is domiciled in Queens County, New York.

44.     Venue is proper in the Eastern District of New York because Ms. Morrison resides in Queens County, New York, and because Mr. Langrick is required under Federal Rule of Civil Procedure 13(a) to assert these counterclaims in the existing action before this Court.

## FACTUAL ALLEGATIONS

### Mr. Langrick And Ms. Morrison Have A Consensual One-Night Stand In 2005

45.     In the early morning hours of Sunday, May 8, 2005, Mr. Langrick, then a first-year student at Dartmouth College's Tuck School of Business in Hanover, New Hampshire, attended a party at the Bones Gate fraternity house.  Along with many others at the party, Mr. Langrick was playing "beer pong," a game popular with university students in which opposing teams of two attempt to throw a ping pong ball into solo cups containing beer.

46.     During the course of playing this game, Mr. Langrick was paired as a teammate with Ms. Morrison.  Mr. Langrick had never met Ms. Morrison before that night, but they hit it off and spent a long time talking and flirting at the party.

47.     At some point, most of Ms. Morrison's friends with whom she attended the party left to return home.  Ms. Morrison elected to stay and continue playing beer pong with Mr. Langrick.

48.     Shortly before 6:00 a.m. on Sunday, May 8, 2005, when she was ready to return home, Ms. Morrison invited Mr. Langrick to accompany her back to "Panarchy," an off-campus house where she lived.  Panarchy is one of Dartmouth's "undergraduate societies," and is similar to a fraternity or sorority in that many students live together in a large shared house, though it is co-ed.

49.     Prior to that evening, Mr. Langrick had never been to Panarchy, had no familiarity with it, and did not even know where it was.  As others would later note to the police, he would not have been able to make his way there unless Ms. Morrison had invited and guided him to her

house.

50.     Once they arrived at Panarchy at approximately 6:00 a.m., Ms. Morrison invited Mr. Langrick to her bedroom on the third floor.  When they arrived, they found that Ms. Morrison's roommate, Jenna Pelletier, was already occupying the bedroom with her boyfriend, Anton Hasenkampf.  Wanting to go somewhere private, Ms. Morrison invited Mr. Langrick out onto the roof of the Panarchy house.

51.     Ms. Morrison then guided Mr. Langrick over the sloping, unfenced rooftop above the third floor to a structure called the "cupola" on the roof of the house.

52.     On information and belief, the cupola was well-known to residents of Panarchy as a place to "hook up," and it contained cushions arranged as makeshift bedding for this purpose.  In fact, when Mr. Langrick was led into the cupola by Ms. Morrison, he noticed a used condom wrapper on the floor.

53.     Just as he had never been to Panarchy, Mr. Langrick had never been on its roof and had no preexisting knowledge of the existence of this cupola.  Again, Mr. Langrick could only have been voluntarily led there by Ms. Morrison.

54.     In addition, accessing the cupola requires climbing out a small window and up a sloped roof, a tricky and dangerous maneuver which a person could not do if he or she were in such an intoxicated state that motor functions or ability to walk were impaired:



*(Image of Panarchy house, showing the "cupola" on the roof [top left])*

55.     Needless to say, Mr. Langrick did not in any way coerce or force Ms. Morrison to lead him out of the window, up the roof, and into this cupola that he did not know existed.  While both Mr. Langrick and Ms. Morrison had been consuming alcohol that night, both were at that point in time not so impaired that they could not perform this somewhat tricky physical maneuver.

56.     At the time they entered the cupola, the sun had risen, and it was light inside the cupola as it has vertical windows on all sides.

57.     They then proceeded to engage in foreplay and ultimately sexual intercourse. While it gives Mr. Langrick no pleasure to reveal intimate details of that encounter publicly, and he does not do so with the intent to embarrass anyone, he has been left with no choice but to do so because Ms. Morrison has publicly accused him of rape, claimed that they did not have sex, and claimed that Mr. Langrick made crude comments to her out of the blue while they were merely talking.

58.     The truth is that upon entering the cupola, Ms. Morrison and Mr. Langrick began

to make out, and Ms. Morrison removed her shirt and her underwear.

59.     Mr. Langrick and Ms. Morrison then both disrobed entirely, and Ms. Morrison began to fondle Mr. Langrick's penis.

60.     While Ms. Morrison was touching Mr. Langrick, he began to use his fingers to stimulate Ms. Morrison's vagina and clitoris.  This went on for some time and Ms. Morrison achieved orgasm.

61.     The orgasm itself was notable and distinctive because, as Mr. Langrick was later able to describe to police, it involved a prolonged ejaculatory stream.

62.     Mr. Langrick, taken by surprise, made a comment to Ms. Morrison at the time about the ejaculate having sprayed his face and torso.

63.     After this mutual foreplay, Ms. Morrison and Mr. Langrick had prolonged and consensual sexual intercourse.  As would later be corroborated by witnesses, Ms. Morrison was a willing, enthusiastic, and vocal participant.

64.     After nearly an hour of sexual activity in the cupola, Ms. Morrison and Mr. Langrick resolved to go to bed, and they both exited the cupola, climbed back down the roof, and went through a window into the bedroom.  They got into Ms. Morrison's bed together at approximately 7:00 a.m.

65.     Ms. Morrison's roommate Jenna Pelletier and her boyfriend Anton Hasenkampf, who were asleep in the same bedroom, were again awakened and saw the two return to the room and get into bed together.

66.     Just minutes later, as the two were still settling into the small bed and continuing to make a bit of noise, Ms. Pelletier, irritated at having now been awoken multiple times, snapped at Ms. Morrison to tell her to be quiet.

67.     Ms. Morrison, embarrassed at having been called out by her roommate and wanting

to sleep, asked Mr. Langrick if he could find his own way home, and then got up and left the small bed to go sleep in the king-sized bed of her best friend and neighbor where she often spent the evening.

68.     Despite the fact that Ms. Morrison would later make the dramatic claims that she had not been intimate with Mr. Langrick, that she had ordered Mr. Langrick to sleep on the couch, and that Mr. Langrick had then surreptitiously entered the bed uninvited and attempted to rape her in her sleep while making crude comments about anal sex, both Ms. Pelletier and Mr. Hasenkampf would later confirm to police that they saw and heard no so such thing.  What they saw was two people who had just had consensual sex return to the room and get into bed together willingly.

69.     Moreover, contrary to her later claims that Mr. Langrick had snuck into her bed uninvited and penetrated her while she was sleeping, she originally told her friends that Mr. Langrick had merely ***asked*** if she wanted to have sex (again) while they were in her small bed together, and because she did not want to and instead wanted to sleep more comfortably, she elected to go lay down in her friend's king-sized bed.

70.     Mr. Langrick, hungover and exhausted from having not slept all night and having just participated in close to an hour of vigorous sexual activity, remained in the bed and fell asleep for a short period of time.

71.     Minutes later, Mr. Langrick, needing to use the bathroom, stirred alone in the bed. By this time, the effects of alcohol consumption and sleep deprivation were having an effect, and Mr. Langrick was disoriented.  He got out of bed, but not knowing where the bathroom was and generally confused, he began to urinate in the bedroom.

72.     Ms. Morrison's roommate and her boyfriend, awakened again, saw this occur and were understandably upset.  They yelled at Mr. Langrick who, not fully comprehending what was going on, tried to get back into the wrong bed that was occupied by the roommate's boyfriend.

Eventually, with the help of a neighbor, they were able to rouse Mr. Langrick and tell him he needed to leave.  Mr. Langrick left the Panarchy house at approximately 7:15 a.m. and walked home on the morning of Sunday, May 8, 2005.

### Ms. Morrison Steals From Mr. Langrick And Attempts To Extort Him

73.     After leaving the Panarchy house on the morning of Sunday, May 8, 2005, Mr. Langrick returned to his residence at Buchanan Hall (a Tuck School dormitory) and slept for several more hours.

74.     That day, during the course of a conversation, Mr. Langrick told his friend Nestor Weigand about the events of the previous evening.  He specifically told Mr. Weigand about how he met a woman at a party, she invited him home to her house, she took him up to a room on the roof of the building, and they had intercourse.  Mr. Langrick also specifically mentioned the distinctive ejaculatory orgasm that Ms. Morrison had as they engaged in foreplay in the cupola.

75.     The description of the encounter that Mr. Langrick gave to Mr. Weigand that day was wholly consistent with the account Mr. Langrick would provide to the Hanover police nine days later.

76.     That same afternoon, Mr. Langrick returned to the Panarchy house at approximately 4:00 p.m., hoping to locate items of personal property that he had misplaced the night before, including his car keys, cash, an expensive digital camera, and a debit card.

77.     Although he did not know the exact address, he was able to locate the Panarchy house by looking for the cupola where he and Ms. Morrison had engaged in sexual intercourse.

78.     When Mr. Langrick arrived at the Panarchy house, he went to Ms. Morrison's room. Ms. Morrison was there sitting on the couch.

