UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MONICA MORRISON,

                    Plaintiff,

        v.

ROBERT LANGRICK,

                   Defendant.

---

CASE NO. 1:18-cv-06127 (CBA)(RML)


**DEFENDANT ROBERT LANGRICK'S BRIEF IN OPPOSITION TO PLAINTIFF MONICA MORRISON'S MOTION TO DISMISS THE DEFAMATION COUNTERCLAIMS**

Andrew C. Phillips (pro hac vice)
Thomas A. Clare, P.C. (pro hac vice)
Elizabeth M. Locke, P.C. (pro hac vice)
Shannon B. Timmann (pro hac vice)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: andy@clarelocke.com
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: shannon@clarelocke.com

Daniel A. Singer (DAS 0978)
THE LAW OFFICES OF DANIEL A. SINGER PLLC
New York, New York 10017
Telephone: (212) 569-7853
Email: dan@singerlaw.com

*Attorneys for Defendant-Counterclaimant Robert Langrick*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION .................................................................................................................1

LEGAL STANDARD ...........................................................................................................4

ARGUMENT ........................................................................................................................5

    I.    MS. MORRISON'S COUNSELS' PRESENTATION OF MATERIAL FAR BEYOND THE FACE OF MR. LANGRICK'S COUNTERCLAIMS IS INAPPROPRIATE AND IRRELEVANT IN THE CONTEXT OF A RULE 12(B)(6) MOTION TO DISMISS. ...............5

    II.    MR. LANGRICK'S COUNTERCLAIMS PLEAD THE FALSITY ELEMENT OF HIS CLAIMS IN GREAT DETAIL.....................................................................................................6

    III.    MS. MORRISON'S STATEMENTS FALSELY ACCUSING MR. LANGRICK OF FOLLOWING HER TO HER HOME AND RAPING HER ARE NOT MERE "OPINION." ..10

    IV.    NO QUALIFIED PRIVILEGE APPLIES TO THE STATEMENTS AT ISSUE, AND QUALIFIED PRIVILEGE IS NOT A BASIS FOR DISMISSAL AT THIS STAGE. ..............16

CONCLUSION ...................................................................................................................20

CERTIFICATE OF SERVICE ...........................................................................................22

## TABLE OF AUTHORITIES

CASES

*600 W. 115th St. Corp. v. Von Gutfeld*,
  80 N.Y.2d 130 (N.Y. Ct. App. 1992) ......................................................................16

*Accadia Site Contracting, Inc. v. Skurka*,
  129 A.D.3d 1453 (N.Y. App. Div. 2015) ..................................................................9

*Afshari v. Barer*,
  186 Misc. 2d 165, 715 N.Y.S.2d 297 (N.Y. Civ. Ct. 2000) ....................................24

*Albert v. Loksen*,
  239 F.3d 256 (2d Cir. 2001) ....................................................................................25

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*,
  151 F. Supp. 3d 287 (E.D.N.Y. 2015) ....................................................................20

*Boushie v. U.S. Investigations Serv., LLC*,
  No. 06-CV-1289, 2007 WL 607394 (N.D.N.Y. Feb. 20, 2007) ..............................25

*Brian v. Richardson*,
  87 N.Y.2d 46 (N.Y. Ct. App. 1995) ........................................................................20

*Brungardt v. Summitt*,
  7 So.3d 879 (La. Ct. App. 2009) .............................................................................19

*Campanella v. Cty. of Monroe*,
  853 F. Supp. 2d 364 (W.D.N.Y. 2012) ...................................................................23

*Chiavarelli v. Williams*,
  256 A.D.2d 111 (N.Y. App. Div. 1998) ..................................................................19

*Condit v. Dunne*,
  317 F. Supp. 2d 344 (S.D.N.Y. 2004) .....................................................................21

*Cuthbert v. Nat'l Org. for Women*,
  207 A.D.2d 624 (N.Y. App. Div. 1994) ..................................................................18

*Daytree at Cortland Square, Inc. v. Walsh*,
  332 F. Supp. 3d 610 (E.D.N.Y. 2018) ....................................................................25

*DeWolf v. Samaritan Hosp.*,
  No. 1:17-cv-0277, 2018 WL 3862679 (N.D.N.Y. Aug. 14, 2018) .........................11

*Enigma Software Grp., USA, LLC v. Bleeping Computer LLC*,
  194 F. Supp. 3d 263 (S.D.N.Y. 2016) .....................................................................21

*Faber v. Metro. Life Ins. Co.*,
   648 F.3d 98 (2d Cir. 2011) ................................................................9, 11

*Flaherty v. All Hampton Limousine, Inc.*,
   No. 02–CV–4801, 2008 WL 2788171 (E.D.N.Y. July 16, 2008) ............................................24

*Fordham v. Islip Union Free Sch. Dist.*,
   662 F. Supp. 2d 261 (E.D.N.Y. 2009) ...................................................25

*Frederique v. Cty. of Nassau*,
   168 F. Supp. 3d 455 (E.D.N.Y. 2016) ...................................................22

*Gilliam v. Ordiway*,
   147 F. Supp. 3d 664 (E.D. Mich. 2015) ................................................19

*Gross v. New York Times Co.*,
   82 N.Y.2d 146 (N.Y. 1993) ...........................................................16, 17, 18

*Horton v. Guillot*,
   No. 1:14-CV-1050, 2016 WL 4444875 (N.D.N.Y. Aug. 23, 2016) ............................23

*Jackson v. Liberty Univ.*,
   No. 17-cv-41, 2017 WL 3326972 (W.D. Va. Aug. 3, 2017) ...................................19

*Johnson v. Medisys Health Network*,
   No. 10-CV-1596, 2011 WL 5222917 (E.D.N.Y. June 1, 2011) ...............................24

Johnson v. Medisys Health Network,
   No. CV-10-1596, 2011 WL 4101323 (E.D.N.Y. Sept. 8, 2011) ...............................24

*Lampert v. Edelman*,
   24 A.D.2d 562 (N.Y. App. Div. 1965) ...................................................24

*Liere v. Paini*,
   93 A.D.3d 825 (N.Y. App. Div. 2012) ...................................................19

