Henry R. Kaufman, P.C.
Henry R. Kaufman (HK-7283)
60 East 42nd Street
New York, New York 10165
(212) 880-0842
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONICA MORRISON, <br><br> Plaintiff, <br><br> v. <br><br> ROBERT LANGRICK, <br><br> Defendant. | INDEX NO: 1:18-cv-06127-CBA-RML <br><br> **AFFIDAVIT OF HENRY R. KAUFMAN IN SUPPORT OF PLAINTIFF'S 12(b)(6) MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS** |

Henry R. Kaufman, Attorney for Plaintiff Monica Morrison, in support of Plaintiff's Motion to Dismiss Defendant's Counterclaims, swears:

### This Motion Presents Issues of Extraordinary Significance
### In the Context of Current Societal Trends

1.  I respectfully submit this affidavit in support of a motion of fundamental consequence to the rights of victims of sexual assault or other sexual abuse, to speak truthfully and openly about their experiences, without fear of the threat or the actuality of retaliatory defamation or other litigation.

2.  I respectfully submit that in considering this motion it is essential for the Court to keep squarely in mind the broader social context of – and afford due sensitivity toward – the current extraordinary, long-overdue and still unfolding revolution in attitudes toward the public

1

airing and frank discussion of such matters, with neither shame nor fear, as embodied in the rapidly developing social movements known variously as #metoo, #timesup, etc.

3. This Court may appropriately take judicial notice of the shocking and increasing frequency of sexual assault, and other unwanted or unconsented sexual contact or activity, resulting from men misusing their often superior physical strength and/or their often predominant business, academic and/or social positions in order to sexually abuse, harass or assault women. Whether victimized as young children or as adults, whether by their own family members or others known or unknown to them, whether at home or in their workplaces or elsewhere, including on college campuses, it has been estimated that – tragically – something like 1 in 3 women (and girls) will suffer the trauma of sexual violence involving physical contact at some time in their lives.[1]

4. Specifically on college and university campuses, this Court can also fairly take judicial notice of recent government data that 1 in 5 women in college experience sexual assault.[2]

5. Yet, until only recently, public discussion of such shockingly widespread traumatic events – that, based on available data, can be roughly estimated to affect well over a million women in college[3] and tens of millions of women and girls in their lifetimes[4] – has largely been suppressed through an almost iron tradition of socially-imposed secrecy – secrecy

---

[1] Smith SG, Zhang X, Basile KC, Merrick MT, Wang J, Kresnow M, Chen J. (2018). The National Intimate Partner and Sexual Violence Survey (NISVS): 2015 Data Brief—Updated Release. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

[2] Krebs, C., Berzofsky, M., Shook-Sa, B., Peterson, K. (2016). Campus Climate Survey Validation Study Final Technical Report. Bureau of Justice Statistics, U.S. Department of Justice.

[33] This very broad estimate is based on an undergraduate population of 16-19 million, with a currently estimated 56% of undergraduates being women. That would translate to as many as 2-plus million based on the 1 in 5 estimate.

[4] Current U.S. female population is approximately 167.5 million. If 1 in 3 of these women will experience sexual violence in their lifetimes, that would be more than 55 million!

exacerbated by means of the shaming and blaming, the discrediting and disbelieving of women and children as the devalued victims of such sexual violence.

6. As one pre-eminent psychiatrist and Harvard scholar in this field has noted, discussion of such taboo subject matter has heretofore "take[n] place outside the realm of socially validated reality." And when this happens, "*Experience becomes unspeakable*." Yet, only "when the truth is finally recognized … can [survivors] begin their recovery." (Judith Herman, *Trauma and Recovery*, Basic Books 1992, 1997, 2015) (emphasis added)

7. This motion seeks to dismiss counterclaims seeking to impose such repressive silence in but a single case, and to put an end to the threats that underlay them that stand squarely in the way of Ms. Morrison's struggle to pursue her own personal recovery and that, in any event, are legally untenable, based on the undisputed facts, and on the legal principles and protections discussed in the accompanying Memorandum of Law.

**The Threat Presented By the Proliferation of Defamation Claims
In the Broader Social Context of #metoo Cases**

8. In the action at bar, this Court will unavoidably be called upon to take a position on one of the most consequential dilemmas of the #metoo movement, at least from the judicial point of view.

