Henry R. Kaufman, P.C.
Henry R. Kaufman (HK-7283)
60 East 42nd Street
New York, New York 10165
(212) 880-0842
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MONICA MORRISON, | ) | CASE NO. 1:18-cv-06127 (CBA)(RML) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT LANGRICK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## OF MONICA MORRISON'S
## MOTION TO DISMISS THE DEFAMATION COUNTERCLAIMS

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

SUMMARY OF ARGUMENT .........................................................................................4

ARGUMENT.....................................................................................................................5

POINT I – IF VIEWED AS STATEMENTS OF FACT, MS. MORRISON'S
ALLEGEDLY DEFAMATORY STATEMENTS ARE TRUE; IN ANY EVENT,
BASED ON HIS OWN ADMISSIONS, MR. LANGRICK WILL BE UNABLE
TO MEET HIS BURDEN OF PROVING THAT ANY OF THE THREE
STATEMENTS ARE FALSE ....................................................................................5

POINT II – MS. MORRISON'S ALLEGEDLY DEFAMATORY STATEMENTS,
EXPRESSING HER SENTIMENTS ABOUT WHAT ROBERT LANGRICK
DID TO HER DURING A DRUG AND ALCOHOL-FUELED ENCOUNTER,
IN MAY 2005, ARE CONSTITUTIONALLY-PROTECTED STATEMENTS OF
OPINION WHEN ANALYZED UNDER THE GOVERNING STANDARDS OF
ARTICLE I, §8 OF THE NEW YORK STATE CONSTITUTION ...........................9

POINT III – ESPECIALLY IN THE CONTEXT OF THE BURGEONING
#METOO MOVEMENT, MS. MORRISON'S ALLEGEDLY DEFAMATORY
STATEMENTS MUST ALSO BE PROTECTED BY NEW YORK'S QUALIFIED
PRIVILEGES FOR (1) COMMUNICATIONS MADE IN THE DISCHARGE OF
SOME PUBLIC OR PRIVATE DUTY AND (2) COMMUNICATIONS ON
A SUBJECT IN WHICH THE PARTIES SHARE A COMMON INTEREST ........15

CONCLUSION ..............................................................................................................16

TABLE OF AUTHORITIES

Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC, 151 F. Supp. 3d 287
        (E.D.N.Y. 2015)...................................................................................13

Brahms v. Carver, 33 F. Supp. 3d 192 (E.D.N.Y.  2014)..................................................13

Brian v Richardson, 87 N.Y.2d 46 (1995) .......................................................... 10-12, 14

Chandok v. Klessig, 632 F.3d 803 (2d Cir. 2011) ...........................................................16

Commonwealth Motor Parts, Ltd. v. Bank of Nova Scotia, 44A.D.2d 375
        (1st Dept. 1974), aff'd, 37 N.Y.2d 824 (1975) .......................................................5

Fairly v. Peekskill Star Corp., 83 A.D.2d 294 (2d. Dept. 1981)........................................5

Garson v. Hendlin, 141 A.D.2d 55 (2d Dept. 1988)........................................................16

Gross v. New York Times Company, 82 N.Y.2d 146 (1993) ....................................10, 15

Immuno v. Moor-Jankowski,  74 N.Y.2d 548 (1989) ........................................................9

Immuno AG v. Moor-Jankowski, 77 N.Y.2d 235, cert. denied,
        500 U.S. 954 (1991)................................................................................10,11

Liberman v. Gelstein, 80 N.Y.2d 429 (1992) ...........................................................15, n.5

Liere v. Scully, 79 A.D.3d 821 (2d Dept. 2010)..............................................................16

Lovell v. Houghton, 116 N.Y. 520 (1889)........................................................................16

Mann v. Abel, 10 N.Y.3d 271 (2008) ........................................................................10, 11

Matter of Woodbridge Structured Funding, LLC v. Pissed Consumer,
        125 A.D.3d 508 (1st Dept. 2015)..........................................................................13

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990) ...................................................9, 10

Mr. Chow of N.Y. v. Ste. Jour Azur S.A., 759 F.2d 219 (2d Cir. 1985)....................14, n.4

Rinaldi v. Holt, Rinehart & Winston, 42 N.Y.2d 369 (1977)...........................................10

Sandals Resorts Intl. Ltd. v Google, Inc., 86 A.D.3d 32 (1st Dept 2011) ........................13

Steinhilber v. Alphonse, 68 N.Y.2d 283 (1986) .....................................................9, 10, 14

Toker v. Pollak, 44 N.Y.2d 211 (1978) ....................................................................15, 16

Versaci v. Richie, 30 A.D.3d 648 (3d Dept 2006)............................................................13

Weis v. Schuebart, 2012 N.Y. Misc. LEXIS 2012, NY Slip Op 30820(U)
    (Suffolk Co. March 12, 2012)....................................................................................

