Henry R. Kaufman, P.C.
Henry R. Kaufman (HK-7283)
60 East 42nd Street
New York, New York 10165
(212) 880-0842
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MONICA MORRISON, | ) | CASE NO. 1:18-cv-06127 (CBA)(RML) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT LANGRICK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

REPLY MEMORANDUM OF LAW IN SUPPORT OF
OF PLAINTIFF MONICA MORRISON'S
MOTION TO DISMISS THE DEFAMATION COUNTERCLAIMS

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

SUMMARY OF ARGUMENT ...................................................................................2

ARGUMENT ...............................................................................................................3

POINT I.  FALSITY IS THE SINE QUA NON OF A DEFAMATION CLAIM, AND
IT IS MR. LANGRICK'S BURDEN TO ESTABLISH NOT ONLY THE FALSITY
BUT THE "SUBSTANTIAL FALSITY" OF THE ALLEGED DEFAMATIONS;
YET BASED ON HIS OWN PLEADED ADMISSIONS IT IS CLEAR THAT
HE CANNOT MEET THAT BURDEN ...................................................................3

POINT II.  UNDER NEW YORK'S HIGHLY-PROTECTIVE
CONSTITUTIONAL REGIME PROTECTING STATEMENTS OF OPINION,
AND BASED ON MR. LANGRICK'S OWN PLEADED ADMISSIONS,
MS. MORRISON IS ABSOLUTELY PRIVILEGED TO HOLD AND TO STATE
HER WELL-SUPPORTED OPINION, BASED ON THOSE ADMITTED FACTS,
THAT THE DRUNKEN SEXUAL ACTIVITY SHE EXPERIENCED AT THE
HANDS OF MR. LANGRICK WAS "SEXUAL ASSAULT" OR INDEED "RAPE" ..........9

POINT III.  AS A MATTER OF LAW, THE PLEADINGS THEMSELVES
ESTABLISH MS. MORRISON'S QUALIFIED PRIVILEGE WITH REGARD TO
THE BLOOMBERG CALL .....................................................................................15

CLOSING STATEMENT ........................................................................................20

CONCLUSION.........................................................................................................22

TABLE OF AUTHORITIES

**Cases**

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ........................................................17

Brian v Richardson, 87 N.Y.2d 46 (1995) ...........................................................11, 14

CACI Premier Tech., Inc. v. Rhodes, 536 F.3d 280 (4th Cir. 2008) ...............................6

Ferguson v. Sherman Square Realty Corp., 30 A.D.2d 287 (1st Dept. 2006) ........15, 18

Garson v. Hendlin, 141 A.D.2d 55 (2d Dept. 1988) .................................................15, 18

Gross v. New York Times Company, 82 N.Y.2d 146 (1993) .................................11, 14

Harris v. Hirsh, 228 A.D.2d 206 (2d Dept. 1996) .........................................................20

Immuno AG v. Moor-Jankowski, 77 N.Y.2d 235, cert. denied,
    500 U.S. 954 (1991)........................................................................................9, 12, 14

Johnson v. MediSys Health Network, No. CV-10-1596, 2011 WL 4101323,
    2011 U.S. Dist. LEXIS 156828 (E.D.N.Y. Sept. 8, 2011)....................................15

Liberman v. Gelstein, 80 N.Y.2d 429 (1992) .......................................................15, n.5

Mann v. Abel, 10 N.Y.3d 271 (2008) ..............................................................................11

Masson v. New Yorker Magazine, Inc., 501 U.S. 496 (1991).........................................6

Mr. Chow of N.Y. v. Ste. Jour Azur S.A., 759 F.2d 219 (2d Cir. 1985)...............14, n.4

M.V.B. Collision Inc. v. Kirchner, 2012 N.Y. Misc. LEXIS 2311, 2012 N.Y.
    Slip Op. 31284(U) (Nassau Co. 2012).................................................................16, 18

O'Neill v. N.Y. Univ., 97 A.D.3d 199 (1st Dept. 2012) .........................................15, 18

Vengroff v. Coyle, 231 A.D.2d 624, 625 (2d Dept. 1996) .............................................14

Weis v. Schuebart, 2012 N.Y. Misc. LEXIS 2012, NY Slip Op 30820(U)
    (Suffolk Co. March 12, 2012)..............................................................................16, 18

Wilcox v. Newark Valley Cent. Sch. Dist., 74 A.D.3d 1558 (3d Dept. 2010) .............15

**Constitutions**

First Amendment to the U.S. Constitution...........................................................................9

Article 1, Section 8 to the New York State Constitution.....................................................9

ii

**Other Authorities**

Sack on Defamation §3:7, "Substantial Truth") ..................................................................6

## PRELIMINARY STATEMENT

In vigorously opposing the motion to dismiss his defamation counterclaims, Mr. Langrick insists he has pleaded plausibly enough to proceed with a factually hopeless action – hopeless based on his own pleaded admissions.  He claims that – if he is permitted to pursue highly-invasive discovery, intruding into the intimacies of 14 to 16 years of Ms. Morrison's life and mental health – he can somehow transform his admittedly promiscuous, sexually-assaultive treatment of a drunk teenager he had just met on one night and day in May 2005 – a teenager who the police found was "heavily-impaired" by alcohol during the incident – into a completely "consensual" event not in any way amounting to "rape" or even "sexual assault" under current, officially-recognized definitions that he may not be happy about or agree with, but that he cannot contest.

