The Henry R. Kaufman, P.C.
Henry R. Kaufman (HK-7283)
60 East 42nd Street
New York, New York 10165
(212) 880-0842
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONICA MORRISON,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>ROBERT LANGRICK,<br><br>　　　　　　　　　　Defendant. | INDEX NO: 1:18-cv-06127-CBA-RML |

## COUNTERCLAIM DEFENDANT MONICA MORRISON's ANSWER

Pursuant to Federal Rule of Civil Procedure 8, Defendant Robert Langrick ("Defendant or "Mr. Langrick"), by and through his undersigned counsel, files this Answer to Plaintiff Monica Morrison's November 1, 2018 Complaint for a Declaratory Judgment [Dkt. 14].

## NATURE OF THE COUNTERCLAIMS

*1. These defamation counterclaims arise out of a long-running effort by Monica Morrison to enrich herself by falsely smearing Robert Langrick as a rapist following a completely consensual sexual encounter that occurred when the two were students at Dartmouth College in 2005.[1]*

1.　　　Denies the allegations in paragraph 1, except admits that, in May of 2005, at Dartmouth College, Robert Langrick proclaims to have had "consensual" sexual intercourse with

---

[1] For the Court's convenience, each paragraph of Defendant's counterclaims is repeated, followed by Plaintiff's answers thereto

Monica Morrison, and then later he attempted and was successful in penetrating her once again, including anally, neither in the absence of her actual consent nor legal consent, at a time during which, as the police confirmed and asserted, she was "heavily impaired due to alcohol" based on their own findings - that she was otherwise unconscious, semi-conscious and totally incapacitated. By definition, according to FBI guidelines and federal regulations, this is rape and sexual assault .

*2. Mr. Langrick met Ms. Morrison for the first time at a college fraternity party in the early morning hours of Sunday, May 8, 2005.  After talking and flirting at the party, Ms. Morrison invited Mr. Langrick back to her residence — a shared house near the Dartmouth campus that Mr. Langrick had never been to before — to "hook up."*

2.       Denies the allegations contained in paragraph 2, except admits that Mr. Langrick was a complete stranger to her at the time of the incident, when she was a teenaged sophomore and he was a graduate student some ten years her senior. Specifically denies she was "flirting" with Mr. Langrick, and instead asserts that a witness, her friend Frank Fucile, told police her reaction to Mr. Langrick's "provoking" behavior that night was a "response of contempt rather than any sort of interest" and that Mr. Fucile had "regret" about leaving Ms. Morrison alone with Mr. Langrick. Categorically denies that Ms. Morrison "invited" Mr. Langrick and instead asserts that he crafted a scheme to convince Ms. Morrison of a fraudulent plan to meet up with Mr. Fucile later.

*3. Upon arriving at the house at approximately 6:00 a.m., Ms. Morrison led Mr. Langrick directly to her bedroom, but she was surprised to discover that her roommate and the roommate's boyfriend — who often stayed elsewhere — were already in the room.  So, Ms. Morrison then led Mr. Langrick out onto, across, and up the unfenced, sloped roof of the house, and into a "cupola" that the house residents regularly used as a place to have romantic encounters.*

3.      Denies the allegations in paragraph 3, except admits that Mr. Langrick lied to obtain entry into the society, and that in the course of looking for Frank, she and Mr. Langrick entered  the so-called "cupola" (not considered to be a "sex room") where Frank's room was located beneath a trap door, where Mr. Langrick proclaims to have had unprotected, "consensual" intercourse – vaginal and digital – with her.

*4. The two spent upwards of an hour together naked in the cupola, engaging in foreplay and sexual intercourse in which Ms. Morrison was an active, willing, and enthusiastic participant.  Ms. Morrison then led Mr. Langrick back out across the roof and through a window into her bedroom, where they got into her bed together at around 7:00 a.m.*

4.      Denies the allegations in paragraph 4, especially the outrageous claim that any intercourse which took place in the "cupola" was in any way "consensual" because of her "heavily impaired" state due to her excessive underage drinking, witnessed and  facilitated by Mr. Langrick at the aforementioned fraternity party.

*5. Mr. Langrick, who admittedly had been drinking the prior evening, arose shortly after at around 7:15 a.m. needing to use the bathroom and, disoriented from alcohol consumption, sleep deprivation, and the preceding hour of vigorous sexual activity, proceeded to act in a boorish way that quite understandably angered Ms. Morrison's roommate and housemates.  Specifically, and to his great embarrassment, Mr. Langrick urinated on the floor of the bedroom.  Ms. Morrison's housemates then asked him to leave the house, and he did.*

5.      Denies the allegations in paragraph 5, except admits that Mr. Langrick, himself recklessly drunk and intoxicated by illegal drugs, went on an uncontrolled and deranged rampage in her shared room, witnessed by her roommate and her roommate's boyfriend - six feet away, among other housemates, during which Mr. Langrick not only wantonly urinated on the floor of her bedroom, befouling one of her sweaters, defecated himself, and left behind soiled underwear stained with feces, and then he got into her roommate's bed and attempted to "cuddle" with the roommate's boyfriend. Then, further staggering uncontrollably around the room, Mr. Langrick

appeared to lunge and "come at" people, including her roommate, before it was demanded several times, by multiple witnesses, that he leaves the society, yet it was only when his grotesque actions demanded that the police be mentioned that he attempted to get dressed, in the process actually trying to put on Ms. Morrison's pants (in spite of having removed his own underwear after soiling them with his own excrement), before finally staggering naked out of the room,

*6. In a strange exchange of emails initiated by Ms. Morrison that Sunday evening (the same day), she and her housemates poked fun at the extremely contrite Mr. Langrick. Though they were less than pleased about him urinating on the floor of the house, they considered it a funny college story and no harm had been done. Mr. Langrick apologized profusely to Ms. Morrison and her housemates for making a mess.*

6.      Denies the allegations in paragraph 6 and also vigorously denies the delusional implication that she ever considered – or that it was in any way appropriate for anyone to consider – Mr. Langrick's revolting drunken actions, as a nearly 30-year-old business school student, with a "heavily impaired" teenager, a "funny college story" with "no harm … done."

*7. Ms. Morrison was annoyed that Mr. Langrick had embarrassed her in front of her housemates, but this was initially tempered by the fact that her housemates seemed to generally consider the incident to be amusing. Ms. Morrison placated herself by vindictively stealing the money and personal property that Mr. Langrick inadvertently left behind at the house — and falsely claiming to Mr. Langrick, when he directly asked her, that nobody had seen his things at the house. She also lied to her housemates and claimed that she had not had sex with Mr. Langrick.*

7.      Denies the allegations in paragraph 7, except admits that Mr. Langrick, in his drunken and out-of-control state, left behind "personal property" that included a vial of illegal cocaine, a camera with photographs proving Mr. Langrick's criminal possession and consumption of that cocaine, his car key, and some cash.

*8. But things took a dark turn on Monday, May 9, 2005, when Ms. Morrison realized that her female roommate was still angry about the episode, and specifically that the roommate was unhappy with Ms. Morrison.*

*The roommate made it clear that she didn't appreciate Ms. Morrison bringing strangers to their bedroom for drunken one-night stands and didn't appreciate her and her boyfriend, who had stayed in that evening, being repeatedly awoken and disturbed at odd hours.  The roommate also began to very conspicuously avoid interacting with Ms. Morrison which further underscored her disapproval of Ms. Morrison's behavior.*

8.      Denies the allegations in paragraph 8, including the misleading implication that Ms. Morrison had devised any scheme to lie about such serious matters – most of which contemporaneous allegations were based on facts already admitted by Mr. Langrick to the police at the time and in sworn pleadings in this case – simply in order to assuage her roommate. She specifically denies the absolutely outrageous claim that after having sexually assaulted a teenager "heavily impaired by alcohol" the day before, including committing all of the abominable deeds in her room which he has himself described and admitted – that somehow it was only the next day, when Ms. Morrison began to complain about having been assaulted and indeed raped, that things took "a dark turn," according to Mr. Langrick's highly deceptive self-serving version of the events.

*9. Ms. Morrison, who on information and belief has long struggled with mental illness, depression, and feelings of insecurity and inadequacy, was panicked at the thought of her roommate — with whom she wanted to be friends — holding anger and contempt towards her.  Ms. Morrison blamed Mr. Langrick for endangering her relationship with her roommate and housemates, and she decided that he needed to be punished.*

9.      Denies the allegations in paragraph 9, and she specifically makes note of Mr. Langrick's disgusting and shameful effort to purport to excuse his perverted assaults by complaining that Ms. Morrison was somehow damaged goods even before his predations began!

*10.      In order to make Mr. Langrick pay for embarrassing her, to save face in front of her would-be friends, and to deflect attention from her own crimes — including theft, extortion, and distribution of narcotics — Ms. Morrison decided to paint herself as a helpless victim and make up a story about Mr. Langrick following her home on a pretense and attempting to rape her in her bed.*

10.     Denies the allegations in paragraph 10, and specifically points out Mr. Langrick's shamelessness in accusing Ms. Morrison of "her own crimes," such as – not knowing what to do with such contraband discarded by Mr. Langrick after his assaultive rampage – ultimately giving away to a housemate the cocaine Mr. Langrick had criminally acquired and possessed and consumed, and that he then drunkenly left behind, and further points out that she later handed over to the police the camera and the cash.

*11.     Ms. Morrison's plan fell apart, however, when the Hanover Police Department did the right thing and aggressively investigated her allegations. The comprehensive investigation produced a police file running to hundreds of pages. It includes notes, summaries, relevant email correspondence obtained from search warrants, and transcripts of interviews with numerous eyewitnesses — including Ms. Morrison's own friends and housemates.*

11.     Denies the allegations in paragraph 11, except admits that there was a police investigation that in no way exonerated Mr. Langrick, although the police did decline to prosecute Mr. Langrick criminally for sexual assault, on the highly-questionable, actually bizarre,  "reasoning" that Ms. Morrison was too drunk to make a good witness to her own rape, and except that Mr. Langrick was himself in fact arrested for criminal possession of the cocaine Ms. Morrison allegedly "stole" after the incident.

*12.     The evidence gathered by Hanover PD detectives conclusively disproved Ms. Morrison's allegations and revealed that virtually everything she said about her involvement with Mr. Langrick was a lie. Given the contents of the full report, it is no surprise that Ms. Morrison and her counsel chose to attach only brief, cherry-picked snippets of this large file to her Complaint.*

12.     Denies the allegations in paragraph 12, and specifically denies that she ever had possession of the full, unredacted police file. The police unfairly and unjustly redacted the names provided to her in the heavily truncated report copy she received, in spite of the police having apparently given Mr. Langrick a full and complete report copy including transcript and exhibit copies.

*13. For example, Ms. Morrison claimed that she did not invite Mr. Langrick back to the house to "hook up" but rather that he came there of his own accord to meet another resident. This was easily disproven when both Mr. Langrick and that other individual told police they did not know each other and had no plans to meet.*

13.     Denies the allegations in paragraph 13. Specifically asserts that Mr. Fucile admitted to police that he remembered and knew Mr. Langrick and "had actually met him before [he] was aware of Monica's presence" that night at Bones Gate and that they "made a conversation," and that Mr. Fucile told police about his real "regret" was having left Ms. Morrison alone with Mr. Langrick.

*14.     Ms. Morrison's claim that Mr. Langrick surreptitiously and predatorily followed her to her bedroom after arriving at the house was easily disproven when Ms. Morrison's roommate and the roommate's boyfriend told police that they were in the bedroom and awake when Ms. Morrison burst in with Mr. Langrick in tow, clearly intending to engage in sexual relations with him. They heard and saw Ms. Morrison check to see if the bedroom was occupied, explain to Mr. Langrick that it was, and relay to him that they would need to find someplace else private to go. They then witnessed Ms. Morrison take Mr. Langrick out onto the roof of the house.*

14.     Denies the allegations in paragraph 14. Specifically denies the implication that any intention to "engage in sexual relations" was given, either verbal or nonverbal, and that any of these imaginary "cues" Mr. Langrick cites could in any way denote any form of consent.

*15.     In fact, multiple witnesses heard and saw Ms. Morrison lead Mr. Langrick — who had never been to the house before and had no knowledge of its layout — out onto and across the sloped, unfenced roof of the house to the small cupola room that house residents used for sexual encounters.*

15.     Denies the allegations in paragraph 15, including its apparent claim that "percipient witness" could have credibly assessed Ms. Morrison's ability to consent, or her state of incapacitation, based on noises the witness overheard from some distance.

*16.     Ms. Morrison's claim that she did not have consensual sex with Mr. Langrick in the cupola was easily disproven when the resident who lived directly underneath this cupola told police she clearly heard Ms.*

*Morrison lead Mr. Langrick to the cupola and very vocally and enthusiastically engage in foreplay and intercourse with him for nearly an hour.*

16.     Denies the allegations in paragraph 16, and once again most vigorously denies the outrageous claim that a distant witness who was not an eye-witness, claiming to have heard vague sounds of sexual activity, could possibly reach a credible conclusion about the issue of her legal consent, vel non, in the incident.

*17.     This witness's statement completely corroborated Mr. Langrick's statements to police.  Mr. Langrick was able to describe the location and layout of the cupola, and detail the sexual encounter that took place there, down to intimate and exculpatory details such as identifying features of Ms. Morrison's anatomy and distinctive characteristics of the orgasm that she had during foreplay in the cupola.*

17.     Denies the allegations of paragraph 17, and vehemently and categorically denies that Mr. Langrick was in fact able to correctly describe "intimate … features of [her] anatomy" or "distinctive characteristics of [the] orgasm she [allegedly] had during foreplay in the cupola." Asserts that shockingly, Mr. Langrick's demonstrably false description of her anatomy to the police was only made known to her after the filing of this lawsuit.

*18.     The housemates heard and saw Ms. Morrison and Mr. Langrick return from their sexual encounter in the cupola, crawl back through the window into the bedroom, and get into bed together.  None of these witnesses saw or heard Ms. Morrison order Mr. Langrick to sleep on the couch, as she would later claim; and more importantly, none saw or heard Mr. Langrick sexually assault Ms. Morrison during the brief ten or so minutes that they were in the bed together.*

18.     Denies the allegations of paragraph 18, and specifically notes that in fact the roommate never claimed to have seen what happened under the covers in Ms. Morrison's bed and that, in fact, she told the police she overheard Mr. Langrick "moaning like a porn star."

*19.      In fact, Ms. Morrison's own roommate, who was **in the room, awake, and just feet away** when Ms. Morrison claimed that Mr. Langrick sexually assaulted her, was asked point blank by Hanover PD detectives whether Ms. Morrison was in fact sexually assaulted in that room.  She responded, "No."  The police file further*

*notes that the roommate — who, again, was a percipient witness to the events in the bedroom — considered Ms.*

*Morrison's allegations to be "bogus."*

19.     Denies the allegations of paragraph 19 and states that Mr. Langrick's claims about

the views of her roommate at the time of the incident are materially misstated, and further that,

on information and belief, Ms. Morrison's roommate never claimed to have witnessed all of the

events leading up to Mr. Langrick's attempt at further sexual activity in Ms. Morrison's bed –

and that, on information and belief, she no longer holds the view that Ms. Morrison's claims

were "bogus" and believes that this incident was one of the most disturbing things Mrs.

Hasenkampf has experienced in her life.

*20.     Ms. Morrison's own friends and roommates also described to police Ms. Morrison's concerning*

*conduct in the following days, including falsely denying that she had sex with Mr. Langrick, and gloating about*

*stealing money and property he accidentally left behind in the house while expressing that she considered it justified*

*because he deserved to be punished for embarrassing her.*

20.     Denies the allegations of paragraph 20. Asserts that Ms. Morrison consulted with

a SAPA, and later commenced making a report with Safety and Security and the Hanover Police

and submitted to a full rape kit at Dick's House within 72 hours of that meeting, noting that the

overwhelming majority of sex crimes have a long delay in being reported if they are ever

reported at all.

*21.     Ms. Morrison's own friends and housemates would also later describe her as a "professional*

*victim" who made "bogus" claims and "faked being raped."*

21.     Denies the allegations of paragraph 21, and vigorously denies the incredible claim

that college undergraduates in 2005 – many of them not witnesses to the critical events – could

under the circumstances  have reliably reached the asserted conclusions as to the actual events at

issue in this case.

*22.       In fact, Ms. Morrison's housemates were so concerned about her sudden talk of bringing false rape charges against Mr. Langrick that they took the extraordinary step of going behind her back to contact Mr. Langrick — who they had no prior relationship with — and warning him to "watch out" for "your new friend Monica Morrison."*

22.     Denies the allegations of paragraph 22, including that the so-called "warning" had any credible basis other than as the result of a sophomoric misunderstanding of assaults they did not witness, combined with a general, reflexive desire by her peers to put pressure on her to minimize the event and also based on the more sinister concern that bringing police into the house could cause problems for the many recreational drug users living in Panarchy house at that time.

*23.       Ultimately, after weeks of investigating, the detectives told Ms. Morrison that because her claims were so thoroughly contradicted, and her credibility so tarnished, there could be no charges against Mr. Langrick for sexual assault or attempted sexual assault.*

23.     Denies the allegations of paragraph 23, and in particular notes and repeats the central but highly-questionable conclusion of the Hanover police that Ms. Morrison – who they found to have been "heavily impaired due to alcohol" – could not make a good witness to her own rape, evidently entirely neglecting to consider the obvious and dispositive issue of lack of ability to legally consent under those circumstances.

*24.       As noted, Ms. Morrison and her counsel notably attached only a few cherry-picked excerpts from the summary portion of this long police file to their Complaint, which action in and of itself betrays a knowledge that the full police file is absolutely devastating to Ms. Morrison's veracity and credibility.*

24.     Denies the allegations of paragraph 24, and refers the court to the entire police file for the contents thereof which speak for themselves.

*25. Mr. Langrick possesses a full copy of the file, including transcripts of police interviews with Ms. Morrison and many of her friends and acquaintances who were present at the time Ms. Morrison claims she was*

*sexually assaulted.  The picture these interviews paint of Ms. Morrison demonstrates very clearly why she and her*

*counsel did not want to attach the full file to their Complaint.*

25.     Denies the allegations of paragraph 25, refers the Court to the entire police file for the contents thereof which speak for themselves and states that, in fact, neither Ms. Morrison nor her counsel possessed anything more of the file than that they attached as Exhibit 1 to the Declaratory Judgment Complaint, despite efforts to obtain the balance of the file which appears to have been discarded by the police over the dozen-plus years since the incident. It is not known how Mr. Langrick managed to obtain the full and unredacted police file which, this case goes forward, should probably be examined by a neutral party to assure that it has not been tampered with in any way over the almost 15 years now since it was first issued.