79.     Mr. Langrick noticed his car keys sitting on a coffee table and picked them up.  He then asked Ms. Morrison if she had his other things.

80.     Ms. Morrison did in fact knowingly have all of Mr. Langrick's possessions.  Earlier that day, she had gone to the cupola and retrieved several items including Mr. Langrick's expensive digital camera, $40 in cash that he left behind, and his debit card.

81.     Ms. Morrison had stated to her housemates that she planned to keep Mr. Langrick's cash and property out of spite for him having embarrassed her that morning.

82.     In fact, when Mr. Langrick arrived, Ms. Morrison actually had his digital camera on her lap, but she hurriedly hid it behind a couch cushion so that Mr. Langrick would not see it.

83.     When Mr. Langrick directly asked for his things back, Ms. Morrison deliberately lied to Mr. Langrick, telling him that she did not have his things and that perhaps he left them at the fraternity house.

84.     Before he left, he asked Ms. Morrison to please send him an email if she did locate the other things.  In fact, he wrote down his last name for her on a piece of paper so that she would have his contact information.  Of course, this would have been a ludicrous thing for Mr. Langrick to have done if he had just sexually assaulted Ms. Morrison only hours earlier.

85.     Although he did not directly accuse Ms. Morrison of stealing his things, Mr. Langrick's tone may have suggested to her that he did not believe she was being honest when she said she did not have his property.

86.      Later that evening, at 11:55 PM, Mr. Langrick received an email message from Ms. Morrison with the subject, "Your Stuff!"  Ms. Morrison copied several other persons, all Panarchy residents, on the email.  The other individuals copied or blind-copied on the email included Jenna Pelletier, Anton Hasenkampf, their neighbor Brent Reidy, and Panarchy resident Selena Hadzibabic.

87.     This strange email contained numerous blatant falsehoods.

88.     First, Ms. Morrison claimed to be emailing Mr. Langrick about his "stuff" — i.e.,

his personal possessions he had asked her for earlier in the day — and Ms. Morrison claimed that she had sent a "blitz" (email) to other Panarchy residents asking them "to be on the lookout for [Mr. Langrick's] things."  But unbeknownst to Mr. Langrick, at the time she sent this email to him, Ms. Morrison had already found all of his things and had decided to steal them.

89.     Ms. Morrison also made a bizarre and mocking reference to the size of Mr. Langrick's genitalia in the email, though Ms. Morrison also said that this information came from her roommate and she herself "[could] not corroborate these claims."  This was an obvious and transparent attempt by Ms. Morrison to falsely imply to her housemates — whom she strangely copied on the email — that she did not have sex with Mr. Langrick.

90.     Ms. Morrison failed to realize at the time that Panarchy resident Alice Johnstone had overheard her sexual encounter with Mr. Langrick and thus would conclusively disprove this lie.

91.     Ms. Morrison's claim that she had never seen Mr. Langrick's penis was also totally inconsistent with her later statement to police that she *did* see Mr. Langrick's penis as he supposedly attempted to sexually assault her in bed.

92.     Ms. Morrison also strangely and falsely claimed that Mr. Langrick had attempted to sexually assault her, her roommate, *and* her roommate's boyfriend.

93.     The next morning, Anton Hasenkampf, the boyfriend of Ms. Morrison's roommate Jenna Pelletier, replied all to that email.  In what appeared to be an attempt to dial back Ms. Morrison's bizarre accusations, he said "Don't be so hard on him … I say he takes [us] all out to dinner and we have a good laugh."

94.     Minutes later Ms. Morrison responded, again replying all, and disclaimed her earlier accusation, saying her email was intended to be "funny" rather than "harsh":

From: Monica C. Morrison [mailto:Monica.C.Morrison@Dartmouth.EDU]
Sent: Monday, May 09, 2005 10:10 AM
To: Anton L. Hasenkampf; Monica C. Morrison; Robert J. Langrick
Cc: Brent C. Reidy; Jenna C. Pelletier
Subject: Re: Your Stuff!


--- Anton L. Hasenkampf wrote:
Don't be so hard on him...I like a man who cuddles...I say he takes all
out to dinner and we have a good laugh
--- end of quote ---
No, it's true. We all discussed this last night. Sorry if the e-mail came
off harsh-- it was supposed to be more funny than harsh.

95.    When Mr. Langrick responded to Mr. Hasenkampf's suggestion that they all go out to dinner and have a good laugh over the incident, Ms. Morrison again responded jokingly, asking if they could "piss" on Mr. Langrick's floor:

-----Original Message-----
From: Monica C. Morrison [mailto:Monica.C.Morrison@Dartmouth.EDU]
Sent: Monday, May 09, 2005 10:28 AM
To: Robert J. Langrick; Monica C. Morrison; Anton L. Hasenkampf
Cc: Brent C. Reidy; Jenna C. Pelletier
Subject: RE: Your Stuff!

--- "Robert J. Langrick" wrote:
I would be up for taking you guys out for dinner if you want to. Somehow I
think you won't but I can get you all properly hammered.
--- end of quote ---
can we piss on your floor?

just teasing...

96.    Minutes later, Ms. Morrison's friend Brent Reidy chimed in, acknowledging and expressing appreciation for Mr. Langrick's sincere apologies for causing a mess.  Ms. Morrison echoed those sentiments and called the entire incident "more funny than anything else":

From: Monica C. Morrison [mailto:Monica.C.Morrison@Dartmouth.EDU]
Sent: Monday, May 09, 2005 10:30 AM
To: Brent C. Reidy; Robert J. Langrick; Monica C. Morrison; Anton L. Hasenkampf
Cc: Brent C. Reidy; Jenna C. Pelletier
Subject: RE: Your Stuff!


--- Brent C. Reidy wrote:
Thanks for being so apologetic and understanding our anger. I appreciate your humility. I'm sure we can all get over this....
--- end of quote ---
it was more funny than anything else. I mean, these things happen I ..ppose...

97.     As this correspondence continued, Mr. Langrick apologized repeatedly for causing a scene and offered to pay for the sweater that Ms. Morrison claimed he had ruined.  Although one of her friends would later tell police that Ms. Morrison was able to salvage the sweater simply by washing it, and although Ms. Morrison had already stolen hundreds of dollars from Mr. Langrick in cash and property, Ms. Morrison quickly seized on the idea of obtaining more money from Mr. Langrick:

Date: 09 May 2005 10:37:04 EDT
From: Monica C. Morrison
Reply-To: JustOneStationAlongTheWay
Subject: RE: Your Stuff!
To: Robert J. Langrick

--- You wrote:
Thanks so much for all your emails and being so ready to forgive my idiocy. This is definitely a story to entertain my grandchildren.
--- end of quote ---
my HB is 2878

So if you wanted to send me the cash

Monica Morrison
Hinman Box 2878
Hanover, NH 03755

98.     Mr. Langrick did, in fact, drop off $200 to compensate Ms. Morrison and her roommates for the sweater and the trouble of cleaning up.  At that time, he still did not know that Ms. Morrison had already stolen cash and valuables from him.

99.     However, far from being satisfied by Mr. Langrick's apology and compensation for

her sweater, Ms. Morrison saw an opportunity to extract even more from Mr. Langrick.  The correspondence continued and took on an ominous tone as Ms. Morrison suddenly demanded that Mr. Langrick — who at the time was a university student without great financial means — treat her and all her friends to an expensive restaurant out of state.  This demand was made in a bizarre, sarcastic, and mocking tone:

```
From: Monica C. Morrison [mailto:Monica.C.Morrison@Dartmouth.EDU]
Sent: Monday, May 09, 2005 3:09 PM

To: Robert J. Langrick
Cc: Anton L. Hasenkampf; Jenna C. Pelletier; Brent C. Reidy; Monica C.
Morrison
Subject: dinner


Dearest Rob,

The four of us sat down this afternoon and discussed an appropriate place to go so that
the five of us could catch up and have a nice dinner.

We're growing rather tired of Hanover eateries and figured that we all should go somewhere
where we can be sure you won't stiff us with the bill.
We teased out our options, and decided that Simon Pearce has great ambience, and it was
featured as an affordable, upscale eatery on the television show $40 per day!

http://foodtv.com/food/show_ad/episode/0,1976,FOOD_9947_22108,00.html

It's in Queechee, Vermont, and has an astounding view of a covered bridge and fantastic
waterfall from a mill. We'll take my car, I drive a nice yellow Volkswagen convertible
that would be lovely to take for a nice evening drive. There's a 30% chance of rain on
Thursday, with a high of 67 degrees. And, all of us are free on Thursday evening.

What do you say, Rob?

Very Sincerely Yours,

Monica Morrison

Cc: Anton Hasenkampf, Jenna Pelletier, Brent Reidy
```