*Lynch v. Christie*,
   815 F. Supp. 2d 341 (D. Me. 2011) ...................................................19

*Matter of Woodbridge Structured Funding, LLC v. Pissed Consumer*,
   125 A.D.3d 508 (N.Y. App. Div. 2015) .................................................20

*Matthew v. Carr*,
   No. 05-247, 2006 WL 689137 (Va. Cir. Ct. Mar. 20, 2006) ...............................19

*Menaker v. C.D.*,
   No. 2:17-cv-5840, 2018 WL 5776533 (E.D.N.Y. Nov. 1, 2018) .......................18, 19

*Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*,
  759 F.2d 219 (2d Cir. 1985) ........................................................................20

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
  102 F.3d 660 (2d Cir. 1996) .........................................................................10

*Nourse v. Cty. of Jefferson*,
  No. 17-cv-0807, 2018 WL 2185504 (N.D.N.Y. May 11, 2018) .................10

*Ratner v. Kohler*,
  No. 17-cv-542, 2018 WL 1055528 (D. Haw. Feb. 26, 2018) ...................19

*Rosen v. Piluso*,
  235 A.D.2d 412 (N.Y. App. Div. 1997) ........................................................23

*Routh v. Univ. of Rochester*,
  981 F. Supp. 2d 184 (W.D.N.Y. 2013)..........................................18, 24, 25

*Sachs v. Matano*,
  50 Misc. 3d 420, 22 N.Y.S.3d 310 (N.Y. Sup. Ct. 2015).....................22, 23

*Saunders v. McDonald Invests. Inc.*,
  110 F. App'x 150 (2d Cir. 2004) ..................................................................22

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) .........................................................................................9

*Thorsen v. Sons of Nor.*,
  996 F. Supp. 2d 143 (E.D.N.Y. 2014)..........................................................22

*Versaci v. Richie*,
  30 A.D.3d 648 (N.Y. App. Div. 2006) ..........................................................20

*Villager Pond, Inc. v. Town of Darien*,
  56 F.3d 375 (2d Cir. 1995) .............................................................................9

## INTRODUCTION

For years, Plaintiff Monica Morrison has been spreading a false, malicious, and defamatory story about how Defendant-Counterclaimant Robert Langrick supposedly followed her home from a party in Hanover, New Hampshire, snuck into her bed while she slept, and sexually assaulted her. She has used that false story to repeatedly attempt to extort money from Mr. Langrick, and when he ignored her efforts to threaten him directly, she then decided to up the ante with a show of force that included calling Mr. Langrick's employer and posting online missives telling the world that Mr. Langrick raped her.

As set forth in detail in Mr. Langrick's December 21, 2018 Answer, Affirmative Defenses, and Counterclaims [Dkt. 14] ("Counterclaims" or "Countercl.") the true facts are very different, and Ms. Morrison's false story has been roundly discredited, disputed, and contradicted — including by her own friends and housemates who were percipient witnesses to the events in question. Mr. Langrick did not stalk or follow Ms. Morrison home; instead, multiple witnesses say that after flirting with Mr. Langrick at the party, she invited and led Mr. Langrick back to her house to "hook up." Mr. Langrick did not sneak into Ms. Morrison's bedroom; in actuality, both her roommate and the roommate's boyfriend saw and heard Ms. Morrison bring Mr. Langrick to the bedroom, at which time she realized it was occupied and told Mr. Langrick they would need to find somewhere else private to go. Mr. Langrick did not assault Ms. Morrison while she lay unconscious; instead, witnesses saw and heard Ms. Morrison lead Mr. Langrick to a lover's lair "cupola" room on the roof of her house, where she proceeded to undress and willingly, enthusiastically, and very vocally engage in foreplay and sexual intercourse with Mr. Langrick for upwards of an hour. And Mr. Langrick did not predatorily creep into Ms. Morrison's bed; instead, the roommate and her boyfriend stated that they watched as she and Mr. Langrick returned from

their loud, amorous session on the roof, entered the bedroom through the window, and got into bed together.

Ms. Morrison's claims that Mr. Langrick followed her to her home, snuck into her bed, and sexually assaulted her as she lay sleeping are lies. Period. This is not a he-said/she-said case, it is not a case of mistaken recollection, and it is not a situation where ambiguous events are open to differing interpretations. Mr. Langrick's Counterclaims set forth the truth in copious detail, supported by the statements of percipient witnesses and the findings of law enforcement officers who investigated Ms. Morrison's fabricated allegations years ago. The witnesses include the housemate who overheard Ms. Morrison very consensually engaging in sex with Mr. Langrick on the roof of the house; the friends of Ms. Morrison who say she is making "bogus" claims and fabricating a rape allegation; the friends of Ms. Morrison who went behind her back to warn Mr. Langrick that she was going to make false accusations against him; the police officers who discovered that her claims were directly contradicted by witnesses and not credible; and the roommate — who was awake and mere feet away at the time Ms. Morrison claims she was sexually assaulted in her bed — who flatly told the police that no sexual assault occurred in that room.

In response to these well-pleaded, detailed Counterclaims, Ms. Morrison's March 18, 2019 Memorandum of Law in Support of [her] Motion to Dismiss the Defamation Counterclaims ("Memorandum" or "Mem.") offers three arguments for dismissal, none of which has any merit.

*First*, Ms. Morrison argues that Mr. Langrick cannot sustain his burden of proving falsity because he has not shown by a "preponderance of the evidence" that he did not rape her. This argument — which is entirely based on the unsupported ruminations and rhetorical questions of Ms. Morrison's counsel — completely ignores the relevant standard at the pleading stage, which requires only that Mr. Langrick plead sufficient facts to state a plausible claim for relief. He has

more than done so.  It is both unusual and conspicuous that while Ms. Morrison appears to be arguing that Mr. Langrick has not sufficiently pleaded the element of falsity, ***this entire section of Ms. Morrison's brief*** is devoid of any discussion of, or citation to, the detailed factual averments in Mr. Langrick's Counterclaims.