9. That is, with the proliferation of defamation actions, or threats of such actions, in the #metoo space, will Courts be pressed to lend themselves as vehicles for the continued suppression of socially-significant speech, along with now highly-publicized and widespread attempts – often by powerful public figures – to enforce oppressive silence by means of "Roger Ailes-style" NDA's[5] down the throats of victims of sexual impropriety, and, where needed, to

---
[5] Note that Plaintiff's case in chief also seeks a declaration as to the unenforceability of the particularly oppressive NDA demanded of Ms. Morrison by Mr. Langrick in the lead up to this litigation.

3

pursue lawsuits to enforce that silence, or to pay for such silence by the transfer of "hush money" to sexual partners of powerful men?

10. Or, on the other hand, will Courts give due and sensitive consideration to the vital need to accord victims of sexual assault the "breathing space" they need in order to "speak their truth" about such deeply personal experiences and, in so doing, to enable them to address and perhaps alleviate the trauma they have suffered?

11. And this dilemma is presented in even more sharp relief here, where a core of admitted facts is already available to put Ms. Morrison's statements about her sexual abuse at the hands of Mr. Langrick into truthful perspective.

12. Her sexual trauma – caused by Mr. Langrick – is no fantasy, as his own pleadings freely and explicitly acknowledge, and as this Court will readily understand.

## Dismissal of the Counterclaims is Warranted
## Because the Central Facts of His Sexually-Assaultive Conduct Are Not Disputed
## – Indeed They Are Admitted – by Mr. Langrick

13. Mr. Langrick's own pleadings and his answer make clear that he does not dispute most of Ms. Morrison's allegations as to his sexually-assaultive behavior.

14. Mr. Langrick's pleadings and counterclaims also contain significant admissions supporting Ms. Morrison's overarching claims of sexual abuse.

15. Mr. Langrick admits that he and Ms. Morrison were strangers before their May 2005 encounter.

16. Mr. Langrick admits that he was nearing 30 while she was still a teenager on that day.

17. Mr. Langrick admits that both he and Ms. Morrison consumed extreme quantities of alcohol. And he cannot deny that he was an eyewitness to her drinking and her ensuing inebriation and incapacitation.

18. Mr. Langrick admits to having been extremely drunk – as drunk as he had ever been. Indeed, he does not deny that during their "encounter" he was stumbling drunk and disoriented, allegedly leading him, among other things: to stagger around Ms. Morrison's dorm room, buck naked, in the presence of her female roommate and the roommate's boyfriend (now her husband) in a bed just six feet away; to brazenly urinate onto objects in her room while still totally naked, in the presence of one or both of her roommates; and to attempt to get into her roommate's bed and to lie next to her roommate's boyfriend.

19. Mr. Langrick admits to having sex with Ms. Morrison, while she was inebriated, without use of a protective condom.

20. Mr. Langrick claims the sex he had with Ms. Morrison was "consensual," although under New Hampshire law – and the law of most if not all other states – it is not possible for legal consent to be given by someone who is incapacitated – and known by the perpetrator to be incapacitated – such as by the voluntary consumption of alcohol or drugs.

21. In fact, a central finding of the police investigation that ensued was that Ms. Morrison was materially incapacitated by alcohol during all of Mr. Langrick's sexual advances. Indeed, the police ultimately concluded that Ms. Morrison was too drunk to make a good witness to her own assault. If that was so, it is unclear how she could possibly have consented to the allegedly consensual sex said to have occurred in the room known as the "cupola."[6]

---

[6] Mr. Langrick relies heavily on his portrayal of Ms. Morrison's ability to navigate a dangerous climb to the cupola as proof that she was not seriously impaired by her heavy drinking and that she was a consenting participant in the supposedly fulfilling sex he says they had there in the cupola. But it is at least an equally-compelling assumption that it was her intoxication that led her to blithely and recklessly ignore any danger of the climb. (Other than one

22. Mr. Langrick also seems almost to take a rather unseemly pride in his claim that Ms. Morrison allegedly had an explosive orgasm during sex with him in the cupola, failing either to be aware of or more likely to being unwilling to acknowledge the known fact that some rape victims – despite their trauma – exhibit signs of sexual arousal while being assaulted.