## PRELIMINARY STATEMENT

The admitted and undisputed facts, as set forth in detail in the lengthy and explicit competing pleadings in this case, and in written police findings[1], are determinative of this motion and of Mr. Langrick's counterclaims. Bottom line: even strictly limiting the analysis to those facts that are admitted by Mr. Langrick, dismissal of each of his three counterclaims for slander or libel is mandated as a matter of law.

It is undisputed that, on the evening and morning of May 8, 2005, Counterclaimant Robert Langrick, then a 29-year old graduate student, had a drug and alcohol fueled encounter with Plaintiff Monica Morrison, a 19 year old teenager, who he had only "met" that day. According to Mr. Langrick, after drinking next to each other at a frat party to the point of severe inebriation, he first had sexual intercourse Ms. Morrison in a room at her dorm room known as "the cupola." Mr. Langrick claims that first sexual encounter (during which he also confesses to not using a condom) was "consensual." Yet he also acknowledges, as he must, that he and Ms. Morrison were both exceedingly drunk, which of course is a decisive factor in determining whether Ms. Morrison could possibly have been sober enough to have given her legal consent to such unprotected sexual intercourse with a much older stranger. Also highly pertinent is that Ms. Morrison has, from the very beginning, consistently reported that she actually had and has *no memory* of any of the claimed events inside the cupola. This inability to recall is itself another powerful, legally-recognized index of incapacitation and lack of consent.

No official determination has ever been made as to Ms. Morrison's capacity to consent to that first sexual encounter. Given the amount of alcohol admittedly consumed before that sexual

---

[1] *See* Declaratory Judgment Complaint, Exhibit 1, at 30-46.

encounter – no one could conclusively claim that the sexual intercourse was consensual. Moreover, the final written police report made no direct finding, one way or another, on the issue of consent. However, there was another official finding by the police that in fact accorded dispositive significance to Ms. Morrison's heavy intoxication for a related purpose (*i.e*., whether Ms. Morrison could be an adequate witness to her own sexual assault). And the finding that she was too drunk to make a good witness would certainly support a finding that Ms. Morrison was also *not legally capable* of giving her consent during that first episode of claimed "consensual" sexual intercourse in the cupola.

Based on those undisputed factual circumstances, Monica Morrison should not on any theory be precluded – especially in the United States of America under the First Amendment and cognate state constitutional protections, and during the full flowering of the #metoo movement finally lifting the veil from the widespread abuses of power by men over women often lacking the power to effectively withhold their consent – from forming, holding and communicating the opinion that she had been "sexually assaulted"– or indeed, that she had been "raped" – for the very reason of her lack of capacity to legally consent to the sex — due to her intoxication, as admitted by Mr. Langrick.

Similarly, as far as the events described in the pleadings that took place in Ms. Morrison's dorm room, there were witnesses (her roommate and her roommate's boyfriend, now her husband) who were and are able to corroborate critical aspects of the further sexual assault by a noisy Mr. Langrick, making telltale sexual sounds, coming from Ms. Morrison's bed just feet away from where they were at the time, and that they overheard. It is clear that the roommate and/or her boyfriend were also able to observe and/or be directly impacted by much of Mr. Langrick's subsequent drunken and out-of-control behavior in Ms. Morrison's dorm room

that morning, urinating on one of her garments, evidently "shitting" his underpants and then bizarrely looking for someone else to lie down with.