Mr. Langrick apparently hopes to excuse himself from his admitted sexual predations, by attempting to savage Ms. Morrison, in this action 14-years after the admitted events, by attacking her subsequent life and musings and her alleged lack of "credibility" and supposed "gold-digging." But, as this Court will see from the very face of Mr. Langrick's own pleadings, in the end of the day even Ms. Morrison's "credibility" has – in a dispositive sense – been rendered irrelevant by the public record that speaks for itself and Mr. Langrick's own damning admissions.

## SUMMARY OF ARGUMENT

The viability of Mr. Langrick's defamation counterclaims cannot withstand his own pleaded admissions regarding his undisputed assault and unconsented sexual activity with Monica Morrison at Dartmouth in May 2005.

It is Mr. Langrick's burden to establish not only the falsity, but the "*substantial falsity*" of Ms. Morrison's alleged defamations. Yet once again based on his own pleaded admissions it is clear that he will not be able to meet that burden and therefore that his defamation counterclaims are subject to dismissal. (Point I)

It is also Mr. Langrick's burden to prove Ms. Morrison's communication of *false facts*. Yet when properly understood, in the context of Mr. Langrick's wide-ranging pleaded admissions, at least two of the allegedly defamatory statements are best understood as absolutely privileged, nonactionable statements of *opinion* and are therefore subject to dismissal. (Point II)

Finally, the subject of at least one of Mr. Langrick's claims (the allegedly slanderous telephone call to Bloomberg) was made in a qualifiedly-privileged context and, once again due to his pleaded admissions, and also to his inability to support his claims of actual or common law malice, that claim is also legally deficient and subject to dismissal. (Point III)

Accordingly, all three of Mr. Langrick's defamation counterclaims are dismissible on the face of the pleadings – including Mr. Langrick's many dispositive admissions – and therefore Ms. Morrison's motion to dismiss defendant's three counterclaims should be granted in its entirety.

## POINT I

**FALSITY IS THE *SINE QUA NON* OF A DEFAMATION CLAIM, AND IT IS MR. LANGRICK'S BURDEN TO ESTABLISH NOT ONLY THE FALSITY BUT THE "SUBSTANTIAL FALSITY" OF THE ALLEGED DEFAMATIONS; YET BASED ON HIS OWN PLEADED ADMISSIONS IT IS CLEAR THAT HE CANNOT MEET THAT BURDEN**

Mr. Langrick attempts to stitch together "facts" showing a "*plausible* entitlement to relief." He does not deny that it will be his burden – as the defamation plaintiff for these purposes – to prove the falsity of Ms. Morrison's statements that she was "sexually assaulted," and indeed "raped," by Mr. Langrick under the currently-accepted legal definitions of those terms.

But Mr. Langrick's defamation claims addressed to truth or falsity are not plausible because – when all the incidental "facts" he pleads, primarily regarding Ms. Morrison's allegedly nefarious motives to lie, and her lack of credibility and consistency – set forth "in great detail" are examined – he simply cannot get around their essential irrelevance to the dispositive power of the central facts he must admit – and that he contemporaneously admitted to the police and now admits in his pleadings – that as a matter of law make out an undeniable case validating the description of his admitted actions in May 2005 as sexual assault and indeed rape, as currently defined and commonly understood.

One specific example of the pervasive implausibility will suffice: Mr. Langrick claims there is a plausible factual dispute that would enable him to sustainably allege that, rather than the admitted circumstances amounting to a sexual assault or rape occurring in the cupola with a woman "heavily impaired" by alcohol and thus unable to give her legal consent, this is a case with witnesses who can plausibly testify that his aggressive sexual activity was all "consensual."

3

And what are these "plausible" factual allegations? That one or more "percipient" witnesses overheard Ms. Morrison making noises in the cupola consistent with extended, aroused, orgasmic sexual intercourse.

But in pressing this point Mr. Langrick stretches credulity beyond the breaking point. On its face it is simply ridiculous to claim that witnesses to such audible sexual activity could possibly reach a credible judgment as to legal consent under the circumstances – including those pivotal circumstances of the excessive drinking of which witnesses near the cupola could not have been aware – that Mr. Langrick is constrained to admit in his pleadings. This includes the currently recognized, fact-based understanding – of which this court can take judicial notice – that a not insignificant percentage of the victims of even violent rape have been known to become sexually aroused, and some percentage to experience orgasms, even during such assaults.

With all due respect to Mr. Langrick's contention, his "percipient" witnesses cannot possibly reach a competent judgment that Ms. Morrison was not sexually assaulted or raped, but that she was in fact a consenting participant in the "amorous" sexual activity, based solely on her pattern of vocal excitement. Or, in other words, from the sound of it this must have been consensual sex. Of course, this is a ridiculous contention that is an insult to this Court's intelligence as much as it is an insult to Ms. Morrison.

On the other hand, this Court can hardly ignore the many, fundamentally questionable – actually quite outrageous – assumptions implicit in the Mr. Langrick's self-righteous insistence that – despite all of his damning admissions – he did nothing wrong and that it is he who has been, since that day in May 2005, the innocent victim of Ms. Morrison's "false" and "defamatory" allegations of sexual assault and rape.

4

Specifically, in attempting to cast doubt on Ms. Morrison's claims, and to purportedly support his selection of a miscellany of allegedly competing "facts" that, he insists, could "plausibly" be collected to raise questions about the credibility of her claims of sexual assault and nonconsensual rape, Mr. Langrick asks this Court to ignore his admitted, pleaded facts in favor of what he now cavalierly wants this Court to credit and conclude was a run-of-the-mill, drunken frat-party "hook up" and sexual conquest of a willing, flirtatious – and well-satisfied – woman.