*26.     In the following years, Ms. Morrison, who is a struggling aspiring writer with a history of mental*

*health issues, made multiple attempts to use the threat of publicizing this fabricated assault claim to obtain money*

*from Mr. Langrick.  Mr. Langrick did not accede to these threats because he did not sexually assault Ms. Morrison*

*and a fulsome, well-documented police investigation fully supports his innocence.*

26.     Denies the allegations of paragraph 26.

*27.      When Mr. Langrick refused to give into her demands, Ms. Morrison lashed out and followed*

*through on her threats to publicly accuse him of rape.  Ms. Morrison proceeded to try and get Mr. Langrick fired by*

*calling his employer, Bloomberg LP, and falsely claiming that he sexually assaulted her.  She made similar false*

*and defamatory statements in several subsequent online postings in which she identified Mr. Langrick by name and*

*claimed that he raped her.  But Mr. Langrick still refused to pay her a dime.*

27.     Denies the speculative allegations of paragraph 27.

*28.     Finally, Ms. Morrison, who has bounced from one short-lived employment position to another for*

*the last decade, decided that this old false allegation would be useful for her to serve another, financially-motivated*

*purpose: to advance her foundering writing career and obtain what she calls "Sacred Wealth" and "sweet rape*

*money" by usurping the #metoo movement and portraying herself as a courageous survivor of sexual assault.*

28.     Denies the allegations of paragraph 28, and asserts, on information and belief, that Mr. Langrick himself was the one who discussed in emails and is using a reputation firm to explore the prospect of obtaining a monetary settlement from the Daily Mail for its press coverage of him.

*29.     In fact, Ms. Morrison has in the past admitted that she "idolized" other women who she saw become well-known figures in the #metoo movement after writing about their experiences and publicly confronting their abusers.  Ms. Morrison has noted that some of these women had become public figures with "viral articles and television appearances" and "six figure memoir" deals.  Ms. Morrison believed that if she went public with her accusations against Mr. Langrick, she too could become a famous and well-known writer.*

29.     Denies the wholly superficial and hollow allegations of paragraph 29.

*30. Ms. Morrison thus recently set in motion her plan to build a lucrative personal brand by creating a Facebook profile, blog, and website where she calls herself "Ms. Universe" and describes herself thusly:*



## Who is Ms. Universe?

MS. UNIVERSE · FRIDAY, SEPTEMBER 28, 2018

Ms. Universe is everything and nothing. She has seen a glorious parallel universe and wishes to bring the gifts of that place back to our own universe. She is a fellow priestess of the Void, of the sisterhood of shadow work and Goddess worship. She rides dragons. She breathes under water. She works well under pressure, until she explodes like a supernova.

Like most humans she contains multitudes. She believes in witches and mermaids and the ancestors and aliens. She is a confessionalist. She is a sacred prostitute. She will show you exactly what that means as her story unfolds.

She has chosen to explore the concept of Radical Faith, executing the vision of embodying the physical foil to the paradigm we now experience. Rather than an infantilized pageant display, an animalistic clawing to the title "Miss Universe," Ms. Universe seeks to provide an open forum for self-empowerment, sovereignty reclamation, and spiritual growth where people can work together to achieve these aims.

Look for weekly dispatches from the Universe, with questions answered and friendly chats. Also look for the forthcoming chat group, Queens of the Universe. Ms. Universe will be coming to a city near you, for glass ceiling initiations for the good of country and the good of humanity. Stay tuned.

30.     Denies the allegations of paragraph 30 and states that Mr. Langrick's transparently self-serving interpretation of the quoted material is baseless.

*31.     In between posts about her interest in witchcraft spells, "mermaids," "ether dragons," "alchemy," "shadow work," and "metaphysical forensics" – she also began to write about her supposed journey from quiet victim of sexual assault to outspoken advocate.*

31.     Denies the allegations paragraph 31 and all of the sinister interpretations and implications Mr. Langrick baselessly attributes to Ms. Morrison's efforts to come to terms with the very real trauma she suffered at Mr. Langrick's hands.

*32. She also wrote about her plans to amass "Sacred Wealth" off of her advocacy and hinted about a new "economic justice" project she plans to unveil in early 2019 called "Rape on the Blockchain." She has invited interested media members and "venture capitalists" to contact her about funding this new project.  She also bragged, in a blog post directed at Mr. Langrick — which she later deleted — about the "mighty treasure" she had coming, and demanded that Mr. Langrick pay her:*

And I promised theives I lived with
That I wouldn't be a snitch
That we were in this shit together
Cause cops was busting in it

Can you see the dragons?
Ether dragons for a bitch
Ether dragons for a witch
Ether dragons rich

And there are dragons in the ether
They all guard a mighty treasure
And they all reign within the depths
You're not willing to measure

While you bother while you posture
As you bluffin', as you front
As you hide you're getting swallowed
By my GODDESS of a cunt

Putting trauma on the blockchain
Sayin' bitch.pay.me, yess
Turning testing into blessing
Cleaning up that filthy mess

And when you wanna stop
And say it hurts too bad
I'll say, "Good, bitch.
Cause you're the worst I ever had."

32.     Denies the allegations of paragraph 32 and their supposed meaning and real world implications that Mr. Langrick seeks to attribute to Ms. Morrison's metaphorical writings.

*33.     `The next step in Ms. Morrison's plan was to file a completely meritless, false complaint asserting plainly unripe and legally deficient declaratory judgment claims.  Her purpose in doing so was to seek media attention for her false rape allegations while also cloaking herself in the litigation privilege that exempts false statements in a court filing from defamation liability.*

33.     Denies the allegations of paragraph 33.

*34. This scheme has already been successful, as the false allegations in Ms. Morrison's Complaint were predictably picked up and republished by a credulous media, causing further, irreparable harm to Mr. Langrick's reputation.*

34.     Denies the allegations of paragraph 34.

*35. Mr. Langrick is a loving family man who abhors the very notion of sexual assault and supports the laudable goal of the #metoo movement to bring attention to sexual violence and gender discrimination.  Mr. Langrick has never in his 20+ year career had any workplace sexual harassment, sexual violence, or gender discrimination complaints made about him with any employer, and he has never been accused of any crimes bar Ms. Morrison's false allegations and a misdemeanor drug possession charge when he was a university student, which resulted in no criminal conviction.*

35.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35, except denies that Ms. Morrison's accusations of sexual assault and rape are false and also notes that Mr. Langrick, or his attorneys, seriously mislead this Court by leaving the false impression that his "misdemeanor drug possession charge when he was a university student," for which there is photographic evidence from the camera Ms. Morrison turned in to the police, was not related to the May 2005 incident.

*36.     But Mr. Langrick also knows that he is innocent of Ms. Morrison's accusations, and he cannot sit back and allow a very disturbed person to falsely tar him as a rapist in front of the entire world.*

36.     Denies the allegations in paragraph 36, and asserts that, based on his own admissions, and according to the FBI definition, Mr. Langrick is a rapist.

*37. Mr. Langrick did not initiate this fight or this litigation, but he will not shrink in the face of these vicious, damaging lies.  The truth must be told, and Mr. Langrick absolutely intends to tell it.*

37.     Denies the allegations in paragraph 37, including specifically the blatantly false claim that "Mr. Langrick did not initiate this fight," when it is undeniable that it was he who first threatened to commence a slander action against Ms. Morrison, also demanding that she sign a dishonest, fictional, and unconscionable NDA, which threat of legal action was pointedly not withdrawn over a period of nearly a year, while a good faith settlement proposal by Ms. Morrison was completely ignored for months, before Ms. Morrison concluded that she must do

something to try to address – and if possible to prevent – the threats of litigation that Mr.
Langrick initiated and never withdrew.

*38. Mr. Langrick brings these counterclaims to vindicate his rights under civil law, to restore his once-sterling personal and professional reputations, and to establish Ms. Morrison's liability for the irreparable harm that she has caused to his reputation by the publication of numerous false and defamatory statements. Mr. Langrick seeks an award of compensatory damages for the reputational and economic harm caused by Ms. Morrison's defamatory statements, and, given the willful and malicious nature of Ms. Morrison's conduct in knowingly making and publishing defamatory falsehoods about him, Mr. Langrick also seeks an award of punitive damages in an amount to be determined at trial.*

38.    Denies the allegations in paragraph 38, and specifically denies Mr. Langrick's
claim to having had a "sterling" reputation which, given all the boorish and repugnant behavior –
and worse – that he admitted to in 2005, and that he essentially reaffirms in his current pleadings,
is either untrue or else could not have been possible without the implicit but all too effective vow
of silence somehow imposed by the Dartmouth community, frankly as a matter of its male-
dominated history and tradition, on the whole grotesque incident, at Ms. Morrison's tragic
expense over more than a decade.

**THE PARTIES**

*39. Robert Joseph Langrick, 42 years old, is originally from the United Kingdom but has resided in the United States for many years. He became a naturalized U.S. citizen in 2016. Mr. Langrick earned an MBA from the Dartmouth College Tuck School of Business in 2006. He works in New York City and lives in Connecticut with his wife of almost a decade and his two small children.*

39.    Denies knowledge or information sufficient to form a belief as to the truth of
paragraph 39, except asserts, on information and belief, that Mr. Langrick's state of complete
denial in the current proceedings suggests the possibility that, in order to achieve U.S.
citizenship, he may have failed to disclose or acknowledge to U.S. naturalization authorities the

criminal charges lodged against him and investigated by the Hanover, New Hampshire police in 2005, for which he was ultimately arrested.

*40.	Monica Morrison, 33 years old, is originally from Orlando, Florida.  She graduated from Dartmouth College in 2007 and is currently a self-described "freelance writer" living in New York City.*

40.	Admits the allegations in paragraph 40, as far as they go, but specifically adds that she is a lifelong American and that at Dartmouth she earned a B.A. in English with a concentration in Creative Writing, and a minor in Theater.

## JURISDICTION AND VENUE

*41. Mr. Langrick's counterclaims in this action are compulsory counterclaims under Federal Rule of Civil Procedure 13(a) because these counterclaims arise out of the same transaction or occurrence that is the subject matter of Ms. Morrison's claims.*

41.	Denies knowledge or information sufficient to form a belief as to the truth of this legal conclusion.

*42. Mr. Langrick is a citizen of the State of Connecticut and Ms. Morrison is a citizen of the State of New York.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.*

42.	Admits the allegations in paragraph 42.

*43.	This Court has personal jurisdiction over Ms. Morrison because she is a resident and citizen of the State of New York and is domiciled in Queens County, New York.*

43.	Admits the allegations in paragraph 43.

*44.	Venue is proper in the Eastern District of New York because Ms. Morrison resides in Queens County, New York, and because Mr. Langrick is required under Federal Rule of Civil Procedure 13(a) to assert these counterclaims in the existing action before this Court.*

44.	Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44.

## FACTUAL ALLEGATIONS
## Mr. Langrick And Ms. Morrison Have A Consensual One-Night Stand In 2005

*45. In the early morning hours of Sunday, May 8, 2005, Mr. Langrick, then a first-year student at Dartmouth College's Tuck School of Business in Hanover, New Hampshire, attended a party at the Bones Gate fraternity house. Along with many others at the party, Mr. Langrick was playing "beer pong," a game popular with university students in which opposing teams of two attempt to throw a ping pong ball into solo cups containing beer.*

45.     Admits the allegations in paragraph 45, except denies the apparent implication that "beer pong" is a completely innocent, "popular" game when in fact its purpose is to facilitate drinking heavy enough to render its participants heavily intoxicated if not incapacitated. Also denies Mr. Langrick's definition of the game "beer pong," because at Dartmouth students play the game with paddles and do not throw the balls. Furthermore, asserts that the cups are clear plastic cups and not "solo cups" as Mr. Langrick states, indicating Mr. Langrick is not familiar with the game and calls into question how much he has actually played the game at all.

*46. During the course of playing this game, Mr. Langrick was paired as a teammate with Ms. Morrison. Mr. Langrick had never met Ms. Morrison before that night, but they hit it off and spent a long time talking and flirting at the party.*

46.     Denies the allegations in paragraph 46, except admits that Mr. Langrick, a complete stranger, approximately 10 years her senior, and a graduate student who would not be invited or welcomed to such an undergraduate fraternity gathering, was observing and, on information and belief surreptitiously recording video of Ms. Morrison playing pong without her consent, as he watched her get increasingly intoxicated and separated from her friends with the corrupt intention of picking her up.

*47. At some point, most of Ms. Morrison's friends with whom she attended the party left to return home. Ms. Morrison elected to stay and continue playing beer pong with Mr. Langrick.*

47.     Denies the allegations in paragraph 47, and specifically denies that she elected to stay with Mr. Langrick, when she was actually looking for her friends, one in particular by the

name of Frank Fucile, a Panarchy housemate, who, unfortunately, had unintentionally left her

behind as she became more and more intoxicated and heavily impaired.

*48.      Shortly before 6:00 a.m. on Sunday, May 8, 2005, when she was ready to return home, Ms.*

*Morrison invited Mr. Langrick to accompany her back to "Panarchy," an off-campus house where she lived.*

*Panarchy is one of Dartmouth's "undergraduate societies," and is similar to a fraternity or sorority in that many*

*students live together in a large shared house, though it is co-ed.*

48.      Denies the allegations in paragraph 48, except admits in general terms the

description of "Panarchy" therein. Reaffirms her assertion that Mr. Langrick lied when he asked

to go back to Panarchy on the false basis that he had plans with Mr. Fucile, lied about being

welcome and expected at the house, and lied when he followed Ms. Morrison home and claimed

it was so he could link up with Mr. Fucile like he had planned.

*49.      Prior to that evening, Mr. Langrick had never been to Panarchy, had no familiarity with it, and*

*did not even know where it was.  As others would later note to the police, he would not have been able to make his*

*way there unless Ms. Morrison had invited and guided him to her house.*

49.      Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 49, except admits that Mr. Langrick was able to find the Panarchy house

by following her home.

*50. Once they arrived at Panarchy at approximately 6:00 a.m., Ms. Morrison invited Mr. Langrick to her*

*bedroom on the third floor.  When they arrived, they found that Ms. Morrison's roommate, Jenna Pelletier, was*

*already occupying the bedroom with her boyfriend, Anton Hasenkampf.  Wanting to go somewhere private, Ms.*

*Morrison invited Mr. Langrick out onto the roof of the Panarchy house.*

50.      Denies the allegations in paragraph 50.

*51.      Ms. Morrison then guided Mr. Langrick over the sloping, unfenced rooftop above the third floor to*

*a structure called the "cupola" on the roof of the house.*

51.      Denies the allegations in paragraph 51, and in particular denies the implication

that, in supposedly "guiding" him to the roof, when she was actually drunkenly looking for

Frank Fucile, whose room was connected by a trap door to the cupola, she had the capacity to legally consent to the sexual activity that Mr. Langrick claims occurred thereafter in the cupola.

52.     *On information and belief, the cupola was well-known to residents of Panarchy as a place to "hook up," and it contained cushions arranged as makeshift bedding for this purpose.  In fact, when Mr. Langrick was led into the cupola by Ms. Morrison, he noticed a used condom wrapper on the floor.*

52.     Denies the allegations in paragraph 52, and in particular denies the implication that she had, at that time, the capacity to legally consent to the sexual activity that Mr. Langrick claims occurred in the cupola.

53.     *Just as he had never been to Panarchy, Mr. Langrick had never been on its roof and had no preexisting knowledge of the existence of this cupola.  Again, Mr. Langrick could only have been voluntarily led there by Ms. Morrison.*

53.     Denies the allegations in paragraph 53 and in particular denies the implication that she had, at that time, the capacity to legally consent to the sexual activity that Mr. Langrick claims occurred in the cupola.

54.     *In addition, accessing the cupola requires climbing out a small window and up a sloped roof, a tricky and dangerous maneuver which a person could not do if he or she were in such an intoxicated state that motor functions or ability to walk were impaired:*



(Image of Panarchy house, showing the "cupola" on the roof [top left])

54.     Denies the allegations in paragraph 54, except admits that the photograph therein contains an image of Panarchy house, including the cupola.

*55.     Needless to say, Mr. Langrick did not in any way coerce or force Ms. Morrison to lead him out of the window, up the roof, and into this cupola that he did not know existed.  While both Mr. Langrick and Ms. Morrison had been consuming alcohol that night, both were at that point in time not so impaired that they could not perform this somewhat tricky physical maneuver.*

55.     With respect to the allegations in paragraph 55, Ms. Morrison has never made a claim of violent rape against Mr. Langrick and she denies the balance of the allegations in paragraph 55, including Mr. Langrick's preposterous claim to have been able to reasonably assess Ms. Morrison consent in his severe state of intoxication,[2]  except admits that the allegedly "tricky physical maneuver" could also have been performed recklessly – and yet survived – by someone "heavily impaired due to alcohol," as Mr. Langrick's ability to survive the supposed ordeal, in his severely inebriated state, also demonstrates.

*56.     At the time they entered the cupola, the sun had risen, and it was light inside the cupola as it has vertical windows on all sides.*

56.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 56.

---

[2] The current Dartmouth College policy, with regard to the evaluation and assessment of sexual consent, when under the influence of alcohol, dispositively states as follows:

"Where alcohol or other drugs are involved, evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs affects a person's decision-making ability; awareness of consequences; ability to make informed, rational judgments; capacity to appreciate the nature and quality of the act; or level of consciousness. The assessment is based on objectively and reasonably apparent indications of incapacitation **when viewed from the perspective of a sober, reasonable person.**" Source: Dartmouth Title IX Office, Definitions of terms such as "consent" and "sexual assault, effective 1 September 2019 (emphasis added)

Accordingly, any claim by Mr. Langrick that he could have fairly evaluated Ms. Morrison's state of incapacitation due to alcohol – or her ability to "consent" to his drunken predations – is incredible on its face, because his admitted actions establish beyond peradventure that he was far, far from "a sober, reasonable person" at that time.

*57. They then proceeded to engage in foreplay and ultimately sexual intercourse. While it gives Mr. Langrick no pleasure to reveal intimate details of that encounter publicly, and he does not do so with the intent to embarrass anyone, he has been left with no choice but to do so because Ms. Morrison has publicly accused him of rape, claimed that they did not have sex, and claimed that Mr. Langrick made crude comments to her out of the blue while they were merely talking.*

57.    Denies the allegations in paragraph 57 and states that, to this day, due to her heavy alcohol consumption, she has little or no memory of the alleged events in the cupola, and for this reason among others she vigorously denies that she either wanted, or intended, or consented to have a sexual encounter with Mr. Langrick, and she thus also vehemently denies that she did or possibly could consent to all of the depraved horrors initiated and perpetrated that night by the intoxicated and out-of-control Mr. Langrick.

*58.    The truth is that upon entering the cupola, Ms. Morrison and Mr. Langrick began to make out, and Ms. Morrison removed her shirt and her underwear.*

58.    Denies the allegations in paragraph 58, except states that, to this day, due to her heavy alcohol consumption, she has little or no memory of the alleged events in the cupola. Asserts that Mr. Langrick stated in police interviews that he was not sure who initiated the activity or who removed the clothing from whom.