100.    Understandably, this continuing correspondence of false accusations and increasing financial demands was of great concern to Mr. Langrick, who was beginning to feel both threatened and taken advantage of.  When he demurred on a firm date for the demanded dinner, Ms. Morrison continued to send him bizarre and disturbing communications:

```
>Date: 09 May 2005 15:28:19 EDT
>From: Monica C. Morrison
>Reply-To: JustOneStationAlongTheWay
>Subject: RE: dinner
>To: Robert J. Langrick, Monica C. Morrison
>Cc: Anton L. Hasenkampf, Jenna C. Pelletier, Brent C. Reidy
>X-Mailer: BlitzMail® version 2.7.1/blitzserv 3.11b11
>MIME-Version: 1.0
>Content-Type: text/plain; charset=iso-8859-1
>Content-Transfer-Encoding: quoted-printable
>Content-Disposition: inline

--- "Robert J. Langrick" wrote:
Guys,


I am seriously busy for the next three weeks as we sprint to the finish line and I got
friends from the UK coming across on Wednesday for the entire weekend. hate to do this but
can we do this at a later date?


Rob
--- end of quote ---
but Roooooooob, the soup tastes "magical." I mean, I know you gave us a little of your
own magic on Saturday night, but when you get us all geared up like that with the magic
and all, we become dependent on this magic for our livelihood. I guess since it's Green
Key we can cut you a break. How about next week?

- from"Travel & Leisure Magazine":
The Simon Pearce Restaurant, with its huge windows and blond wood furniture-is so bright
and airy, you feel you're dining inside one of Pearce's glass bowls. The food is modern
American eclectic, with an occasional Irish touch. It's hard to stop eating the savory
scones and thin slices of Irish brown bread, so delicious with the house-smoked salmon.
The Vermont cheddar soup tastes almost magical when spooned from an exquisite bell-shaped
celadon Pearce cup.
```

**Ms. Morrison Falsely Accuses Mr. Langrick Of Sexual Assault**

101.    As Ms. Morrison and some of her friends that she included on this bizarre email correspondence continued to joke about the incident, mock Mr. Langrick, and gleefully plan an expensive dinner on his dime, Ms. Morrison's roommate, Jenna Pelletier, made it clear that she was not as amused by the situation.

102.    On the same email chain later that Monday evening, Ms. Pelletier expressed annoyance at the "jolly" tone of Ms. Morrison's email correspondence and articulated her aggravation at having been "woken up from a sober night," at having had to witness Mr. Langrick naked in her bedroom, and at his having peed on her floor.

103.    Ms. Pelletier also made it clear that she was particularly annoyed by the incident because she had "nothing to do with [Mr. Langrick] being naked or being [in the bedroom]."

104.     When Ms. Morrison realized that Ms. Pelletier was angry about the incident and about Ms. Morrison and her friends making so light of it, Ms. Morrison became concerned that Ms. Pelletier and the other Panarchy residents would blame her.  After all, as Ms. Pelletier had said in her email, Ms. Morrison was the one who brought Ms. Langrick back to the house to hook up with him, and she was the one responsible for him being naked in the bedroom.

105.     Ms. Morrison, who on information and belief has a long history of emotional difficulties, depression, and insecurity, became terrified that her housemates were going to blame her for the incident and think less of her for bringing back a drunken man for a one-night stand that led to a disturbance and displeased the other Panarchy residents.

106.     Ms. Morrison was also aware that she had blatantly committed theft by stealing Mr. Langrick's cash and property, and that she had created a paper trial of emails that could easily be construed as an extortion attempt.

107.     Concerned about her exposure both socially and legally, Ms. Morrison decided that she could deflect the scorn of her housemates, and earn their sympathy instead, by portraying herself as a victim of sexual assault.

108.     After receiving Ms. Pelletier's angry email on the evening of Monday, May 9, Ms. Morrison's tone changed.  She now told her friends that she was starting to feel "uncomfortable" and was planning to meet with a university Sexual Abuse Peer Advisor ("SAPA").

109.     On Wednesday, May 11, 2005, Ms. Morrison met with a SAPA at "Dick's House" on the Dartmouth campus, and the administrator there called the Hanover Police Department.  A Hanover PD patrol officer interviewed Ms. Morrison along with a sergeant from Dartmouth Safety and Security.

110.     During this interview, Ms. Morrison told the officers that she met Mr. Langrick at Bones Gate, but she denied inviting Mr. Langrick back to the Panarchy house to hook up with him.

Instead, she claimed that Mr. Langrick was going to Panarchy to meet up with Panarchy resident Frank Fucile, and Ms. Morrison said that she simply agreed to walk with Mr. Langrick back to Panarchy.

111.    Ms. Morrison claimed that when she arrived at Panarchy and went to her bedroom, she was surprised to see that Mr. Langrick had followed her there.   Because Ms. Morrison's roommate, Jenna Pelletier was occupying the room with Ms. Pelletier's boyfriend, Ms. Morrison claimed that she and Mr. Langrick went out the window and out onto the roof to "talk."

112.    Ms. Morrison claimed that as she and Mr. Langrick stood talking on the roof just outside the window, he began to kiss her, and then, unprompted, asked her to "piss in his mouth." She claimed that she was offended and asked him to leave, but when he supposedly protested that it was late, and he was too intoxicated to find his way home, she claimed that she directed him to sleep on the couch in the bedroom.

113.    Ms. Morrison then claimed that she woke up sometime later and was shocked to find Mr. Langrick in bed with her, naked, and attempting to have sex with her. Ms. Morrison also claimed that she was naked from the waist down even though she had gone to bed clothed.

114.    Ms. Morrison stated that she then left the bedroom to sleep in a friend's bed and was later awakened by Ms. Pelletier who told her that Mr. Langrick had urinated in the bedroom and was not responding to attempts to wake him up.   Ms. Pelletier demanded that Ms. Morrison come address the situation.

115.    Ms. Morrison denied having engaged in sexual intercourse with Mr. Langrick.

116.    On Thursday, May 12, 2005, Ms. Morrison was interviewed by Hanover Police Department lead detective Captain Francis T. Moran.

117.    Ms. Morrison relayed a similar story to Captain Moran.   She claimed that she did not bring Mr. Langrick back to the house, but that instead she agreed to walk with him to Panarchy

because he supposedly had plans to meet resident Frank Fucile there.

118.    She told Captain Moran that she did not bring Mr. Langrick to her bedroom but instead simply became "aware" that he was there when she walked in — implying that he had essentially followed her to her room.  She claimed that she then brought him outside just to "talk."

119.    Whereas Ms. Morrison had told the officers the day before that her and Mr. Langrick talked and kissed on the roof directly outside the bedroom window, she now changed her story and admitted to Captain Moran that she had taken Mr. Langrick to the cupola.  But she continued to insist that they had done no more than kiss in the cupola, and that she had been fully clothed.

120.    She also maintained the story of Mr. Langrick saying out of the blue that he wanted her to "piss on [his] face," and claimed that it was after this that she attempted to kick him out, but ultimately relented and ordered him to sleep on the couch.

121.    She also continued to assert that she did not engage in consensual intercourse with Mr. Langrick and claimed to have been shocked to allegedly wake up and find him naked in her bed.

### A Thorough Police Investigation Debunks Ms. Morrison's Allegations And Reveals Numerous Falsehoods And Inconsistencies In Her Statements to Police

122.    Over the following weeks, Captain Moran and other officers conducted an exhaustive investigation that included the issuance of warrants for electronic communications, physical searches, review of email correspondence, and detailed, audio-recorded and transcribed interviews with all possible witnesses.  These included:

- Multiple interviews of Ms. Morrison;

- An interview of Mr. Langrick;

- An interview of Ms. Morrison's roommate Jenna Pelletier;

- Two interviews of Ms. Morrison's friend and Panarchy resident Brent Reidy;

- An interview of Mr. Langrick's friend Nestor Weigand;

- An interview of Ms. Morrison's acquaintance and Panarchy resident Selena Hadzibabic;

- An interview of Panarchy resident Alice Johnstone;

- An interview of Panarchy resident and Ms. Morrison's friend Frank Fucile;

- An interview of witness Anton Hasenkampf;

- An interview of Panarchy resident and witness Sarita Hudgins.

123. These interviews and reviews of electronic records revealed numerous inconsistencies and outright falsehoods in Ms. Morrison's account, as well as other actions by Ms. Morrison that underscored her lack of credibility and honesty.

124. First, Ms. Morrison — in an apparent effort to deny that she invited Mr. Langrick back to Panarchy to "hook up" — had claimed that Mr. Langrick only accompanied her to Panarchy because he was hoping to meet up with Panarchy resident Frank Fucile.

125. But this made no sense because, as Mr. Langrick told the detectives, Mr. Langrick did not know Mr. Fucile, would not have known that Mr. Fucile lived at Panarchy, and would not have had reason to go there to meet Mr. Fucile at 6:00 a.m.

126. On May 19, 2005, Captain Moran interviewed Mr. Fucile, who confirmed to Captain Moran that he was not friends with Mr. Langrick and did not have any plans to meet up with Mr. Langrick at Panarchy, as Ms. Morrison claimed.  Mr. Fucile said he went home alone that evening and went right to bed.