***Second***, Ms. Morrison argues that her statements are not capable of being defamatory because they are "opinion."  Just as her argument purporting to set forth a pleading deficiency conspicuously ignores the well-pleaded facts at issue, the argument that her statements are "opinion" very notably fails to address the actual language of the statements in question, which include her assertions that Mr. Langrick is a "rapist," that he "attempted to sexually assault me in college," that he "followed me home, I was passed out and when I woke up he was trying to rape me," that he "committed sexual assault with a woman who was 19 years old when he was a business school grad at Tuck and he was in his late 20's," that he "penetrat[ed] and attempt[ed] anal sex with an unconscious woman," that this was a "rape," and that he is now "blaming the victim for his own criminal activity."  These statements were not couched in the language of opinion, and they were not presented to listeners and readers as hypothetical, conjectural, speculative, or rhetorical hyperbole.  They simply are not "opinion" under any standard, let alone the relevant standard here, which asks only whether a reasonable reader could have concluded that Ms. Morrison's statements were conveying facts about Mr. Langrick.

And ***third***, Ms. Morrison baldly posits that certain "qualified privileges" are "arguably available here," such as a qualified privilege for statements made "in the discharge of some public or private duty…"  But her brief makes no effort to explain how or why any qualified privilege applies to the statements at issue, let alone how that applicability is established as a matter of law on the face of Mr. Langrick's Counterclaims.  Moreover, even if Ms. Morrison could conclusively

3

establish the applicability of a fact-dependent qualified privilege at this stage (and she cannot), it would be irrelevant to this Rule 12(b)(6) motion to dismiss because by definition a "qualified" privilege is defeated by a showing of common law or actual malice.  Mr. Langrick's Counterclaims amply allege that Ms. Morrison acted with both common law and actual malice, and she does not contend otherwise.  Therefore, for the reasons set forth further herein, the Motion to Dismiss Mr. Langrick's Counterclaims lacks merit and should be denied.

## LEGAL STANDARD

In considering a motion to dismiss made pursuant to Rule 12(b)(6), the Court should assume that all well-pleaded factual allegations are true, draw all reasonable inferences in the non-movant's favor, and determine whether the facts alleged in the relevant pleading plausibly give rise to an entitlement to relief.  *Faber v. Metro. Life Ins. Co*., 648 F.3d 98, 104 (2d Cir. 2011).  The focus of the inquiry is not "whether the [non-moving party] will ultimately prevail but whether [he] is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)).

The elements of a cause of action for defamation under New York law are: (1) a false statement; (2) published to a third party; (3) with negligence; (4) that causes special harm or constitutes defamation per se.  *Accadia Site Contracting, Inc. v. Skurka*, 129 A.D.3d 1453, 1453 (N.Y. App. Div. 2015).[1]

---

[1] Ms. Morrison's Memorandum does not dispute that Mr. Langrick has adequately pled the elements of publication, fault, and defamation per se.

**ARGUMENT**

I.  **MS. MORRISON'S COUNSELS' PRESENTATION OF MATERIAL FAR BEYOND THE FACE OF MR. LANGRICK'S COUNTERCLAIMS IS INAPPROPRIATE AND IRRELEVANT IN THE CONTEXT OF A RULE 12(B)(6) MOTION TO DISMISS.**

To begin with, Mr. Langrick notes that Ms. Morrison has attempted to "support" her Motion and Memorandum with materials that are far afield from the allegations in Mr. Langrick's Counterclaims and completely irrelevant and immaterial to the question of whether Mr. Langrick has pled plausible defamation claims against her.  Most notably, this includes a digressive, 14-page affidavit from ***Ms. Morrison's Counsel***, Henry R. Kaufman, in which Mr. Kaufman meditates about the history and importance of the #metoo movement, presents studies concerning the number of sexual assault cases in the United States (which of course has nothing to do with the truth or falsity of ***Ms. Morrison's*** accusations), claims phantom "admissions" by Mr. Langrick without ***any citation*** to where one might find those supposed admissions in Mr. Langrick's pleading, presents his personal interpretation of obviously disputed facts, and expresses his personal sentiments that Mr. Langrick is "unseemly," "indecent," "grotesque," and "vile." (*See, e.g.*, Mar. 18, 2019 Aff. of Henry R. Kaufman in Supp. of Pl.'s 12(b)(6) Mot. to Dismiss Def.'s Countercls. ¶¶ 2-12, 13-25, 32-35, 39-41.)  It is axiomatic that such a document has no place in the context of a Rule 12(b)(6) motion to dismiss, where the Court must accept Mr. Langrick's pleaded allegations as true, cannot resolve disputed issues of fact, and cannot consider materials outside of the face of Mr. Langrick's pleading.[2]  *See, e.g., Newman & Schwartz v. Asplundh Tree*

---

[2] The same issue infects Ms. Morrison's Memorandum in support of her Motion to Dismiss, which is rife with factual assertions for which no citation is given, and which do not appear anywhere in Mr. Langrick's Counterclaims.  For example, the Memorandum claims that Ms. Morrison was too incapacitated to consent to sexual intercourse with Mr. Langrick, but of course this supposed fact appears ***nowhere*** in Mr. Langrick's Counterclaims.  Mr. Langrick instead alleges repeatedly that his encounter with Ms. Morrison was entirely consensual and that she was an alert, active, willing, and consenting participant.

*Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996).  It appears that Ms. Morrison's counsel either has a fundamental misapprehension as to the standards and procedures applicable to Rule 12(b)(6) motions, or that he knowingly chose to file a document consisting solely of immaterial and impertinent matter.  Regardless, the Court can and must disregard Mr. Kaufman's irrelevant affidavit, as well as the host of supposed "facts" scattered throughout the Memorandum that are nowhere to be found in the pleading at issue here.  *See Nourse v. Cty. of Jefferson*, No. 17-cv-0807, 2018 WL 2185504, at *1 n.1 (N.D.N.Y. May 11, 2018) (refusing to consider or even review an affidavit from defendant's attorney offered in support of defendant's Rule 12(b)(6) motion to dismiss); *DeWolf v. Samaritan Hosp.*, No. 1:17-cv-0277, 2018 WL 3862679, at *3 n.3 (N.D.N.Y. Aug. 14, 2018) (court would not consider an affidavit from a defendant's attorney on a motion to dismiss for failure to state a claim).