23. In addition, although he admits to being extremely drunk and to having very limited recollection of many of the events of that day, including *any* recollection of the events in Ms. Morrison's room,[7] Mr. Langrick is somehow adamant that he did not undress and sexually assault Ms. Morrison while she lay unconscious (or otherwise passed out or sleeping) in her dorm room bed or attempt to penetrate her while he was sexually "moaning like a porn star," as reported by her roommate to the police.[8]

24. Yet, in the end, no official finding was ever made, one way or another, as to what did or did not occur in Ms. Morrison's bed that day and there is simply no way that any witness to that event who could possibly say with certainty exactly what did or did not occur – *under the covers of her bed* – as between Mr. Langrick and Ms. Morrison, on that day.[9]

25. And finally, Mr. Langrick does not deny that he was in possession of, and had used and shared with friends, some amount of cocaine (as conclusively established by photos on

---

kiss, Ms. Morrison has consistently maintained that she has no recollection at all of the *entire* alleged sexual encounter in the cupola, including the supposedly athletic maneuvering to get there. And this is yet another indication of her incapacity to consent to the sexual activity in the cupola.)

[7] Actually, in his audiotaped police interview on May 17, 2005 (Final Police Report at 3; DJ Complaint at 38), Mr. Langrick "denied *any* recollection of the events thereafter in Ms. Morrison'[s] bedroom." (emphasis added)

[8] Morrison reference to what her [name redacted] roommate told her she had overheard from her closely proximate bed that morning. *See* Exhibit 1 at 33.

[9] Mr. Langrick also seems to be somehow suggesting in his pleadings that the supposedly wild, admittedly unprotected, allegedly "consensual" sex he claims to have had with Ms. Morrison in the cupola, somehow transformed her from a substantially impaired teenage stranger, whose consent was at the very least in serious doubt, into some kind of willing "sex buddy" whereby her consent to any further "fun" sexual activity – even when she was passed out in her own bed – is either irrelevant or can be presumed. Of course, this is nonsense – outrageous nonsense – both from an interrelational and from a legal point of view.

6

his – expensive, he tells us – camera, that he also drunkenly left behind, that was apparently relied upon by the police in pursuing a drug charge against him;[10] and a scheduled drug that, this Court may justifiably presume, might well have still further impaired Mr. Langrick's judgment, recollection and self-control during his drunken rampage in Ms. Morrison's room.

### Current Broadened Definitions of Sexually-Assaultive Behavior Also Call Into Question Mr. Langrick's Claims as to the Falsity of the Alleged Defamations

26. Moreover, the immediate context of the specific language and terminology Ms. Morrison has employed, in making her allegedly defamatory statements about Mr. Langrick and his indecent assault on her and her roommates that night and morning in May of 2005, is also critical.

27. This is because the definitions of "sexual violence," "sexual assault" and even "rape" have themselves been evolving and expanding so that they now encompass a much broader range of behaviors – behaviors that are no longer confined merely to the more rigid categories of criminal conduct where "rape" only occurs as a result of some predicate and brutal criminal act that physically incapacitates the victim, as in being struck, forcibly restrained, and/or rendered helpless and overwhelmed, if not unconscious, as part of the unconsented act of sexual penetration.

28. Thus, in the context of this motion, this Court can and should take judicial notice of the broader and more fluid definitions that have increasingly been recognized regarding "sexual violence," including "sexual assault" and even "rape" – the very terminology complained of by Mr. Langrick in his three counterclaims.

---

[10] But Mr. Langrick acknowledges – as he must – that he was later arrested and charged with misdemeanor possession and concealing of the cocaine, although he would prefer to obfuscate in his pleadings the obvious and undeniable linkage of the cocaine to the events that day including his wrongful sexual assault on Ms. Morrison, as if it were some completely separate event, which of course it was not. And all of this obfuscation has evidently been in the service of the – untenable – position that he had been "completely exonerated" of "*any* wrongdoing" by the Hanover police.