Finally, as far as any other witnesses to the events under the covers in the dorm room, the only other possible witnesses were Mr. Langrick and Ms. Morrison. But Mr. Langrick told the police he remembered *nothing* about what happened in the dorm room. And so it is only Ms. Morrison who can testify to what happened in her bed. And she has recounted, from the outset, that what she experienced under those covers, after being jarred into consciousness by Mr. Langrick's sudden, shocking and vile physical and verbal attempts at initiating more sexual contact with her included penetration of her anus. And however adamantly Mr. Langrick might wish to deny her testimony in that regard, on what basis could he possibly do so? He remembered *nothing* that happened in the dorm room, he told the police. Yet the roommates placed him in Monica's bed, feet away, "moaning like a porn star." By all accounts, he emerged from Monica's bed completely naked and drunkenly out of control, needing to relieve himself (which he did) and looking for someone else to lie down with.

At the end of the day, one simple and potentially dispositive question remaining to be considered in connection with this motion becomes whether – in the context of the pleaded and undisputed facts, along with the official police findings at the time – Ms. Morrison is entitled to hold – and to communicate to third parties – her personal experience, and her well-founded opinion, that even only those facts of her encounter as are either admitted by Mr. Langrick, or that he cannot possibly dispute, can themselves fairly be described, *inter alia*, as admissions by Mr. Langrick of his sexual assaults on her person – indeed, assaults actually amounting to "rape" under the currently-accepted, broad and rapidly evolving definitional scope of that term in this #metoo era.

3

Accordingly, and, in sum, given these admitted facts and/or undisputed testimony and findings, along with those set forth and analyzed at greater length hereinbelow and in the accompanying affidavit, it is respectfully submitted, as will become readily apparent to this Court, that each and every one of the applicable elements of New York's common and constitutional law of defamation fully support an on-the-pleadings conclusion that Mr. Langrick simply has no possible viable claim for slander or libel as against Ms. Morrison, and that, therefore, this 12(b)(6) motion should be granted and Defendant's counterclaims should be dismissed.

To hold otherwise would be to involve this Court in the all-too-common attempts of men, who have assaulted less powerful women, to perpetrate a "second assault" by employing defamation law as a tool in seeking to silence them.

## SUMMARY OF ARGUMENT

On the issue of "truth" or "falsity," if viewed as statements of fact, Ms. Morrison's allegedly defamatory statements are true when judged in the context of Mr. Langrick's own admissions in the pleadings herein. In any event, for purposes of a claim of defamation under New York law, it is the burden of the party alleging defamation to prove falsity. In that regard, were Mr. Langrick held to be a "public figure," he would be required to prove falsity by "clear and convincing" evidence. On the other hand, if Mr. Langrick is held to be a "private figure," because allegations of rape and sexual assault of a college student – especially in this #metoo era – are certainly matters of "public interest and concern," it will be his burden to prove defamation by a "preponderance of the evidence." Yet under the admitted or undisputed facts, Mr. Langrick will quite simply not be able to sustain whatever might be his burden as far as proof of the falsity of plaintiff's three allegedly defamatory statements. (Point I)

4

In any event, New York's tradition of extremely broad constitutional protection for statements of opinion ("decidedly more protective" even than the First Amendment), mandates the conclusion that both the "sexual assault" and the "rape/rapist" statements, in context, cannot properly be viewed as anything other than statements of opinion, protected under Article I, §8 of the New York State constitution. (Point II)

And finally, all three of Ms. Morrison's allegedly defamatory statements were also subject to one and/or the other of two "qualified" common law privileges, recognized under New York law (i) for communications made in the discharge of some public or private duty to one with a corresponding duty, and (ii) for communications on a subject in which the parties share a common interest. (Point III)

## ARGUMENT

## I.

### IF VIEWED AS STATEMENTS OF FACT, MS. MORRISON'S ALLEGEDLY DEFAMATORY STATEMENTS ARE TRUE; IN ANY EVENT, BASED ON HIS OWN ADMISSIONS, MR. LANGRICK WILL BE UNABLE TO MEET HIS BURDEN OF PROVING THAT ANY OF THE THREE STATEMENTS ARE FALSE

Under New York law, "truth" is an absolute, unqualified defense to a defamation claim. *Commonwealth Motor Parts, Ltd. v. Bank of Nova Scotia*, 44A.D.2d 375 (1st Dept. 1974), *aff'd*, 37 N.Y.2d 824 (1975). If the party alleging defamation is a public official or a public figure, the burden is on him to establish falsity by "clear and convincing" evidence. *Yiamouyannis v. Consumers Union*, 619 F.2d 936 (2d Cir. 1980). If the defamation claimant is a private figure, in a matter of "public concern," the burden is on him to prove falsity by a "preponderance of the evidence." *Fairly v. Peekskill Star Corp.*, 83 A.D.2d 294 (2d. Dept. 1981).