In examining this claim of the facial plausibility of Mr. Langrick's allegations that Ms. Morrison's labeling of his actions as "sexual assault" or "rape" can be proven to be complete "falsehoods" and canards, this Court cannot but take into account at least the following of Mr. Langrick's own, facially inconsistent, pleaded admissions:

- That he picked up a stranger and had (allegedly "consensual") full-on sexual intercourse with her barely hours after their first meeting;

- That this stranger with whom he allegedly had consensual sex was still a teenager, nearly 10 years younger than him;

- That he indulged in this promiscuous sexual encounter when he was admittedly extremely drunk and (at least later in Ms. Morrison's room) totally out of control of himself and his bodily functions;

- That he indulged in the sexual encounter knowing that Ms. Morrison was also drunk and (if he had bothered or been able to consider this for even a moment in his own drunken state) that she was thus by law unable to consent to the sexual intercourse;

- That he indulged in the sexual encounter while not only drunk but while having recently and illegally ingested cocaine in close proximity to that same time period, for the possession of which he was ultimately arrested and criminally charged;

- That in having sex with this teenage stranger, he did not bother to use a condom (a choice itself widely considered to be dangerously assaultive), thus placing both parties at risk of STI's and Ms. Morrison at risk of a teenage pregnancy at the hands of a 29-year-old stranger under circumstances where he would be highly unlikely, to say the least, to accept the potential responsibilities of fatherhood;

5

- That in his out-of-control, alcohol and possibly drug-induced intoxication, he was also responsible for all of the outrageous, obscene activities when in Ms. Morrison's dorm room that he now also candidly admits to in his pleadings (although he originally claimed to police that he was too out of it to remember *any* of the grotesque carnage he had there inflicted on Ms. Morrison and her roommates, and for which he later purported to "apologize," when told about what he had done).

- And so, finally, can it really be said to be "plausible" that, under all of those admitted, damning, pleaded circumstances, Mr. Langrick could reasonably be found to be the innocent victim of defamatory "lies" about that very same, admitted, promiscuous, alcohol and drug-fueled sexual encounter – lies supposedly concocted out of whole cloth by Ms. Morrison for allegedly nefarious reasons – while at the same time he could plausibly allege that it is provably false and defamatory to label this encounter to be "rape" or even "sexual assault" as a factual or legal matter?

Mr. Langrick also neglects to address the fact that his burden is actually to prove the "substantial" falsity of Ms. Morrison's claims – claims that on their face are consistent with Mr. Langrick's own pleaded admissions. As the U.S. Supreme Court has held:

> "The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication… It overlooks minor inaccuracies and concentrates upon *substantial truth*." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-17 (1991). (Emphasis added.)

And, as Judge Robert Sack has noted, with regard to the issue of "truth" in a defamation action, "the import of the words of which complaint is made and as to which falsity must be established is not confined to their technical meaning." (Sack on Defamation §3:7, "Substantial Truth")

Judge Sack then illustrates that concept of "substantial truth," with reference to the on-point case of *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280 (4th Cir. 2008). In *Rhodes*, the libel plaintiff complained of use of the word "torture," in connection with the notorious abuse of prisoners at Abu Ghraib during the Iraq War. The Fourth Circuit concluded that "a reasonable listener would have understood that [the defendant] was not using the word 'torture' in any

6

narrow, legalistic sense, but in a broader sense that encompassed the range of severe abuses at Abu Ghraib.…" *Id*. at 297.

That is precisely the same situation here where Plaintiff admits, as he must, that he had sexual intercourse with a drunk Ms. Morrison under circumstances as to which, at the very least, reasonable questions can be raised – and well-founded opinions can be stated – regarding the assaultive nature of the admitted activities and also regarding the existence *vel non* of legal consent in the absence of any contemporaneous finding of such consent.

Therefore, under the substantial truth doctrine, where proof of falsity must go to the "gist" or "sting" of the alleged defamation, Ms. Morrison is not bound to the narrowest criminal construction of the terms "sexual assault" and "rape," and therefore where a reasonable reader could have understood that she was not necessarily using the words only in a "narrow, legalistic sense," but in a "broader sense that encompassed the range of," here, sexual abuses and promiscuous activities to which Mr. Langrick has already admitted.

Specifically applying the doctrine of substantial truth here, Mr. Langrick's First Counterclaim for Slander is a perfect example of these fundamental principles of modern, post-*Sullivan*, defamation law. Thus, Mr. Langrick's claim, regarding Ms. Morrison's allegedly slanderous statements to the HR Department at Bloomberg, appears to be that use of the terms attempted "sexual assault" and attempted "rape" must be understood as conveying their most severe legalistic connotation. Yet, a reasonable reader is not assumed to believe – incorrectly – that Ms. Morrison has the power to indict Mr. Langrick on criminal charges. In any event, in her statements to Bloomberg, as recited *in haec verba* in Mr. Langrick's First Counterclaim, Ms. Morrison actually undertook to address and dispel such an over-reading, when she made clear during the same call that she was in fact *not* – indeed she could not have been – asserting the

strongest criminal connotation of those labels. That is because, at the same time that she referenced attempted sexual assault and rape, she also immediately and truthfully acknowledged that "the police did nothing." (Answer and Counterclaims ¶193). In so stating, Ms. Morrison made crystal clear to a reasonable listener that she was in fact not asserting the strongest possible meaning of criminality – i.e., that Mr. Langrick had been charged and perhaps convicted of the crimes of sexual assault or of rape.