*59.    Mr. Langrick and Ms. Morrison then both disrobed entirely, and Ms. Morrison began to fondle Mr. Langrick's penis.*

59.    Denies the allegations in paragraph 59 except states that, to this day, due to her heavy alcohol consumption, she has little or no memory of the alleged events in the cupola. Further asserts that Mr. Langrick at the time of the police interrogation was unsure of who initiated the sexual activity, so stating that Ms. Morrison was the one who "began to fondle" is both materially misleading as well as inconsistent, and casts major doubts on Mr. Langrick's recollection.

60.     *While Ms. Morrison was touching Mr. Langrick, he began to use his fingers to stimulate Ms. Morrison's vagina and clitoris.  This went on for some time and Ms. Morrison achieved orgasm.*

60.     Denies the allegations in paragraph 60, except states that, to this day, due to her heavy alcohol consumption, she has little or no memory of the alleged events in the cupola and she also specifically questions Mr. Langrick's claims as to her supposed "orgasm," while she must at best have been semi-conscious, which was overwhelmingly more likely to have been her urinating on Mr. Langrick (after a night of heavy drinking) while totally under his physical and sexual control.

61.     *The orgasm itself was notable and distinctive because, as Mr. Langrick was later able to describe to police, it involved a prolonged ejaculatory stream.*

61.     Denies the allegations in paragraph 61, and in particular Mr. Langrick's claims that the "ejaculatory stream" was an orgasm and anything other than urine, except states that, to this day, due to her heavy alcohol consumption, she has little or no memory of the alleged events in the cupola.

62.     *Mr. Langrick, taken by surprise, made a comment to Ms. Morrison at the time about the ejaculate having sprayed his face and torso.*

62.     Denies the allegations in paragraph 62, except states that, to this day, due to her heavy alcohol consumption, she has little or no memory of the alleged events in the cupola. Asserts that this comment jolted Ms. Morrison in her drunken stupor, made Ms. Morrison extremely uncomfortable and that Ms. Morrison left the roof and told Mr. Langrick he needed to leave the society.

63.     *After this mutual foreplay, Ms. Morrison and Mr. Langrick had prolonged and consensual sexual intercourse.  As would later be corroborated by witnesses, Ms. Morrison was a willing, enthusiastic, and vocal participant.*

63.     Denies the allegations in paragraph 63, and she also specifically and strenuously denies that, under all of the admitted circumstances, she could possibly have given her legal consent to the sexual activity described; nor could a witness overhearing any such sounds of sexual activity have possibly made any meaningful judgment as to her consent, except states that, to this day, due to her heavy alcohol consumption, she has little or no memory of the alleged events in the cupola,.

*64.     After nearly an hour of sexual activity in the cupola, Ms. Morrison and Mr. Langrick resolved to go to bed, and they both exited the cupola, climbed back down the roof, and went through a window into the bedroom.  They got into Ms. Morrison's bed together at approximately 7:00 a.m.*

64.     Denies the allegations in paragraph 64. Asserts that Mr. Langrick was asked to leave and he obstinately refused.

*65.     Ms. Morrison's roommate Jenna Pelletier and her boyfriend Anton Hasenkampf, who were asleep in the same bedroom, were again awakened and saw the two return to the room and get into bed together.*

65.     Denies the allegations in paragraph 65 and specifically denies that either her roommate or her boyfriend ever claimed to have seen Ms. Morrison and Mr. Langrick get into bed together or to have witnessed all of the events leading up to Mr. Langrick's entry into her bed.

*66.     Just minutes later, as the two were still settling into the small bed and continuing to make a bit of noise, Ms. Pelletier, irritated at having now been awoken multiple times, snapped at Ms. Morrison to tell her to be quiet.*

66.     Denies the allegations in paragraph 66, and specifically notes that Ms. Pelletier told the Hanover police that she overheard Mr. Langrick, under the covers of Ms. Morrison's bed, not making "a bit of noise," but "moaning like a porn star." No witnesses reported hearing noise from Ms. Morrison during this time.

*67.    Ms. Morrison, embarrassed at having been called out by her roommate and wanting to sleep, asked Mr. Langrick if he could find his own way home, and then got up and left the small bed to go sleep in the king-sized bed of her best friend and neighbor where she often spent the evening.*

67.    Denies the allegations in paragraph 67, and specifically denies that she "often spent the evening" with Brent Reidy, who later told the police that Ms. Morrison came into his room exclaiming that "a strange British man was trying to f*** me in the a**;" and she also notes that, thereafter, Reidy told the police that Ms. Morrison immediately passed out in his bed and her roommates later testified that they were unable to rouse her as the situation deteriorated during Mr. Langrick's soiled rampage and serial sexual assault in the nearby room of the society.

*68.    Despite the fact that Ms. Morrison would later make the dramatic claims that she had not been intimate with Mr. Langrick, that she had ordered Mr. Langrick to sleep on the couch, and that Mr. Langrick had then surreptitiously entered the bed uninvited and attempted to rape her in her sleep while making crude comments about anal sex, both Ms. Pelletier and Mr. Hasenkampf would later confirm to police that they saw and heard no so such thing.  What they saw was two people who had just had consensual sex return to the room and get into bed together willingly.*

68.    Denies the allegations in paragraph 68, and once again notes that Ms. Pelletier told the Hanover police that she overheard Mr. Langrick, under the covers of Ms. Morrison's bed, "moaning like a porn star." Affirms that witnesses saw her run out of the room, after they did not hear Ms. Morrison while they had heard Mr. Langrick's depraved outburst.

*69. Moreover, contrary to her later claims that Mr. Langrick had snuck into her bed uninvited and penetrated her while she was sleeping, she originally told her friends that Mr. Langrick had merely asked if she wanted to have sex (again) while they were in her small bed together, and because she did not want to and instead wanted to sleep more comfortably, she elected to go lay down in her friend's king-sized bed.*

69.    Denies the allegations in paragraph 69.

*70.    Mr. Langrick, hungover and exhausted from having not slept all night and having just participated in close to an hour of vigorous sexual activity, remained in the bed and fell asleep for a short period of time.*

70.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70. Asserts that Mr. Langrick was charging at and sexually attacking other witnesses in the room during this time while naked and stained with feces, contradicting his claims about being "exhausted" and how Mr. Langrick "remained in the bed and fell asleep."

*71.     Minutes later, Mr. Langrick, needing to use the bathroom, stirred alone in the bed. By this time, the effects of alcohol consumption and sleep deprivation were having an effect, and Mr. Langrick was disoriented. He got out of bed, but not knowing where the bathroom was and generally confused, he began to urinate in the bedroom.   to sleep, asked Mr. Langrick if he could find his own way home, and then got up and left the small bed to go sleep in the king-sized bed of her best friend and neighbor where she often spent the evening.*

71.     As to the allegations in paragraph 71, admits, on information and belief, that Mr. Langrick – buck naked and feces-stained and in front of both of her roommates – urinated on the floor of her room, on her sweater.

*72.     Ms. Morrison's roommate and her boyfriend, awakened again, saw this occur and were understandably upset.  They yelled at Mr. Langrick who, not fully comprehending what was going on, tried to get back into the wrong bed that was occupied by the roommate's boyfriend.  Eventually, with the help of a neighbor, they were able to rouse Mr. Langrick and tell him he needed to leave.  Mr. Langrick left the Panarchy house at approximately 7:15 a.m. and walked home on the morning of Sunday, May 8, 2005.*

72.     As to the allegations in paragraph 72, admits, on information and belief, that Mr. Langrick – behaving sadistically, wantonly, and indiscriminately with no regard to anyone's consent and in flagrant acts of harassment, assault, and vandalism in leaving his feces stained underwear behind at the crime scene – careened around her room, lunged, "came at" and jumped on both of her roommates, groped at both without their consent as they "yelled" and screamed in an extremely frightened state, and ultimately required multiple housemates to warn Mr. Langrick that the police would be called, before he finally left Ms. Morrison's room. Mr. and Mrs. Hasenkampf's decision to not hold Mr. Langrick criminally responsible for his actions on that

fateful night in no way exonerates him from the truth of what he did, which was witnessed by multiple people.

**Ms. Morrison Steals From Mr. Langrick And Attempts To Extort Him**

*73.    After leaving the Panarchy house on the morning of Sunday, May 8, 2005, Mr. Langrick returned to his residence at Buchanan Hall (a Tuck School dormitory) and slept for several more hours.*

73.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73, except denies the implication that Mr. Langrick left of his own accord after being finally kicked out of Ms. Morrison's society, only leaving when he was warned that the police would be called, upon being physically pushed out the hallway by Brent Reidy, who is approximately 6'5" tall. Upon leaving he was banned from the premises and warned to never return to the society again.

*74.    That day, during the course of a conversation, Mr. Langrick told his friend Nestor Weigand about the events of the previous evening.  He specifically told Mr. Weigand about how he met a woman at a party, she invited him home to her house, she took him up to a room on the roof of the building, and they had intercourse.  Mr. Langrick also specifically mentioned the distinctive ejaculatory orgasm that Ms. Morrison had as they engaged in foreplay in the cupola.*

74.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74, except denies any suggestion that the whitewashed, bragging, inflated, and demonstrably propagandist story Mr. Langrick supposedly told his friend about the evening's events could somehow serve competent to prove the truth of his underlying claims, including about his depraved and wanton criminal acts involving Ms. Morrison; and she specifically denies the implication that any supposed sexual activity in the cupola was consensual in light of her "heavy impairment due to alcohol."

*75.    The description of the encounter that Mr. Langrick gave to Mr. Weigand that day was wholly consistent with the account Mr. Langrick would provide to the Hanover police nine days later.*

75.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75. Furthermore, asserts that none of Mr. Langrick's statements are consistent with any witness statements, and that the only time he has been forthcoming or truthful about any of the circumstances of the incident is when he has been confronted with (or intimidated by, as was the case with the drugs Det. Moran interrogated Mr. Langrick about possessing) overwhelming physical evidence.

76.    *That same afternoon, Mr. Langrick returned to the Panarchy house at approximately 4:00 p.m., hoping to locate items of personal property that he had misplaced the night before, including his car keys, cash, an expensive digital camera, and a debit card.*

76.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76, except points out that either Mr. Langrick or his counsel are intent on providing misleading information about the things he drunkenly left behind after the incident, that included a vial of cocaine, for possession of which Mr. Langrick was later arrested and criminally charged. Also, asserts that in returning to the Panarchy society, Mr. Langrick was trespassing on the premises at this time after having been banned, as well as entering Ms. Morrison's room in an intimidating manner, uninvited, attempting to remove and eliminate any traces of items that might later be entered into evidence in association with charges pursued against him in connection with this incident.

77.    *Although he did not know the exact address, he was able to locate the Panarchy house by looking for the cupola where he and Ms. Morrison had engaged in sexual intercourse.*

77.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77. Also asserts that Panarchy is an open co-ed undergraduate society with a website and is indexed and the location is freely accessible in all Internet search engines

and its location is no secret. Also re-affirms that Mr. Langrick was banned from the premises of the Panarchy Undergraduate Society.

78.     *When Mr. Langrick arrived at the Panarchy house, he went to Ms. Morrison's room. Ms. Morrison was there sitting on the couch.*

78.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78, except admits that at some point in time Mr. Langrick did return to Panarchy house to attempt to seize his property which would later be entered into evidence with the police, and entered Ms. Morrison's room again without her consent, after having been banned from the premises.

79.      *Mr. Langrick noticed his car keys sitting on a coffee table and picked them up.  He then asked Ms. Morrison if she had his other things.*

79.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79, except admits that Mr. Langrick had left his car keys in her room after being forcibly removed from the Panarchy Society and banned from the premises. Further asserts that he intimidated Ms. Morrison  while he was looking freely around the house for items connected with his crimes from the night before, including a vial of illegal narcotics that was later admitted as evidence to the police.

80.      *Ms. Morrison did in fact knowingly have all of Mr. Langrick's possessions.  Earlier that day, she had gone to the cupola and retrieved several items including Mr. Langrick's expensive digital camera, $40 in cash that he left behind, and his debit card.*

80.     Admits the allegations in paragraph 80, but only inasmuch as she was cooperating with other society residents in collecting the items and deciding about the appropriate action to take with them. Denies any implication that she was wrongfully in possession of any such items, drunkenly left behind by Mr. Langrick. Further admits that all cash and physical property, except

for a small amount of cocaine which was consumed by a fellow housemate, was ultimately handed over to police as evidence in connection with the investigation of this incident.

*81.      Ms. Morrison had stated to her housemates that she planned to keep Mr. Langrick's cash and property out of spite for him having embarrassed her that morning.*

81.      Denies the allegations in paragraph 81, and specifically denies she intended to keep his "expensive" camera, the same camera with evidence of him consuming illegal narcotics, which Ms. Morrison turned over to the police and they used as evidence in their investigation of his criminal possession of cocaine, and later charged him.

*82.      In fact, when Mr. Langrick arrived, Ms. Morrison actually had his digital camera on her lap, but she hurriedly hid it behind a couch cushion so that Mr. Langrick would not see it.*

82.      Denies the allegations in paragraph 82, and in particular denies any suggestion that Ms. Morrison was intent on "stealing" the camera Mr. Langrick drunkenly left behind, which she turned over to the police. Furthermore, admits she was confronted and scared and intimidated when Mr. Langrick trespassed and entered her room without her consent, demanding physical property which was later used as evidence in connection with charges levied against him as a result of an investigation of the incident the night before.

*83.      When Mr. Langrick directly asked for his things back, Ms. Morrison deliberately lied to Mr. Langrick, telling him that she did not have his things and that perhaps he left them at the fraternity house.*

83.      Denies the allegations in paragraph 83, and specifically denies any intent to keep his camera which she later turned over to the police as evidence of Mr. Langrick's criminal activity.

*84       Before he left, he asked Ms. Morrison to please send him an email if she did locate the other things.  In fact, he wrote down his last name for her on a piece of paper so that she would have his contact information.  Of course, this would have been a ludicrous thing for Mr. Langrick to have done if he had just sexually assaulted Ms. Morrison only hours earlier.*

84.     Denies the allegations in paragraph 84 and also specifically questions Mr. Langrick's logic or authority as a "criminologist" assessing her claims of soiled and naked aggressive sexual assault, and whatever he did or did not appreciate about the events in his drunken state and she also questions his alleged credibility given that the record is clear that he at first persistently denied to the police, on information and belief, knowing anything about the cocaine he left behind after his grotesque rampage, until he was ultimately pressured into confessing.

*85.     Although he did not directly accuse Ms. Morrison of stealing his things, Mr. Langrick's tone may have suggested to her that he did not believe she was being honest when she said she did not have his property.*

85.     Denies the allegations in paragraph 85. Except admits that the only perceived "tone" Ms. Morrison picked up from Mr. Langrick was a tone of intimidation, coercion, and urgency as Mr. Langrick was trespassing in Panarchy and in her bedroom without her consent after having been banned just hours earlier.

*86.      Later that evening, at 11:55 PM, Mr. Langrick received an email message from Ms. Morrison with the subject, "Your Stuff!"  Ms. Morrison copied several other persons, all Panarchy residents, on the email. The other individuals copied or blind-copied on the email included Jenna Pelletier, Anton Hasenkampf, their neighbor Brent Reidy, and Panarchy resident Selena Hadzibabic.*

86.     Admits that there was a series of email exchanges related to the incident, the investigation of which led to Mr. Langrick's later arrest, and refers the court to those emails for the contents thereof.

*87.     This strange email contained numerous blatant falsehoods.*

87.     As to the allegations in paragraph 87, admits that there was a series of email exchanges related to the incident, and refers the court to those emails (part of the Hanover police record) for the contents thereof. Denies the characterization of the emails as having "blatant falsehoods" attributable to Ms. Morrison.

88.     *First, Ms. Morrison claimed to be emailing Mr. Langrick about his "stuff" — i.e., his personal possessions he had asked her for earlier in the day — and Ms. Morrison claimed that she had sent a "blitz" (email) to other Panarchy residents asking them "to be on the lookout for [Mr. Langrick's] things."  But unbeknownst to Mr. Langrick, at the time she sent this email to him, Ms. Morrison had already found all of his things and had decided to steal them.*

88.     As to the allegations in paragraph 88, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, except specifically denies that she intended to "steal" the items drunkenly left behind by Mr. Langrick which she later handed over to the police, which they used as evidence in conjunction with Mr. Langrick's arrest.

89.     *Ms. Morrison also made a bizarre and mocking reference to the size of Mr. Langrick's genitalia in the email, though Ms. Morrison also said that this information came from her roommate and she herself "[could] not corroborate these claims."  This was an obvious and transparent attempt by Ms. Morrison to falsely imply to her housemates — whom she strangely copied on the email — that she did not have sex with Mr. Langrick.*

89.     As to the allegations in paragraph 89, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the unpersuasively exculpatory interpretation consistently given to those emails by Mr. Langrick or his counsel. Admits that to this day, Ms. Morrison's only recollection of Mr. Langrick's penis was of it being an unnaturally small, shriveled, and uncircumcised blob which also had an offensive odor and smelled like human feces, which was also acknowledged by her roommate and her roommate's boyfriend.

90.     *Ms. Morrison failed to realize at the time that Panarchy resident Alice Johnstone had overheard her sexual encounter with Mr. Langrick and thus would conclusively disprove this lie.*

90.     Denies the allegations in paragraph 90 and specifically denies that what Alice Johnston allegedly overheard would "conclusively disprove" anything about her inability to

consent to the allegedly "consensual" sexual intercourse, which occurred while she was incapacitated and later unconscious.

*91.     Ms. Morrison's claim that she had never seen Mr. Langrick's penis was also totally inconsistent with her later statement to police that she did see Mr. Langrick's penis as he supposedly attempted to sexually assault her in bed.*

91.     As to the allegations in paragraph 91, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof and also refers the court to the police files, which speak for themselves. Again asserts that her recollection of his penis is to this day vague and impressionistic.

*92.     Ms. Morrison also strangely and falsely claimed that Mr. Langrick had attempted to sexually assault her, her roommate, and her roommate's boyfriend.*

92.     Denies the allegations in paragraph 92, including notably Mr. Langrick's strange and pathological claim that he had not attempted to serially sexually assault her roommate and roommate's boyfriend, having admitted that he, while completely naked, got into the roommate's bed and attempted to "cuddle" the boyfriend while refusing to get out of the roommate's bed despite repeated demands; and that he attempted to sexually assault her roommate when, on information and belief, he "came at her" at some point – while still buck naked and, on information and belief, stained with excrement. If those events are not at least fairly characterized as attempted assaults of a sexual nature, it is hard to imagine what are. These are admitted facts and uncontested events. In fact, Mrs. Hasenkampf later admitted to Ms. Morrison in an apology letter that her interaction with Mr. Langrick was "one of the most disturbing ones I've had in my life" and that Mr. Langrick was "aggressive and scary while being super fucked up."