127. But Mr. Fucile did tell Captain Moran that he had actually been at the Bones Gate party for a time and had witnessed Ms. Morrison "flirting" with Mr. Langrick there.

128. Second, Ms. Morrison claimed to have been surprised to find that Mr. Langrick was still with her when she got to her bedroom.  Ms. Morrison denied that she had brought Mr. Langrick to her room to engage in a sexual encounter, and instead attempted to insinuate that Mr. Langrick

was following her against her wishes.

129.    But on May 20, Captain Moran interviewed Anton Hasenkampf, who was the boyfriend of Ms. Morrison's roommate Jenna Pelletier.  Mr. Hasenkampf was in bed with Ms. Pelletier in the room she shared with Ms. Morrison when Ms. Morrison arrived home with Mr. Langrick in tow on the morning of May 8, 2005.

130.    Mr. Hasenkampf described how Ms. Morrison entered the bedroom with Mr. Langrick, and how it was plain from the context of the situation that they were intending to "hook up."  He explained that Ms. Pelletier would often spend the night at his residence, and that Ms. Morrison appeared surprised to find that the bedroom was occupied when she arrived with Mr. Langrick.

131.    Mr. Hasenkampf said that upon discovering that the room was already occupied, Ms. Morrison said to Mr. Langrick, "well, what do you want to do?"  She then led Mr. Langrick out to the cupola, where they remained for an extended period of time.

132.    Ms. Pelletier similarly described how Ms. Morrison entered the room early in the morning with Mr. Langrick, whom she did not recognize and whom she noted was not "the guy that [Ms. Morrison] had been hooking up with."

133.    Ms. Pelletier heard Ms. Morrison say Ms. Pelletier's name — obviously checking to see if the bedroom was occupied — and when Ms. Pelletier responded, Ms. Pelletier heard Ms. Morrison whisper to Mr. Langrick that her roommate was there.  Ms. Pelletier said Ms. Morrison then asked Mr. Langrick what he wanted to do, and shortly after they went to the cupola to "hook up."

134.    Next, Ms. Morrison had claimed to Captain Moran that she and Mr. Langrick only kissed briefly in the cupola before going back inside.  Ms. Morrison had claimed that she remained clothed the entire time.

135.   But on May 19, 2005, Captain Moran interviewed Panarchy resident Alice Johnstone, who lived in the unit directly beneath the cupola.  Ms. Johnstone told Captain Moran that because of the location of her bedroom, she was able to clearly hear when residents engaged in sexual activity in the cupola.

136.   On the morning of May 8, 2005, Ms. Johnstone heard a woman she recognized as Ms. Morrison and a male voice she did not recognize as they made their way across the roof and into the cupola at around 6:00 a.m.  For "close to an hour," she heard what were clearly "sex noises," and specifically, Ms. Morrison's voice repeatedly "groaning," "moaning," and making "rhythmic" vocalizations consistent with a woman experiencing an "orgasm."

137.   Because she was present, awake, sober, and overheard the entire encounter, Ms. Johnstone knew that Ms. Morrison had engaged in sexual intercourse with Mr. Langrick in the cupola and that it was clearly consensual.  She expressed to Captain Moran that she was surprised that afternoon to hear Ms. Morrison, in front of the other residents, "pretending" that she did not have intercourse with Mr. Langrick.

138.   Additionally, Mr. Langrick's friend, Nestor Weigand, confirmed to the police that Mr. Langrick had told him about the consensual sexual encounter on the day that it occurred.  Mr. Langrick had specifically mentioned to Mr. Weigand that the sex had occurred in the cupola, and he had mentioned Ms. Morrison's heavy volume, ejaculatory orgasm.

139.   In stark contrast to Ms. Morrison's shifting versions of events, the description of a consensual sexual encounter that Mr. Langrick relayed to Mr. Weigand the same day it occurred was completely consistent with the version of events that Mr. Langrick provided to Captain Moran nine days later, and this account was further corroborated by percipient witness Alice Johnstone.

140.   Ms. Morrison had also falsely claimed that, while they were standing on the roof together, merely kissing and entirely clothed, Mr. Langrick made a crude, non-sequitur comment

to the effect that he wanted Ms. Morrison to "piss" on his face.

141.    In reality, Mr. Langrick had made a similar type of comment, but it was not an unprompted, crude remark but rather a surprised utterance he made at the moment when Ms. Morrison's ejaculate sprayed his face and torso as the two were naked and engaged in mutual, consensual foreplay in the cupola.

142.    Next, Ms. Morrison had claimed that after they had merely kissed briefly outside, she had ordered Mr. Langrick to sleep on the couch because he supposedly protested that he was unable to make it home.  Ms. Morrison then claimed that she awoke some time later, shocked to discover that he had gotten into her bed and was naked.

143.    But again, eyewitnesses and Ms. Morrison's own friends disputed this account to police.

144.    Both Mr. Hasenkampf and Ms. Pelletier described being awakened when Ms. Morrison and Mr. Langrick returned from the cupola and crawled back through the bedroom window.  Neither heard Ms. Morrison ask Mr. Langrick to leave or direct him to sleep on the couch.  Instead, they saw Ms. Morrison and Mr. Langrick return to the room jointly after having sex in the cupola and then get right into Ms. Morrison's bed together.

145.    Both witnesses also disputed Ms. Morrison's claim that Mr. Langrick had snuck into Ms. Morrison's bed uninvited and attempted to rape her while she was passed out.  Instead, they said that both Mr. Langrick and Ms. Morrison got into bed together and were continuing to shift about and make noise. This prompted Ms. Pelletier, who was irritated at having been disturbed and kept awake by her roommate, to yell at Ms. Morrison to knock it off.

146.    After being yelled at by her roommate, Ms. Morrison left to go sleep in her next-door neighbor's bed where she frequently spent the night.

147.    During an interview discussing the events she witnessed during the short period of

time that Mr. Langrick and Ms. Morrison were in the bedroom together, Captain Moran asked Ms. Pelletier point blank whether Mr. Langrick had sexually assaulted Ms. Morrison.  Ms. Pelletier responded, "No."

148.    Sarita Hudgins, another Panarchy resident, said that Ms. Morrison had told her that Mr. Langrick had wanted to engage in further sexual relations after they returned from having sex in the cupola, but that Ms. Morrison at that point just wanted to sleep and moved beds for this reason.

149.    Ms. Morrison told a similar story to Panarchy resident Selena Hadzibabic.  Ms. Morrison said that Mr. Langrick was pestering her to have sex with him again in the morning and she just wanted to sleep, so she left Mr. Langrick in her bed and went to sleep in her neighbor's king-sized bed.

150.    That neighbor, Brent Reidy, also contradicted Ms. Morrison's claim to police that she had been shocked to wake up naked in bed with Mr. Langrick penetrating her — and the implication that Mr. Langrick had somehow removed the sleeping Ms. Morrison's jeans and underwear.  Instead, Mr. Reidy was told by Ms. Morrison that after they got into bed, Mr. Langrick had suggestively "humped her leg," merely trying to initiate further consensual sexual contact.  Ms. Morrison did not claim that Mr. Langrick sexually penetrated her in bed, and in fact she told Mr. Reidy that she was clothed at the time.

151.    Ms. Morrison's friends and roommates who witnessed these events and interacted with her in the following days also expressed to police that they were surprised and deeply uncomfortable when Ms. Morrison suddenly began talking of pressing charges against Mr. Langrick for sexual assault.

152.    Ms. Johnstone — the resident who lived under the cupola and heard Ms. Morrison engaged in consensual intercourse with Mr. Langrick — told police that she was "surprised" to

hear Ms. Morrison telling her housemates the next day that she did not have sex with Mr. Langrick.

153.   Ms. Johnstone also witnessed Ms. Morrison bragging about stealing Mr. Langrick's things and about forcing him to take a large group out to an expensive meal.

154.   Ms. Johnstone told Captain Moran that it was "upsetting" when Ms. Morrison started making claims of rape, and Ms. Johnstone was concerned that Ms. Morrison's intentions were not "sincere."

155.   In fact, Ms. Johnstone told Captain Moran that it became "a big topic of conversation around the [Panarchy] house" because it "[didn't] seem right" or "fair" that Ms. Morrison was suddenly claiming that Mr. Langrick raped her.  Ms. Johnstone's impression, from witnessing the sexual encounter and Ms. Morrison's behavior afterwards, was that Ms. Morrison had engaged in consensual sex with Mr. Langrick, then became angry that he had embarrassed her in front of her housemates and twisted the incident into one of sexual assault to punish Mr. Langrick.

156.   In fact, Ms. Johnstone was so concerned about Ms. Morrison's behavior that she and Selena Hadzibabic, another Panarchy resident, took the extraordinary step of going behind their friend's back to warn Mr. Langrick directly, advising him by email on Friday, May 13 that he needed to "watch out" for his "new friend Monica Morrison."