## II.       MR. LANGRICK'S COUNTERCLAIMS PLEAD THE FALSITY ELEMENT OF HIS CLAIMS IN GREAT DETAIL.

First, Ms. Morrison appears to argue that Mr. Langrick's Counterclaims fail because Mr. Langrick has supposedly admitted the truth of the statements at issue and because Mr. Langrick's pleading has not proven falsity by "a preponderance of the evidence."  (*See* Mem. at 6-8.)[3]  This argument has no merit.  Mr. Langrick has not only alleged the falsity of Ms. Morrison's false claims of rape, but he has also set forth the true facts in great detail ***and*** shown how those facts are supported by eyewitness accounts and contemporaneous documents that completely disprove those false statements. Mr. Langrick has more than plausibly alleged the falsity of the statements at issue, and Ms. Morrison's Memorandum completely fails to demonstrate otherwise.

---

[3] Plaintiff's argument mischaracterizes the relevant standard for a 12(b)(6) motion.  Mr. Langrick is not required to "prove" the element of falsity in his pleading; rather, he is only required to allege facts showing a plausible entitlement to relief.  *Faber*, 648 F.3d at 104.  He has more than met this requirement.

As far as Mr. Langrick can discern, Ms. Morrison's argument appears to be that Mr. Langrick cannot "prove" falsity because his own "admissions" concede that the statements at issue are true. (*See id.* at 4, 6-8.) But the only supposed "admissions" that she points to are that "Mr. Langrick admits to having sex with Ms. Morrison in the cupola," that both Mr. Langrick and Ms. Morrison had consumed alcohol that day, and that Mr. Langrick did not wear a condom during the sexual encounter. (*See id*. at 6-8.) It is entirely unclear how Ms. Morrison believes these points can possibly be construed as fatal admissions to her claims that Mr. Langrick is a "rapist," that Mr. Langrick "attempted to sexually assault [her] in college," that Mr. Langrick "followed [her] home, [she] was passed out and when [she] woke up he was trying to rape [her]," that Mr. Langrick "committed sexual assault with a woman who was 19 years old when he was a business school grad at Tuck," that Mr. Langrick is guilty of "penetrating and attempting anal sex with an unconscious woman," that he "rape[d]" Ms. Morrison, and that he is a "rapist." (*See* Countercls. at 87-91, Exs. A-B.)

It is certainly true that Mr. Langrick alleges that he engaged in ***mutual and consensual*** sexual intercourse with Ms. Morrison, but nowhere does he remotely admit that he followed her home and sexually assaulted, penetrated, and raped her while she was "unconscious" or "passed out." That is literally ***the exact opposite*** of what Mr. Langrick alleges. He alleges in great detail how he met Ms. Morrison at a party where they talked and flirted, and she then invited him to accompany her back to her house (which he had no familiarity with and had never been to before). (*Id.* ¶¶ 45-49.) He alleges that she then brought him to her bedroom, only to find that it was already occupied by her roommate and the roommate's boyfriend. (*Id*. ¶ 50.) He alleges that the roommate and her boyfriend both later confirmed to police that Ms. Morrison brought Mr. Langrick to the bedroom clearly intending to "hook up," and that they overheard her whispering to Mr. Langrick

that they would have to find some other private place to go to because her roommate was already occupying the bedroom.  (*Id*. ¶¶ 128-133.)  Mr. Langrick describes how Ms. Morrison then led him out a window and across the sloped, unfenced roof of the house to a "cupola" room that residents of the house utilized for romantic encounters.  (*Id*. ¶¶ 51-56.)

Mr. Langrick alleges that once inside the cupola, a very-much-awake Ms. Morrison proceeded to remove her shirt and undergarments while kissing Mr. Langrick.  (*Id*. ¶¶ 56-58.)  She then began to fondle Mr. Langrick's penis, and he began to stimulate her vagina, which went on for some time until she achieved a vigorous and distinctive orgasm.  (*Id*. ¶¶ 59-62.)  Mr. Langrick and Ms. Morrison then had prolonged and consensual sexual intercourse in which she was a "willing, enthusiastic, and vocal participant."  (*Id*. ¶ 63.)  Mr. Langrick describes how the resident who lived directly below the cupola would later tell police that she overheard the whole encounter, and that she heard Ms. Morrison in particular making "sex noises," "moaning," "groaning," and making "rhythmic" vocalizations that were easily recognized as the sound of Ms. Morrison having an "orgasm."  (*Id*. ¶¶ 134-137.)  After nearly an hour of sexual activity, Mr. Langrick and Ms. Morrison decided to go to bed, and they exited the cupola, climbed back down the roof, went through a window into the bedroom, and got into Ms. Morrison's bed ***together*** — which, again, was witnessed by the roommate and the roommate's boyfriend.  (*Id*. ¶¶ 64, 144.)

 Mr. Langrick further details how a comprehensive police investigation uncovered numerous inconstancies and outright falsehoods told by Ms. Morrison regarding this encounter. For example, she told the police — just as she would later tell Bloomberg — that she did not invite Mr. Langrick to accompany her home and that, instead, he predatorily followed her there.  (*Id*. ¶¶ 124, 128.)  This lie was easily disproven by the numerous witnesses who heard and saw Ms. Morrison lead Mr. Langrick to her bedroom for the purpose of "hooking up."  (*Id*. ¶¶ 125-

133.)  She claimed to the police that she and Mr. Langrick had only briefly kissed on the roof of the house and had not had sex, but she did not realize that there was a percipient witness who would completely contradict this lie as well.  (*Id.* ¶¶ 134-137.)  Ms. Morrison also told police that after she and Mr. Langrick merely kissed on the roof, she ordered him to sleep on the couch and was shocked to later discover that he was in her bed.  (*Id.* ¶ 142.)  But again, this was completely contradicted by her own roommate and the roommate's boyfriend, who said they witnessed Ms. Morrison and Mr. Langrick return from the roof after having sex in the cupola and get into her bed together to go to sleep.  (*Id.* ¶¶ 143-145.)  In fact, the roommate — who was awake and mere feet away at the precise time and place that Ms. Morrison claimed Mr. Langrick snuck into her bed and raped her — was asked point blank by Hanover Police Department detectives whether that claim was true.  ***The roommate's response: "No."*** [4]  (*Id.* ¶ 147.)