7

29. For example, according to the Department of Justice, "Rape" in the United States is defined simply and broadly as the "penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim."[11]

30. And, according to the Centers for Disease Control, "sexual violence" now appears to be the favored, simplified and over-arching terminology, but the CDC's definition of sexual violence now covers:

- "**Completed or attempted alcohol or drug-facilitated penetration of a victim** Includes unwanted vaginal, oral, or anal insertion when the victim was unable to consent because he or she was too intoxicated (e.g., unconscious, or lack of awareness) through voluntary or involuntary use of alcohol or drugs."[12]

31. In other contexts, the law of defamation has also traditionally accommodated itself to changing social mores. From the dramatic development more than fifty years ago of the expansive, constitutionally-based, First Amendment privileges in connection with the speech of "public officials" needed in order to defend against the kinds of repressive defamation actions and severe damage awards that could have become a tool to stifle media coverage of the civil rights movement in the South; to the ever-changing definitions of "defamatory meaning," in response to society's evolution of views, for example, toward race, homosexuality, the defense of feminine "chastity," out of wedlock sexual activity, gay marriage, transgender sexuality, the

---

[11] US Department of Justice Archives, An Updated Definition of Rape, January 6, 2012. The previous definition of rape, limited to "forcible rape," for purposes of Uniform Crime Report statistics, had been unchanged since 1927. In commentary to the 2012 revision it was noted that the new definition did *not* require the use of force or violence. And, "[f]urthermore, because many rapes are facilitated by drugs or alcohol, the new definition recognizes that a victim can be incapacitated and thus unable to consent because of ingestion of drugs or alcohol." *See* https://www.justice.gov/archives/opa/blog/updated-definition-rape.

[12] Basile KC, Smith SG, Breiding MJ, Black MC, Mahendra RR., Sexual Violence Surveillance: Uniform Definitions and Recommended Data Elements, Version 2.0. Atlanta (GA): National Center for Injury Prevention and Control, Centers for Disease Control and Prevention (2014).

law of libel has shown the necessary capacity to evolve in assessing what should or should not be considered "going defamatory" over time.

### Who Will Be Permitted to Speak Their Truth and Under What Circumstances?

32. As another way to illustrate and put into perspective the nature of this #metoo case, relative to others, and of the fundamentally troubling assumptions and implications that underlie Mr. Langrick's counterclaims, one can ask a simple question:

33. If Monica Morrison cannot speak out freely, without fear of retaliatory defamation litigation, about the grotesque sexual and other assaults she experienced at the hands of Mr. Langrick, under the largely undisputed facts and circumstances of this case, and with all of the admissions contained in Mr. Langrick's detailed pleadings and counterclaims, and also in the context of an available, contemporaneous police report, based on an official investigation, then what other category of sexually-abused women would be free to speak publicly about their experiences without fear of retaliatory legal claims?

34. In the vast majority of cases, allegations of sexual abuse come down to a classic "he said/she said" dispute. And if in such cases, claims of defamation are not sensitively evaluated, in recognition of the need to protect personal free speech, expression and opinions about one's own most intimate experiences, then the courts may, unfortunately, become complicit by default in favoring the alleged perpetrator who is claimed to have initiated the disputed harassment or abuse from the superior position of power, resources and influence.

35. In any event, the comprehensive body of undisputed facts available here, should, it is respectfully submitted, lead to a socially-sensitive understanding that disputes over the interpretation or the labeling of sexual encounters – as for example being consensual or not –

should be left to discussion in the marketplace of ideas and not in the regressive precincts of courts, compulsory process and the chilling threat of ruinous costs, attorney's fees and damages.

### The Dispositive Significance of Ms. Morrison's Complaint to the Police

36.     In the current case, the deeply-damaging legacy of the societal suppression of free and open expression and discussion about shameful sexual violence was broken – at least to an extent – when Ms. Morrison found the courage to contemporaneously report her allegations of sexual assault to local police authorities.

37.     The police investigation and resultant publicly-available findings – however inadequate, insensitive and indeed regressive they may arguably appear from a more current perspective, almost a decade and a half later – at least put a chink in the typical mold of self-doubt, reticence and guilt too often leading to silence and withdrawal in the face of serious sexual abuse.

38.     Yet, as set forth and acknowledged in the very detailed, competing pleadings herein, even in Monica Morrison's case – with more than enough facts of abusive sexual activity freely admitted by Mr. Langrick – the powerful forces of social suppression still largely succeeded in a refusal to completely credit her claims, thus ultimately placing yet again a lid of secrecy and shame back onto the grotesque and largely undisputed events of May 2005, as between Mr. Langrick and Ms. Morrison, notwithstanding Mr. Langrick's admittedly out-of-control – indeed undeniably outrageous and assaultive – behavior on that day.