Applying these well-settled standards, as for his First Counterclaim for slander[2] by Ms.

Morrison, in her January 2, 2018 telephone call to a representative of Bloomberg, Mr. Langrick

admits to having had sex with Ms. Morrison in the cupola, while she was extremely inebriated.

There has never been any official finding of legal consent to that (unprotected) intercourse with

an alcoholically-impaired  teenager who had been a complete stranger to him before that drunken

encounter. Indeed, a subsequent police investigation found that, at the time, Ms. Morrison was

too inebriated to make a competent witness to her own assault. Therefore, the allegation that Mr.

Langrick "sexually assaulted" Ms. Morrison in the cupola (even if it is deemed a statement of

fact rather than of the opinion it also was – *see* Point II below) is either true, or at least it cannot

possibly be proven false, as is Mr. Langrick's burden. And even if it were argued (unsustainably,

Ms. Morrison submits) that an allegation of "sexual assault" or "attempted rape" could somehow

*only* reasonably be interpreted as a *factual* claim of *criminal* conduct, that contention also could

not be sustained in the case of Ms. Morrison's oral statements to Bloomberg, as memorialized in

Bloomberg's own records. That is because, as acknowledged in Mr. Langrick's First

Counterclaim, after referencing the "sexual assault of a 19 year old," Ms. Morrison immediately

made clear, to the Bloomberg representative, that the police "did nothing about it." In other

words, the referenced "sexual assault" claim could not reasonably have been understood, in

context, as any false claim that there was an official finding of criminality on the part of Mr.

Langrick because, since Morrison admitted upfront that the police "did nothing about it," the

---

[2] Mr. Langrick's *exact* claim as to what Ms. Morrison told Bloomberg (Langrick's employer who she had learned was dispatching him to college and university campuses to recruit students) is as follows: "Ms. Morrison stated that she was calling about Bloomberg executive Robert Langrick and stated that Mr. Langrick 'attempted to sexually assault me in college.' Ms. Morrison further stated that, 'He followed me home, I was passed out and when I woke up he was trying to rape me.' She further claimed that she had reported Mr. Langrick but that 'the police did nothing.'" *See* Langrick Answer and Counterclaims at ¶193.

referenced "sexual assault" could not reasonably have been understood as a claim based on the suggestion of any finding – or even any charge – of a criminal nature.

As far as the allegedly defamatory "personal review" on MyLife.com,[3] the only two statements in that lengthy post that could possibly be contested by Mr. Langrick – under the admitted or undisputed circumstances here – would be that "Rob committed sexual assault" along with that portion of the otherwise self-evidently conditional and hypothetical statement referencing: "… penetrating and attempting anal sex with an unconscious woman…" But Ms. Morrison is surely entitled to describe the sexual activity that Mr. Langrick admittedly engaged in as a "sexual assault," in light of her admittedly severely inebriated condition, not to mention the fact that Mr. Langrick also admits that he chose not to use a condom during that encounter – thus inevitably placing Ms. Morrison in some meaningful jeopardy of contracting sexually transmitted disease or becoming pregnant. One must therefore reasonably ask how that – in and of itself – would not be fairly and truthfully described as a "sexual assault," by any common sense standard – even dating back to the "ancient history" of the year 2005? For in that year – this Court can take judicial notice –STDs were already a widespread, dangerous and potentially

---

[3] The verbatim language of Ms. Morrison's allegedly defamatory, "personal review" of Mr. Langrick, posted on MyLife.com, and the subject of Mr. Langrick's Third Counterclaim, is as follows: "Rob committed sexual assault with a woman who was 19 years old when he was a business school grad at Tuck and he was in his late 20's. He urinated in the room of the victim and also left drugs in her room, which he attempted to tell police did not belong to him. Afterward, he attempted to pay off the victim with $200 in cash and an apology note. He was arrested for criminal activity related to the night in question. He also hired a lawyer in attempts to silence and intimidate his victim, using the threat of a slander lawsuit. He also had his attorney lie on his behalf. His own attorney falsely stated that the police determined that no wrongdoing occurred on the night in question, even though Rob was arrested for drug possession. If you believe that penetrating and attempting anal sex with an unconscious woman is rape, then you would likely call him a rapist. On top of that, he has attempted to avoid accepting responsibility for every single bad decision he has made in relation to the circumstance – going as far as literally blaming the victim for his own criminal activity. It seems that to him, speaking about his criminal activity is more of a violation that [sic] the criminal acts themselves. The irony for all of this is not at all lost on his victim and his victim's attorney." *See* Langrick Answer and Counterclaims at ¶211.

deadly epidemic among both teenagers and adults and condoms were in general use by those caring to protect their sexual partners from such dangers.