And so, under the doctrine of "substantial truth," it is clear that Mr. Langrick will not be able to meet *his* burden to establish the substantial falsity of Ms. Morrison's use of the terms sexual assault and rape, in their common, non-criminal sense. And as we have already demonstrated, Mr. Langrick's admissions about his sexual intercourse in the cupola[1] with Ms. Morrison herself "heavily impaired" by alcohol, preclude a finding of substantial falsity in regard to use of the labels "sexual assault" and "rape" – certainly at the very least in their reasonably-understood, non-criminal connotations. For surely, it is not logically possible for Mr. Langrick – given Mr. Langrick's pleaded admissions – to establish the substantial falsity of labeling Mr. Langrick's admitted, promiscuous, unprotected, sexual activities with a drunk teenager as "sexual assault." The same can be said for "rape," especially as the currently accepted, official federal definition of that term is no more than the "slightest [sexual] penetration, without legal consent."

---

[1] When carefully parsed Mr. Langrick's pleadings, and his opposing brief, frequently conflate and thus attempt to obfuscate the two episodes of alleged sexual assault and rape – the first being the sexual intercourse in the cupola candidly admitted in his pleadings and the second being in Ms. Morrison's bed where no third-party witness can say for certain exactly what did or did not happen under those covers. Nonetheless, it is undisputed that Ms. Morrison's roommate and her boyfriend heard Mr. Langrick moaning sexually under those covers. And it remains unclear whether Mr. Langrick denies having any recollection of what happened in the dorm room and under the covers or whether he acknowledges making those sexual noises but insists that somehow he clearly remembers that he did not penetrate or attempt to penetrate Ms. Morrison at that time, while she was unconscious or sleeping, albeit that he admits to having had wild, consensual sex with her in the cupola and he insists – in the end irrelevantly – that she willingly invited him into her bed back in the dorm room. And, of course, it is crystal clear as a legal matter that any alleged "consent" in the cupola would not automatically carry over to the dorm room.

POINT II

UNDER NEW YORK'S HIGHLY-PROTECTIVE CONSTITUTIONAL REGIME
PROTECTING STATEMENTS OF OPINION, AND BASED ON MR. LANGRICK'S OWN
PLEADED ADMISSIONS, MS. MORRISON IS ABSOLUTELY PRIVILEGED TO HOLD
AND TO STATE HER WELL-SUPPORTED OPINION, BASED ON THOSE ADMITTED
FACTS, THAT THE DRUNKEN SEXUAL ACTIVITY SHE EXPERIENCED AT THE
HANDS OF MR. LANGRICK WAS "SEXUAL ASSAULT" OR INDEED "RAPE"

In his opposing papers, Mr. Langrick does not gainsay New York's powerful

commitment, under Article 1, Section 8 of the New York State Constitution, even more so than

under the First Amendment, to seek and apply with great care a deep understanding and

assessment of allegedly defamatory factual statements that, in context, may be best understood

and treated as opinions. As the Court of Appeals has frequently emphasized:

> "This State, a cultural center for the Nation, has long provided a hospitable
> climate for the free exchange of ideas. That tradition is embodied in the free
> speech guarantee of the New York State Constitution, beginning with the ringing
> declaration that "every citizen may freely speak, write and publish * * *
> sentiments on all subjects." (NY Const, art I, § 8.) Those words, unchanged since
> the adoption of the constitutional provision in 1821, reflect the deliberate choice
> of the New York State Constitutional Convention not to follow the language of
> the First Amendment, ratified 30 years earlier, but instead to set forth our basic
> democratic ideal of liberty of the press in strong affirmative terms (see, Forkosch,
> Freedom of the Press: Croswell's Case, 33 Fordham L Rev 415 [1965]).

*Immuno AG v. Moor-Jankowski,* 77 N.Y.2d 235, 249, cert. denied, 500 U.S. 954 (1991).[2]

---

[2] The common and constitutional law of defamation – in the U.S. Supreme Court and in New York – has, at least
since 1964, attempted to accommodate itself to the advancement of important social trends as well as to the
expansion of our freedom of expression.

In order to achieve this overarching goal, the Court of Appeals has commanded that not only must the "specific" context of each of the statements here at issue be carefully analyzed but also that the broader "social" context must be sought out and defined as well. What more clarion call could there be – in this Court's evaluation of the facial viability of the defamation counterclaims in this case – to seek a deeper understanding of the plight of victims (it seems the preponderance of them women) subjected to similar, sexually-assaultive treatment. Unfortunately, discussion of such abuses has, heretofore, too often been oppressed by a societal blanket of silence that has historical been thrown over these delicate but hugely consequential matters. And such silence will continue, unless the law is applied sensitively enough to accommodate itself to these new understandings and realities, and to protect free expression in the process as per the applicable constitutional commands.

Although Mr. Langrick recognizes, as he must, New York's oft-stated intent to achieve broad constitutional protection for statements of opinion, in these context of defamation actions, he nonetheless rejects the argument that accusations of "sexual assault" and "rape" can possibly be considered anything but statements of fact unrestrictedly subject to claims of defamation.

Upon the requisite deep and careful analysis, this court will appreciate that there is a huge distinction between allegations of sexual assault and rape only made long after the fact, where no contemporaneous and reliable record has been made and preserved. In contrast here, Ms. Morrison contemporaneously brought her experience to the attention of college, and then also to local police authorities. As a result, as copiously recognized and acknowledged in Mr. Langrick's own pleadings, there still exists a historical record that can provide factual support to the victim, in speaking out years later, about what she experienced and, in the current circumstances, that more than sufficiently lend support to her view that she had been subjected to

sexual assault and rape. For better or worse, other arguably sincere protestations of such prior sexual assaults, when kept completely secret for years, will be far more difficult to justify as opinions based on admitted facts in the absence of the kind of contemporaneous record available in this case.