*93.     The next morning, Anton Hasenkampf, the boyfriend of Ms. Morrison's roommate Jenna Pelletier, replied all to that email.  In what appeared to be an attempt to dial back Ms. Morrison's bizarre accusations, he said "Don't be so hard on him ... I say he takes [us] all out to dinner and we have a good laugh."*

93.     As to the allegations in paragraph 93, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, except of course denies that Ms. Morrison's allegations were in any fashion "bizarre," much less false, and also denies Mr. Langrick's self-serving interpretation of Mr. Hasenkampf's attempts to lighten the mood as in any way representing a statement denying or disclaiming the grotesque truth of the underlying events in Ms. Morrison's dorm room. Also admits that this email proves that it was never Ms. Morrison's idea to have Mr. Langrick take her or anyone else out for dinner.

*94.     Minutes later Ms. Morrison responded, again replying all, and disclaimed her earlier accusation, saying her email was intended to be "funny" rather than "harsh":*

> From: Monica C. Morrison [mailto:Monica.C.Morrison@Dartmouth.EDU]
> Sent: Monday, May 09, 2005 10:10 AM
> To: Anton L. Hasenkampf; Monica C. Morrison; Robert J. Langrick
> Cc: Brent C. Reidy; Jenna C. Pelletier
> Subject: Re: Your Stuff!
>
>
> --- Anton L. Hasenkampf wrote:
> Don't be so hard on him...I like a man who cuddles...I say he takes all
> out to dinner and we have a good laugh
> --- end of quote ---
> No, it's true. We all discussed this last night. Sorry if the e-mail came
> off harsh-- it was supposed to be more funny than harsh.

94.     As to the allegations in paragraph 94, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the completely unpersuasive and self-serving interpretations consistently given to those emails by Mr. Langrick or his counsel. Further admits that Brent Reidy stated to the police during the investigation that "Monica was still having trouble sleeping in her own room, doesn't

feel safe walking on campus and that became more and more apparent in the day after and the day after that... it takes anyone a little time to sort of get through the shock of the situation."

95.     *When Mr. Langrick responded to Mr. Hasenkamp's suggestion that they all go out to dinner and have a good laugh over the incident, Ms. Morrison again responded jokingly, asking if they could "piss" on Mr. Langrick's floor:*

```
-----Original Message-----
From: Monica C. Morrison [mailto:Monica.C.Morrison@Dartmouth.EDU]
Sent: Monday, May 09, 2005 10:28 AM
To: Robert J. Langrick; Monica C. Morrison; Anton L. Hasenkampf
Cc: Brent C. Reidy; Jenna C. Pelletier
Subject: RE: Your Stuff!

--- "Robert J. Langrick" wrote:
I would be up for taking you guys out for dinner if you want to. Somehow I
think you won't but I can get you all properly hammered.
--- end of quote ---
can we piss on your floor?

just teasing...
```

95.     As to the allegations in paragraph 95, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the unpersuasively self-servingly exculpatory interpretations consistently given to those emails by Mr. Langrick or his counsel. Further admits that fellow society member Brent Reidy told the police during the investigation that "if you know Monica, she's the kind of person that deals with anything with humor that's like her motive. You know some people cry and some people don't talk to anyone and some people go and punch things but Monica makes jokes." Further admits that Mr. Langrick offered to illegally take the underaged Ms. Morrison and her friends out and get her "properly hammered" again, as if they were somehow owed a repeat performance of the intoxicated, animalistic, and traumatizing events which happened during the original incident.

96. *Minutes later, Ms. Morrison's friend Brent Reidy chimed in, acknowledging and expressing appreciation for Mr. Langrick's sincere apologies for causing a mess. Ms. Morrison echoed those sentiments and called the entire incident "more funny than anything else":*

From: Monica C. Morrison [mailto:Monica.C.Morrison@Dartmouth.EDU]
Sent: Monday, May 09, 2005 10:30 AM
To: Brent C. Reidy; Robert J. Langrick; Monica C. Morrison; Anton L. Hasenkampf
Cc: Brent C. Reidy; Jenna C. Pelletier
Subject: RE: Your Stuff!

--- Brent C. Reidy wrote:
Thanks for being so apologetic and understanding our anger. I appreciate
your humility. I'm sure we can all get over this....
--- end of quote ---
it was more funny than anything else. I mean, these things happen I
..ppose...

96.     As to the allegations in paragraph 96, admits that there was a series of email
exchanges related to the incident, and refers the court to those emails for the contents thereof, but
denies the unpersuasively self-serving interpretations consistently given to those emails by Mr.
Langrick or his counsel. Once again admits that Ms. Morrison processes difficult situations with
"humor," as noted by witnesses.

*97.     As this correspondence continued, Mr. Langrick apologized repeatedly for causing a scene and
offered to pay for the sweater that Ms. Morrison claimed he had ruined.  Although one of her friends would later tell
police that Ms. Morrison was able to salvage the sweater simply by washing it, and although Ms. Morrison had
already stolen hundreds of dollars from Mr. Langrick in cash and property, Ms. Morrison quickly seized on the idea
of obtaining more money from Mr. Langrick:*

Date: 09 May 2005 10:37:04 EDT
From: Monica C. Morrison
Reply-To: JustOneStationAlongTheWay
Subject: RE: Your Stuff!
To: Robert J. Langrick

--- You wrote:
Thanks so much for all your emails and being so ready to forgive my
idiocy. This is definitely a story to entertain my grandchildren.
--- end of quote ---
my HB is 2878

So if you wanted to send me the cash

Monica Morrison
Hinman Box 2878
H-nover, NH 03755

97.     As to the allegations in paragraph 97, admits that there was a series of email
exchanges related to the incident, and refers the court to those emails for the contents thereof, but
denies the self-serving interpretations consistently given to those emails by Mr. Langrick or his

counsel. Admits that his conciliatory tone suggests a consciousness of guilt and further admits that Mr. Langrick is apologetic for "causing a scene," although Mr. Langrick and Ms. Morrison are clearly in dispute over what actions constitute the "scene" he is so apologetic about causing. Further admits that Mr. Langrick offering money during this time was done as an intimidation tactic from a position of an imbalance of power meant to silence Ms. Morrison's complaints so that she would no longer publicly accuse him or come forward with the truth about what happened, which he has already falsely categorized as "bizarre" and "strange." Further admits that compensating Ms. Morrison with cash was entirely Mr. Langrick's idea.

98.     *Mr. Langrick did, in fact, drop off $200 to compensate Ms. Morrison and her roommates for the sweater and the trouble of cleaning up.  At that time, he still did not know that Ms. Morrison had already stolen cash and valuables from him.*

98.     Denies the allegations about "stolen cash and valuables" in paragraph 98. Specifically admits that based on Mr. Langrick's directions, an unannounced, intimidating and suspicious person with an envelope of cash trespassed without consent at the Panarchy society, where Mr. Langrick had just been banned, and further trespassed in Ms. Morrison's room without her permission or consent and dropped off this supposed "apology" envelope in a highly invasive fashion, in spite of having been given Ms. Morrison's mailbox information. This was a strategic decision to downplay the seriousness of Mr. Langrick's actions and to further stake claim to the ongoing violation of Ms. Morrison's autonomy and boundaries by continuing to trespass and send others to trespass on her property and to coerce her into consenting after the fact to the horrors of the incident.

99.     *However, far from being satisfied by Mr. Langrick's apology and compensation for her sweater, Ms. Morrison saw an opportunity to extract even more from Mr. Langrick.  The correspondence continued and took on an ominous tone as Ms. Morrison suddenly demanded that Mr. Langrick — who at the time was a university*

*student without great financial means — treat her and all her friends to an expensive restaurant out of state. This*

*demand was made in a bizarre, sarcastic, and mocking tone:*



99.     As to the allegations in paragraph 99, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the self-serving interpretations consistently given to those emails by Mr. Langrick or his counsel, including the overheated characterizations such as "ominous tone," as well as the plea of poverty from a man who casually leaves behind his cocaine, the keys to his own car, cash and credit card and a "very expensive" professional camera, after a drunken, coke-fueled, sadistic and despicable rampage.

*100.     Understandably, this continuing correspondence of false accusations and increasing financial demands was of great concern to Mr. Langrick, who was beginning to feel both threatened and taken advantage of. When he demurred on a firm date for the demanded dinner, Ms. Morrison continued to send him bizarre and disturbing communications:*

```
>Date: 09 May 2005 15:28:19 EDT
>From: Monica C. Morrison
>Reply-To: JustonecationAlongTheWay
>Subject: RE: dinner
>To: Robert J. Langrick, Monica C. Morrison
>Cc: Anton L. Hasenkampf, Jenna C. Pelletier, Brent C. Reidy
>X-Mailer: BlitzMail@ version 2.7.1/blitzserv 3.31b11
>MIME-Version: 1.0
>Content-Type: text/plain; charset-iso-8859-1
>Content-Transfer-Encoding: quoted-printable
>Content-Disposition: inline

--- "Robert J. Langrick" wrote:
Guys,


I am seriously busy for the next three weeks as we sprint to the finish line and I got
friends from the UK coming across on Wednesday for the entire weekend. hate to do this but
can we do this at a later date?


Rob
--- end of quote ---
but Rooooooooob, the soup tastes "magical." I mean, I know you gave us a little of your
own magic on Saturday night, but when you get us all geared up like that with the magic
and all, we become dependent on this magic for our livelihood. I guess since it's Green
Key we can cut you a break. How about next week?

- from"Travel & Leisure Magazine":
The Simon Pearce Restaurant, with its huge windows and blond wood furniture-is so bright
and airy, you feel you're dining inside one of Pearce's glass bowls. The food is modern
American eclectic, with an occasional Irish touch. It's hard to stop eating the savory
scones and thin slices of Irish brown bread, so delicious with the house-smoked salmon.
The Vermont cheddar soup tastes almost magical when spooned from an exquisite bell-shaped
celadon Pearce cup.
```

100.     As to the allegations in paragraph 100, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the self-serving interpretations consistently given to those emails by Mr. Langrick or his counsel, including the overheated characterizations in this paragraph such as feeling "threatened" by a proposed dinner, and referring to the supposedly "bizarre and disturbing" language contained therein. Further admits that as her friend and witness Brent Reidy stated to the police, at this time that Ms. Morrison was "having trouble sleeping," and was plagued with disturbing thoughts of the incident which resulted in her soon after this point contacting a Sexual Abuse Peer Advisor (SAPA) and later filing a report with Safety and Security and later a police report and rape kit. Further admits that dinner was not actually her initial idea, and was actually the idea of her roommate Jenna Pelletier.

**Ms. Morrison Falsely Accuses Mr. Langrick Of Sexual Assault**

*101.     As Ms. Morrison and some of her friends that she included on this bizarre email correspondence continued to joke about the incident, mock Mr. Langrick, and gleefully plan an expensive dinner on his dime, Ms. Morrison's roommate, Jenna Pelletier, made it clear that she was not as amused by the situation.*

101.     As to the allegations in paragraph 101, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the self-serving interpretations consistently given to those emails by Mr. Langrick or his counsel, including the characterizations of Ms. Pelletier's views, in this paragraph as well.

*102.     On the same email chain later that Monday evening, Ms. Pelletier expressed annoyance at the "jolly" tone of Ms. Morrison's email correspondence and articulated her aggravation at having been "woken up from a sober night," at having had to witness Mr. Langrick naked in her bedroom, and at his having peed on her floor.*

102.     As to the allegations in paragraph 102, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the always self-serving interpretations given to those emails by Mr. Langrick, or his counsel, including the characterizations in this paragraph as well, most notably the tone-deaf attempt to blame Ms. Pelletier's annoyance  on Ms. Morrison rather than taking responsibility for his own, totally unacceptable, nasty and reprehensible behavior.

*103.     Ms. Pelletier also made it clear that she was particularly annoyed by the incident because she had "nothing to do with [Mr. Langrick] being naked or being [in the bedroom]."*

103.     As to the allegations in paragraph 103, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the self-serving interpretations consistently given to those emails by Mr. Langrick, or his counsel, including the similarly tone-deaf characterizations in this paragraph as well.

*104.    When Ms. Morrison realized that Ms. Pelletier was angry about the incident and about Ms. Morrison and her friends making so light of it, Ms. Morrison became concerned that Ms. Pelletier and the other Panarchy residents would blame her.  After all, as Ms. Pelletier had said in her email, Ms. Morrison was the one who brought Ms. Langrick back to the house to hook up with him, and she was the one responsible for him being naked in the bedroom.*

104.    As to the allegations in paragraph 104, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the consistently self-serving interpretations given to those emails by Mr. Langrick, or his counsel, including the tone-deaf characterizations in this paragraph as well, such as the claim that it was Ms. Morrison – and not Mr. Langrick – who was responsible for his own admittedly drunken, out-of-control and threatening staggering around Ms. Morrison's room, in front of her roommate, buck naked.

*105.    Ms. Morrison, who on information and belief has a long history of emotional difficulties, depression, and insecurity, became terrified that her housemates were going to blame her for the incident and think less of her for bringing back a drunken man for a one-night stand that led to a disturbance and displeased the other Panarchy residents.*

105.    As to the allegations in paragraph 105, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the unpersuasive interpretations consistently given to those emails by Mr. Langrick, or his counsel, including the utterly tone-deaf characterizations in this paragraph as well, such as blaming Ms. Morrison's alleged "emotional difficulties" for the repulsive, drunken disturbance that he admittedly caused and for the rape that he denies without reasonable basis.

*106.    Ms. Morrison was also aware that she had blatantly committed theft by stealing Mr. Langrick's cash and property, and that she had created a paper trial of emails that could easily be construed as an extortion attempt.*

106.    As to the allegations in paragraph 106, admits that there was a series of email exchanges related to the incident, and refers the court to those emails for the contents thereof, but denies the self-serving interpretations consistently given to those emails by Mr. Langrick, or his counsel, including the ridiculously overheated characterizations in this paragraph as well regarding allegations of "theft by stealing" the property – including contraband such as the cocaine Mr. Langrick left behind – and of attempted "extortion."

*107.    Concerned about her exposure both socially and legally, Ms. Morrison decided that she could deflect the scorn of her housemates, and earn their sympathy instead, by portraying herself as a victim of sexual assault.*

107.    Denies the allegations and characterizations in paragraph 107, and specifically denies the credibility of her drunken rapist to impose his own self-serving gloss on the interactions between her roommate and Ms. Morrison – Ms. Morrison from the very first having been extremely uncomfortable, with or without her roommate's input, regarding all of the events precipitated by Mr. Langrick's drunken predations against a heavily impaired teenager, including those her roommate knew nothing about.

*108.    After receiving Ms. Pelletier's angry email on the evening of Monday, May 9, Ms. Morrison's tone changed.  She now told her friends that she was starting to feel "uncomfortable" and was planning to meet with a university Sexual Abuse Peer Advisor ("SAPA").*

108.    Denies the allegations and characterizations in paragraph 108.

*109.    On Wednesday, May 11, 2005, Ms. Morrison met with a SAPA at "Dick's House" on the Dartmouth campus, and the administrator there called the Hanover Police Department.  A Hanover PD patrol officer interviewed Ms. Morrison along with a sergeant from Dartmouth Safety and Security.*

109.    Admits the allegations in paragraph 109, except the SAPA was not at Dick's House and instead referred her to Safety and Security as well as Dick's House to file formal

complaints and reports. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*110.     During this interview, Ms. Morrison told the officers that she met Mr. Langrick at Bones Gate, but she denied inviting Mr. Langrick back to the Panarchy house to hook up with him.  Instead, she claimed that Mr. Langrick was going to Panarchy to meet up with Panarchy resident Frank Fucile, and Ms. Morrison said that she simply agreed to walk with Mr. Langrick back to Panarchy.*

110.     Admits the allegations in paragraph 110. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*111. Ms. Morrison claimed that when she arrived at Panarchy and went to her bedroom, she was surprised to see that Mr. Langrick had followed her there.  Because Ms. Morrison's roommate, Jenna Pelletier was occupying the room with Ms. Pelletier's boyfriend, Ms. Morrison claimed that she and Mr. Langrick went out the window and out onto the roof to "talk."*

111.     Admits the allegations in paragraph 111. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*112.     Ms. Morrison claimed that as she and Mr. Langrick stood talking on the roof just outside the window, he began to kiss her, and then, unprompted, asked her to "piss in his mouth."   She claimed that she was offended and asked him to leave, but when he supposedly protested that it was late, and he was too intoxicated to find his way home, she claimed that she directed him to sleep on the couch in the bedroom.*

112.     Admits the allegations in paragraph 112. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*113.     Ms. Morrison then claimed that she woke up sometime later and was shocked to find Mr. Langrick in bed with her, naked, and attempting to have sex with her. Ms. Morrison also claimed that she was naked from the waist down even though she had gone to bed clothed.*

113.     Admits the allegations in paragraph 113. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*114. Ms. Morrison stated that she then left the bedroom to sleep in a friend's bed and was later awakened by Ms. Pelletier who told her that Mr. Langrick had urinated in the bedroom and was not responding to attempts to wake him up.  Ms. Pelletier demanded that Ms. Morrison come address the situation.*

114.    Admits the allegations in paragraph 114. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*115.    Ms. Morrison denied having engaged in sexual intercourse with Mr. Langrick.*

115.    Admits the allegations in paragraph 115 and alleges that, due to her heavy intoxication, she was having great difficulty remembering anything about the alleged events in the cupola.

*116.    On Thursday, May 12, 2005, Ms. Morrison was interviewed by Hanover Police Department lead detective Captain Francis T. Moran.*

116.    Admits the allegations in paragraph 116.

*117. Ms. Morrison relayed a similar story to Captain Moran.  She claimed that she did not bring Mr. Langrick back to the house, but that instead she agreed to walk with him to Panarchy because he supposedly had plans to meet resident Frank Fucile there.*

117.    Admits the allegations in paragraph 117.

*118. She told Captain Moran that she did not bring Mr. Langrick to her bedroom but instead simply became "aware" that he was there when she walked in — implying that he had essentially followed her to her room. She claimed that she then brought him outside just to "talk."*

118.    Admits the allegations in paragraph 118. However, denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*119.    Whereas Ms. Morrison had told the officers the day before that her and Mr. Langrick talked and kissed on the roof directly outside the bedroom window, she now changed her story and admitted to Captain Moran that she had taken Mr. Langrick to the cupola.  But she continued to insist that they had done no more than kiss in the cupola, and that she had been fully clothed.*

119. Denies the allegations in paragraph 119, including that she "changed her story" to the police in any material fashion, except admits she told the police that she recalled "making out" with Mr. Langrick in the cupola.