157.   Ms. Hadzibabic, during an interview on May 19, 2005, told Captain Moran that Ms. Morrison initially joked about the urination incident with the other residents, but that things took a dark turn as Ms. Morrison and others began sending threatening messages to Mr. Langrick and demanding that he take a group of them to Simon Pearce, an expensive restaurant in Vermont known as a place where parents would take Dartmouth students for celebratory graduation dinners.

158.   Based on Ms. Morrison's actions in the following days, it was Ms. Hadzibabic's perception that Ms. Morrison was angry that a boy she had brought back to the house had acted in

a way that caused her embarrassment in front of the other residents, and Ms. Morrison began talking about filing sexual assault charges against Mr. Langrick because, as Ms. Morrison put it, "he shouldn't get away [with] coming in here and like peeing on my floor and disturbing my roommate and disturbing me."

159.    Ms. Hadzibabic further stated that she was "very confused" when Ms. Morrison suddenly began to speak of pressing charges, particularly given that Ms. Morrison had spent days gloating about stealing a $400 camera and Mr. Langrick's cash, in addition to receiving compensation from Mr. Langrick for a sweater that she was able to simply wash.  Ms. Hadzibabic said that it simply didn't "sound right" and was "uncalled for," and she described an air of consternation among Ms. Morrison's friends and fellow Panarchy residents who collectively felt that Ms. Morrison was twisting and misrepresenting the incident — but were afraid to say so out loud.

160.    Ms. Hadzibabic stated that she and Ms. Johnstone reached out to Mr. Langrick directly because of their concern that he was going to be "treated unfairly" by Ms. Morrison.

161.    The investigation also exposed Ms. Morrison's blatant theft of Mr. Langrick's property, as well as additional lies she told to the police regarding her disposition of those items.

162.    During her Thursday, May 12, 2005 interview, Ms. Morrison acknowledged that when Mr. Langrick came to retrieve his property, she intentionally did not return to him his expensive digital camera.  She purposely neglected to mention to police that she had also found and stolen cash that Mr. Langrick left behind.

163.    But Ms. Morrison's friends told police how Ms. Morrison had retrieved and kept Mr. Langrick's cash, giving half to Ms. Pelletier and half to Mr. Fucile to settle a debt that she owed.

164.    Ms. Morrison's friends told police about how Ms. Morrison bragged about stealing

Mr. Langrick's mislaid property and stated that she considered it justified as pay-back for him having urinated in the bedroom and embarrassed her.

165.    Ms. Morrison was also questioned by police regarding a silver film cannister-type tube that she found in the cupola.  Mr. Langrick had candidly admitted to police that the container was his and that it held a small amount of a recreational drug.

166.    Ms. Morrison claimed to police that when she found the tube it was empty.

167.    But numerous witnesses told police that they witnessed Ms. Morrison remove and retain the drugs from the vial.  Confronted with the statements of multiple witnesses, Ms. Morrison was later forced to admit that her earlier statement to police had been a lie, and that she had not only removed the drugs but illegally distributed them to another person.

**The Hanover Police Department Clears Mr. Langrick Of Sexual Assault**

168.    On May 25, 2005, Captain Moran conducted a follow-up interview with Ms. Morrison in which he explained to Ms. Morrison that his interviews of Ms. Morrison's friends and roommates had discredited her account.

169.    Captain Moran noted that, contrary to Ms. Morrison's claims that Mr. Langrick had surreptitiously followed her back to her room and that she had been attempting to get rid of him, Ms. Morrison's roommates had seen and heard conduct clearly demonstrating that Ms. Morrison willingly invited Mr. Langrick back to her bedroom at Panarchy for the purpose of having a sexual encounter.

170.    Captain Moran also noted that Ms. Morrison's claim that she only kissed Mr. Langrick in the cupola was not credible.  Mr. Langrick was able to describe the sexual encounter in detail, including identifying specific, unique features of Ms. Morrison's anatomy as well as describing her distinctive orgasm.  Mr. Langrick's account was also corroborated by witness Alice Johnstone, who overheard the extended 45 to 60-minute sexual encounter in which Ms. Morrison

was clearly an active, consenting, and enthusiastic participant.

171.    Captain Moran also noted that Ms. Morrison had not claimed to anyone that Mr. Langrick had penetrated or molested her after they got into bed until days later.  In fact, the claims she made days later were inconsistent with what she told her friends on Sunday, May 8 and over the following days.

172.    Captain Moran stated that it was his impression from speaking with Ms. Morrison's own friends in Panarchy that there was a general "suspicion" that Ms. Morrison had "embellished some of these circumstances with the passage of time," and that Ms. Morrison's friends and roommates "don't believe that this is what's been reported" by Ms. Morrison.

173.    In sum, Captain Moran informed Ms. Morrison that her own friends and roommates had contradicted core aspects of her account and that her credibility was therefore highly suspect.

174.    Captain Moran also referenced the threatening emails in which Ms. Morrison and her friends demanded that Mr. Langrick pay to take them all to a fancy restaurant, noting that those emails could easily be interpreted "as being an attempt at extortion."

175.    Next, Captain Moran noted that Ms. Morrison committed the crime of theft when she intentionally took, possessed, and withheld Mr. Langrick's cash and expensive digital camera.

176.    Captain Moran also confronted Ms. Morrison regarding her earlier denials concerning whether or not she removed any drugs from the film cannister she found in the cupola. Ms. Morrison was finally forced to admit that her earlier statements to police had been lies and that in fact she had removed drugs from the vial and had given them to a fellow Panarchy resident who she knew to have a serious drug addiction.

177.    Captain Moran informed her that this act constituted both possession and distribution of narcotics and noted that it was particularly concerning that Ms. Morrison had provided drugs to a person that she believed to have a serious addiction problem.

178.     On May 27, 2005, Captain Moran met with Ms. Morrison and her father at the Hanover Police Department to discuss the findings of the investigation.  Captain Moran advised Ms. Morrison and her father that no sexual assault charges would be pursued against Mr. Langrick.

### Ms. Morrison Threatens To Make Public Allegations Against Mr. Langrick If He Does Not Agree To Pay Her Off

179.     On May 31, 2005 — just days after the Hanover Police Department informed Ms. Morrison that they would not be pursuing any charges related to sexual assault — Ms. Morrison retained a lawyer to send a letter to Mr. Langrick demanding money.

180.     The letter was explicitly threatening and demanded that Mr. Langrick quickly pay Ms. Morrison a "settlement" for her "damages" in order to avoid "publicity."  In other words, Ms. Morrison threatened that if Mr. Langrick did not pay her off, she would go public with false rape claims in order to damage his reputation:

May 31, 2005

Robert J. Langrick
Tuck School of Business
Dartmouth College
Hinman Box 9000
Hanover, NH 03755

     Re:   **Monica Morrison**

Dear Mr. Langrick:

     Monica Morrison has retained this firm to represent her in connection with an action to obtain damages from you as a result of the assault you perpetrated on her. Before I filed suit, I wanted to provide you with the opportunity to discuss potential settlement in this case, thereby avoiding the expense and publicity which would be a probable consequence of a lawsuit in this matter. If you wish to settle the matter, I would strongly suggest that you act with alacrity.

                        Sincerely yours,

                        Charlie Buttrey

CTB/mnm

cc:   Monica Morrison

181.    Knowing full well that he had not "perpetrated" any "assault" on Ms. Morrison, and that he had just been cleared of these false allegations by a comprehensive police investigation, Mr. Langrick of course did not agree to pay Ms. Morrison anything.

182.    Instead, Mr. Langrick chose not to respond to the letter at all, and he heard nothing more from Ms. Morrison or this attorney.

**Ms. Morrison Reemerges Years Later To Again Attempt To Obtain Money From Mr. Langrick, But He Again Refuses To Engage With Her**

183.    After graduating from Dartmouth with a degree in "creative writing," Ms. Morrison intended to pursue a career as a writer in New York City.

184.    However, she struggled to find paid work as a writer and bounced between a

number of short-lived corporate jobs.  Her LinkedIn profile lists no fewer than nine different employment positions between March 2008 and June 2017, and it appears there were multiple extended periods of time during which she was not employed.

185.     As Ms. Morrison herself has acknowledged, her writing career was unsuccessful, and she found herself in "financial desperation."

186.     On June 4, 2016, Ms. Morrison contacted Mr. Langrick out of the blue.  She called his office line at Bloomberg on a Saturday night at 6:31 p.m. and left a strange voicemail in which she claimed to be making a "press inquiry" regarding his employer:

> *Hello Mr. Langrick, my name in Monica.  I am Monica Morrison.  I am calling you in regards to a press inquiry about the Bloomberg Institute and about your time at Dartmouth College and the Tuck School.  If you could kindly give me a call, my number is [], again this is [].  I'm a writer I've worked with xoJane and Business Insider.  And we knew each other briefly because of a sexual assault incident.  I hope you'll give me a call so I can discuss the piece that I'm going to run.  Again, my number is [].  Thank you.*

187.     At the time, Ms. Morrison was working as a temp for a corporate logistics company and was not employed by any professional media company or journalistic entity.  As far as Mr. Langrick knows, Ms. Morrison has never actually been employed as a journalist by any organization.