Mr. Langrick's Counterclaims further detail Ms. Morrison's disturbing pattern of contradictory statements and extortionary actions in the following days, including sending emails denying that anything untoward took place, telling her housemates that she did not have sex with Mr. Langrick, demanding that Mr. Langrick treat her and her housemates to an expensive dinner out of state, and then making accusations of sexual assault after realizing her roommate was upset with her for repeatedly disturbing the roommate and boyfriend while leading Mr. Langrick from the room to the roof and back.  (*See id.* ¶¶ 73-100.)  Mr. Langrick also describes how Ms. Morrison's own friends and housemates — who were percipient witnesses to the interactions between her and Mr. Langrick, as well as to Ms. Morrison's behavior in the days afterward — expressed how they were "surprised" when she began to make accusations of rape, how they found

---

[4] Emphases added unless otherwise noted.

it "upsetting" and felt that Ms. Morrison's intentions were not "sincere," how the sudden accusations became a big topic of conversation around the shared house because it "[didn't] seem right" or "fair," how Ms. Morrison appeared spiteful towards Mr. Langrick for causing a rift between her and her housemates, and how Ms. Morrison's own friends went behind her back to warn Mr. Langrick that she was planning to make false allegations against him, because they felt he was being "treated unfairly" by a vindictive person.   (*Id*. ¶¶ 151-160.)   Finally, the Counterclaims detail how a comprehensive investigation into Ms. Morrison's claims by the Hanover Police Department found that her allegations that Mr. Langrick followed her home against her will, that she did not have consensual sex with him, that he snuck into her bed, and that he raped her while she was unconscious were not credible in light of her false and contradictory statements, as well as the statements of numerous eyewitnesses who expressed to the police that she had "embellished … these circumstances" and that her rape claims were "bogus." (*Id*. ¶¶ 19, 168-178.)

The foregoing is only a small sampling of the many detailed factual allegations in Mr. Langrick's Counterclaims plausibly demonstrating that Ms. Morrison's statements asserting that he followed her home and raped her while she was unconscious are completely and utterly false. The argument that Mr. Langrick has not adequately alleged the falsity element of his three defamation Counterclaims is wholly without merit and must be rejected.

**III.     MS. MORRISON'S STATEMENTS FALSELY ACCUSING MR. LANGRICK OF FOLLOWING HER TO HER HOME AND RAPING HER ARE NOT MERE "OPINION."**

Next, Ms. Morrison argues that Mr. Langrick's Counterclaims should be dismissed on the grounds that her statements falsely accusing Mr. Langrick of following her home and raping her while she slept are non-actionable "opinion." (*See* Mem. at 9-15.)   But her Memorandum fundamentally fails to explain how these self-evidently factual statements making concrete,

10

unambiguous, and highly injurious allegations against Mr. Langrick could possibly be interpreted by anyone as mere opinion.  Under the relevant pleading standard, abundant precedent interpreting New York law, and plain common sense,[5] the statements at issue obviously are not opinion, and this argument is no basis for dismissal of Mr. Langrick's Counterclaims.

Ms. Morrison devotes several pages of her brief to the general treatment of "opinion" statements under New York law, but she then fails to actually apply those standards to the statements at issue here.  The question of law for the Court at the pleadings stage is a simple one: "whether a reasonable [reader/listener] could have concluded that [the statements were] conveying facts about [Mr. Langrick]."  *Gross v. New York Times Co*., 82 N.Y.2d 146, 152 (N.Y. 1993) (quoting *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 139 (N.Y. Ct. App. 1992).)  In analyzing a claim that a particular statement constitutes opinion, the Court can consider whether (1) the specific language used has a readily understood meaning; (2) whether the statements are capable of being proven true or false; and (3) whether the context in which the statements were made would signal to readers or listeners that the statements are in the nature of opinion.  *Id*. at 153.  Applying both the general standard and the elements of the test for opinion to the statements at issue here, it is indisputable that a reasonable reader/listener could have and would have understood Ms. Morrison to be conveying facts about Mr. Langrick.  She told Mr. Langrick's employer that he "attempted to sexually assault me in college…. He followed me home, I was passed out, and when I woke up he was trying to rape me." (Countercls. ¶ 257.)  She wrote on the website Vimeo.com that Mr. Langrick is a "rapist."  (*Id*. ¶ 273.)  And she wrote a reputational review of Mr. Langrick on the website MyLife.com that claims he "committed sexual assault with

---

[5] As the Court noted during the May 7, 2019 pre-motion conference concerning this Motion: ". . . he is a rapist, he raped me, ***that's a statement of fact*.**"  *See* May 7, 2019 Hearing Tr. 5:18-6:3.

a woman who was 19 years old when he was a business school grad at Tuck," accused him of "penetrating and attempting anal sex with an unconscious woman," accused him of "rape," and called Mr. Langrick "a rapist."  (*Id*. ¶ 289.)  She does not explain how these statements could possibly be interpreted as anything but assertions of fact.

Unlike more difficult cases where courts have to determine whether a statement that was "couched in the form of opinion" is nevertheless actionable because it potentially also conveyed factual content, the statements at issue here clearly were ***not*** presented as "mere hypothesis," "rhetorical hyperbole," or the "speculative accusation[s] of an angry but ill-informed citizen made during the course of a heated debate."  *See Gross*, 82 N.Y.2d at 155-56 (explaining that ***even statements presented in the form of opinion*** are actionable if they would be understood by a reasonable reader as conveying assertions of fact).  Instead, Ms. Morrison made the direct, unambiguous, and false assertions that Mr. Langrick followed her home and raped her while she was unconscious.  These statements have a readily understood meaning, they are provably false, and they were presented to the reader/listener as an effort to convey facts about Mr. Langrick rather than as pure, subjective, and uninformed opinion.