### Trauma, Attempted Recovery and the Oppression of Defamation Claims

39.     Finally, it is also undisputed that – in the ensuing dozen years – it was Plaintiff who continued to suffer from the trauma she had experienced at the hands (and other unnamable parts) of Mr. Langrick while – evidently – Mr. Langrick was not in any meaningful sense

traumatized by his own drunken rampage – which he says he barely remembers, in any event. Yet Mr. Langrick appears to have been easily able to get on with his life, career and family – now concerned only by the embarrassment of the public disclosure of his admitted actions.[13]

40. Now, with his three counterclaims, Mr. Langrick seeks to complete this tradition of suppression by seeking to punish Ms. Morrison for her temerity in speaking out about the essentially undisputed material events at issue in this case. And – most saliently – Mr. Langrick now asks this Court – even when the fact of his sexually-assaultive behavior toward Ms. Morrison is almost proudly acknowledged in his pleadings – to serve as the mechanism for the renewal of punitive censorship and suppression in matters involving documented allegations of sexual violence.

41. Surely the embarrassment Mr. Langrick claims, as the result of having his vile, drunken –admitted – sexual rampage exposed, cannot be compared to the decade-long pain and suffering of Ms. Morrison caused by the cavalier assaults that Mr. Langrick perpetrated on her back in that day in 2005.

**The Sound Legal Basis, and the Intensely Personal Need, for Early Dismissal**

42. By this motion to dismiss, on the other hand, Plaintiff urges the Court to decline Defendant's invitation to censor, punish and suppress Ms. Morrison's right – and indeed her deep-seated emotional need and that of other victims of sexual violence – to speak her (and their) truth without unwarranted sanction.

---

[13] Undue space in this affidavit will not be wasted dignifying Mr. Langrick's transparently obvious, but frivolous, future litigation strategy that will apparently spare no expense and leave no stone unturned in attempting to blacken Ms. Morrison's image – should this case be ordered to go forward into discovery and possible trial – by spinning baseless and outrageous fantasies of Ms. Morrison as some kind of lying, cheating, mentally-disturbed, gold-digger – who supposedly even hungered from the very get go for her measly share of a $200 meal! – who is now supposedly seeking to exploit her decade and a half of allegedly "fake" trauma for the crass purpose of gaining "publicity" and consequent "riches" at the expense of Mr. Langrick's long ago, white-washed image. This is complete nonsense, as any further-developed record would show.

11

43. Toward the same end, by her pre-answer motion to dismiss, along with her Declaratory Judgment claims, Ms. Morrison urges this Court to give the highest priority to the protection of her human and First Amendment rights, at the very outset of this case, based on fundamental and well-established constitutional and other legal principles – many of them specifically adopted in order to avoid the chill and expense of defending facially baseless defamation claims along with the extended, costly litigation they would otherwise require.

### The Specific Context of Defendant's Counterclaims for Defamation

44. Defendant's threat of a slander claim was first made in response to Plaintiff's fateful decision –in the context of the burgeoning #metoo movement – to speak out publicly about her experience of Defendant's sexual assault, for the stated purpose of warning and protecting others on college and university campuses with an interest – shared in common – in avoiding victimization. And Ms. Morrison knew – from her undisputed first-hand experience – that, on at least one occasion, Mr. Langrick had been the perpetrator of a drunken, out-of-control, sexually-abusive assault on a college campus against a teenage student who was essentially a stranger to him, and who was obviously (and personally known to him to be) impaired by heavy drinking.

45. Plaintiff's underlying case in chief seeks declarations by this Court protecting her – in three ways – from Defendant's live, active and recurring threats, to commence a slander action to silence her, and as punishment for her temerity in speaking out about her life-changing experience with Mr. Langrick in May 2005.

46. Nonetheless, in response to Plaintiff's attempt to protect herself by means of her preemptive declaratory judgment action, Defendant has now made good on his longstanding,

purposeful threats of retribution by asserting herein his three meritless Counterclaims for defamation against Plaintiff.