And finally, as far as the allegedly defamatory Vimeo post of the single word, "Rapist," complained of in Mr. Langrick's Second Counterclaim, by any definition (current or historic), Mr. Langrick could truthfully be labeled a "rapist," based on his admitted sexual intercourse with Ms. Morrison who he knew by first hand observation to be very drunk, whose ability to legally consent to such activity is therefore unproven and whose consent has never been formally or officially determined, one way or another. Moreover, Mr. Langrick is simply unable to deny the objective fact that he later also ended up naked in Ms. Morrison's dorm room bed, "moaning like a porn star," according to the only eyewitnesses to that event other than Ms. Morrison, at a time when, Mr. Langrick told the police, he was so drunk that he remembered *nothing at all* about what happened in Ms. Morrison's dorm room.

And so one must ask, where is the evidence – much less a preponderance of the evidence – that could possibly support Mr. Langrick's claim that under those covers, where only he and Ms. Morrison lay – he had not attempted to once again initiate sex with – and to penetrate or attempt to penetrate – Ms. Morrison while she was unconscious or slept – still indisputably compromised by alcohol – in that bed on the day in question?

By any definition, it is respectfully submitted, this can be characterized as "rape"– and which characterization by Ms. Morrison should be without legal consequences.

## II.

**MS. MORRISON'S ALLEGEDLY DEFAMATORY STATEMENTS, EXPRESSING HER SENTIMENTS ABOUT WHAT ROBERT LANGRICK DID TO HER DURING A DRUG AND ALCOHOL-FUELED ENCOUNTER, IN MAY 2005, ARE CONSTITUTIONALLY-PROTECTED STATEMENTS OF OPINION WHEN ANALYZED UNDER THE GOVERNING STANDARDS OF ARTICLE I, §8 OF THE NEW YORK STATE CONSTITUTION**

Over nearly three decades now, at least since the New York Court of Appeals expressly rejected the federal approach to opinion analysis under the First Amendment as too narrow, the Court of Appeals has staked out a separate state constitutional test of its own for identifying and broadly protecting statements of opinion.

The history of New York's "decidedly more protective" state constitutional protection for statements of opinion, under Article I, §8 of the New York State constitution can be briefly summarized.

The Court of Appeals first articulated its approach to separating potentially actionable statements of fact from constitutionally-protected expressions of opinion in *Steinhilber v. Alphonse*, , 68 N.Y.2d 283 (1986). Later, in *Immuno v. Moor-Jankowski*, 74 N.Y.2d 548 (1989) (*Immuno I*), the Court of Appeals carefully applied its *Steinhilber* analysis to affirm  a grant of summary judgment on the ground that the allegedly defamatory statements involved constitutionally-protected opinion.

While *Immuno I* was pending on *certiorari*,  the U.S. Supreme Court decided its own case addressing the breadth of First Amendment protection for statements of opinion. *Milkovich v. Lorrain Journal*, 497 U.S. 1 (1990). Based on that decision, the Supreme Court remanded *Immuno I* for reconsideration in light of *Milkovich*.

On remand, the New York Court of Appeals concluded that its decision to grant summary judgment was proper under the holding in *Milkovich*, 77 N.Y.2d 235, *cert. denied*, 500 U.S. 954 (1991).  In addition, it analyzed the case on the separate and independent ground of New York State law, including Article I, Section 8 of the New York State Constitution, "beginning with the declaration that 'every citizen may freely speak, write and publish * * * sentiments on all subjects.'"  77 N.Y.2d at 249.

Indeed, as the Court of Appeals has made resoundingly clear, for nearly three decades now, the New York State Constitution is even more protective of speech than the First Amendment:

> [T]his Court . . . under our own State Constitution . . . has embraced a test for determining what constitutes a nonactionable statement of opinion that is more flexible and is decidedly more protective of the cherished constitutional guarantee of free speech.