Nor does Mr. Langrick explain how, in the end of the day, New York's powerful commitment to the protection of opinion, in the context of its broader commitment to freedom of expression, can possibly be achieved without according due latitude to the "sentiments" of a woman – who was undeniably subjected to the indecent, horrifying treatment detailed and admitted by Mr. Langrick back in 2005 – and without leaving a documented victim of such sexual abuse free to express her deeply personal view that she had been sexual assaulted and indeed to raped, under currently-accepted definitions.

Mr. Langrick correctly cites the prevailing test for separating protected expressions of opinion from actionable statements of fact, namely:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross v. New York Times Company*, 82 N.Y.2d 146, 153 (1993); *quoted by* Brian v Richardson, 87 N.Y.2d 46, 51 (1995); Mann v. Abel, 10 N.Y.3d 271, 276 (2008).

However, Mr. Langrick fails to heed the repeated, governing admonition of the New York Court of Appeals that courts must begin, rather than end, with analysis of the context in which the communication is made:

> Isolating challenged speech and first extracting its express and implied factual statements, without knowing the full context in which they were uttered, indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context.

11

*Immuno AG., supra*, 77 N.Y.2d at 255.

When Mr. Langrick finally deigns to consider context, he falsely suggests, for example, that Ms. Morrison contends "statements made on the internet are 'pure opinion.'" Brief in Op. 15. That is not at all her contention.  Ms. Morrison merely cited a series of cases supporting New York courts' important recognition that people encountering statements on the Internet are inherently more likely to receive them as opinion rather than fact as they might in the context of news reporting.  Only in the case of the MyLife posting did Ms. Morrison claim that her statement was pure opinion, and only then because it was couched in the conditional: "If you believe that penetrating and attempting anal sex with an unconscious woman is rape, then you would likely call him a rapist."

Mr. Langrick also seeks to muddy the waters by conflating "the internet cases cited by Ms. Morrison" and contending that "all involve clear instances of rhetorical hyperbole, heated argument, conjecture, and imprecise language that are readily distinguishable from Ms. Morrison's specific and explicit claims that Mr. Langrick followed her home and raped her while she was unconscious." Brief in Op. at 15.

Once again, Mr. Langrick pushes his point much too far. Each of the three alleged defamations must be separately evaluated in their context for purposes of the mandated, careful opinion analysis. And Ms. Morrison has never suggested otherwise.

First, as to the alleged Bloomberg "slander," Ms. Morrison has of course not advanced an Internet context claim in connection with her qualifiedly-privileged telephone call directly to Bloomberg – see Point III, *infra*.[3]

---

[3] We set forth below (see Point III) our further analysis of qualified privilege for purposes of this action. As there explained, Ms. Morrison is only asserting qualified privilege with respect to the call to Bloomberg (First Counterclaim for Slander). Similarly, Ms. Morrison does not assert that the call to Bloomberg was in tone or context

Second, as to the Vimeo[4] post: this is clearly an Internet context; and it is a good example of how presentations on particular Internet sites are, due to the format of their presentation, and the scope and nature of the topics they address, simply not reasonably received by readers or viewers as presenting assertions intended to be understood as statements of fact. To suggest that the word "rapist" – standing alone – is not an opinion in the case of the Vimeo posting ignores the hyperbolic tone of name-calling, the obscure context (framing with a single word a seemingly otherwise unrelated videotape of a business lecture), as well as the inherent ambiguity of well-recognized alternate (non-sexual) meanings of the word "rape" – such as, among others, "an act of plunder, violent seizure, or abuse; despoliation; violation, as in 'the rape of the countryside.'" https://www.dictionary.com/browse/rapist.

And finally, the "personal review" in MyLife.com is both by context and language a paradigmatic example of an online posting that no even slightly knowledgeable Internet user would confuse with factual reporting. The site is devoted exclusively to highly-idiosyncratic and opinionated personal evaluations on a website that is clearly also the home of opinion – opinions that will generate a "reputation score." Reputation scores – if they mean anything – surely are not received as, nor are expected to be, "the facts, and only the facts."

Mr. Langrick also argues that Ms. Morrison "entirely fails to address numerous New York cases holding that direct and specific accusations of serious criminal or sexual misconduct . . . are not only actionable but are ***defamatory per se***." Brief in Op. 13 (emphasis in original). Of

---

an opinion. But that claim does remain subject to the issue of proof of falsity/substantial falsity addressed in Point I, *supra*.

[4] Vimeo is an internet community where people are free to post videos on essentially any topic, whether fiction, nonfiction, feature films, corporate videos (as Mr. Langrick's video was), wild conspiracy theories, and more. This is certainly the type of Internet site courts have in mind when they recognize that people do not and cannot expect they are receiving journalistically-curated, factual information as opposed to unfiltered opinions.

course, the issue here is not whether Ms. Morrison's statements would – if actionable – be defamatory "per se," *but whether or not they are even actionable in the first place*. *See*, *e.g.*, *Gross v. New York Times Company*, 82 N.Y.2d 146, 155 (1993) ("there is simply no special rule of law making criminal slurs actionable regardless of whether they are asserted as opinion or fact"); *Torain v. Liu*, 279 F. App'x 46, 47 n.2 (2d Cir. 2008) ("While specific allegations of particular criminal conduct may be actionable, there is simply no special rule of law making criminal slurs actionable regardless of whether they are asserted as opinion or fact") (internal quotations and citations omitted); *cited by Vengroff v. Coyle*, 231 A.D.2d 624, 625 (2d Dept. 1996); *see also* the widely-cited Court of Appeals case, *Brian v. Richardson*.