*120. She also maintained the story of Mr. Langrick saying out of the blue that he wanted her to "piss on [his] face," and claimed that it was after this that she attempted to kick him out, but ultimately relented and ordered him to sleep on the couch.*

120. Admits the allegations in paragraph 120. However, denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*121. She also continued to assert that she did not engage in consensual intercourse with Mr. Langrick and claimed to have been shocked to allegedly wake up and find him naked in her bed.*

121. Admits the allegations in paragraph 121.

**A Thorough Police Investigation Debunks Ms. Morrison's Allegations And Reveals Numerous Falsehoods And Inconsistencies In Her Statements to Police**

*122. Over the following weeks, Captain Moran and other officers conducted an exhaustive investigation that included the issuance of warrants for electronic communications, physical searches, review of email correspondence, and detailed, audio-recorded and transcribed interviews with all possible witnesses. These included:*

- *Multiple interviews of Ms. Morrison;*
- *An interview of Mr. Langrick;*
- *An interview of Ms. Morrison's roommate Jenna Pelletier;*
- *Two interviews of Ms. Morrison's friend and Panarchy resident Brent Reidy;*
- *An interview of Mr. Langrick's friend Nestor Weigand;*
- *An interview of Ms. Morrison's acquaintance and Panarchy resident Selena Hadzibabic;*
- *An interview of Panarchy resident Alice Johnstone;*
- *An interview of Panarchy resident and Ms. Morrison's friend Frank Fucile;*
- *An interview of witness Anton Hasenkampf;*
- *An interview of Panarchy resident and witness Sarita Hudgins.*

122. Admits the allegations in paragraph 122 insofar as they generally outline the investigation by the Hanover, New Hampshire Police Department, but denies the false claim that

the police investigation "debunked" her allegations of unconsented sexual assault and rape or that the police findings "exonerated" Mr. Langrick, and refers the court to the police files for the contents thereof, which speak for themselves.

*123. These interviews and reviews of electronic records revealed numerous inconsistencies and outright falsehoods in Ms. Morrison's account, as well as other actions by Ms. Morrison that underscored her lack of credibility and honesty.*

123.   Denies the allegations in paragraph 123 , and refers the court to the police files for the contents thereof, which speak for themselves.

*124. First, Ms. Morrison — in an apparent effort to deny that she invited Mr. Langrick back to Panarchy to "hook up" — had claimed that Mr. Langrick only accompanied her to Panarchy because he was hoping to meet up with Panarchy resident Frank Fucile.*

124.   Denies the allegations in paragraph 124, including all of Mr. Langrick's self-serving allegations that her claims about fellow Panarchist Frank Fucile were false, and refers the court to the relevant police files for the contents thereof, which speak for themselves.

*125. But this made no sense because, as Mr. Langrick told the detectives, Mr. Langrick did not know Mr. Fucile, would not have known that Mr. Fucile lived at Panarchy, and would not have had reason to go there to meet Mr. Fucile at 6:00 a.m.*

125.   Denies the allegations in paragraph 125, and specifically notes that the record actually establishes that Mr. Langrick met Mr. Fucile at Bones Gate on the night of the incident, and refers the court to the relevant police files for the contents thereof, which speak for themselves.

*126. On May 19, 2005, Captain Moran interviewed Mr. Fucile, who confirmed to Captain Moran that he was not friends with Mr. Langrick and did not have any plans to meet up with Mr. Langrick at Panarchy, as Ms. Morrison claimed.  Mr. Fucile said he went home alone that evening and went right to bed.*

126.    Denies the allegations in paragraph 126, and in particular denies the self-serving allegation that Mr. Fucile essentially confirmed all of Mr. Langrick's claims, which he did not, and refers the court to Mr. Fucile's statement in the police files, which speaks for itself.

*127. But Mr. Fucile did tell Captain Moran that he had actually been at the Bones Gate party for a time and had witnessed Ms. Morrison "flirting" with Mr. Langrick there.*

127.    Denies the allegations in paragraph 127, and specifically denies the self-serving and false allegation that Mr. Fucile had witnessed Ms. Morrison "flirting" with Mr. Langrick, or evidencing a desire to "hook up" with him, which is by no means supported in Mr. Fucile's nuanced testimony to the police, wherein he noted a response of "contempt" on the part of Ms. Morrison, which speaks for itself.

*128. Second, Ms. Morrison claimed to have been surprised to find that Mr. Langrick was still with her when she got to her bedroom.  Ms. Morrison denied that she had brought Mr. Langrick to her room to engage in a sexual encounter, and instead attempted to insinuate that Mr. Langrick was following her against her wishes.*

128.    Admits the allegations in paragraph 128 to the extent they accurately describe her state of mind at the time, except vigorously denies any false implication that she was taking Mr. Langrick home in order to be sexually assaulted and raped, without her legal consent, and refers the court to the relevant portions of the police files, which speak for themselves.

*129. But on May 20, Captain Moran interviewed Anton Hasenkampf, who was the boyfriend of Ms. Morrison's roommate Jenna Pelletier.  Mr. Hasenkampf was in bed with Ms. Pelletier in the room she shared with Ms. Morrison when Ms. Morrison arrived home with Mr. Langrick in tow on the morning of May 8, 2005.*

129.    Admits the allegations in paragraph 129 to the extent Anton Hasenkampf's location at the time of the incident is accurately described, except denies any false implication that she was taking Mr. Langrick home to be sexually assaulted and raped, and refers the court to Mr. Hasenkampf's statement to the police, which speaks for itself.

*130. Mr. Hasenkampf described how Ms. Morrison entered the bedroom with Mr. Langrick, and how it was plain from the context of the situation that they were intending to "hook up."  He explained that Ms. Pelletier would often spend the night at his residence, and that Ms. Morrison appeared surprised to find that the bedroom was occupied when she arrived with Mr. Langrick.*

130.    Denies the allegations in paragraph 130, and specifically denies the characterization of Mr. Hansenkampf's testimony regarding any intention to "hook up" – which Hasenkampf emphasized was just an "assumption" – and notes Hasenkampf's observation that "they were both very drunk," and refers the court to Mr. Hassenkampf's statement to the police, which speaks for itself.

*131. Mr. Hasenkampf said that upon discovering that the room was already occupied, Ms. Morrison said to Mr. Langrick, "well, what do you want to do?"  She then led Mr. Langrick out to the cupola, where they remained for an extended period of time.*

131.    Admits the allegations in paragraph 131, to the extent they accurately describe Mr. Hasenkampf's testimony to the police, and refers the court to Mr. Hasenkampf's statement to the police, which speaks for itself.  Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*132. Ms. Pelletier similarly described how Ms. Morrison entered the room early in the morning with Mr. Langrick, whom she did not recognize and whom she noted was not "the guy that [Ms. Morrison] had been hooking up with."*

132.    Admits the allegations in paragraph 132, and refers the court to Jenna Pelletier's statement to the police, which speaks for itself.  Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*133. Ms. Pelletier heard Ms. Morrison say Ms. Pelletier's name — obviously checking to see if the bedroom was occupied — and when Ms. Pelletier responded, Ms. Pelletier heard Ms. Morrison whisper to Mr. Langrick that her roommate was there.  Ms. Pelletier said Ms. Morrison then asked Mr. Langrick what he wanted to do, and shortly after they went to the cupola to "hook up."*

133.    Admits the allegations in paragraph 133, to the extent they accurately describe Ms. Pelletier's statement to the police, and refers the court to Ms. Pelletier's testimony, which speaks for itself, except notes and questions Mr. Langrick's misrepresentation to the court of what Ms. Pelletier said about the purpose of the departure to the cupola as she actually said "to hookup **or whatever**," in a context making clear that she was speculating. Unfortunately, this purposeful editing appears to be a clear attempt to mislead the court.

*134. Next, Ms. Morrison had claimed to Captain Moran that she and Mr. Langrick only kissed briefly in the cupola before going back inside.  Ms. Morrison had claimed that she remained clothed the entire time.*

134.    Admits the allegations in paragraph 134, to the extent they accurately describe some portion of Ms. Morrison's three statements to the police, except notes that, overall, the sum and substance of Ms. Morrison's statements to the police made clear that she was – due to her drunken state and impairment – very unclear and indeed confused as to the exact progression and details of the relevant events, and refers the court to Ms. Morrison's police testimony for the contents thereof.

*135. But on May 19, 2005, Captain Moran interviewed Panarchy resident Alice Johnstone, who lived in the unit directly beneath the cupola.  Ms. Johnstone told Captain Moran that because of the location of her bedroom, she was able to clearly hear when residents engaged in sexual activity in the cupola.*

135.    Admits the allegations in paragraph 135, to the extent they accurately describe Alice Johnston's[3] statement to the police, specifically notes that Johnstone's testimony confirmed that "a lot of people were really drunk [at Bones Gate]" and refers the court to Ms. Johnstone's testimony for the contents thereof.

*136. On the morning of May 8, 2005, Ms. Johnstone heard a woman she recognized as Ms. Morrison and a male voice she did not recognize as they made their way across the roof and into the cupola at around 6:00 a.m.*

---

[3] Misspelled as "Johnston" throughout the police files.

*For "close to an hour," she heard what were clearly "sex noises," and specifically, Ms. Morrison's voice repeatedly "groaning," "moaning," and making "rhythmic" vocalizations consistent with a woman experiencing an "orgasm."*

136.    Admits the allegations in paragraph 136, to the extent they accurately describe Ms. Johnston's testimony, except notes that Johnston made clear that "it's hard to hear what people are saying [in the upstairs cupola] … [and] I might be wrong but that's what I thought it was ['people having sex'] at the time," and refers the court to Ms. Johnston's testimony for the precise contents thereof.

*137.    Because she was present, awake, sober, and overheard the entire encounter, Ms. Johnstone knew that Ms. Morrison had engaged in sexual intercourse with Mr. Langrick in the cupola and that it was clearly consensual.  She expressed to Captain Moran that she was surprised that afternoon to hear Ms. Morrison, in front of the other residents, "pretending" that she did not have intercourse with Mr. Langrick.*

137.    Denies the allegation in paragraph 137, notes the absurdity of the claim that Ms. Johnston could know that the sexual activity she overheard was "consensual," specifically notes Mr. Langrick's transparently false and misleading presentation of Ms. Johnston use of the word "pretending," in its actual context,[4] and refers the court to Ms. Johnstone's testimony for the precise contents thereof.

*138. Additionally, Mr. Langrick's friend, Nestor Weigand, confirmed to the police that Mr. Langrick had told him about the consensual sexual encounter on the day that it occurred.  Mr. Langrick had specifically mentioned to Mr. Weigand that the sex had occurred in the cupola, and he had mentioned Ms. Morrison's heavy volume, ejaculatory orgasm.*

---

[4] Here is what Ms. Johnston actually told the police in that portion of her testimony – which was not recounting what she did or did not overhear from the cupola, but was discussing the post-incident "uproar and excitement," and the rumors that were circulating at Panarchy: "and so my impression was like it was just a bad hookup or a bad not even a hookup or may be Monica was pretending that it wasn't a hookup but from what I heard, I thought it was probably a bad hookup." This is hardly the compelling testimony of a "percipient [eye]witness."

138.    Denies the allegations in paragraph 138, and notes in particular the absurdity of the suggestion that Mr. Langrick's friend, Nestor Weigand, could reach any competent judgment on whether the "sexual encounter" Mr. Langrick described was or was not "consensual," and refers the court to Mr. Weigand's testimony for the contents thereof.

*139. In stark contrast to Ms. Morrison's shifting versions of events, the description of a consensual sexual encounter that Mr. Langrick relayed to Mr. Weigand the same day it occurred was completely consistent with the version of events that Mr. Langrick provided to Captain Moran nine days later, and this account was further corroborated by percipient witness Alice Johnstone.*

139.    Denies the self-serving allegations in paragraph 139, once again specifically denies that "percipient witness" Johnston was in a position to credibly assess the issue of consent, and refers the court to Mr. Langrick's testimony for the contents thereof.

*140. Ms. Morrison had also falsely claimed that, while they were standing on the roof together, merely kissing and entirely clothed, Mr. Langrick made a crude, non-sequitur comment to the effect that he wanted Ms. Morrison to "piss" on his face.*

140.    Admits the allegations in paragraph 140, to the extent they accurately describe some portion of Ms. Morrison's three statements to the police, except notes that, overall, the sum and substance of Ms. Morrison's statements to the police made clear that she was – due to her drunken state and consequent impairment – very unclear and indeed confused as to the exact progression and details of the relevant events, and she does also note that the "pissing" testimony is actually consistent with the overall testimony regarding the somewhat confused claims Mr. Langrick himself made about the "orgasmic… stream" he says resulted from his digital penetration of Ms. Morrison in the cupola, and refers the court to Ms. Morrison's police testimony for the contents thereof.

*141. In reality, Mr. Langrick had made a similar type of comment, but it was not an unprompted, crude remark but rather a surprised utterance he made at the moment when Ms. Morrison's ejaculate sprayed his face and torso as the two were naked and engaged in mutual, consensual foreplay in the cupola.*

141.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 141, and refers the court to her answer to paragraph 140. Further denies any paraphrasing and selective or subjective cherry-picked characterizations by Mr. Langrick or his counsel.

*142. Next, Ms. Morrison had claimed that after they had merely kissed briefly outside, she had ordered Mr. Langrick to sleep on the couch because he supposedly protested that he was unable to make it home.  Ms. Morrison then claimed that she awoke some time later, shocked to discover that he had gotten into her bed and was naked.*

142.    Denies the allegations in paragraph 142, and specifically notes that Mr. Langrick never claims to have been invited by Ms. Morrison to take off his clothes and to get into bed with her buck naked.

*143.    But again, eyewitnesses and Ms. Morrison's own friends disputed this account to police.*

143.    Denies the allegations in paragraph 143, and refers the court to the statements of Anton Hasenkampf and Jenna Pelletier for the contents thereof.

*144.    Both Mr. Hasenkampf and Ms. Pelletier described being awakened when Ms. Morrison and Mr. Langrick returned from the cupola and crawled back through the bedroom window.  Neither heard Ms. Morrison ask Mr. Langrick to leave or direct him to sleep on the couch.  Instead, they saw Ms. Morrison and Mr. Langrick return to the room jointly after having sex in the cupola and then get right into Ms. Morrison's bed together.*

144.    Denies the allegations in paragraph 144, and specifically denies that either Mr. Hassenkampf or Ms. Pelletier ever testified to have seen the two "get right into Ms. Morrison's bed together."

*145. Both witnesses also disputed Ms. Morrison's claim that Mr. Langrick had snuck into Ms. Morrison's bed uninvited and attempted to rape her while she was passed out.  Instead, they said that both Mr. Langrick and*

*Ms. Morrison got into bed together and were continuing to shift about and make noise. This prompted Ms. Pelletier, who was irritated at having been disturbed and kept awake by her roommate, to yell at Ms. Morrison to knock it off.*

145.    Denies the allegations in paragraph 145, and once again specifically denies that either percipient witness ever stated that they saw the two get into bed together, and also vigorously denies that the witness's testimony supports the claim that that they did not see anything that could be characterized as unconsented sex or attempted sex while no sounds were coming from Ms. Morrison.

*146. After being yelled at by her roommate, Ms. Morrison left to go sleep in her next-door neighbor's bed where she frequently spent the night.*

146.    Admits the allegations in paragraph 146 to the extent they accurately track Ms. Pelletier's testimony, and refers the court to the police files for the content thereof, which speak for themselves. Denies that she frequently spent the night in her next-door neighbor's bed. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*147. During an interview discussing the events she witnessed during the short period of time that Mr. Langrick and Ms. Morrison were in the bedroom together, Captain Moran asked Ms. Pelletier point blank whether Mr. Langrick had sexually assaulted Ms. Morrison.  Ms. Pelletier responded, "No."*

147.    Admits the allegations in paragraph 147 to the extent that the interview transcript does quote Ms. Pelletier as saying "No," but denies the supposedly "point blank" context or asserted meaning, because the very next words out of Ms. Pelletier's mouth – conveniently left out by Mr. Langrick – were: "Again, I really don't know …" and, earlier on that same page of her transcript, Ms. Pelletier was asked (in effect) whether the sexual activity she observed in Ms. Morrison's bed was mutual and consensual, or whether "one was doing something to the other while the other was not conscious?" Her answer: "I honestly don't know …" cannot possibly be

confused with the supposedly conclusive ("point blank") testimony by Ms. Pelletier that an unconsented sexual assault had not occurred.

*148. Sarita Hudgins, another Panarchy resident, said that Ms. Morrison had told her that Mr. Langrick had wanted to engage in further sexual relations after they returned from having sex in the cupola, but that Ms. Morrison at that point just wanted to sleep and moved beds for this reason.*

148.     Denies the allegations of paragraph 148, because Sarita Hudgins's actual transcribed testimony in the police files was not that no sexual activity occurred in her society bedroom – to the contrary, Ms. Hudgins reported twice that Ms. Morrison complained that Mr. Langrick kept "humping her leg."

*149. Ms. Morrison told a similar story to Panarchy resident Selena Hadzibabic.  Ms. Morrison said that Mr. Langrick was pestering her to have sex with him again in the morning and she just wanted to sleep, so she left Mr. Langrick in her bed and went to sleep in her neighbor's king-sized bed.*

149.     Admits the allegations in paragraph 149, to the extent that Ms. Hudgins was at that point in her interview purporting to repeat no more than the gist of what Hudgins recalled Ms. Morrison telling her that was, while not graphic, entirely consistent with Morrison's claims about Langrick's attempts to have sex with her in her dorm room bed while she was asleep or unconscious. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*150. That neighbor, Brent Reidy, also contradicted Ms. Morrison's claim to police that she had been shocked to wake up naked in bed with Mr. Langrick penetrating her — and the implication that Mr. Langrick had somehow removed the sleeping Ms. Morrison's jeans and underwear.  Instead, Mr. Reidy was told by Ms. Morrison that after they got into bed, Mr. Langrick had suggestively "humped her leg," merely trying to initiate further consensual sexual contact.  Ms. Morrison did not claim that Mr. Langrick sexually penetrated her in bed, and in fact she told Mr. Reidy that she was clothed at the time.*

150.    Denies the allegations in paragraph 150, which appear to have little to no relationship to what Brent Reidy actually said at the relevant point in his transcribed interview (71[5] ), which was that Ms. Morrison woke up to find a naked Mr. Langrick in her bed; that she only had some of her clothes on – possibly only her shirt, and that was the state of the two as she woke up to find Mr. Langrick humping her, moaning and attempting carnal penetration.

*151. Ms. Morrison's friends and roommates who witnessed these events and interacted with her in the following days also expressed to police that they were surprised and deeply uncomfortable when Ms. Morrison suddenly began talking of pressing charges against Mr. Langrick for sexual assault.*

151.    Admits the allegations in paragraph 151, to the extent that there was a substantial degree of Monday morning quarterbacking, primarily by people with no direct knowledge of the underlying events, for purposes of attempting to tamp down a disruptive situation in the house. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*152. Ms. Johnstone — the resident who lived under the cupola and heard Ms. Morrison engaged in consensual intercourse with Mr. Langrick — told police that she was "surprised" to hear Ms. Morrison telling her housemates the next day that she did not have sex with Mr. Langrick.*

152.    Denies the allegations in paragraph 152, to the extent they repeat the discredited claim that Ms. Johnston could possibly make a credible assessment as to the issue of consent based on "sex noises," and also notes that Ms. Johnston's reasoning, regarding whether charges of sexual assault or rape should be pursued, was primarily based on the issues of inconsistency and fairness rather than based on her limited knowledge as a "percipient witness" based on sounds of unknown sexual activity coming from above her in the cupola.