188.     Upon hearing this voicemail, it was Mr. Langrick's impression that Ms. Morrison was once again renewing her threat to publicly accuse him of sexual assault unless he made an extortionary payment to her.

189.     Just as he had with Ms. Morrison's previous attempt to demand money from him, Mr. Langrick simply ignored the call and did not respond to Ms. Morrison.

190.     Notably, although she had claimed she was seeking to speak to Mr. Langrick regarding a "press inquiry" for a "piece that [she was] going to run," Mr. Langrick is not aware of any "piece" that Ms. Morrison actually published relating to him in 2016.

191.     A year-and-a-half after Mr. Langrick declined to respond to this strange message, Ms. Morrison emerged again.

192.     On January 2, 2018, Ms. Morrison placed a call to Mr. Langrick's employer, Bloomberg L.P.  She spoke to Chris Kane, a representative for Bloomberg global customer support, then was routed to Leslie Paul in Bloomberg Human Resources.

193.     Ms. Morrison stated that she was calling about Bloomberg executive Robert Langrick and stated that Mr. Langrick "attempted to sexually assault me in college."  Ms. Morrison further stated that, "He followed me home, I was passed out and when I woke up he was trying to rape me."  She further claimed that she had reported Mr. Langrick but that "the police did nothing."

194.     Ms. Morrison falsely claimed to Bloomberg that this had occurred in 2006.

195.     This call and Ms. Morrison's words were memorialized both in contemporaneous notes and in a contemporaneous email record of the conversation sent to Mr. Langrick by Leslie Paul.

196.     Ms. Morrison left her phone number and an email address.

197.     This action caused Mr. Langrick great emotional distress, damaged his professional reputation among his colleagues, and caused him great embarrassment and humiliation at his place of employment.

198.     Two days later, on January 4, 2018, Ms. Morrison created an account on the video-sharing site VIMEO.  She created a group on the site that she titled, "rapist."  The website identifies her as the founding member of this group.  Other postings by this same user confirm that it is the Plaintiff, Monica Morrison.



199.    The sole media posted on the account was a video titled "Bloomberg for Education – June 26th, New York – Rob Langrick."  The video is a 21-minute clip of Mr. Langrick giving a presentation in New York City in 2015.

200.    The Vimeo group that Ms. Morrison created, calling Mr. Langrick a "rapist," is still online and publicly available at the URL https://vimeo.com/groups/510471.  A printout of this webpage is attached hereto as Exhibit A.

201.    As of December 13, 2018, this video has been viewed and played 489 times.  Each of the hundreds of people who visited this site and viewed the video understood Ms. Morrison, in context, to be calling Mr. Langrick a rapist — causing great harm to Mr. Langrick's reputation:



202.    After Ms. Morrison placed the phone call to his employer, Mr. Langrick retained counsel to deal with this menacing, threatening and bizarre situation.

203.    Mr. Langrick's counsel sent a cease and desist demand to Ms. Morrison by email on February 12, 2018, advising her that if she continued to contact and defame Mr. Langrick, he would be forced to take legal action against her.

204.    Ms. Morrison's hope was that the phone call to Mr. Langrick's employer and her other hostile actions would frighten Mr. Langrick into paying her "hush money" in order to keep her from making false allegations that would severely harm his reputation.

205.    Indeed, as Ms. Morrison herself put it in a later online posting, this would not be her "first time at the rodeo" in terms of using threats to obtain a monetary settlement.   In a September 22, 2018 post on her blog, Ms. Morrison spoke of learning that "silence" can be "financially valuable."   She also referenced having previously, with some other individual,

"entered into an agreement of non-disclosure for silence in the exchange of compensation."[6]

206.    However, because he knew he had done nothing wrong, Mr. Langrick refused to be cowed by Ms. Morrison's threats.  Instead, his counsel sent Ms. Morrison a proposal that offered her no money whatsoever.  Mr. Langrick offered only that he would not sue Ms. Morrison for the false statements she had already made if she agreed to refrain from making such false statements concerning Mr. Langrick in the future.

207.    Ms. Morrison, who expected to be paid off by Mr. Langrick, was not happy.  In an email to Mr. Langrick's counsel, she complained that the proposed agreement was not a "good faith [effort] to seek a resolution," and insisted that if Mr. Langrick wanted an "amicable resolution where he is actually positioned in a favorable light," then he would need to pursue a "different resolution" that would "acknowledge the damages that [Ms. Morrison] ha[d] experienced."

208.    In other words, Ms. Morrison wanted money.  But Mr. Langrick refused to pay her a dime.

209.    In a further attempt to extort Mr. Langrick and make him fear her false allegations, Ms. Morrison decided to up the ante.

210.    On July 19, 2018, Ms. Morrison posted a "Personal Review" of Mr. Langrick on the website MyLife.com, which is a site that is dedicated to providing public "reputation scores" of individuals.

211.    In the review, which she posted anonymously, Ms. Morrison falsely claimed that Mr. Langrick "committed a sexual assault with a woman who was 19 years old when he was a business school grad at Tuck and he was in his late 20's."  She further falsely claimed that he "penetrat[ed] and attempt[ed] anal sex with an unconscious woman," and called him a "rapist."

---

[6] Monica Morrison, *I Am Not Sorry,* MEDIUM (Sep. 22, 2018),
https://medium.com/@monicamorrison/i-am-not-sorry-da048f09cece.

She also falsely characterized his offer to pay for the sweater she claimed he ruined as an attempt to "pay [her] off" for this nonexistent sexual assault:



**Anonymous**
Personal Review posted on: Jul 19, 2018

Rob committed sexual assault with a woman who was 19 years old when he was a business school grad at Tuck and he was in his late 20's. He urinated in the room of the victim and also left drugs in her room, which he attempted to tell police did not belong to him. Afterward, he attempted to pay off the victim with $200 in cash and an apology note. He was arrested for criminal activity related to the night in question. He also hired a lawyer in attempts to silence and intimidate his victim, using the threat of a slander lawsuit. He also had his attorney lie on his behalf. His own attorney falsely stated that the police determined that no wrongdoing occurred on the night in question, even though Rob was arrested for drug possession. If you believe that penetrating and attempting anal sex with an unconscious woman is rape, then you would likely call him a rapist. On top of that, he has attempted to avoid accepting responsibility for every single bad decision he has made in relation to this circumstance-- going as far as literally blaming the victim for his own criminal activity. It seems that to him, speaking about his criminal activity is more of a violation that the criminal acts themselves. The irony for all of this is not at all lost on his victim and his victim's attorney.

212.    These false statements were publicly available and accessible on the internet, and the false statements also contributed to Mr. Langrick having a low "reputation score" on the website.  A printout of the review Ms. Morrison posted on MyLife.com is attached hereto as Exhibit B.

213.    Additionally, these statements turned up on page two of a google search for anyone who searched Mr. Langrick's name, and the search preview result even contained the statement that "Rob committed sexual assault with a woman who was 19 years old…"



214.    But again Ms. Morrison's actions did not yield the desired result, and Mr. Langrick continued to refuse to pay off Ms. Morrison.

**Ms. Morrison Becomes "Ms. Universe" And Lays The Groundwork For Profiting Off Of Her False Rape Claims**

215.    With her hopes for a monetary pay out from Mr. Langrick dashed again, Ms. Morrison resolved to put her "Plan B" into action.  She decided that if she could not get a quick payday from Mr. Langrick in exchange for keeping quiet, then maybe she could instead find a way to make money for speaking out.

216.    Ms. Morrison, a long-struggling writer, had watched the unfolding #metoo movement and seen many women applauded for writing about their experiences with sexual assault and gender discrimination.  Ms. Morrison decided that by positioning herself as a leader in this movement, she could potentially make a name for herself as a writer and simultaneously improve her precarious financial situation.

217.    What followed was a carefully planned and highly orchestrated effort by Ms. Morrison to garner maximum publicity and exposure for herself.

218.    In August 2018, Ms. Morrison created a blog on the website www.medium.com.

Her first blog post was titled "Someone Really Doesn't Want You to Read This."[7]  In it, Ms. Morrison began to lay the groundwork for her plan and to portray herself as someone "triggered" by the #metoo movement and coming to grips with a past trauma:[8]

> In the wake of the #MeToo wave, to say that I found myself triggered was an understatement. I was hospitalized for six days, called myself "Whore of Babylon, Queen of the Universe," rented office space in the World Trade Center, and joined a mystery school coven where people practiced Goddess worship and believed in "Sacred Wealth" and talked about alchemizing their trauma. I was telling anyone who would listen that I had a message for the world about how to reclaim our sovereignty from those who stole it and usher in a new era. The only problem was that I had no idea what I was doing. I had no idea how to really express myself in a manner where people would actually listen. And then, there was Valentine's Day.