Moreover, by disputing as a factual matter the truth or falsity of each of the statements that are the subjects of Mr. Langrick's Counterclaims, Ms. Morrison's Memorandum implicitly — and in some cases explicitly — concedes that the statements at issue are not "opinion" but rather factual statements that "can be proven true or false."  *See id.* at 153.  In fact, Ms. Morrison herself alleges that the call to Mr. Langrick's then-employer, the subject of Mr. Langrick's First Counterclaim, was made for the express purposes of "truthfully alert[ing]" Bloomberg that Mr. Langrick sexually assaulted her and warning Bloomberg that allowing him to travel to college campuses as part of his employment duties could give him a chance to "reenact" that "sexual abuse."  (Pl.'s Compl.

for a Declaratory J. ¶¶ 14, 85 (Nov. 1, 2018) [Dkt. 1].)  Ms. Morrison does not explain how the recipient of that call in Bloomberg's Human Resources department could have understood her statement as anything but a factual accusation, nor does she address her own admissions *that it was absolutely her intention that her statements be so understood*.  Similarly, Ms. Morrison defends her statements on the MyLife.com website (Counterclaim III) by arguing that they "fairly and truthfully" labelled Mr. Langrick's actions a "sexual assault," and she defends her accusation on the Vimeo.com website (Counterclaim II) by arguing as a factual matter that "by any definition … Mr. Langrick could truthfully be labelled a 'rapist.'"  (Mem. at 7-8.)  Because by definition "only 'facts' are capable of being proven [true or] false," Ms. Morrison's repeated protestations that her statements concerning Mr. Langrick *were in fact true* completely undercuts her inherently contradictory argument that the statements are mere subjective opinion (which by definition can be neither objectively true nor false).  *See Gross*, 82 N.Y.2d at 152-53.

Ms. Morrison also entirely fails to address the numerous cases applying New York law and holding that direct and specific accusations of serious criminal or sexual misconduct — such as those at issue here — are not only actionable but are ***defamatory per se***.  For example, in *Routh v. University of Rochester*, 981 F. Supp. 2d 184, 212 (W.D.N.Y. 2013), the plaintiff, a male university student, brought a defamation claim against a female classmate after she accused him of sexual assault with respect to a sexual encounter that he alleged was entirely consensual.  The district court denied the defendant's motion to dismiss, noting that the plaintiff alleged the accusations of non-consensual intercourse were false, and concluding that "[a] statement falsely accusing someone of rape is defamation *per se*."  *Id*. at 212-213.  Similarly, in *Cuthbert v. National Organization for Women*, 207 A.D.2d 624 (N.Y. App. Div. 1994), the court upheld the denial of the defamation defendant's motion for summary judgment because the statements at issue "clearly

and unequivocally accuse[d] plaintiff (or a person who could easily be identified as plaintiff) of rape and are thus defamatory." *Id.* at 626.  In *Menaker v. C.D.*, No. 2:17-cv-5840, 2018 WL 5776533, at *1-2 (E.D.N.Y. Nov. 1, 2018), a collegiate athletics coach sued for defamation after an athlete on the tennis team accused him of sexual harassment after he declined the student's request to increase the amount of her scholarship.  Judge Hurley denied the defendant's motion to dismiss and rejected the argument that the direct allegations of sexual harassment were "opinion," holding that such accusations "have a precise meaning, are capable of being proven false, and are likely to be taken as facts in the context in which they were shared." *Id.* at *4-5.  Similarly, in *Chiavarelli v. Williams*, 256 A.D.2d 111, 113-114 (N.Y. App. Div. 1998), the Appellate Division considered statements by a hospital resident accusing his supervising physician of "misus[ing] his supervisory power over residents to obtain sexual favors."  The court rejected the defendant's argument that this was a "non-actionable statement of opinion," holding that the "explicitly alleged purported incidents of sexual harassment" were factual assertions and libelous per se. *Id.* at 113. Simply put, and contrary to Ms. Morrison's conclusory arguments, her statements accusing Mr. Langrick of following her home and sexually assaulting her while she lay unconscious are "reasonably susceptible of a defamatory meaning and d[o] not constitute personal opinion since they reasonably appear[] to contain assertions of objective fact, which do not fall within the scope of protected opinion." *See Liere v. Paini*, 93 A.D.3d 825, 826 (N.Y. App. Div. 2012).[6]

---

[6] Courts in other jurisdictions evaluating similar statements also routinely hold that allegedly false accusations of sexual assault are actionable. *See, e.g., Jackson v. Liberty Univ.*, No. 17-cv-41, 2017 WL 3326972, at *10-11 (W.D. Va. Aug. 3, 2017) (plaintiff stated a defamation claim regarding press release that implied he committed a sexual assault); *Lynch v. Christie*, 815 F. Supp. 2d 341, 351-52 (D. Me. 2011) (denying motion to dismiss defamation claim brought by chiropractor against patient who claimed in online posting that she was sexually assaulted by the chiropractor); *Brungardt v. Summitt*, 7 So.3d 879, 885-86 (La. Ct. App. 2009) (granting plaintiff partial summary judgment on the issue of liability concerning defamation claim against defendant who circulated an anonymous leaflet accusing plaintiff of rape); *Ratner v. Kohler*, No. 17-cv-542, 2018 WL 1055528, at *7-8 (D. Haw. Feb. 26, 2018)

(Continued…)

Finally, Ms. Morrison attempts to suggest that the fact that the Vimeo.com (Counterclaim II) and MyLife.com (Counterclaim III) statements were made on the internet is somehow sufficient in and of itself to bring those clearly factual statements within the ambit of "pure opinion."  (*See* Mem. at 13-14.)  But there simply is no rule that false statements made on the internet are immune from defamation liability, and the cases Ms. Morrison cites all involve clear instances of rhetorical hyperbole, heated argument, conjecture, and imprecise language that are readily distinguishable from Ms. Morrison's specific and explicit claims that Mr. Langrick followed her home and raped her while she was unconscious.  (*See id*. (citing *Versaci v. Richie*, 30 A.D.3d 648, 648-49 (N.Y. App. Div. 2006) (statement by disgruntled former client that plaintiff attorney is a "so called attorney"); *Matter of Woodbridge Structured Funding, LLC v. Pissed Consumer*, 125 A.D.3d 508, 508-09 (N.Y. App. Div. 2015) (anonymous comment on the website "PissedConsumer.com" that plaintiff company "will forget about you and … all the promises they made to you" once "you sign on the dotted line"); *Brian v. Richardson*, 87 N.Y.2d 46, 53-54 (N.Y. Ct. App. 1995) (opinion column in the New York Times Op Ed section that made clear "its contents represented the opinion of the author and that its specific charges about plaintiff were allegations and not demonstrable fact."); *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 222 (2d Cir. 1985) (statements by defendant restaurant critic that plaintiff Chinese restaurant's "sweet and sour pork contained more dough . . . than meat," and that the rice was "soaking . . . in oil."); *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295-96 (E.D.N.Y. 2015) (noting that there