47. Defendant's first counterclaim relates to an allegedly "slanderous" telephone call, made by Defendant to functionaries at Mr. Langrick's employer, Bloomberg LP, on January 2, 2018. According to Defendant's pleading, Plaintiff stated that she was calling about Bloomberg executive Robert Langrick; she allegedly stated that Mr. Langrick "attempted to sexually assault me in college." Plaintiff allegedly also stated that, "He [Defendant] followed me home, I was passed out and when I woke up he was trying to rape me" and that she further stated that she had reported Mr. Langrick but that "the police did nothing." This is the original claim that Mr. Langrick and his counsel, Mr. Singer, had been threatening to pursue against Ms. Morrison in the months before November 1, 2018, shortly before the statute of limitations would have expired, and after Mr. Singer had rejected a proposed tolling agreement, when she commenced her Declaratory Judgment action seeking, *inter alia*, a declaration from this Court that her call to Bloomberg did not amount to actionable slander.

48. Defendant's Second Counterclaim is for the "libel" allegedly inflicted by Ms. Morrison's online post, also in January 2018, on a video website known as "Vimeo." Vimeo is an ad-free open video platform providing tools and technology to, inter alia, distribute and display videos. Ms. Morrison's allegedly defamatory post is of a video recording of a speech given by Mr. Langrick, titled "Bloomberg for Education," on or about June 26, 2015. The otherwise unedited video is presented in proximity to the single-word comment, "Rapist."

49. Defendant's Third Counterclaim, also for "libel," is alleged to arise out of a "personal review" of Mr. Langrick posted online by Ms. Morrison, in July 2018, on an Internet site known as "MyLife.com." MyLife.com is a website that offers visitors an opportunity to

13

"rate" people in their lives, yielding a "reputation score." In her "review" of Mr. Langrick, Plaintiff repeated her belief that Mr. Langrick had "sexually assaulted" her and characterized his attempt to penetrate her while she was unconscious as "rape."

50. Plaintiff now moves to dismiss Defendant's three counterclaims, pursuant to Fed.R.Civ.P. 12(b)(6), based on the following central legal deficiencies that are more fully briefed and examined in the accompanying Memorandum of Law:

(i) To the extent Counterclaim Defendant's statements, or any of them, are deemed to be ones of fact as opposed to opinion, they are true and Mr. Langrick will be unable to meet his burden of proving otherwise;

(ii) The alleged defamations, properly understood, are non-actionable statements of opinion under New York's especially-protective state constitutional privilege for statements of opinion; and

(iii) The allegedly defamatory communications are protected by New York's qualified privileges for communications made in the discharge of some public or private duty as well as communications on a subject in which the parties to the communication share a common interest.

## CONCLUSION

51. Based on all of the foregoing, along with the points more fully set forth in the accompanying Memorandum of Law, this Court should grant Plaintiff's motion to dismiss each of the three of Counterclaims against her, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted. It should then turn its exclusive attention to the remainder of Plaintiff's case in chief.

*[signature]*
Henry R. Kaufman (HK-7283)
HENRY R KAUFMAN, PC
*Attorneys for Plaintiff and Counterclaim Defendant*
60 East 42nd Street, 47th Floor
New York, New York 10165
(212) 880-0842

Signed and sworn before me
this 18th day of March, 2019

*[signature]*
Notary Public

SUSAN STEIGER
Notary Public, State of New York
No. 31 4799454
Qualified in New York County
Commission expires August 31, 20_21_

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Affidavit of Henry R. Kaufman in Support of Plaintiff's 12(b)(6) Motion to Dismiss Defendant's Counterclaims in the above captioned matter was served on the below counsel of record on March 18, 2019, in accordance with the Rules of Civil Procedure:

Thomas A. Clare (admitted pro hac vice)
Elizabeth M. Locke (admitted pro hac vice)
Andrew C. Phillips (admitted pro hac vice)
Shannon B. Timmann (admitted pro hac vice)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: andy@clarelocke.com
Email: shannon@clarelocke.com
Daniel A. Singer (DAS 0978)
THE LAW OFFICES OF DANIEL A. SINGER PLLC
New York, New York 10017
Telephone: (212) 569-7853
Email: dan@singerlaw.com

*Attorneys for Defendant Robert Langrick*

Dated: March 18, 2019                            By: */s/ Henry R. Kaufman*
                                                      Henry R. Kaufman