*Gross v. New York Times Company*, 82 N.Y.2d 146, 152, 603 N.Y.S.2d 813, 816 (1993) (*citing Immuno II*, 77 N.Y.2d at 256).

Whether a potentially actionable statement is one of fact or opinion is a question of law to be decided by the Court.  *Rinaldi v. Holt, Rinehart & Winston*, 42 N.Y.2d 369, 381, 397 N.Y.S.2d 943, 950 (1977).  To aid courts in the "difficult task" of separating constitutionally protected expression of opinion from potentially actionable statements of fact, the Court of Appeals has set forth the following factors to be considered:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Mann v. Abel*, 10 N.Y.3d 271, 276, 856 N.Y.S.2d 31, 33 (2008) (*quoting Brian v. Richardson*, 87 N.Y.2d 46, 51, 637 N.Y.S.2d 347 (1995), quoting *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813 (1993), *quoting Steinhilber v. Alphonse*, 68 N.Y.2d 283, 292, 508 N.Y.S.2d 901, 905 (1986).

In conducting the required analysis, the Court of Appeals in *Immuno II* expressly rejected the Supreme Court's approach in *Milkovich* for distinguishing fact from opinion, holding that the Supreme Court's emphasis on an initial search for segregable statements of fact, would lead to an all too frequent finding of actionable facts in what the Court of Appeals viewed as inappropriate circumstances:

> Isolating challenged speech and first extracting its express and implied factual statements, without knowing the full context in which they were uttered, indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context.

*Immuno II*, 77 N.Y.2d at 255,  *accord, Mann v. Abel*, 10 N.Y.3d at 276 ("declin[ing] to adopt an analysis that would require courts first to search the article for particular factual statements and then to hold such statements actionable unless couched in figurative or hyperbolic language").  Such "hypertechnical parsing of a possible 'fact' from its plain context of 'opinion' loses sight of the objective of the entire exercise, which is to assure that . . . the cherished constitutional guarantee of free speech is preserved." *Immuno II*, 77 N.Y.2d at 256, 566 N.Y.S.2d at 918. Instead, the Court of Appeals in *Immuno II*, and ever since that time, has repeatedly emphasized the importance of *first* "looking at the content of the whole communication, its tone and apparent purpose." *Id*. at 254; *Brian*, 87 N.Y.2d at 51;, 637 N.Y.S.2d at 350-51; *Mann*, 10 N.Y.3d at 276, 856 N.Y.S.2d at 33.  Consideration of the "context" within which the allegedly defamatory comments were published is critical, and the Court of Appeals has repeatedly directed courts to begin, rather than end, the analysis with context:

> [S]tatements must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying any facts.

*Immuno II*, 77 N.Y.2d at 254, N.Y.S.2d at 917 (emphasis in original); *Mann*, 10 N.Y.3d at 276, 856 N.Y.S.2d at 33 (courts must "look to the over-all context in which the assertions were made

and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff" (internal citations and quotations omitted); *Brian*, 87 N.Y.2d at 51, 637 N.Y.S.2d at 351 ("Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff").

Although three of the judges concurred in a separate opinion in *Immuno II*, arguing that they would *not* have engaged in a separate analysis under state law, Judge Kaye's majority opinion has for nearly thirty years become the governing standard by which New York State courts have distinguished potentially actionable statements of fact from constitutionally protected expressions of opinion.

Moving beyond this overarching philosophical structure of the fact/opinion dichotomy, it is illuminating – indeed ultimately dispositive – to dig a bit deeper into how courts – including the Court of Appeals in subsequent cases – have applied *Immuno II* and its progeny.

As to their "tone and apparent purpose," all three of Ms. Morrison's allegedly defamatory communications share the purpose of sounding a warning about Mr. Langrick, whether sharing her concerns through a telephone conversation with his employer, posting a "personal review" of Mr. Langrick on MyLife.com, or uploading to Vimeo a single word of commentary on a video presentation by Mr. Langrick.

All of these communications must also be assessed within the broader social context of the #metoo movement, which has educated women (and many men) that male behavior and

treatment of women once considered acceptable no longer is, and that the open and robust public

discussion of such behavior is no longer off limits.