Beginning with context, as *Immuno* instructs, both the immediate online context and the broader social context signal to the reader of the MyLife.com review that they are encountering opinion. First, and by definition, it is a review.  And a "personal review" – especially one that appears on an obviously opinionated Internet site like MyLife.com.[5]  Moreover, Ms. Morrison clearly signaled, in her MyLife review, that she "was not a disinterested observer," *see Brian*, *supra*, 87 N.Y.2d at 53, and she also set out the basis for her personal opinion, "leaving it to the readers to evaluate it for themselves." *Id*. at 53-54.

Finally, neither does Mr. Langrick explain how, in the end of the day, New York's powerful commitment to the protection of opinion, in the context of its broader commitment to freedom of expression, can possibly be achieved and secured without according due latitude to the opinions of a woman who has been subjected to the treatment admitted by Mr. Langrick back

---

[5] The cases are legion holding that "reviews" are not reasonably read as statements of fact. See, e.g., *Mr. Chow of New York v. Ste. Jour Azur S.a.*, 759 F.2d 219 (2d Cir. 1985): "Restaurant reviews are also the well recognized home of opinion and comment. Indeed, "[b]y its very nature, an article commenting upon the quality of a restaurant or its food, like a review of a play or movie, constitutes the opinion of the reviewer."

in 2005, without being able to express her deeply personal – yet perfectly reasonable – opinion

that his actions – in all of their damning, admitted grotesquery – amounted to "sexual assault"

and indeed to "rape," under currently accepted definitions.

## POINT III

### AS A MATTER OF LAW, THE PLEADINGS THEMSELVES ESTABLISH MS. MORRISON'S QUALIFIED PRIVILEGE WITH REGARD TO THE BLOOMBERG CALL

Mr. Langrick contends that "qualified privilege is an affirmative defense to be raised in

[an] answer rather than on a motion to dismiss." Brief in Opposition at 19 (*citing Johnson v.*

*MediSys Health Network*, No. CV-10-1596, 2011 WL 4101323 at *13, 2011 U.S. Dist. LEXIS

156828 (E.D.N.Y. Sept. 8, 2011). While the cited quotation from the *Johnson* case is correct, the

claim that qualified privilege cannot be successfully raised on a motion to dismiss is most

definitely not a correct statement of the law in New York.

This is immediately apparent upon reading the case cited by the magistrate judge in

*Johnson*.  What the Third Department decision on which *Johnson* relied actually said is that the

qualified privilege defense "does not *lend itself* to a preanswer motion to dismiss pursuant to

CPLR 3211(a)." *Wilcox v. Newark Valley Cent. Sch. Dist.*, 74 A.D.3d 1558, 1562 (3d Dept.

2010) (emphasis added).

Whether or not the assertion of a qualified privileged always "lend[s] itself" to a motion

to dismiss, it is clear that New York courts do not hesitate to grant motions to dismiss based on

qualified privilege when applicable. *See*, *e.g.*, *O'Neill v. N.Y. Univ.*, 97 A.D.3d 199, 213 (1st

Dept. 2012) (granting motion to dismiss because complaint  "contains no more than conclusory

allegations of malice"); *Ferguson v. Sherman Square Realty Corp.*, 30 A.D.2d 287, 288 (1st

Dept. 2006) (same; reversing trial court and granting defendants' motion to dismiss  ); *Garson v.*

15

*Hendlin*, 141 A.D.2d 55, 65 (2d Dept. 1988) (granting motion to dismiss because conclusory

allegations of malice are insufficient to overcome qualified privilege); *M.V.B. Collision Inc. v.*

*Kirchner*, 2012 N.Y. Misc. LEXIS 2311, 2012 N.Y. Slip Op. 31284(U) (Nassau Co. 2012)

(granting motion to dismiss based absence of showing of malice); *Weis v. Schuebart*, 2012 NY

Slip Op 30820(U) (Suffolk Co. March 12, 2012) ) (granting motion to dismiss because

"allegations of malice contained in the plaintiff's affidavit, submitted in opposition to the motion,

are based on no more than surmise, conjecture and suspicion and are, thus, insufficient to raise a

triable issue of fact")).

Mr. Langrick also claims that "Ms. Morrison does not identify any facts alleged in Mr.

Langrick's Counterclaims establishing the existence of a cognizable duty or shared common

interest between Ms. Morrison and either Bloomberg or the global internet audience." Brief in

Op. 19.

This is also not correct.

In her Declaratory Judgment Complaint, Ms. Morrison has identified such a common

interest with Bloomberg, and Mr. Langrick cannot deny it. In fact, Mr. Langrick once again

confirms the factual basis for that common interest in his own pleadings:

> Complaint ¶13. What her research revealed, among other things, was that
> Defendant's executive position required him to visit colleges and universities to
> potentially interact with students on those campuses.
>
> Answer ¶13. Defendant lacks information or knowledge sufficient to form a belief
> as to what research Plaintiff did or did not do and what it did or did not reveal,
> and therefore denies that portion of the allegations in Paragraph 13. *Defendant*
> *admits that as part of his duties at Bloomberg he did on occasion travel to college*
> *and university campuses and interact with students on those campuses.*

Ms. Morrison has alleged that she was motivated by a concern for "further potential

[student] victims on college campuses." Complaint  ¶14. And this is surely a concern that

Bloomberg would naturally share, as the corporate entity legally responsible for the on-the-job

16

activities of its executive and agent, Mr. Langrick, whether in the Bloomberg offices or else traveling in the field.