---

[5] Page references are to the pdf of the full police file provided to Plaintiff by Mr. Langrick in the course of the currently suspended discovery process.

*153. Ms. Johnstone also witnessed Ms. Morrison bragging about stealing Mr. Langrick's things and about forcing him to take a large group out to an expensive meal.*

153.   Admits the allegations in paragraph 153, but denies any of the untoward implications suggested.  Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*154. Ms. Johnstone told Captain Moran that it was "upsetting" when Ms. Morrison started making claims of rape, and Ms. Johnstone was concerned that Ms. Morrison's intentions were not "sincere."*

154.   Admits the allegations in paragraph 154, but not their untoward implications, and refers the court to the police files for the complete context of these statements.  Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*155. In fact, Ms. Johnstone told Captain Moran that it became "a big topic of conversation around the [Panarchy] house" because it "[didn't] seem right" or "fair" that Ms. Morrison was suddenly claiming that Mr. Langrick raped her.  Ms. Johnstone's impression, from witnessing the sexual encounter and Ms. Morrison's behavior afterwards, was that Ms. Morrison had engaged in consensual sex with Mr. Langrick, then became angry that he had embarrassed her in front of her housemates and twisted the incident into one of sexual assault to punish Mr. Langrick.*

155.   Denies the allegations in paragraph 155 and their intended implications, but admits that some uninvolved observers in Panarchy House – not knowing the full facts – concerned themselves with what they thought were issues of "fairness" rather than the disturbing reality of unconsented sexual assault and rape of a "heavily impaired" teenager.

*156. In fact, Ms. Johnstone was so concerned about Ms. Morrison's behavior that she and Selena Hadzibabic, another Panarchy resident, took the extraordinary step of going behind their friend's back to warn Mr. Langrick directly, advising him by email on Friday, May 13 that he needed to "watch out" for his "new friend Monica Morrison."*

156.   Admits the allegations in paragraph 156, but denies their intended implications.

*157. Ms. Hadzibabic, during an interview on May 19, 2005, told Captain Moran that Ms. Morrison initially joked about the urination incident with the other residents, but that things took a dark turn as Ms. Morrison and others began sending threatening messages to Mr. Langrick and demanding that he take a group of them to Simon Pearce, an expensive restaurant in Vermont known as a place where parents would take Dartmouth students for celebratory graduation dinners.*

157.    Denies the allegations and intended implications in paragraph 157. 158. Based on Ms. Morrison's actions in the following days, it was Ms. Hadzibabic's perception that Ms. Morrison was angry that a boy she had brought back to the house had acted in a way that caused her embarrassment in front of the other residents, and Ms. Morrison began talking about filing sexual assault charges against Mr. Langrick because, as Ms. Morrison put it, "he shouldn't get away [with] coming in here and like peeing on my floor and disturbing my roommate and disturbing me."

*158. Based on Ms. Morrison's actions in the following days, it was Ms. Hadzibabic's perception that Ms. Morrison was angry that a boy she had brought back to the house had acted in a way that caused her embarrassment in front of the other residents, and Ms. Morrison began talking about filing sexual assault charges against Mr. Langrick because, as Ms. Morrison put it, "he shouldn't get away [with] coming in here and like peeing on my floor and disturbing my roommate and disturbing me."*

158.    Denies the allegations and intended implications in paragraph 158.

*159. Ms. Hadzibabic further stated that she was "very confused" when Ms. Morrison suddenly began to speak of pressing charges, particularly given that Ms. Morrison had spent days gloating about stealing a $400 camera and Mr. Langrick's cash, in addition to receiving compensation from Mr. Langrick for a sweater that she was able to simply wash.  Ms. Hadzibabic said that it simply didn't "sound right" and was "uncalled for," and she described an air of consternation among Ms. Morrison's friends and fellow Panarchy residents who collectively felt that Ms. Morrison was twisting and misrepresenting the incident — but were afraid to say so out loud.*

159.    Admits the allegations in paragraph 159, except denies that the concern over any supposed "unfairness" has any bearing on the underlying issues of unconsented sexual assault

and rape.  Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*160. Ms. Hadzibabic stated that she and Ms. Johnstone reached out to Mr. Langrick directly because of their concern that he was going to be "treated unfairly" by Ms. Morrison.*

160.    Admits the allegations in paragraph 160, except denies that the concern over "unfairness" has any bearing on the underlying issues of unconsented sexual assault and rape of a "heavily impaired" teenager.  Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*161. The investigation also exposed Ms. Morrison's blatant theft of Mr. Langrick's property, as well as additional lies she told to the police regarding her disposition of those items.*

161.    Denies the allegations in paragraph 161.

*162. During her Thursday, May 12, 2005 interview, Ms. Morrison acknowledged that when Mr. Langrick came to retrieve his property, she intentionally did not return to him his expensive digital camera.  She purposely neglected to mention to police that she had also found and stolen cash that Mr. Langrick left behind.*

162.    Admits the allegations in paragraph 162, but denies any suggestion that her claims of sexual assault and rape are thus unjustified.

*163. But Ms. Morrison's friends told police how Ms. Morrison had retrieved and kept Mr. Langrick's cash, giving half to Ms. Pelletier and half to Mr. Fucile to settle a debt that she owed.*

163.    Admits the allegations in paragraph 163, but denies any suggestion that her claims of sexual assault and rape are thus unjustified.

*164. Ms. Morrison's friends told police about how Ms. Morrison bragged about stealing Mr. Langrick's mislaid property and stated that she considered it justified as pay-back for him having urinated in the bedroom and embarrassed her.*

164.    Admits the allegations in paragraph 164, but denies any suggestion that her claims of sexual assault and rape are thus unjustified.

*165. Ms. Morrison was also questioned by police regarding a silver film cannister-type tube that she found in the cupola.  Mr. Langrick had candidly admitted to police that the container was his and that it held a small amount of a recreational drug.*

165.    Denies the allegations in paragraph 165, which are shamelessly false in claiming that Mr. Langrick was initially "candid" with the police about his criminal possession of cocaine.

*166.    Ms. Morrison claimed to police that when she found the tube it was empty.*

166.    Denies the allegations in paragraph 166, to the extent they overlook Ms. Morrison's admission that she saw cocaine powder or residue in the vial.

*167.    But numerous witnesses told police that they witnessed Ms. Morrison remove and retain the drugs from the vial.  Confronted with the statements of multiple witnesses, Ms. Morrison was later forced to admit that her earlier statement to police had been a lie, and that she had not only removed the drugs but illegally distributed them to another person.*

167.    Admits the allegations in paragraph 167, to the extent they recount the actual facts of Ms. Morrison's handling of the cocaine vial that Mr. Langrick drunkenly left behind,  but also notes the hypocrisy of this claim, because it was Mr. Langrick who originally acquired the cocaine illegally and because Langrick was himself caught in a series of bald-faced lies during his interview with the police regarding his original acquisition and possession of the cocaine and Mr. Langrick only relented in this lie after extended and skilled questioning and pressure by Captain Moran.

**The Hanover Police Department Clears Mr. Langrick Of Sexual Assault**

*168. On May 25, 2005, Captain Moran conducted a follow-up interview with Ms. Morrison in which he explained to Ms. Morrison that his interviews of Ms. Morrison's friends and roommates had discredited her account.*

168.    Denies the allegations in paragraph 168, and in particular denies counterclaimant's baseless claim that he was "exonerated" by the Hanover police, in the report of their inquiry or otherwise in the files that they developed.

*169. Captain Moran noted that, contrary to Ms. Morrison's claims that Mr. Langrick had surreptitiously followed her back to her room and that she had been attempting to get rid of him, Ms. Morrison's roommates had seen and heard conduct clearly demonstrating that Ms. Morrison willingly invited Mr. Langrick back to her bedroom at Panarchy for the purpose of having a sexual encounter.*

169.    Denies the allegations in paragraph 169, and once again refers the court to the full police files, which speak for themselves and which give lie to the claim that that the roommates' statements "clearly" support a credible much less confident conclusion regarding Ms. Morrison's intent or consent with regard to the sexual activity that night and morning.

*170. Captain Moran also noted that Ms. Morrison's claim that she only kissed Mr. Langrick in the cupola was not credible. Mr. Langrick was able to describe the sexual encounter in detail, including identifying specific, unique features of Ms. Morrison's anatomy as well as describing her distinctive orgasm. Mr. Langrick's account was also corroborated by witness Alice Johnstone, who overheard the extended 45 to 60-minute sexual encounter in which Ms. Morrison was clearly an active, consenting, and enthusiastic participant.*

170.    Denies the allegations in paragraph 170, and in particular again repeats that nothing in Ms. Johnston's statements to the police could possibly make her a credible witness as to the issues of actual or legal consent. Specifically and categorically denies that Mr. Langrick accurately identified unique features of Ms. Morrison's anatomy.

*171. Captain Moran also noted that Ms. Morrison had not claimed to anyone that Mr. Langrick had penetrated or molested her after they got into bed until days later. In fact, the claims she made days later were inconsistent with what she told her friends on Sunday, May 8 and over the following days.*

171.    Denies the allegations in paragraph 171, and refers the court to the full police files for the contradictory contents thereof.

*172. Captain Moran stated that it was his impression from speaking with Ms. Morrison's own friends in Panarchy that there was a general "suspicion" that Ms. Morrison had "embellished some of these circumstances with the passage of time," and that Ms. Morrison's friends and roommates "don't believe that this is what's been reported" by Ms. Morrison.*

172.    Admits the allegations in paragraph 172, to the extent that the referenced statements were among Captain Moran's many comments in the police files – comments that were almost always presented by Moran as an "on the one hand, on the other hand" dialectical analysis, and so can only be understood in the context of the entire police file, to which the court is referred for the full content thereof.

*173. In sum, Captain Moran informed Ms. Morrison that her own friends and roommates had contradicted core aspects of her account and that her credibility was therefore highly suspect.*

173.    Denies the allegations in paragraph 173.

*174. Captain Moran also referenced the threatening emails in which Ms. Morrison and her friends demanded that Mr. Langrick pay to take them all to a fancy restaurant, noting that those emails could easily be interpreted "as being an attempt at extortion."*

174.    Admits the allegations in paragraph 176, to the extent that it does quote one thing that Captain Moran said about the issue of "extortion," but notes that this entirely misrepresents the sum and substance of Moran's views on that subject, because he immediately followed that quoted language up with "… I don't believe it's an extortion attempt …"

*175. Next, Captain Moran noted that Ms. Morrison committed the crime of theft when she intentionally took, possessed, and withheld Mr. Langrick's cash and expensive digital camera.*

175.    Admits the allegations in paragraph 175, and notes that she returned to the police all of the allegedly "stolen" property that Mr. Langrick had drunkenly left behind in the wake of his unconsented assaults on – and related depraved behavior with – Ms. Morrison and her room and housemates.

*176. Captain Moran also confronted Ms. Morrison regarding her earlier denials concerning whether or not she removed any drugs from the film cannister she found in the cupola.  Ms. Morrison was finally forced to admit that her earlier statements to police had been lies and that in fact she had removed drugs from the vial and had given them to a fellow Panarchy resident who she knew to have a serious drug addiction.*

176.    Admits the allegations in paragraph 176, to the extent that she changed her testimony regarding removal of some of the cocaine from the vial Mr. Langrick drunkenly left behind, but also notes that Mr. Langrick lied to the police about his cocaine and only confessed to the lie after persistent interrogation by Captain Moran of the Hanover police, as documented in page after page of Mr. Langrick's police testimony.

*177. Captain Moran informed her that this act constituted both possession and distribution of narcotics and noted that it was particularly concerning that Ms. Morrison had provided drugs to a person that she believed to have a serious addiction problem.*

177.    Admits the allegations in paragraph 177, and notes that she was not charged with any illegal activity related to Mr. Langrick's cocaine, but also notes that Mr. Langrick was arrested and criminally charged for his possession of cocaine.

*178. On May 27, 2005, Captain Moran met with Ms. Morrison and her father at the Hanover Police Department to discuss the findings of the investigation.  Captain Moran advised Ms. Morrison and her father that no sexual assault charges would be pursued against Mr. Langrick.*

178.    Admits the allegations in paragraph 178.

**Ms. Morrison Threatens To Make Public Allegations Against Mr. Langrick If He Does Not Agree To Pay Her Off**

*179. On May 31, 2005 — just days after the Hanover Police Department informed Ms. Morrison that they would not be pursuing any charges related to sexual assault — Ms. Morrison retained a lawyer to send a letter to Mr. Langrick demanding money.*

179.    Admits the allegations in paragraph 179, except denies any implication that her consultation with an attorney regarding the incident represented some kind of illegitimate extortion scheme.

*180. The letter was explicitly threatening and demanded that Mr. Langrick quickly pay Ms. Morrison a "settlement" for her "damages" in order to avoid "publicity."  In other words, Ms. Morrison threatened that if Mr. Langrick did not pay her off, she would go public with false rape claims in order to damage his reputation:*

May 31, 2005

Robert J. Langrick
Tuck School of Business
Dartmouth College
Hinman Box 9000
Hanover, NH 03755

    Re:    **Monica Morrison**

Dear Mr. Langrick:

    Monica Morrison has retained this firm to represent her in connection with an action to obtain damages from you as a result of the assault you perpetrated on her.  Before I filed suit, I wanted to provide you with the opportunity to discuss potential settlement in this case, thereby avoiding the expense and publicity which would be a probable consequence of a lawsuit in this matter.  If you wish to settle the matter, I would strongly suggest that you act with alacrity.

            Sincerely yours,

            Charlie Buttrey

CTB/mnm

cc:    Monica Morrison

180.    Denies the allegations in paragraph 180, and specifically denies that she ever threatened or intended to "go public with false" claims.

*181. Knowing full well that he had not "perpetrated" any "assault" on Ms. Morrison, and that he had just been cleared of these false allegations by a comprehensive police investigation, Mr. Langrick of course did not agree to pay Ms. Morrison anything.*

181.    Admits the allegations in paragraph 181 to the extent they state the fact that Mr. Langrick did not offer to settle the threatened claims or to pay anything in settlement of those claims.

*182. Instead, Mr. Langrick chose not to respond to the letter at all, and he heard nothing more from Ms. Morrison or this attorney.*

182.    Admits the allegations in paragraph 182.

**Ms. Morrison Reemerges Years Later To Again Attempt To Obtain Money From Mr. Langrick, But He Again Refuses To Engage With Her**

*183. After graduating from Dartmouth with a degree in "creative writing," Ms. Morrison intended to pursue a career as a writer in New York City.*

183.    Admits the allegations in paragraph 183, to the extent that pursuing a career as a writer was one of the options she considered.

*184. However, she struggled to find paid work as a writer and bounced between a number of short-lived corporate jobs. Her LinkedIn profile lists no fewer than nine different employment positions between March 2008 and June 2017, and it appears there were multiple extended periods of time during which she was not employed.*

184.    Admits the allegations in paragraph 184, to the extent that, due among other things to the continuing effects of the trauma she suffered at the hands of Mr. Langrick, Ms. Morrison's career path was a difficult one.

*185. As Ms. Morrison herself has acknowledged, her writing career was unsuccessful, and she found herself in "financial desperation."*

185.    Admits the allegations in paragraph 185, to the extent that she found herself to be a "struggling" writer, a classic situation hardly unique to Ms. Morrison. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*186. On June 4, 2016, Ms. Morrison contacted Mr. Langrick out of the blue. She called his office line at Bloomberg on a Saturday night at 6:31 p.m. and left a strange voicemail in which she claimed to be making a "press inquiry" regarding his employer:*

> *Hello Mr. Langrick, my name in Monica. I am Monica Morrison. I am calling you in regards to a press inquiry about the Bloomberg Institute and about your time at Dartmouth College and the Tuck School. If you could kindly give me a call, my number is [], again this is []. I'm a writer I've worked with xoJane and Business Insider. And we knew each other briefly because of a sexual assault incident. I hope you'll give me a call so I can discuss the piece that I'm going to run. Again, my number is []. Thank you.*

186.    Admits the allegations in paragraph 186, to the extent that the quoted language appears to be the voicemail that Ms. Morrison left for Mr. Langrick on or about June 4, 2016, but denies the balance of the characterizations in this paragraph.

*187. At the time, Ms. Morrison was working as a temp for a corporate logistics company and was not employed by any professional media company or journalistic entity.  As far as Mr. Langrick knows, Ms. Morrison has never actually been employed as a journalist by any organization.*

187.    Denies the allegations in paragraph 187, although admits that as of June 4, 2016, she was employed by Working Voices, a U.K.-based corporate communications consulting firm which coaches executives on how to have more personal impact and executive presence, among other things.

*188. Upon hearing this voicemail, it was Mr. Langrick's impression that Ms. Morrison was once again renewing her threat to publicly accuse him of sexual assault unless he made an extortionary payment to her.*

188.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 188 as to what was or was not Mr. Langrick's "impression;" however denies as baseless and absurd Mr. Langrick's claim that "Ms. Morrison was once again renewing her threat to publicly accuse him of sexual assault unless he made an extortionary payment to her," as the only prior demand for any payment was made by her attorney in a typical lawyer's letter threatening litigation, more than a decade before, which litigation was in fact never commenced.

*189. Just as he had with Ms. Morrison's previous attempt to demand money from him, Mr. Langrick simply ignored the call and did not respond to Ms. Morrison.*

189.    Admits the allegations in paragraph 189, to the extent that Mr. Langrick never responded to Ms. Morrison's voicemail.

*190. Notably, although she had claimed she was seeking to speak to Mr. Langrick regarding a "press inquiry" for a "piece that [she was] going to run," Mr. Langrick is not aware of any "piece" that Ms. Morrison actually published relating to him in 2016.*

190.    Admits the allegations in paragraph 190 to the extent that Ms. Morrison did not publicly publish any press piece about Mr. Langrick in 2016, for purposes of supposed "extortion" or for any other reason. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*191. A year-and-a-half after Mr. Langrick declined to respond to this strange message, Ms. Morrison emerged again.*

191.    Admits the allegations in paragraph 191 to the extent that Ms. Morrison did not renew her efforts to communicate with Mr. Langrick for another year and a half.

*192. On January 2, 2018, Ms. Morrison placed a call to Mr. Langrick's employer, Bloomberg L.P.  She spoke to Chris Kane, a representative for Bloomberg global customer support, then was routed to Leslie Paul in Bloomberg Human Resources.*

192.    Admits the allegations in paragraph 192, although denies knowledge or information sufficient to form a belief as to the names of the two persons that she spoke to at Bloomberg.