219.    These strange references to "Goddess worship" and "Sacred Wealth" refer to the teachings of an obscure self-help guru named Prema Lee Gurreri, a self-described "Vedic Astrologer" and "Business Consultant" who sells books and online seminars that purport to teach followers how to achieve their "birthright of true wealth" and "experience a new level of prosperity" by divining their ordained "purpose" in life.

220.    On information and belief, Ms. Morrison became obsessed with Ms. Gurreri's writings and convinced herself that it was her cosmic destiny to attain great wealth and acclaim by becoming a leader of the #metoo movement.

---

[7] Monica Morrison, *Someone Really Doesn't Want You to Read This*, Medium (Aug. 3, 2018), https://medium.com/@monicamorrison/someone-really-doesnt-want-you-to-read-this-42e29844f165.

[8] Monica Morrison, *Someone Really Doesn't Want You to Read This*, MEDIUM (Aug. 3, 2018), https://medium.com/@monicamorrison/someone-really-doesnt-want-you-to-read-this-42e29844f165

221.     In the same post, Ms. Morrison referenced the cease and desist letter she received from Mr. Langrick's attorney and expressed disappointment that "there was no offer of money in exchange for my silence."

222.     She noted that other #metoo accusers have received such payments or been paid small sums to publish their accounts.  But she ultimately concluded, "I knew my story was worth more than that."

223.     In essence, the blog post lays out Ms. Morrison's plan to amass "Sacred Wealth" and "sweet rape money" by building an online brand as a writer and voice of the #metoo movement.

224.     At the same time, Ms. Morrison's own writings and actions betray her cunning and calculating nature and strongly imply that she knows her claims are provably false.  She has admitted to coordinating with an attorney on her #metoo postings, obviously out of concern that she could be liable to Mr. Langrick for making false and defamatory statements if she publicly accuses him of raping her.

225.     To this end, over and over again, she took pains to attempt to phrase her allegations of rape as "my opinion" or "my truth."  These strange turns of phrase are transparent attempts to try to escape liability for making defamatory statements by setting up a future defense that the statements are opinion rather than fact.

226.     For example, Ms. Morrison began one blog post about her supposed sexual assault with a ***disclaimer*** that her accusations should not actually be taken as "statements of fact":

227.     At various times, Ms. Morrison has also referred to Mr. Langrick — but not by name — as "someone I call a rapist" and said of her supposed assault, "I call it rape."

228.     In all of these blog postings, Ms. Morrison avoided ever using Mr. Langrick's name.  This is yet another transparent effort to avoid liability for making false claims under the apparent belief that she cannot be held liable for making false accusations if she does not actually use Mr. Langrick's name in her posts.

229.     As noted, Ms. Morrison's writings also reveal the financial motivation behind her actions.  Around the same time as she began her Medium blog, Ms. Morrison also started her website where she calls herself "Ms. Universe," and she also launched an associated Facebook page for this new personal brand.

230.     She even wrote about a forthcoming "economic justice project" related to her "advocacy" that she calls "Rape on the Blockchain," and she invited "venture capitalists" to contact her about providing funding for this business:[9]

---

[9] Monica Morrison, *Rape On The Blockchain*, MS.UNIVERSE (Sep. 23, 2018),
http://box2076.temp.domains/~msunive1/rape-on-the-blockchain/.

> I am thrilled to tease my newest transmedia and collective economic justice project, Rape on the Blockchain. I will be unveiling much, much more, beginning in 2019. To learn more please be sure to sign up for my Ms. Universe newsletter. There is still far too much going on behind the scenes to reveal much more than this.
>
> If you are a venture capitalist or have a press inquiry regarding Rape on the Blockchain, you can contact cinemomoproductions@gmail.com. Thank you for your interest!

231.    Ms. Morrison, who regularly posts about her belief in spells and witchcraft, tagged this post as relating to the subject of "Alchemy." Alchemy, of course, refers to a mystical medieval process for generating gold.

**Ms. Morrison Files A Meritless Lawsuit To Attract Attention To Her New Brand**

232.    The final step in Ms. Morrison's plan to amass "Sacred Wealth" off of her false rape claims required her to make a public PR "splash" that would attract attention to her new business and personal brand as a #metoo advocate.

233.    As noted, Ms. Morrison's blog posts avoided using the name of the man she "calls a rapist" and who supposedly committed what she "call[s] rape," because Ms. Morrison has been advised that she could face legal liability for falsely accusing Mr. Langrick of rape.

234.    But Ms. Morrison was also advised that under New York law, litigants in court cases are typically immune from defamation liability for statements made in court filings. Moreover, media entities often enjoy a "fair report privilege" for reporting on the contents of court filings — regardless of whether the claims made therein are actually true or not.

235.    Thus, Ms. Morrison realized that she could use the courts to further publicize her false claims regarding Mr. Langrick and then expect that credulous media entities would report on her lawsuit. She expected that this would help garner attention to her nascent efforts to position herself as a thought leader of the #metoo movement.

236.   To put this plan into action, Ms. Morrison and her counsel crafted a complaint for "declaratory judgment" that asserts facially meritless claims that have no chance of actually being successful.

237.   For example, Ms. Morrison seeks a declaration that anything she might say in the future is not subject to liability for defamation.  This is a legally absurd request that seeks an impermissible advisory opinion and is wholly non-justiciable as no court could possibly evaluate whether unknown and undefined things Ms. Morrison may or may not say at some future date are false or defamatory.

238.   Similarly, Ms. Morrison seeks a declaration that a first draft of a proposed agreement that *she never signed* is "unenforceable."  Again, this is a transparent, unripe request for an advisory opinion that no court could possibly grant.

239.   But Ms. Morrison knows this.  The intent of her complaint was never to actually obtain any legal relief, but rather to allow Ms. Morrison to freely defame Mr. Langrick and air her false accusations in any arena in which she believes she is immune from suit for making false statements.

240.   Ms. Morrison's plan to achieve maximum publicity for herself was successful. Shortly after she filed her complaint, the widely-read United Kingdom publication "Daily Mail," as well as other media outlets, ran breathless articles repeating at length and in great detail the false allegations in Ms. Morrison's complaint.  The Daily Mail article is still publicly available online at the URL https://www.dailymail.co.uk/news/article-6360665/Ex-Bloomberg-executive-accused-sexually-assaulting-college-student-booze-fueled-rampage.html.

### Ms. Morrison's False Statements Concerning Mr. Langrick Were Made With Actual Malice And Common Law Malice

241.   While bold and audacious, Ms. Morrison's scheme to profit from by defaming Mr. Langrick, and to thereby amass "Sacred Wealth," suffers from one fatal flaw — which is that her

claims of sexual assault are ***provably and demonstrably false***.

242.     Moreover, before she hired lawyers who advised her to label her false rape accusations on her blog as her "opinion" and to artfully refer to Mr. Langrick not by name or even as a rapist, but as "someone I call a rapist," Ms. Morrison had already published numerous defamatory statements concerning Mr. Langrick.  She was not so careful when she made those statements.

243.     As noted, Ms. Morrison contacted Mr. Langrick's employer on January 2, 2018 and explicitly claimed that he followed her home and attempted to sexually assault her when she was passed out in bed.

244.     She also directly called Mr. Langrick a "rapist" on the website Vimeo on January 4, 2018.

245.     And finally, she wrote a post on the website MyLife.com on July 19, 2018 in which she claimed that Mr. Langrick sexually assaulted her, asserted that he is a rapist, and stated that he penetrated her while she was unconscious.

246.     As set forth herein, each of the statements that are the subject of these counterclaims are false.

247.     These statements accuse Mr. Langrick of serious crimes and therefore are defamatory per se.

248.     These statements were made negligently, with gross irresponsibility, and with actual malice.

249.     As described herein, Ms. Morrison knew that her allegations concerning Mr. Langrick were false when she made them.

250.     Ms. Morrison knew that Mr. Langrick did not sexually assault her or rape her, nor did he attempt to sexually assault or rape her.  Ms. Morrison, of course, knew the truth because

she was present and because she fabricated the allegations.

251.    Ms. Morrison likewise knew that she had sexual intercourse with Mr. Langrick that was very much consensual, and that she was a willing and enthusiastic participant in sexual activity with Mr. Langrick.

252.    Ms. Morrison also knew that a police investigation had cleared Mr. Langrick, and she knew that numerous eyewitnesses — indeed, her own friends who were there that night — had stated unequivocally that Ms. Morrison was not sexually assaulted by Mr. Langrick.

253.    Indeed, as Ms. Morrison herself has acknowledged, those friends described her claims as "bogus," called her a "professional victim," and confirmed that she "faked being raped."

254.    Moreover, Ms. Morrison's actions were motivated by common law malice and evince a high degree of moral turpitude and wanton dishonesty.  Ms. Morrison has made highly damaging accusations of serious criminal activity that she knows to be false out of vindictiveness and a desire to enrich herself.