---

(plaintiff stated claim for defamation based on defendant's allegedly false Facebook post accusing plaintiff of raping her); *Gilliam v. Ordiway*, 147 F. Supp. 3d 664, 668-69 (E.D. Mich. 2015) (plaintiff's allegations that defendants sent email to third parties falsely accusing him of rape stated a claim for defamation per se); *Matthew v. Carr*, No. 05-247, 2006 WL 689137, at *1 (Va. Cir. Ct. Mar. 20, 2006) ("The statements at issue, namely the Defendant's accusation that the Plaintiff was a rapist and possibly a serial rapist, are clearly actionable per se.").

(Continued…)

15

"[o]bviously" is no per se rule that comments posted on an online forum cannot be defamatory).)[7]
The statements as issue here are plainly not comparable to base epithets exchanged in a heated
website comment section or to the exaggerated prose of a food critic panning a Chinese restaurant's
cuisine.    Ms. Morrison repeatedly, directly, unambiguously, and matter-of-factly **accused
Mr. Langrick of following her home and raping her** when she was a student at Dartmouth.  Such
an accusation simply is not a subjective statement of "opinion" in any sense of the word, and
Ms. Morrison cannot demonstrate otherwise.

## IV.    NO QUALIFIED PRIVILEGE APPLIES TO THE STATEMENTS AT ISSUE, AND QUALIFIED PRIVILEGE IS NOT A BASIS FOR DISMISSAL AT THIS STAGE.

Finally, Ms. Morrison argues that her false statements are protected by a qualified privilege
governing statements made in the discharge of some public or private duty, or to persons who have
a common interest in the subject matter.   (Mem. at 15-16.)   But although Ms. Morrison's
Memorandum makes reference to this qualified privilege, she makes no meaningful effort to
describe its scope or explain how or why it is applicable to the statements at issue here.  It is not.
Moreover, even if Plaintiff could establish the potential applicability of a qualified privilege (and
she cannot), it is entirely irrelevant in the context of a motion to dismiss.  A qualified privilege is
an affirmative defense dependent on a factual showing of applicability — and thus cannot be
determined at the motion to dismiss stage — and, in any event, a "qualified" privilege is by

---

[7] Ms. Morrison also appears to argue that her assertions that Mr. Langrick followed her home and raped her are protected as "opinion based on disclosed facts." (*See* Mem. at 14.) This argument has no merit because, as set forth herein, the statements at issue simply are not opinion. And in any event, this doctrine only applies where the speaker expresses an ultimate opinion that is based on **true, non-defamatory facts** that are disclosed by the speaker to the listener. *See, e.g., Condit v. Dunne*, 317 F. Supp. 2d 344, 364 (S.D.N.Y. 2004) (the doctrine of opinion based on disclosed facts is inapplicable when the "disclosed facts" are themselves false); *Enigma Software Grp., USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 281 (S.D.N.Y. 2016) (noting that even statements of opinion are actionable "if the predicate facts are disclosed but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity".) Here, as noted in Section I, *supra*, Mr. Langrick amply alleges that Ms. Morrison's statements are entirely false, and that she knew them to be false when she made them.

16

definition overcome by a showing of common law or actual malice.  Ms. Morrison does not dispute

that Mr. Langrick has amply alleged both common law and actual malice, and therefore qualified

privilege cannot be a basis for dismissal of his Counterclaims.

Under New York law, in order for a party to demonstrate that allegedly defamatory

statements are covered by qualified privilege, that party must prove: (1) that she had an interest in

the subject matter of the statements or a moral or legal duty to speak on the matter; and (2) that the

statements were published to a party ***that had a corresponding interest or duty to receive the***

***statement***.  *See, e.g., Frederique v. Cty. of Nassau*, 168 F. Supp. 3d 455, 488 (E.D.N.Y. 2016);

*Sachs v. Matano*, 50 Misc. 3d 420, 422, 22 N.Y.S.3d 310 (N.Y. Sup. Ct. 2015).  This qualified

privilege has a narrow application and New York courts apply it only in limited circumstances

where a defined relationship between the speaker and listener creates both an interest or duty to

speak on the subject matter ***and*** a corresponding interest or duty on the part of the recipient to

receive the communication — for example, statements made by affected persons to police or

regulatory bodies, or statements made between persons who are members of the same organization

or legal entity regarding matters concerning that organization.  *See, e.g*., *Saunders v. McDonald*

*Invests. Inc.*, 110 F. App'x 150, 153 (2d Cir. 2004) (brokerage firm's letter to National Association

of Securities Dealers indicating that two salesmen were terminated for violating company policies

was qualifiedly privileged because the firm was required to report reasons for terminations to the

Association); *Thorsen v. Sons of Nor.*, 996 F. Supp. 2d 143, 174 (E.D.N.Y. 2014) (statements made

by a member of fraternal organization to other members that member stole money was qualifiedly

privileged because the members "share a common interest in the operations of the organization

and how [its] funds are being used"); *Campanella v. Cty. of Monroe*, 853 F. Supp. 2d 364, 371-72

(W.D.N.Y. 2012) (statements made by police lieutenant charging deputy with violating rules in an

internal sheriff's department report were protected by common interest privilege because they were "[w]ork-related communications within a workplace about an employee").