For example, the police who originally investigated Ms. Morrison's complaint concluded

that her inebriation was an impediment to prosecution.  Today (and with much of the credit due

to the #metoo movement) the fact that Ms. Morrison was too drunk to make a reliable witness to

her own assault would surely be viewed by prosecutors as *supporting* rather than *preventing* a

prosecution.

And Ms. Morrison's communications "related to a public controversy," *Immuno II*, 77

N.Y.2d at 254 –  namely, in the case at bar, one involving sexual assault on a college campus,

also currently subject to a wide-ranging public debate on the issue of so-called campus "date

rape."

Moreover, the fact that both the Vimeo and MyLife.com communications occurred as

anonymous Internet postings have also been widely held to signal that what is being read is

opinion rather than fact:

> The culture of Internet communications, as distinct from that of print media such as
> newspapers and magazines, has been characterized as encouraging a freewheeling,
> anything-goes writing style.

*Sandals Resorts Intl. Ltd. v Google, Inc.*, 86 A.D.3d 32, 43-44 (1st Dept 2011); *accord*, *Bellavia*

*Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015) ("New

York courts have consistently protected statements made in online forums as statements of

opinion rather than fact."); *Matter of Woodbridge Structured Funding, LLC v. Pissed Consumer*,

125 A.D.3d 508, 509 (1st Dept. 2015) (disgruntled tone, anonymous posting . . . on consumer

grievance website); *Versaci v. Richie*, 30 A.D.3d 648, 649  (3d Dept 2006) ("rambling

commentary . . . on an Internet public message board . . .  where people air concerns about any

matter" was opinion), *lv denied*, 7 N.Y.3d  710, 855 NE2d 1173 (2006); *Brahms v. Carver*, 33 F.

Supp. 3d 192, 198-199 (E.D.N.Y.  2014) (statement "made on an internet forum where people typically solicit and express opinions" is non-actionable opinion).

Lastly, the MyLife.com posting is expressly identified as a "personal review," which, on its face, signals to the reader that what they are looking at is based on a subjective point of view, and not professional reporting as in a journalistically-vetted, objective wire service news report.

In any event, the MyLife.com "review" is also clearly protected as "pure opinion" under New York law:

> A "pure opinion" is a statement of opinion which is accompanied by a recitation of the facts upon which it is based.  An opinion not accompanied by such a factual recitation may, nevertheless, be "pure opinion" if it does not imply that it is based upon undisclosed facts.

*Steinhilber*, 68 N.Y.2d at 289.  Ms. Morrison set forth all the facts on which she based her opinion that Mr. Langrick had committed sexual assault, and indeed, as she also defines it therein, rape.[4]

As to the "specific" context, many of the factors that have been identified which point to a characterization of opinion rather than fact, are also shared by this case.

*Brian v. Richardson* is especially notable because in that case the Court of Appeals held that even a suggestion of "murder" could, in the particular context, be considered a statement of opinion rather than fact.  Among contextual elements that would signal to readers that they were encountering opinion, *Brian* first identified the fact that the writer made clear that he was not a disinterested observer, as does Ms. Morrison in the case at bar. Additionally, the tone of the article at issue in *Brian* signaled readers (much as the tone of Ms. Morrison's in the case at bar) that it "was something less than serious, objective reportage."  87 N.Y.2d at 53.

---

[4] It is also protected under a litany of restaurant review cases. *See*, *e.g.*, Mr. Chow of N.Y. v. Ste. Jour Azur S.A., 759 F.2d 219, 227 (2d Cir. 1985) ("Restaurant reviews are also the well recognized home of opinion and comment.")

Finally, since *Gross,* the question of whether seeming allegations of criminality can be statements of opinion has been considered and authoritatively determined by the Court of Appeals. The Court has squarely rejected the claim that there is any rule mandating that all allegations of crime must be deemed actionable statements of fact:

> Although plaintiff repeatedly suggests otherwise, there is simply no special rule of law making criminal slurs actionable regardless of whether they are asserted as opinion or fact.

*Gross*, 82 N.Y.2d at 155.