Under New York law, once a defamation defendant has asserted a qualified privilege, the plaintiff bears the burden of overcoming ("defeasing") it by establishing that the defendant was motivated by "malice," which encompasses either "actual malice" (i.e., knowledge of falsity or high degree of awareness of probable falsity) or "common law malice" (i.e., hatred or ill will). *See Liberman v. Gelstein*, 80 N.Y.2d 429, 437-38 (1992).

Notwithstanding Mr. Langrick's claim that he "amply alleges both actual and common law malice," sufficient to defease the qualified privilege, Brief in Op. 20, in actuality he can establish neither type of malice here. Although it is correct that Mr. Langrick has purported to describe in a legal sense both actual and common law malice here, unlike factual allegations it is now well understood that courts need not accept legal conclusions as true:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).[6]

---

[6] Mr. Langrick's counterclaims do attempt to get beyond conclusory allegations, but only with respect to "actual malice" (i.e., knowledge of falsity or reckless disregard). Yet on their face the allegations of actual malice fail. (Answer and Counterclaims ¶¶ 248-254.) Thus, as far as his attempts to identify "actual malice," at the time Ms. Morrison originally made her charge of sexual assault, in 2005, the police had found that she was "heavily impaired due to alcohol" during the assaults. And Mr. Langrick has acknowledged, as he must, that the police report "speaks for itself," and as an Exhibit to the Declaratory Judgment Complaint. It is therefore totally inadequate – indeed it is essentially meaningless – to tautologically argue, as to her alleged "actual malice," that Ms. Morrison must have known her charge of sexual assault was false "because she was there." Yes, she was there. And she was also there to experience Mr. Langrick's admitted, promiscuous sexual activity with her (including active genital penetration for one hour, he claims) while she was "heavily impaired due to alcohol," and when she thus could not have legally consented to Mr. Langrick's unprotected – and thus also very risky – sexual predations. And at the time in 2018, when Ms. Morrison conveyed similar charges to Bloomberg, she had had 13 years to further reflect on the fundamental truth and significance of Mr. Langrick's assault on her in 2005. So the assertion that she had actual knowledge of the falsity of her claims of assault and rape is totally inadequate on its face.

This is true whether such legal conclusions are part of a complaint (or counterclaim) or instead asserted as part of an attempt to defease a defendant's claim of a qualified privilege at the motion stage. *See O'Neill*, *supra* at 213  ("complaint fails to overcome this privilege because it contains no more than conclusory allegations of malice"); *Ferguson*, *supra* at 288 (1st Dept. 2006) (same; reversing trial court and granting defendants' motion to dismiss); *Garson*, *supra* at 65 (conclusory allegations of malice insufficient to overcome qualified privilege); *M.V.B. Collision*, *supra* (applying qualified privilege and granting defendant's motion to dismiss); *Weis v. Schuebart*, *supra* at  ¶ 5  ("allegations of malice contained in the plaintiff's affidavit, submitted in opposition to the motion, are based on no more than surmise, conjecture and suspicion and are, thus, insufficient to raise a triable issue of fact").

Moreover, Mr. Langrick's argument that Ms. Morrison was motivated by "common law malice" (i.e., hatred of or ill will) is also defeated by the stringent requirement in New York that, as a matter of law, the defamation claimant must establish the defendant was motivated *solely* by such hatred or ill. This rule has been clearly and definitively established in the leading Court of Appeals case on the issue:

> "If the defendant's statements were made to further the interest protected by the privilege, it matters not that defendant also despised plaintiff.  Thus, a triable issue is raised only if a jury could reasonably conclude that "malice was the *one and only* cause for the publication."

*Liberman*, *supra,* at 439 (emphasis added).

Here, Mr. Langrick himself has already pled, and has thus at least implicitly acknowledged, that Ms. Morrison was motivated by a motive other than ill will:

> "Indeed, Ms. Morrison made these defamatory statements to the human resources department at Mr. Langrick's employer for the express purpose of attempting to get him fired from his job."

Counterclaim ¶264.

That is, even assuming arguendo that Ms. Morrison wanted Bloomberg to fire Mr. Langrick because she despised him, she was also motivated by concern for "further potential victims on college campuses," *Declaratory Judgment* ¶14, a concern that Bloomberg would naturally share.  Because Ms. Morrison's "statements were made to further the interest protected by the privilege, it matters not that defendant also despised plaintiff," *Liberman*, *supra*, or, for that matter, that she allegedly wanted him to be fired. But Mr. Langrick also pleads no basis for that surmise. For example an equally reasonable explanation for her statements to Bloomberg, is that Ms. Morrison simply – but importantly – wanted Mr. Langrick to be carefully supervised and monitored based on more complete information regarding his previous, admitted, drunken interaction with a student on a college campus, including all of its unsavory aspects and consequences. It is very fair to imagine that Mr. Langrick never revealed that most relevant and significant information to his employer, *before* he was sent out in the field to colleges and universities in order to interact with students.

Finally, it is also significant, for purposes of Mr. Langrick's First Counterclaim for Slander, that Ms. Morrison's message to Bloomberg was not broadcast widely,[7] but was basically targeted and conveyed to only a single person in the Bloomberg Human Resources Department (Answer & Counterclaims ¶192). And that was undeniably a person at Bloomberg who had an especially great and targeted institutional interest in the kind of concern Ms. Morrison was raising about the potential corporate liability that could be caused by an employee of the company should he misbehave in the course of his duties while "traveling to college and university campuses and interacting with students."