*193. Ms. Morrison stated that she was calling about Bloomberg executive Robert Langrick and stated that Mr. Langrick "attempted to sexually assault me in college."  Ms. Morrison further stated that, "He followed me home, I was passed out and when I woke up he was trying to rape me."  She further claimed that she had reported Mr. Langrick but that "the police did nothing."*

193.    Admits the allegations in paragraph 193, and, because she neither used nor kept any notes, has no reason to dispute the verbatim quotations offered by Mr. Langrick. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*194.    Ms. Morrison falsely claimed to Bloomberg that this had occurred in 2006.*

194.   Admits the allegations in paragraph 194 to the extent that, if Bloomberg's notes are correct, she mistakenly but harmlessly referenced the year 2006 rather than 2005.

*195.   This call and Ms. Morrison's words were memorialized both in contemporaneous notes and in a contemporaneous email record of the conversation sent to Mr. Langrick by Leslie Paul.*

195.   Denies knowledge or information sufficient to form a confident belief as to the truth or falsity of the allegations in paragraph 195, except based on a review of the language allegedly quoted from those notes and email records, she has no reason to contest their accuracy.

*196.   Ms. Morrison left her phone number and an email address.*

196.   Admits, on information and belief, the allegations in paragraph 196.

*197.   This action caused Mr. Langrick great emotional distress, damaged his professional reputation among his colleagues, and caused him great embarrassment and humiliation at his place of employment.*

197.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 197. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*198. Two days later, on January 4, 2018, Ms. Morrison created an account on the video-sharing site VIMEO.  She created a group on the site that she titled, "rapist."  The website identifies her as the founding member of this group.  Other postings by this same user confirm that it is the Plaintiff, Monica Morrison.*



198.    Admits the allegations in paragraph 198. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel. Asserts that Langrick's characterization of the viewcount here is misleading.

*199. The sole media posted on the account was a video titled "Bloomberg for Education – June 26th, New York – Rob Langrick."  The video is a 21-minute clip of Mr. Langrick giving a presentation in New York City in 2015.*

199.    Admits the allegations in paragraph 199. However, asserts that the screenshot given is for a different hyperlink, which goes to the Bloomberg Vimeo page, and has nothing to do with Ms. Morrison's own personal profile or groups.

*200. The Vimeo group that Ms. Morrison created, calling Mr. Langrick a "rapist," is still online and publicly available at the URL https://vimeo.com/groups/510471.  A printout of this webpage is attached hereto as Exhibit A.*

200.    Admits the allegations in paragraph 200, but refers this Court to the contents of Exhibit A, which speak for themselves.

*201. As of December 13, 2018, this video has been viewed and played 489 times.  Each of the hundreds of people who visited this site and viewed the video understood Ms. Morrison, in context, to be calling Mr. Langrick a rapist — causing great harm to Mr. Langrick's reputation:*



201.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 201, but denies Mr. Langrick's claim to know how each viewer on the site at issue understood that video in relation to Mr. Langrick's reputation.

*202. After Ms. Morrison placed the phone call to his employer, Mr. Langrick retained counsel to deal with this menacing, threatening and bizarre situation.*

202.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 202.

*203. Mr. Langrick's counsel sent a cease and desist demand to Ms. Morrison by email on February 12, 2018, advising her that if she continued to contact and defame Mr. Langrick, he would be forced to take legal action against her.*

203.    Admits the allegations in paragraph 203. Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*204. Ms. Morrison's hope was that the phone call to Mr. Langrick's employer and her other hostile actions would frighten Mr. Langrick into paying her "hush money" in order to keep her from making false allegations that would severely harm his reputation.*

204.    Denies the allegations in paragraph 204, and specifically notes the baselessness and the absurdity of Mr. Langrick's continuing claim that Ms. Morrison was asking him to pay "hush money" although she had never communicated – over the by then dozen years since the sexual assault incident – any such demand, and although it was ultimately Mr. Langrick through his attorney who was demanding from Ms. Morrison a "nondisclosure agreement" that would have required her to pay him $500,000 each and every time she departed in any public statements from the false script Mr. Langrick was demanding she adhere to.

*205. Indeed, as Ms. Morrison herself put it in a later online posting, this would not be her "first time at the rodeo" in terms of using threats to obtain a monetary settlement.  In a September 22, 2018 post on her blog, Ms. Morrison spoke of learning that "silence" can be "financially valuable."  She also referenced having previously,*

*with some other individual, "entered into an agreement of non-disclosure for silence in the exchange of compensation."[6]*

205.    Denies the allegations in paragraph 205, except admits that she did enter into a nondisclosure agreement in return for a financial settlement in a completely separate and unrelated case involving her meritorious claims of retaliatory and wrongful discharge and other serious violations of labor and wage regulations.[7]    Further denies any paraphrasing and selectively cherry-picked characterizations by Mr. Langrick or his counsel.

*206. However, because he knew he had done nothing wrong, Mr. Langrick refused to be cowed by Ms. Morrison's threats.  Instead, his counsel sent Ms. Morrison a proposal that offered her no money whatsoever.  Mr. Langrick offered only that he would not sue Ms. Morrison for the false statements she had already made if she agreed to refrain from making such false statements concerning Mr. Langrick in the future.*

206.    Denies the allegations of paragraph 206, except admits that Mr. Langrick's overreaching demand for a nondisclosure agreement offered no money and, in effect, propose to sanction Ms. Morrison to the tune of $500,000 every time she did not read from Mr. Langrick's phony script.

*207. Ms. Morrison, who expected to be paid off by Mr. Langrick, was not happy.  In an email to Mr. Langrick's counsel, she complained that the proposed agreement was not a "good faith [effort] to seek a resolution," and insisted that if Mr. Langrick wanted an "amicable resolution where he is actually positioned in a favorable light," then he would need to pursue a "different resolution" that would "acknowledge the damages that [Ms. Morrison] ha[d] experienced."*

---

[6]*Monica Morrison, I Am Not Sorry, MEDIUM (Sep. 22, 2018),  https://medium.com/@monicamorrison/i-am-not-sorry-da048f09cece.*

[7] In connection with that settlement there had also been a claim referenced of "sexual harassment" in the workplace, the nature of which were obscene cat calls to women from male employees on the worksite. The settlement thus had no bearing whatsoever on allegedly false claims of sexual assault or rape.

207.     Denies the allegations in paragraph 207, and specifically denies Mr. Langrick's consistently baseless misinterpretation of Ms. Morrison's position having nothing to do with, as he alleges, being "paid off."

*208.     In other words, Ms. Morrison wanted money.  But Mr. Langrick refused to pay her a dime.*

208.     Denies the allegations in paragraph 208, except admits that Mr. Langrick has – subsequent to the original incident – never paid her a dime or been asked by Ms. Morrison to pay her anything, up to and including the commencement of her Declaratory Judgment action and throughout the negotiations in 2018 with Mr. Langrick's counsel.

*209.     In a further attempt to extort Mr. Langrick and make him fear her false allegations, Ms. Morrison decided to up the ante.*

209.     Denies the allegations in paragraph 209.

*210. On July 19, 2018, Ms. Morrison posted a "Personal Review" of Mr. Langrick on the website MyLife.com, which is a site that is dedicated to providing public "reputation scores" of individuals.*

210.     Admits the allegations in paragraph 210. Also, asserts that scores calculated from personal reviews, which by nature, are a collection of opinions and would not have value therein to the extent that such reviews were not opinions.

*211. In the review, which she posted anonymously, Ms. Morrison falsely claimed that Mr. Langrick "committed a sexual assault with a woman who was 19 years old when he was a business school grad at Tuck and he was in his late 20's."  She further falsely claimed that he "penetrat[ed] and attempt[ed] anal sex with an unconscious woman," and called him a "rapist."  She also falsely characterized his offer to pay for the sweater she claimed he ruined as an attempt to pay [her] off" for this nonexistent sexual assault:*



211.    Denies the allegations in paragraph 211, except refers the court to the "personal review" quoted for the contents thereof.

*212. These false statements were publicly available and accessible on the internet, and the false statements also contributed to Mr. Langrick having a low "reputation score" on the website.   A printout of the review Ms. Morrison posted on MyLife.com is attached hereto as Exhibit B.*

212.    Denies the allegations in paragraph 212, except refers the court to Exhibit B for the contents thereof.

*213. Additionally, these statements turned up on page two of a google search for anyone who searched Mr. Langrick's name, and the search preview result even contained the statement that "Rob committed sexual assault with a woman who was 19 years old…"*



213.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 213, except refers the court to the excerpted Google snippet for the contents thereof.

*214. But again Ms. Morrison's actions did not yield the desired result, and Mr. Langrick continued to refuse to pay off Ms. Morrison.*

214.    Denies the allegations in paragraph 214, except admits that Mr. Langrick has never paid her a penny subsequent to the May 2005 incident at Dartmouth College, other than to reimburse her for her befouled sweater.

## Ms. Morrison Becomes "Ms. Universe" And Lays The Groundwork For Profiting Off Of Her False Rape Claims

*215. With her hopes for a monetary pay out from Mr. Langrick dashed again, Ms. Morrison resolved to put her "Plan B" into action.  She decided that if she could not get a quick payday from Mr. Langrick in exchange for keeping quiet, then maybe she could instead find a way to make money for speaking out.*

215.    Denies the allegations in paragraph 215, including the false implications stated therein.

*216. Ms. Morrison, a long-struggling writer, had watched the unfolding #metoo movement and seen many women applauded for writing about their experiences with sexual assault and gender discrimination.  Ms. Morrison decided that by positioning herself as a leader in this movement, she could potentially make a name for herself as a writer and simultaneously improve her precarious financial situation.*

216.    Denies the allegations in paragraph 216, including the false implications stated therein.

*217. What followed was a carefully planned and highly orchestrated effort by Ms. Morrison to garner maximum publicity and exposure for herself.*

217.    Denies the allegations in paragraph 217.

*218. In August 2018, Ms. Morrison created a blog on the website www.medium.com. Her first blog post was titled "Someone Really Doesn't Want You to Read This."[8]  In it, Ms. Morrison began to lay the groundwork for*

---

[8]  *Monica Morrison, Someone Really Doesn't Want You to Read This, Medium (Aug. 3, 2018), https://medium.com/@monicamorrison/someone-really-doesnt-want-you-to-read-this-42e29844f165.*

*her plan and to portray herself as someone "triggered" by the #metoo movement and coming to grips with a past trauma:[9]*

> In the wake of the #MeToo wave, to say that I found myself triggered was an understatement. I was hospitalized for six days, called myself "Whore of Babylon, Queen of the Universe," rented office space in the World Trade Center, and joined a mystery school coven where people practiced Goddess worship and believed in "Sacred Wealth" and talked about alchemizing their trauma. I was telling anyone who would listen that I had a message for the world about how to reclaim our sovereignty from those who stole it and usher in a new era. The only problem was that I had no idea what I was doing. I had no idea how to really express myself in a manner where people would actually listen. And then, there was Valentine's Day.

218.    Denies the allegations in paragraph 218, and specifically denies Mr. Langrick's misinterpretation of the quoted language, except refers the court to the excerpt quoted for the contents thereof.

*219. These strange references to "Goddess worship" and "Sacred Wealth" refer to the teachings of an obscure self-help guru named Prema Lee Gurreri, a self-described "Vedic Astrologer" and "Business Consultant" who sells books and online seminars that purport to teach followers how to achieve their "birthright of true wealth" and "experience a new level of prosperity" by divining their ordained "purpose" in life.*

219.    Denies the allegations in paragraph 219, specifically including the false characterizations and implications stated therein.

*220. On information and belief, Ms. Morrison became obsessed with Ms. Gurreri's writings and convinced herself that it was her cosmic destiny to attain great wealth and acclaim by becoming a leader of the #metoo movement.*

220.    Denies the allegations in paragraph 220.

*221. In the same post, Ms. Morrison referenced the cease and desist letter she received from Mr. Langrick's attorney and expressed disappointment that "there was no offer of money in exchange for my silence."*

---

[9]*Monica Morrison, Someone Really Doesn't Want You to Read This, MEDIUM (Aug. 3, 2018), https://medium.com/@monicamorrison/someone-really-doesnt-want-you-to-read-this-42e29844f165.*

221.    Denies the allegation in paragraph 221. Asserts this was a statement of fact, and denies any color of emotion falsely interposed by Mr. Langrick.

*222. She noted that other #metoo accusers have received such payments or been paid small sums to publish their accounts.  But she ultimately concluded, "I knew my story was worth more than that."*

222.    Denies the allegations in paragraph 222, including the false characterizations and implications stated therein.

*223. In essence, the blog post lays out Ms. Morrison's plan to amass "Sacred Wealth" and "sweet rape money" by building an online brand as a writer and voice of the #metoo movement.*

223.    Denies the allegations in paragraph 223, including the false characterizations and implications stated therein.

*224. At the same time, Ms. Morrison's own writings and actions betray her cunning and calculating nature and strongly imply that she knows her claims are provably false.  She has admitted to coordinating with an attorney on her #metoo postings, obviously out of concern that she could be liable to Mr. Langrick for making false and defamatory statements if she publicly accuses him of raping her.*

224.    Denies the allegations in paragraph 224, except admits that "pre-publication review" to avoid or minimize potential liability is a standard practice in the publishing industry – especially when an active threat of litigation overhangs the publication(s).

*225. To this end, over and over again, she took pains to attempt to phrase her allegations of rape as "my opinion" or "my truth."  These strange turns of phrase are transparent attempts to try to escape liability for making defamatory statements by setting up a future defense that the statements are opinion rather than fact.*

225.    Denies the allegations in paragraph 225, except admits that the constitutional law of defamation currently provides far-reaching legal protections to statements of opinion for the purpose of preserving freedom of expression.

*226. For example, Ms. Morrison began one blog post about her supposed sexual assault with a disclaimer that her accusations should not actually be taken as "statements of fact":*

Monica Morrison  [Follow]
storytelling, ether dragons, alchemy, metaphysical forensics. read more about spiritual revelations
and the hustle at www.msuniverse.co.
Sep 24 · 3 min read · ⚯ Unlisted

## I Think About Your Wife

*This stream of <u>consciousness</u> is not meant to reflect
any legally binding statements of <u>fact</u>. They are merely
my <u>opinions</u> about a legal and moral <u>quandary</u> I <u>face</u>.

226.    Denies the allegations in paragraph 226, except admits that the constitutional law
of defamation currently provides far-reaching legal protections to statements of opinion (as
opposed to statements of fact) for the purpose of preserving freedom of expression.

*227. At various times, Ms. Morrison has also referred to Mr. Langrick — but not by name — as "someone I
call a rapist" and said of her supposed assault, "I call it rape."*

227.    Admits the allegations in paragraph 227, except denies the false implication that
such cautious use of language is inappropriate or improper under the circumstances.

*228. In all of these blog postings, Ms. Morrison avoided ever using Mr. Langrick's name.  This is yet
another transparent effort to avoid liability for making false claims under the apparent belief that she cannot be
held liable for making false accusations if she does not actually use Mr. Langrick's name in her posts.*

228.    Denies the allegations and implied legal conclusions in paragraph 228.

*229. As noted, Ms. Morrison's writings also reveal the financial motivation behind her actions.  Around the
same time as she began her Medium blog, Ms. Morrison also started her website where she calls herself "Ms.
Universe," and she also launched an associated Facebook page for this new personal brand.*

229.    Denies the allegations in paragraph 229, including its false implications.

*230. She even wrote about a forthcoming "economic justice project" related to her "advocacy" that she
calls "Rape on the Blockchain," and she invited "venture capitalists" to contact her about providing funding for
this business:[10]*

---

[10]Monica   Morrison,   Rape   On   The   Blockchain,   MS.UNIVERSE   (Sep.   23,   2018),
http://box2076.temp.domains/~msunive1/rape-on-the-blockchain/.

> I am thrilled to tease my newest transmedia and collective economic justice
> project, Rape on the Blockchain. I will be unveiling much, much more, beginning
> in 2019. To learn more please be sure to sign up for my Ms. Universe newsletter.
> There is still far too much going on behind the scenes to reveal much more than
> this.
>
> If you are a venture capitalist or have a press inquiry regarding Rape on the
> Blockchain, you can contact cinemomoproductions@gmail.com. Thank you for
> your interest!

230.   Denies the allegations in paragraph 230, and refers the court to the quoted language for the contents thereof.

*231. Ms. Morrison, who regularly posts about her belief in spells and witchcraft, tagged this post as relating to the subject of "Alchemy." Alchemy, of course, refers to a mystical medieval process for generating gold.*

231.   Denies the allegations and false implications in paragraph 231.

## Ms. Morrison Files A Meritless Lawsuit To Attract Attention To Her New Brand

*232.   The final step in Ms. Morrison's plan to amass "Sacred Wealth" off of her false rape claims required her to make a public PR "splash" that would attract attention to her new business and personal brand as a #metoo advocate.*

232.   Denies the allegations and false implications in paragraph 232.

*233.   As noted, Ms. Morrison's blog posts avoided using the name of the man she "calls a rapist" and who supposedly committed what she "call[s] rape," because Ms. Morrison has been advised that she could face legal liability for falsely accusing Mr. Langrick of rape.*

233.   Denies the allegations and false implications in paragraph 233.

*234.   But Ms. Morrison was also advised that under New York law, litigants in court cases are typically immune from defamation liability for statements made in court filings. Moreover, media entities often enjoy a "fair report privilege" for reporting on the contents of court filings — regardless of whether the claims made therein are actually true or not.*

234.     Denies the allegations in paragraph 234, especially to the extent that they purport to divine what Ms. Morrison was or was not told by her attorney in connection with her Declaratory Judgment Action.

235.     *Thus, Ms. Morrison realized that she could use the courts to further publicize her false claims regarding Mr. Langrick and then expect that credulous media entities would report on her lawsuit.  She expected that this would help garner attention to her nascent efforts to position herself as a thought leader of the #metoo movement.*

235.     Denies the allegations in paragraph 235, including the baseless soothsaying contained therein.

236.     *To put this plan into action, Ms. Morrison and her counsel crafted a complaint for "declaratory judgment" that asserts facially meritless claims that have no chance of actually being successful.*

236.     Denies the allegations in paragraph 236, including its legal claims which are for this Court to determine.

237.     *For example, Ms. Morrison seeks a declaration that anything she might say in the future is not subject to liability for defamation.  This is a legally absurd request that seeks an impermissible advisory opinion and is wholly non-justiciable as no court could possibly evaluate whether unknown and undefined things Ms. Morrison may or may not say at some future date are false or defamatory.*

237.     Denies the allegations in paragraph 237, especially including its legal claims which are for this Court to determine.

238.     *Similarly, Ms. Morrison seeks a declaration that a first draft of a proposed agreement that she never signed is "unenforceable."  Again, this is a transparent, unripe request for an advisory opinion that no court could possibly grant.*

238.     Denies the allegations in paragraph 238, especially including its legal claims which are for this Court to determine.