255.    Accordingly, Mr. Langrick seeks an award of punitive damages.

**FIRST COUNTERCLAIM: SLANDER — JANUARY 2, 2018 BLOOMBERG CALL**

256.    Mr. Langrick repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

257.    Ms. Morrison published false and defamatory statements concerning Mr. Langrick on January 2, 2018 when she placed a telephone call to Bloomberg Human Resources, identified herself, stated that she was calling regarding Bloomberg employee Robert Langrick, and then claimed that Mr. Langrick attempted to rape her when she was in college.  Specifically, Ms. Morrison stated to Leslie Paul that Mr. Langrick "attempted to sexually assault me in college," and further stated that, "He followed me home, I was passed out and when I woke up he was trying to rape me."

258.     These statements are reasonably understood to be statements of fact concerning Mr. Langrick and were reasonably so understood by Ms. Paul.

259.     These statements are false.

260.     These statements are of and concerning Mr. Langrick.  Indeed, Ms. Morrison explicitly stated that she was referring to Bloomberg employee Robert Langrick.

261.     Ms. Morrison had no applicable privilege or legal authorization to publish these false and defamatory statements or, if she did, she abused that privilege.

262.     These statements are defamatory in that they tend to expose Mr. Langrick to hatred, contempt, and aversion and to induce an evil or unsavory opinion in the minds of a substantial number of people in the community.

263.     These statements are defamatory per se because they charge Mr. Langrick with committing attempted rape, a serious crime.

264.     These statements are also defamatory per se because they tend to affect, and did affect, Mr. Langrick in his profession, trade, or business, or by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness, or want of any necessary qualifications in the exercise thereof.  Indeed, Ms. Morrison made these defamatory statements to the human resources department at Mr. Langrick's employer for the express purpose of attempting to get him fired from his job.

265.     Ms. Morrison acted negligently and with gross irresponsibility in publishing these false and defamatory statements.

266.     Ms. Morrison published these statements with actual malice because she had knowledge that these statements were false, or she published these statements with reckless disregard for their truth or falsity.

267. Ms. Morrison published these false and defamatory statements with common law malice toward Mr. Langrick and with the specific intent to cause damage to Mr. Langrick.

268. As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick's professional and personal reputations were impugned and damaged.

269. As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick has been forced to make an expenditure of money to remedy the defamation.

270. As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick has been exposed to public hatred, ridicule, and contempt.

271. In view of the foregoing, Mr. Langrick is entitled to actual, presumed, punitive, and other damages in an amount to be specifically determined at trial.

**SECOND COUNTERCLAIM: LIBEL — JANUARY 4, 2018 VIMEO POST**

272. Mr. Langrick repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

273. Ms. Morrison published a false and defamatory statement concerning Mr. Langrick on January 4, 2018, when she created an account and group on the video hosting website Vimeo that states that Mr. Langrick is a "rapist."

274. This statement was viewed by hundreds of people online, who reasonably understood it to be a statement of fact concerning Mr. Langrick.

275. This statement is false.

276. This statement is of and concerning Mr. Langrick. Indeed, the sole content posted in the Vimeo group is a video featuring Mr. Langrick and identifying him in the title of the video. From this context, it is clear and obvious to readers that the "rapist" Ms. Morrison referred to is Mr. Langrick.

277.    Ms. Morrison had no applicable privilege or legal authorization to publish this false and defamatory statement or, if she did, she abused that privilege.

278.    This statement is defamatory and libelous per se in that it tends to expose Mr. Langrick to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of right-thinking persons, and to deprive him of his friendly intercourse in society

279.    This statement is libelous per se because it charges Mr. Langrick with committing rape, a serious crime.

280.    This statement is also libelous per se because it tends to affect, and did affect, Mr. Langrick in his profession, trade, or business, or by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness, or want of any necessary qualifications in the exercise thereof. Indeed, in calling Mr. Langrick a rapist, Ms. Morrison purposefully posted a video that identified Mr. Langrick by name and as an employee of Bloomberg.

281.    Ms. Morrison acted negligently and with gross irresponsibility in publishing this false and defamatory statement.

282.    Ms. Morrison published this statement with actual malice because she had knowledge that this statement was false, or she published this statement with reckless disregard for its truth or falsity.

283.    Ms. Morrison published this false and defamatory statement with common law malice toward Mr. Langrick and with the specific intent to cause damage to Mr. Langrick.

284.    As a result of this false and defamatory statement published by Ms. Morrison, Mr. Langrick's professional and personal reputations were impugned and damaged.

285.    As a result of this false and defamatory statement published by Ms. Morrison, Mr. Langrick has been forced to make an expenditure of money to remedy the defamation.

286.    As a result of this false and defamatory statement published by Ms. Morrison, Mr. Langrick has been exposed to public hatred, ridicule, and contempt.

287.    In view of the foregoing, Mr. Langrick is entitled to actual, presumed, punitive, and other damages in an amount to be specifically determined at trial.

### THIRD COUNTERCLAIM: LIBEL — JULY 19, 2018 MYLIFE.COM POST

288.    Mr. Langrick repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

289.    Ms. Morrison published false and defamatory statements concerning Mr. Langrick on July 19, 2018, when she posted a "personal review" about Mr. Langrick on the website MyLife.com.  Ms. Morrison's posting falsely stated that "Rob committed sexual assault with a woman who was 19 years old when he was a business school grad at Tuck and he was in his late 20's," falsely accused Mr. Langrick of "penetrating and attempting anal sex with an unconscious woman," accused Mr. Langrick of "rape," and called Mr. Langrick a "rapist."

290.    These statements are reasonably understood to be statements of fact concerning Mr. Langrick.

291.    These statements are false.

292.    These statements are of and concerning Mr. Langrick.  Ms. Morrison identified him by name in the statements and posted them on a webpage that was specifically concerning Mr. Langrick.

293.    Ms. Morrison had no applicable privilege or legal authorization to publish these false and defamatory statements or, if she did, she abused that privilege.

294.    These statements are defamatory and libelous per se in that they tend to expose Mr. Langrick to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of right-thinking persons, and to deprive him of his friendly intercourse in society.

295.    These statements are libelous per se because they charge Mr. Langrick with committing attempted rape and rape, which are both serious crimes.

296.    These statements are also libelous per se because they tend to affect, and did affect, Mr. Langrick in his profession, trade, or business, or by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness, or want of any necessary qualifications in the exercise thereof.

297.    Ms. Morrison acted negligently and with gross irresponsibility in publishing these false and defamatory statements.

298.    Ms. Morrison published these statements with actual malice because she had knowledge that these statements were false, or she published these statements with reckless disregard for their truth or falsity.

299.    Ms. Morrison published these false and defamatory statements with common law malice toward Mr. Langrick and with the specific intent to cause damage to Mr. Langrick.

300.    As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick's professional and personal reputations were impugned and damaged.

301.    As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick has been forced to make an expenditure of money to remedy the defamation.

302.    As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick has been exposed to public hatred, ridicule, and contempt.

303.    In view of the foregoing, Mr. Langrick is entitled to actual, presumed, punitive, and other damages in an amount to be specifically determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Langrick respectfully requests that the Court enter judgment in his favor, and against Ms. Morrison, on all claims asserted in the Complaint and on all counterclaims set forth herein.  Mr. Langrick also prays for judgment as follows:

304.    That Ms. Morrison's Complaint, and all claims asserted therein, be dismissed with prejudice;

305.    That Mr. Langrick be awarded actual, presumed, and punitive damages in excess of $75,000, in an amount to be specifically determined at trial;

306.    That the Court enter an injunction requiring that Plaintiff Monica Morrison remove from the internet the defamatory posts that are the subjects of the Second and Third Counterclaims, that Ms. Morrison remove any other online postings that defame Mr. Langrick, and that Ms. Morrison refrain from similarly defaming Mr. Langrick in the future;

307.    That he be awarded costs, disbursements, interest; and reasonable attorneys' fees; and

308.    Such other and additional remedies as the Court may deem just and proper.

## JURY DEMAND

309.    Mr. Langrick demands and preserves his right to a trial by jury as to any and all issues so triable.

Dated:  December 21, 2018

Respectfully Submitted,

*/s/ Andrew C. Phillips*

Thomas A. Clare, P.C. (pro hac vice)
Elizabeth M. Locke, P.C. (pro hac vice)
Andrew C. Phillips (pro hac vice)
Shannon B. Timmann (pro hac vice)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: andy@clarelocke.com
Email: shannon@clarelocke.com


Daniel A. Singer (DAS 0978)
THE LAW OFFICES OF DANIEL A. SINGER PLLC
New York, New York 10017
Telephone: (212) 569-7853
Email: dan@singerlaw.com

*Attorneys for Defendant-Counterclaimant*
*Robert Langrick*

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew C. Phillips, an attorney with Clare Locke LLP, hereby certify that on December 21, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing via email to all counsel of record.

*/s/ Andrew C. Phillips*
Andrew C. Phillips
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
(202) 628-7404
andy@clarelocke.com