It is well-settled under New York law that communications are ***not*** protected by qualified privilege when they are disseminated to those who do not have a shared interest in the subject matter or a corresponding legal or moral duty to receive the statement at issue.  *See Horton v. Guillot*, No. 1:14-CV-1050, 2016 WL 4444875, at *6 (N.D.N.Y. Aug. 23, 2016).  With respect to Counterclaims II and III, which concern false statements Plaintiff broadcast to the entire world on the internet, courts in New York have repeatedly held that the qualified privilege ***does not apply to statements published indiscriminately to the general public via the internet or the press***, because the speaker cannot demonstrate an interest or duty she shares with the public at large.  *See, e.g.*, *id.* (no qualified privilege for statements made to the media alleging illegal horseracing tactics); *Sachs*, 50 Misc. 3d at 422-23 (statements on a website accusing a doctor of malpractice were not protected because the statements were made to the general public without regard to any shared interest with a specific recipient); *Rosen v. Piluso*, 235 A.D.2d 412, 412 (N.Y. App. Div. 1997) (no qualified privilege for statements made in a published letter to the editor because the statements were communicated to the general public and thus were "disseminated to persons other than those with a corresponding interest or duty in the subject matter of the communication").

Nor can Ms. Morrison articulate any duty she had to make accusations regarding Mr. Langrick to his then-employer, Bloomberg, or how Bloomberg had any relationship with Ms. Morrison that created a shared interest in receiving that communication (Counterclaim I). Ms. Morrison simply does not and did not have the requisite nexus to Bloomberg to create such a duty or interest. *See Lampert v. Edelman*, 24 A.D.2d 562, 563 (N.Y. App. Div. 1965) (defendants' statements disparaging property to a broker and prospective buyer were not protected because

18

defendants shared no common interest or other supporting relationship with the broker and buyer); *Afshari v. Barer*, 186 Misc. 2d 165, 168, 715 N.Y.S.2d 297 (N.Y. Civ. Ct. 2000) (defendant's statements accusing plaintiff of illegal acts to an attorney who represented plaintiff not protected by qualified privilege because defendant shared no common interest with the attorney). No legal, contractual, or professional obligation created a "public or private duty" requiring Ms. Morrison to communicate with Mr. Langrick's employer regarding Mr. Langrick, or a corresponding interest on the part of Bloomberg in receiving a communication about Mr. Langrick from Ms. Morrison.

Moreover, the question of qualified privilege is at this stage an academic one with no relevance to the question of whether or not Mr. Langrick's Counterclaims can proceed, for two reasons. First, "A claim of qualified privilege is an affirmative defense to be raised in [an] answer rather than on a motion to dismiss." *Johnson v. Medisys Health Network*, No. 10-CV-1596, 2011 WL 5222917, at *13 (E.D.N.Y. June 1, 2011), *report & recommendation adopted as modified*, No. CV-10-1596, 2011 WL 4101323 (E.D.N.Y. Sept. 8, 2011); *Flaherty v. All Hampton Limousine, Inc.,* No. 02–CV–4801, 2008 WL 2788171, at *8 (E.D.N.Y. July 16, 2008). The applicability of qualified privilege can ***only*** be adjudicated on a Rule 12(b)(6) motion when the facts necessary to establish the defense are evident on the face of the complaint — or, in this case, the Counterclaims. *Routh*, 981 F. Supp. 2d at 213. Here, Ms. Morrison does not identify any facts alleged in Mr. Langrick's Counterclaims conclusively establishing the existence of a cognizable duty or shared common interest between Ms. Morrison and either Bloomberg or the global internet audience, and therefore the Court cannot make the factual determination at this stage that Ms. Morrison is entitled to claim the protection of any qualified privilege. *See Boushie v. U.S. Investigations Serv., LLC*, No. 06-CV-1289, 2007 WL 607394, at *3 (N.D.N.Y. Feb. 20, 2007)

(court could not make a determination of whether a qualified privilege applied at the motion to dismiss stage where existence of a sufficient relationship between the speaker and the party receiving the communication could not be determined from the face of the complaint).

Second, even if this Court were able to conclusively determine from the facts alleged in the Counterclaims that a qualified privilege attaches to any of Ms. Morrison's statements at issue (and it cannot) it still could not dismiss any of Mr. Langrick's defamation Counterclaims on that basis because by definition a *qualified* privilege is overcome if the statement was published with actual *or* common law malice.  *See Fordham v. Islip Union Free Sch. Dist.*, 662 F. Supp. 2d 261, 276 (E.D.N.Y. 2009).  "Actual malice" is defined as publishing with knowledge that the statement was false or with a reckless disregard for whether or not it was true, *see Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 629 (E.D.N.Y. 2018), while "common law malice" means publishing with spite or ill will, *see Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001). Here, Mr. Langrick amply alleges both actual and common law malice, as he has averred that Ms. Morrison published the statements with knowledge that they were false and that she did so solely out of a vindictive desire to enrich herself at the expense of Mr. Langrick's reputation. (*See e.g.* Countercls. ¶¶ 241-54, 264-67, 281-83, 297-99.)   Ms. Morrison has not argued that Mr. Langrick failed to adequately plead actual or common law malice, and therefore his claims are not subject to dismissal even if a qualified privilege did apply here.  *See Routh*, 981 F. Supp. 2d at 213 (defamation claim could not be dismissed on grounds of qualified privilege where plaintiff alleged that defendant made the statements at issue with knowledge that they were false).

## CONCLUSION

For the foregoing reasons, Defendant-Counterclaimant Robert Langrick respectfully requests that the Court deny Plaintiff Monica Morrison's March 18, 2019 Motion to Dismiss the Defamation Counterclaims.

Dated:  May 21, 2019

Respectfully Submitted,

*/s/ Andrew C. Phillips*
Andrew C. Phillips (pro hac vice)
Thomas A. Clare, P.C. (pro hac vice)
Elizabeth M. Locke, P.C. (pro hac vice)
Shannon B. Timmann (pro hac vice)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: andy@clarelocke.com
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: shannon@clarelocke.com

Daniel A. Singer (DAS 0978)
THE LAW OFFICES OF DANIEL A. SINGER PLLC
New York, New York 10017
Telephone: (212) 569-7853
Email: dan@singerlaw.com

*Attorneys for Defendant-Counterclaimant*
*Robert Langrick*

## CERTIFICATE OF SERVICE

I, Andrew C. Phillips, an attorney with Clare Locke LLP, hereby certify that on May 21,

2019 a copy of the foregoing document was served on all counsel of record via email.

/s/ Andrew C. Phillips
Andrew C. Phillips
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
(202) 628-7404
andy@clarelocke.com