## III.

### ESPECIALLY IN THE CONTEXT OF THE BURGEONING #METOO MOVEMENT, MS. MORRISON'S ALLEGEDLY DEFAMATORY STATEMENTS MUST ALSO BE PROTECTED BY NEW YORK'S QUALIFIED PRIVILEGES FOR (1) COMMUNICATIONS MADE IN THE DISCHARGE OF SOME PUBLIC OR PRIVATE DUTY AND (2) COMMUNICATIONS ON A SUBJECT IN WHICH THE PARTIES SHARE A COMMON INTEREST

In addition to the broad protection for statements of opinion, New York State recognizes two related privileges that are an alternative avenue to 12(b)(6) dismissal. The first is the qualified privilege for communications "fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his own affairs, in a matter where his interest is concerned." *Toker v. Pollak*, 44 N.Y.2d 211, 219 (1978).[5] As the Court of Appeals noted in *Toker*,

> while not providing an absolute cloak of protection, a qualified privilege does provide an atmosphere in which a civic-minded citizen may, without fear, convey information which he believes the disclosure of which will redound to the benefit of the public.

*Id*. at 221.

---

[5] New York State also recognizes a related qualified privilege for "a communication made by one person to another upon a subject in which both have an interest." *Liberman v. Gelstein*, 80 N.Y.2d 429, 437 (1992).  Although this "common interest privilege" is somewhat narrower, arguably it is available here as well, if one defines the interest as available to those who have been or are at risk of being subject to sexual harassment or assault.

This privilege has been applied to circumstances as varied as allegations of bribery, *Toker*, *supra*; allegations of copyright infringement, *Lovell v. Houghton*, 116 N.Y. 520 (1889); allegations plaintiff bulldozed his farm to create a "solid waste facility," *Liere v. Scully*, 79 A.D.3d 821 (2d Dept. 2010); letter seeking psychiatric evaluation of plaintiff's minor children, written by children's great-aunt, *Garson v. Hendlin*, 141 A.D.2d 55 (2d Dept. 1988), allegation impugning accuracy and veracity of plaintiff's scientific research, *Chandok v. Klessig*, 632 F.3d 803 (2d Cir. 2011), and an allegation that plaintiff had "groped a librarian." *Weis v. Schuebart*, 2012 N.Y. Misc. LEXIS 2012, NY Slip Op 30820(U) (Suffolk Co. March 12, 2012)), among others.

Morrison fits comfortably within the privileges with respect to both the slander and libel counterclaims.

### Conclusion

Because Mr. Langrick has neither a factual nor a legal basis for further pursuing his claims of libel and slander against Ms. Morrison; because his own admissions preclude success as a factual and legal matter on each of his three counterclaims; because Ms. Morrison has established that her allegedly defamatory statements are either true or not provably false; because her statements and posts about Mr. Langrick are best understood as constitutionally-protected opinions; and because permitting Mr. Langrick to further pursue his baseless counterclaims would represent an unwarranted burden on Ms. Morrison's personal freedom to express her legitimate views -  both on her own deeply troubling and debilitating  personal experiences as

well as on an issue of great and public concern – i.e., #metoo –  Plaintiff's motion to dismiss

should be granted in its entirety.

Dated: March 18, 2019

Henry R. Kaufman (HK-7283)
HENRY R. KAUFMAN, PC
*Attorneys for Plaintiff and*
*Counterclaim Defendant Monica*
*Morrison*
60 East 42nd Street, 47th Floor
New York, New York 10165
(212) 880-0842

Of Counsel:

Carol A. Schrager, Esq.

17

## CERTIFICATE   OF   SERVICE

I  hereby  certify  that  a  true  and  correct  copy  of  t h e  Memorandum of Law In Support of
Monica Morrison's Motion to Dismiss the Defamation Counterclaims in the above
captioned matter was served on  the  below counsel  of  record on  March 18, 2019, in
accordance  with the  Rules  of  Civil Procedure:

Thomas A. Clare (admitted pro hac vice)
Elizabeth M. Locke (admitted pro hac vice)
Andrew C. Phillips (admitted pro hac vice)
Shannon B. Timmann (admitted pro hac vice)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: andy@clarelocke.com
Email: shannon@clarelocke.com
Daniel A. Singer (DAS 0978)
THE LAW OFFICES OF DANIEL A. SINGER PLLC
New York, New York 10017
Telephone: (212) 569-7853
Email: dan@singerlaw.com

*Attorneys for Defendant Robert Langrick*

Dated: March 18, 2019                          By: */s/ Henry R. Kaufman*
                                                   Henry R. Kaufman