---

[7] Indeed, Mr. Langrick challenges Ms. Morrison's qualified privilege defense only with respect to the Second and Third Counterclaims. Mr. Langrick thus implicitly concedes that the targeted nature of Ms. Morrison's communication with respect to his First Counterclaim at least brings that claim within the general ambit of qualified privilege.

Under New York law, "where there is no dispute as to the facts, the determination as to whether a qualified privilege exists is one for the court and not the jury." *O'Neil v. Peekskill Faculty Assoc.*, 120 A.D.2d 36, 42, (2d Dept. 1986); *accord Harris v. Hirsh*, 228 A.D.2d 206, 207 (2d Dept. 1996). Here, it is clear that Mr. Langrick has failed to allege either the actual malice, or the common law malice, required to defease Ms. Morrison's qualified privilege with respect to the First Counterclaim for Slander.

Accordingly, on this basis alone, this Court should dismiss the First Counterclaim on the ground that it relates to a publication that was, as a matter of law, qualifiedly privileged.

## CLOSING STATEMENT

In his opposing papers, Mr. Langrick vigorously complains "that Ms. Morrison has attempted to support her Motion and Memorandum with materials that are far afield from the allegations in Mr. Langrick's Counterclaims and completely irrelevant and immaterial to the question of whether Mr. Langrick has pled plausible defamation claims against her."[8]

This Court will not have observed any dearth of analysis of Mr. Langrick's many dispositive admissions in this Reply Memorandum, spotlighting that Mr. Langrick's claims of defamation, under the undenied circumstances, are totally implausible.

Moreover, as we have also demonstrated, the various legal standards applicable to defamation claims in New York not only permit consideration of the broader social context of the allegedly defamatory statements – but they actually require it.

In any event, of course, this Court is never required to leave common knowledge and common sense back in chambers when she rules on a motion like this – a motion that is being

---

[8] See Defendant Langrick's Memorandum of Law in Opposition to the Motion to Dismiss, Point I, at 5.

made in the context of new revelations and perceptions about the definition and social significance of what is being revealed to be a pattern of widespread sexual harassment, sexual abuse, sexual violence, sexual assault and rape along with historically systematic efforts to cover up such wrongdoing or else at least to be shamed from speaking about it.

Finally, although it is acknowledged that this is not itself an independent reason supporting the grant of Ms. Morrison's motion to dismiss the defamation counterclaims, there will be an additional benefit – which will we submit certainly advance the interests of justice – deriving from such a dismissal. That is because it has become clear that Mr. Langrick is poised, if given the opportunity, to vigorously pursue highly offensive discovery in an attempt to invade and to fish through Ms. Morrison's most intimate personal life and ruminations, her employment records (also for highly-questionable purposes) and her confidential medical and psychological records, over a period of 14 to 16 years – nearly half of Morrison's life.

Based on the issues presented on this motion, such intrusive discovery will ultimately be properly seen as bootless and irrelevant. And, if such unwarranted discovery is not nipped in the bud, it will unavoidably have the very unfortunate result – for no good reason, we submit – of "triggering" Ms. Morrison's traumatic recollections of the events of 2005, and their aftermath, for the balance of her years after at Dartmouth, and thereafter to the present day.[9]

---

[9] It has been suggested by Mr. Langrick that Ms. Morrison cannot but have expected and understood that her Declaratory Judgment action would inevitably result in discovery, some of it unavoidably personally intrusive. But, as should be self-evident, the primary purpose of Ms. Morrison's action was to head off, and to protect herself from, the meritless and intrusive defamation action that Mr. Langrick had been threatening against her for upwards of a year before she brought this action whose primary intention was to put an end to Mr. Langrick's threats.

## CONCLUSION

For all of the foregoing reasons, Ms. Morrison's motion to dismiss all three of Mr. Langrick's defamation counterclaims should be granted in its entirety.

In addition, in light of the intimate relationship between Ms. Morrison's First Claim for Declaratory relief, and the first of Mr. Langrick's defamation counterclaims, this Court should also examine – with the input of the parties to the extent appropriate – the full implications of any grant of Ms. Morrison's motion to dismiss for the grant or approval of Ms. Morrison's closely-related First Claim for a Declaratory Judgment against Mr. Langrick.

Dated: June 11, 2019

_____/s/_____
Henry R. Kaufman (HK-7283)
HENRY R. KAUFMAN, PC
*Attorneys for Plaintiff*
*Counterclaim Defendant Monica Morrison*
60 East 42nd Street, 47th Floor
New York, New York 10165
(212) 880-0842

Of Counsel:

Carol A. Schrager, Esq.

22

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Morrison's Reply Memorandum of Law in the above captioned matter was served on the below counsel of record on June 11, 2019, in accordance with the Rules of Civil Procedure:

Thomas A. Clare (admitted pro hac vice)
Elizabeth M. Locke (admitted pro hac vice)
Andrew C. Phillips (admitted pro hac vice)
Shannon B. Timmann (admitted pro hac vice)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: andy@clarelocke.com
Email: shannon@clarelocke.com
Daniel A. Singer (DAS 0978)
THE LAW OFFICES OF DANIEL A. SINGER PLLC
New York, New York 10017
Telephone: (212) 569-7853
Email: dan@singerlaw.com
*Attorneys for Defendant Robert Langrick*
Dated: June 11, 2019 By: */s/ Henry R. Kaufman*
Henry R. Kaufman