*239.       But Ms. Morrison knows this.  The intent of her complaint was never to actually obtain any legal relief, but rather to allow Ms. Morrison to freely defame Mr. Langrick and air her false accusations in any arena in which she believes she is immune from suit for making false statements.*

239.       Denies the allegations in paragraph 239.

*240.       Ms. Morrison's plan to achieve maximum publicity for herself was successful. Shortly after she filed her complaint, the widely-read United Kingdom publication "Daily Mail," as well as other media outlets, ran breathless articles repeating at length and in great detail the false allegations in Ms. Morrison's complaint.  The Daily Mail article is still publicly available online at the URL https://www.dailymail.co.uk/news/article-6360665/Ex-Bloomberg-executive-accused-sexually-assaulting-college-student-booze-fueled-rampage.html.*

240.       Denies the allegations in paragraph 240, and notes that Mr. Langrick soon had his say in the same "Daily Mail" publication – see https://www.dailymail.co.uk/news/article-6555703/Bloomberg-executive-denies-sexually-assaulted-Dartmouth-coed.html.

### Ms. Morrison's False Statements Concerning Mr. Langrick Were Made With Actual Malice And Common Law Malice

*241.       While bold and audacious, Ms. Morrison's scheme to profit from by defaming Mr. Langrick, and to thereby amass "Sacred Wealth," suffers from one fatal flaw — which is that her claims of sexual assault are* **provably and demonstrably false**.

241.       Denies the allegations in paragraph 241.

*242.       Moreover, before she hired lawyers who advised her to label her false rape accusations on her blog as her "opinion" and to artfully refer to Mr. Langrick not by name or even as a rapist, but as "someone I call a rapist," Ms. Morrison had already published numerous defamatory statements concerning Mr. Langrick.  She was not so careful when she made those statements.*

242.       Denies the allegations in paragraph 242.

*243.       As noted, Ms. Morrison contacted Mr. Langrick's employer on January 2, 2018 and explicitly claimed that he followed her home and attempted to sexually assault her when she was passed out in bed.*

243.       Denies the allegations in paragraph 243.

*244.       She also directly called Mr. Langrick a "rapist" on the website Vimeo on January 4, 2018.*

244.     Admits the allegations in paragraph 244 to the extent that she did use the word "rapist" in her Vimeo post.

*245.     And finally, she wrote a post on the website MyLife.com on July 19, 2018 in which she claimed that Mr. Langrick sexually assaulted her, asserted that he is a rapist, and stated that he penetrated her while she was unconscious.*

245.     Admits the allegations in paragraph 245, except refers the court to the actual statements she made in that "personal review" to assess the reasonable meaning thereof.

*246.     As set forth herein, each of the statements that are the subject of these counterclaims are false.*

246.     Denies the allegations in paragraph 246.

*247.     These statements accuse Mr. Langrick of serious crimes and therefore are defamatory per se.*

247.     Denies the allegations in paragraph 247 and refers the court to the actual language and context of the allegedly defamatory statements.

*248.     These statements were made negligently, with gross irresponsibility, and with actual malice.*

248.     Denies each of the three allegations in paragraph 248.

*249.      As described herein, Ms. Morrison knew that her allegations concerning Mr. Langrick were false when she made them.*

249.     Denies the allegations in paragraph 249.

*250.     Ms. Morrison knew that Mr. Langrick did not sexually assault her or rape her, nor did he attempt to sexually assault or rape her.  Ms. Morrison, of course, knew the truth because she was present and because she fabricated the allegations.*

250.     Denies the allegations in paragraph 250.

*251.     Ms. Morrison likewise knew that she had sexual intercourse with Mr. Langrick that was very much consensual, and that she was a willing and enthusiastic participant in sexual activity with Mr. Langrick.*

251.     Denies the allegations in paragraph 251.

*252.    Ms. Morrison also knew that a police investigation had cleared Mr. Langrick, and she knew that numerous eyewitnesses — indeed, her own friends who were there that night — had stated unequivocally that Ms. Morrison was not sexually assaulted by Mr. Langrick.*

252.    Denies the allegations in paragraph 252, specifically denies that her friends were in a position to competently reach such legal conclusions at the time of the original incident and also denies that paragraph 252 accurately states their current views about the incident.

*253.    Indeed, as Ms. Morrison herself has acknowledged, those friends described her claims as "bogus," called her a "professional victim," and confirmed that she "faked being raped."*

253.    Denies the allegations in paragraph 253, specifically denies that her friends were in a position to competently reach such legal (or factual) conclusions at the time of the original incident and also denies that paragraph 253 accurately states their current views about the incident.

*254.    Moreover, Ms. Morrison's actions were motivated by common law malice and evince a high degree of moral turpitude and wanton dishonesty.  Ms. Morrison has made highly damaging accusations of serious criminal activity that she knows to be false out of vindictiveness and a desire to enrich herself.*

254.    Denies the allegations in paragraph 254.

*255.    Accordingly, Mr. Langrick seeks an award of punitive damages.*

255.    As to the allegations in paragraph 255, denies that Mr. Langrick has a meritorious claim for an award of punitive damages.

**FIRST COUNTERCLAIM: SLANDER — JANUARY 2, 2018 BLOOMBERG CALL**

*256.    Mr. Langrick repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.*

256.    As to the allegations in paragraph 256, Ms. Morrison repeats and realleges each of her corresponding answers as if set forth fully herein.

*257.    Ms. Morrison published false and defamatory statements concerning Mr. Langrick on January 2, 2018 when she placed a telephone call to Bloomberg Human Resources, identified herself, stated that she was calling regarding Bloomberg employee Robert Langrick, and then claimed that Mr. Langrick attempted to rape her*

*when she was in college.  Specifically, Ms. Morrison stated to Leslie Paul that Mr. Langrick "attempted to sexually assault me in college," and further stated that, "He followed me home, I was passed out and when I woke up he was trying to rape me."*

257.    Denies the allegations in paragraph 257, except refers the court to the specific language, context and intent of Ms. Morrison statements to Bloomberg

*258.    These statements are reasonably understood to be statements of fact concerning Mr. Langrick and were reasonably so understood by Ms. Paul.*

258.    As to the allegations of paragraph 258, these are legal conclusions for this Court of the trier of fact to determine.

*259.    These statements are false.*

259.    Denies the allegations of paragraph 259

*260.    These statements are of and concerning Mr. Langrick.  Indeed, Ms. Morrison explicitly stated that she was referring to Bloomberg employee Robert Langrick.*

260.    Admits that the statements referenced in paragraph 260 were "of and concerning" Mr. Langrick.

*261.    Ms. Morrison had no applicable privilege or legal authorization to publish these false and defamatory statements or, if she did, she abused that privilege.*

261.    Denies the allegations of paragraph 261.

*262.    These statements are defamatory in that they tend to expose Mr. Langrick to hatred, contempt, and aversion and to induce an evil or unsavory opinion in the minds of a substantial number of people in the community.*

262.    As to the allegations in paragraph 262, denies that statements can be defamatory when they are true.

*263.    These statements are defamatory per se because they charge Mr. Langrick with committing attempted rape, a serious crime.*

263.    As to the allegations in paragraph 263, denies that statements can be defamatory per se when they are true.

*264.     These statements are also defamatory per se because they tend to affect, and did affect, Mr. Langrick in his profession, trade, or business, or by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness, or want of any necessary qualifications in the exercise thereof.  Indeed, Ms. Morrison made these defamatory statements to the human resources department at Mr. Langrick's employer for the express purpose of attempting to get him fired from his job.*

264.     Denies the allegations in paragraph 264.

*265. Ms. Morrison acted negligently and with gross irresponsibility in publishing these false and defamatory statements.*

265.     Denies the allegations in paragraph 265.

*266.     Ms. Morrison published these statements with actual malice because she had knowledge that these statements were false, or she published these statements with reckless disregard for their truth or falsity.*

266.     Denies the allegations in paragraph 266.

*267.     Ms. Morrison published these false and defamatory statements with common law malice toward Mr. Langrick and with the specific intent to cause damage to Mr. Langrick.*

267.     Denies the allegations in paragraph 267.

*268.     As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick's professional and personal reputations were impugned and damaged.*

268.     Denies the allegations in paragraph 268.

*269.     As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick has been forced to make an expenditure of money to remedy the defamation.*

269.     Denies the allegations in paragraph 269.

*270.     As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick has been exposed to public hatred, ridicule, and contempt.*

270.     Denies the allegations in paragraph 270.

*271. In view of the foregoing, Mr. Langrick is entitled to actual, presumed, punitive, and other damages in an amount to be specifically determined at trial.*

271.     Denies the allegations in paragraph 271.

## SECOND COUNTERCLAIM: LIBEL — JANUARY 4, 2018 VIMEO POST

*272.     Mr. Langrick repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.*

272.     As to the allegations in paragraph 272, Ms. Morrison repeats and realleges each of her corresponding answers as if set forth fully herein.

*273.     Ms. Morrison published a false and defamatory statement concerning Mr. Langrick on January 4, 2018, when she created an account and group on the video hosting website Vimeo that states that Mr. Langrick is a "rapist."*

273.     Denies the allegations in paragraph 273.

*274.     This statement was viewed by hundreds of people online, who reasonably understood it to be a statement of fact concerning Mr. Langrick.*

274.     Admits that the statements referenced in paragraph 274 were "of and concerning" Mr. Langrick, but denies the balance of the allegations.

*275.     This statement is false.*

275.     Denies the allegations in paragraph 275.

*276.     This statement is of and concerning Mr. Langrick.  Indeed, the sole content posted in the Vimeo group is a video featuring Mr. Langrick and identifying him in the title of the video. From this context, it is clear and obvious to readers that the "rapist" Ms. Morrison referred to is Mr. Langrick.*

276.     Admits that the statements referenced in paragraph 276 were "of and concerning" Mr. Langrick but denies the balance of the allegations in that paragraph, .

*277.     Ms. Morrison had no applicable privilege or legal authorization to publish this false and defamatory statement or, if she did, she abused that privilege.*

277.     Denies the allegations in paragraph 277.

*278.     This statement is defamatory and libelous per se in that it tends to expose Mr. Langrick to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of right-thinking persons, and to deprive him of his friendly intercourse in society*

278.     Denies the allegations in paragraph 278.

*279.    This statement is libelous per se because it charges Mr. Langrick with committing rape, a serious crime.*

279.    Denies the allegations in paragraph 279.

*280.    This statement is also libelous per se because it tends to affect, and did affect, Mr. Langrick in his profession, trade, or business, or by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness, or want of any necessary qualifications in the exercise thereof.  Indeed, in calling Mr. Langrick a rapist, Ms. Morrison purposefully posted a video that identified Mr. Langrick by name and as an employee of Bloomberg.*

280.    Denies the allegations in paragraph 280.

*281.    Ms. Morrison acted negligently and with gross irresponsibility in publishing this false and defamatory statement.*

281.    Denies the allegations in paragraph 281.

*282.    Ms. Morrison published this statement with actual malice because she had knowledge that this statement was false, or she published this statement with reckless disregard for its truth or falsity.*

282.    Denies the allegations in paragraph 282.

*283.    Ms. Morrison published this false and defamatory statement with common law malice toward Mr. Langrick and with the specific intent to cause damage to Mr. Langrick.*

283.    Denies the allegations in paragraph 283.

*284.    As a result of this false and defamatory statement published by Ms. Morrison, Mr. Langrick's professional and personal reputations were impugned and damaged.*

284.    Denies the allegations in paragraph 284.

*285.    As a result of this false and defamatory statement published by Ms. Morrison, Mr. Langrick has been forced to make an expenditure of money to remedy the defamation.*

285.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 285, except denies that Ms. Morrison published any false and defamatory statement of and concerning Mr. Langrick.

286.    *As a result of this false and defamatory statement published by Ms. Morrison, Mr. Langrick has been exposed to public hatred, ridicule, and contempt.*

286.    Denies the allegations in paragraph 286.

287.    *In view of the foregoing, Mr. Langrick is entitled to actual, presumed, punitive, and other damages in an amount to be specifically determined at trial.*

287.    Denies the allegations in paragraph 287.

### THIRD COUNTERCLAIM: LIBEL — JULY 19, 2018 MYLIFE.COM POST

288.    *Mr. Langrick repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.*

288.    As to the allegations in paragraph 288, Ms. Morrison repeats and realleges each of her corresponding answers as if set forth fully herein.

289.    *Ms. Morrison published false and defamatory statements concerning Mr. Langrick on July 19, 2018, when she posted a "personal review" about Mr. Langrick on the website MyLife.com.  Ms. Morrison's posting falsely stated that "Rob committed sexual assault with a woman who was 19 years old when he was a business school grad at Tuck and he was in his late 20's," falsely accused Mr. Langrick of "penetrating and attempting anal sex with an unconscious woman," accused Mr. Langrick of "rape," and called Mr. Langrick a "rapist."*

289.    Denies the allegations in paragraph 289.

290.    *These statements are reasonably understood to be statements of fact concerning Mr. Langrick.*

290.    Denies the allegations in paragraph 290.

291.    *These statements are false.*

291.    Denies the allegations in paragraph 291.

292.    *These statements are of and concerning Mr. Langrick.  Ms. Morrison identified him by name in the statements and posted them on a webpage that was specifically concerning Mr. Langrick.*

292.    Denies the allegations in paragraph 292 to the extent that they purport to state legal conclusions.

*293.     Ms. Morrison had no applicable privilege or legal authorization to publish these false and defamatory statements or, if she did, she abused that privilege.*

293.     Denies the allegations in paragraph 293.

*294.     These statements are defamatory and libelous per se in that they tend to expose Mr. Langrick to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of right-thinking persons, and to deprive him of his friendly intercourse in society.*

294.     Denies the allegations in paragraph 294.

*295. These statements are libelous per se because they charge Mr. Langrick with committing attempted rape and rape, which are both serious crimes.*

295.     Denies the allegations in paragraph 295.

*296. These statements are also libelous per se because they tend to affect, and did affect, Mr. Langrick in his profession, trade, or business, or by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness, or want of any necessary qualifications in the exercise thereof.*

296.     Denies the allegations in paragraph 296.

*297. Ms. Morrison acted negligently and with gross irresponsibility in publishing these false and defamatory statements.*

297.     Denies the allegations in paragraph 297.

*298. Ms. Morrison published these statements with actual malice because she had knowledge that these statements were false, or she published these statements with reckless disregard for their truth or falsity.*

298.     Denies the allegations in paragraph 298.

*299.     Ms. Morrison published these false and defamatory statements with common law malice toward Mr. Langrick and with the specific intent to cause damage to Mr. Langrick.*

299.     Denies the allegations in paragraph 299.

*300.     As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick's professional and personal reputations were impugned and damaged.*

300.     Denies the allegations in paragraph 300.

*301.      As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick has been forced to make an expenditure of money to remedy the defamation.*

301.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 301, except denies that Ms. Morrison published any false and defamatory statement of and concerning Mr. Langrick.

*302.      As a result of these false and defamatory statements published by Ms. Morrison, Mr. Langrick has been exposed to public hatred, ridicule, and contempt.*

302.      Denies the allegations in paragraph 302.

*303.      In view of the foregoing, Mr. Langrick is entitled to actual, presumed, punitive, and other damages in an amount to be specifically determined at trial.*

303.      Denies the allegations in paragraph 302.

## PRAYER FOR RELIEF

*WHEREFORE, Mr. Langrick respectfully requests that the Court enter judgment in his favor, and against Ms. Morrison, on all claims asserted in the Complaint and on all counterclaims set forth herein.  Mr. Langrick also prays for judgment as follows:*

*304.      That Ms. Morrison's Complaint, and all claims asserted therein, be dismissed with prejudice;*

304.      As to the allegations in paragraph 304,  Defendant denies that Counterclaimant is entitled to the relief he seeks

*305.      That Mr. Langrick be awarded actual, presumed, and punitive damages in excess of $75,000, in an amount to be specifically determined at trial;*

305.      As to the allegations in paragraph 305,  Defendant denies that Counterclaimant is entitled to the relief he seeks.

*306.      That the Court enter an injunction requiring that Plaintiff Monica Morrison remove from the internet the defamatory posts that are the subjects of the Second and Third Counterclaims, that Ms. Morrison*

*remove any other online postings that defame Mr. Langrick, and that Ms. Morrison refrain from similarly defaming*

*Mr. Langrick in the future;*

306.   As to the allegations in paragraph 306,  Defendant denies that Counterclaimant is entitled to the relief he seeks.

*307.    That he be awarded costs, disbursements, interest; and reasonable attorneys's fees;*

307.   As to the allegations in paragraph 307,  Defendant denies that Counterclaimant is entitled to the relief he seeks

*308.    Such other and additional remedies as the Court may deem just and proper.*

308.   As to the allegations in paragraph 308,  Defendant denies that Counterclaimant is entitled to the relief he seeks

## JURY DEMAND

*309.    Mr. Langrick demands and preserves his right to a trial by jury as to any and all issues so triable.*

## AFFIRMATIVE AND OTHER DEFENSES

### First Defense

The three defamation counterclaims fail to state claims upon which relief can be granted.

### Second Defense

Should the case go forward, and upon completion of discovery, it will be clearly established that – on the undisputed facts – the three defamation counterclaims fail to state claims upon which relief can be granted.

### Third Defense

Should the case go forward, and upon completion of discovery, it will be clearly established that – on Counterclaimants own admissions – the three defamation counterclaims failed to state claims upon which relief can be granted.

## Fourth Defense

Truth is a complete defense to the three counterclaims for defamation. Counterclaimant will be unable to meet his burden of establishing the substantial falsity of the allegedly defamatory statements.

## Fifth Defense

Counterclaimant has the burden of establishing the factual falsity of the allegedly defamatory statements. To the extent that the allegedly actionable statements are ones of opinion, they are absolutely privileged under the New York State and U.S. Constitutions and the counterclaims are not actionable.

## Sixth Defense

One or more of the allegedly defamatory statements are also qualifiedly privileged under New York common law with respect to communications on a subject in which the parties share a common interest and counterclaimant will be unable to defease that privilege by the requisite proof of "malice."

## Seventh Defense

Counterclaimant has the burden of establishing "fault" in relation to the any statements published by counterclaim defendant and proven by counterclaimant to be factually false and defamatory.   Counterclaimant will be unable to meet his burden of establishing the requisite degree of "fault."

## Reservation of Rights

Plaintiff (Counterclaim Defendant) hereby reserves her right to assert and rely upon such other and further defenses as may become available or apparent during pre-trial proceedings in this case and hereby reserves her right to amend this answer and to assert additional defenses.

Dated: August 28, 2019

_____/s/_____
Henry R. Kaufman (HK-7283)
HENRY R KAUFMAN, PC
Attorneys    for    Plaintiff/Counterclaim
Defendant
60 East 42nd Street, 47th Floor
New York, New York 10168
(212) 880-0842