# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

MONICA MORRISON,                    )        CASE NO. 1:18-cv-06127 (CBA)(RML)
                                    )
                    Plaintiff,      )
                                    )
                                    )
            v.                      )
                                    )
ROBERT LANGRICK,                    )
                                    )
                    Defendant.      )
_____)


**PLAINTIFF MONICA MORRISON'S RESPONSES TO DEFENDANT ROBERT LANGRICK'S SECOND REQUESTS FOR ADMISSIONS**

Plaintiff Monica Morrison (hereafter "Plaintiff" or "Ms. Morrison"), by her attorneys, Henry R. Kaufman, P.C., for her Responses to Defendant Robert Langrick's Second Requests for Admissions, states as follows, reserving the right to supplement this response, as may be necessary or appropriate, prior to trial:


**REQUEST FOR ADMISSION NO. 3**
Admit that neither you nor Mr. Langrick ever signed the "proposed 'Settlement Agreement'" referenced in Paragraph 125 of your November 1, 2018 Complaint.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 3:
Admitted. Although, on information and belief, Mr. Langrick to this day is still demanding settlement terms for the most part identical to those proposed in the unconscionable pre-litigation NDA.

**REQUEST FOR ADMISSION NO. 4**
Admit that neither Mr. Langrick nor anyone purporting to act on Mr. Langrick's behalf
has ever stated or argued that the "proposed 'Settlement Agreement'" referenced in
Paragraph 125 of your November 1, 2018 Complaint is a valid or enforceable contract.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 4:
Neither admitted nor denied. This was Mr. Langrick's proposed document, not Plaintiff's.
In any event, on information and belief, Mr. Langrick to this day is still demanding
settlement terms for the most part identical to those proposed in the unenforceable pre-
litigation NDA.

**REQUEST FOR ADMISSION NO. 5**
Admit that during an audio-recorded interview on May 12, 2005, you told Hanover
Police Department Captain Frank Moran that while you and Mr. Langrick were at the
Bones Gate party, you made the suggestion to Mr. Langrick that he "go back to [your]
place."

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 5:
Admits that, in one of her police interviews, she was reported to have testified that she
said to Mr. Langrick the words "go back to my place."

Denies, however, the extraordinarily misleading implication that these words in any way
suggested she was flirtatiously inviting Mr. Langrick back to her dorm room to, as he
has also claimed, "hook up." Here is the entire context of the "go back to my place"
quote:

"I don't normally go home alone uh, but my friend Frank was there, Frank Fucile, and
um, he also Ilives [sic] in my house and so Brent and Frank and all agreed that I'd end
up, you know, Frank would walk me home and that'd be it. So um, we're all hanging out,
um, this, the rest of this is kind of fuzzy to me though I remember the generals of what
happened but I was very intoxicated at the time and um, Frank, uh, uh, ended up
needing a pong partner and um, they decided to introduce me to this guy Rob who was
a freshman said he was a Tuckie so he said he was a Tuck Student and um, I played
pong with him and he wasn't very good so we lost 2 games and by then it was fairly,
fairly hammered and um, I decided it was time to go home and uh, Frank had left and I
didn't know where he was, he might have gone to the bathroom, I'm not sure but I
ended up walking home with this guy, um, Rob. And uh, I believe at this time Rob told
me that he knew Frank and um, I at the time said that you know he lives with me, let's
just *go back to my place* …"

**REQUEST FOR ADMISSION NO. 6**
Admit that on May 8, 2005, you accused Mr. Langrick of sexually assaulting your roommate and your roommate's boyfriend.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 6:
Admitted, to the following extent: On information and belief, after Ms. Morrison had left her dormroom, Mr. Langrick, while still entirely naked, attempted to get into her roommate's bed where her boyfriend was lying. On information and belief, Langrick touched and attempted to "cuddle" the boyfriend without his consent and later went at Ms. Morrison's roommate and touched, or threatened to touch, her, without her consent – all still while wearing no clothes. Also, on information and belief, when asked to stop menacing the roommate and her boyfriend in this naked, sexually assaultive fashion, and to leave Ms. Morrison's room, Mr. Langrick refused to do so until a threat had to be made to call the police.

**REQUEST FOR ADMISSION NO. 7**
Admit that you wrote a blog post on Medium.com entitled "An Imaginary Open Rap Battle With My Rapist" which was published on September 23, 2018.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 7:
Admitted.

**REQUEST FOR ADMISSION NO. 8**
Admit that the "Rapist" you refer to in your blog post "An Imaginary Open Rap Battle With My Rapist" is Mr. Langrick.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 8:
Admitted. Although Mr. Langrick is not named or otherwise identified in Ms. Morrison's post.

**REQUEST FOR ADMISSION NO. 9**
Admit that when you wrote "bitch.pay.me" in your blog post "An Imaginary Open Rap Battle With My Rapist," "bitch" referred to Mr. Langrick

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 9:

Denied. Mr. Langrick is not the "bitch" in that post.

**REQUEST FOR ADMISSION NO. 10**
Admit that you told Brent Reidy you had your clothes on when you claimed Mr. Langrick tried to "hump" your leg in your bed.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 10:
Admits that, according to the police transcript of his interview, Reidy told the police that Ms. Morrison told him that "she woke up and the guy Rob was naked and was sort of, I guess, humping her." However, Ms. Morrison asserts that there were significant, pre-existing reasons why she would not be inclined to report the actual details of any sex-related incident to Brent Reidy – especially one as disturbing as the incident with Mr. Langrick.

Denied to the extent that, according to Brent Reidy's own police transcript, Ms. Morrison actually told him "she still has *some* clothes on, I don't remember how much she said she still had on, *I think she said she still had her shirt on* …" (Emphasis added)


**REQUEST FOR ADMISSION NO. 11**
Admit that you told Mr. Langrick on the afternoon of May 8, 2005 that he tried to hump your leg in bed.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 11:
Admitted. But, once again, this is highly misleading and is a transparent but unpersuasive attempt to minimize what actually occurred.

First of all, that statement about "humping" was made in a context where Mr. Langrick had just shown up unannounced in Ms. Morrison's dormroom – the "scene of the crime," as it were, and at a time when she was alone in the room – notwithstanding that Langrick had been banned from Panarchy House.

Second, when recounting the events of Langrick's surprise visit, Ms. Morrison specifically recalled that she was shaking at the time and "was really kind of scared, I couldn't decide if I was, I still don't know if I was scared because I was scared that he was going to find the camera or scared because this guy was in my room again."

In any event, Ms. Morrison specifically explained to the police that she "told him that he tried to hump my leg *because I wasn't comfortable with explaining the full details of everything that happened at the time*." (Emphasis added)

And, finally, of course, Ms. Morrison did explain to the police in disturbing detail that, although when she was first awoken by Mr. Langrick she initially thought he was trying

4

to "hump her leg," she then realized what Mr. Langrick was doing was much more than mere "humping." She told the police that Langrick – who was completely naked – was using his non-erect penis and also his finger to "slightly penetrate her vagina" and she also reported that his penis contacted her anus but she did not recall that there was any penetration, according to the police transcript of her testimony.

**REQUEST FOR ADMISSION NO. 12**
Admit that you told Frank Fucile that Mr. Langrick tried to hump your leg in bed.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 12:
Admitted. But see Responses to Requests for Admissions Nos.10 and 11.

**REQUEST FOR ADMISSION NO. 13**
Admit that you found and kept cash that Mr. Langrick left at Panarchy house, some of which you then gave to Jenna Pelletier.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 13:
Admitted. To the best of Plaintiff's recollection the cash Mr. Langrick left behind was less than $50 and the cash she gave to Jenna Pelletier was approximately $25.

**REQUEST FOR ADMISSION NO. 14**
Admit that on the morning of May 8, 2005, you brought Mr. Langrick to the cupola on top of Panarchy house.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 14:
Neither admitted nor denied. Plaintiff was in a "blackout" state from heavy intoxication due to alcohol – at least on and off during the sexually-assaultive incident with Mr. Langrick – and does not remember the details of how she and Mr. Langrick apparently ended up in the so-called "cupola." Separately, Plaintiff has always had a recollection, from before she left the Bones Gate fraternity, that Langrick had been asking for or about Frank Fucile. Fucile and his roommate, Alice Johnston (now Melendez), lived in Panarchy House, *immediately below the cupola*. It is possible that Plaintiff was initially taking Langrick toward Mr. Fucile's room.

**REQUEST FOR ADMISSION NO. 15**
Admit that Casey Rieder gave you money in exchange for the cocaine that you provided to him on or about May 10, 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 15:
Denied.

**REQUEST FOR ADMISSION NO. 16**
Admit that during your May 12, 2005 interview with Hanover Police Captain Frank Moran you stated that you remembered sitting and talking with Mr. Langrick in the cupola "for a while."

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 16:
Admitted. But this again is misleading. Here is the entire context:

"…and so we walk home to my place, uh, to my place and we go up to my room and so at this point I was aware that he was in my room and I thought that he was going to go see Frank so I said um, 'what are you doing here', and uh, what did say....I said "What do you want" that's what I said "What do you want" and um he said "Look, can we go somewhere to talk, is there some place we can go and talk" and I said um, well "Yeah I guess we can go outside" and um, through my room there's a door to go outside onto the roof deck into the cupola which a sort of like a turret room, and so we go up onto the roof deck and onto the cupola and we started talking and we *talked for a while* if I remember correctly and I was really out of it and drunk and he started kissing me and this all is very, very hazy to me, I don't remember exactly what happened in the cupola, um, I was definitely not of a coherent nature …"

**REQUEST FOR ADMISSION NO. 17**
Admit that you initially lied to police on May 12, 2005 by stating that the metal container you retrieved from the cupola on May 8, 2005 contained only cocaine residue, when in fact it contained over a gram of cocaine that you had distributed to an individual named Casey Rieder.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 17:
Admitted. However, Ms. Morrison denies the characterization that she had "distributed" this found cocaine of Mr. Langrick's which was not her possessed property to distribute.

6

**REQUEST FOR ADMISSION NO. 18**
Admit that you were never employed by xoJane as a writer.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 18:
Denied as misleading. Without going into unnecessary detail, while Ms. Morrison's formal job position was not "writer," as an unpaid "intern," she was later tasked with writing and content creation duties while working directly for editor-in-chief Jane Pratt and with the entity Jane Pratt LLC)


**REQUEST FOR ADMISSION NO. 19**
Admit that you were never employed as a writer by Business Insider.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 19:
Denied as misleading. At Business Insider she was an assistant to the COO Julie Hansen on an administrative/operations level, but her voluntary duties also included professional writing.


**REQUEST FOR ADMISSION NO. 20**
Admit that in 2016 you were hospitalized for in-patient psychiatric care, at which time you were having visions, believed your dreams were coming true, and believed you were receiving communications directly from God.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 20:
Denied. This attempt to characterize Plaintiff's hospitalization is inaccurate. It is also objected to for the reasons stated in Plaintiff's Revised Answer to Interrogatory No.12, especially as it relates to her mental state two years before the alleged defamations.


**REQUEST FOR ADMISSION NO. 21**
Admit that you had sexual intercourse with Mr. Langrick in the cupola of the Panarchy house on the morning of May 8, 2005.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 21:
Neither admitted nor denied. Mr. Langrick has on many occasions proudly proclaimed that – after allegedly orgasmic foreplay – he had unprotected, noisy sexual intercourse with Monica Morrison in the cupola. Ms. Morrison has consistently maintained that she had – and to this day she now has – no recollection of having sexual intercourse in the

7

cupola with Mr. Langrick. Plaintiff believes that she was in a "blackout" state from heavy intoxication due to alcohol at the time of the alleged sexual intercourse.

**REQUEST FOR ADMISSION NO. 22**
Admit that you experienced an orgasm during sexual foreplay with Mr. Langrick in the cupola at the Panarchy house on May 8, 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 22:
Neither admitted nor denied. Plaintiff has a vague recollection of Mr. Langrick kissing her when they were in or near the cupola. Plaintiff recalls nothing of the alleged sexual foreplay or of having an orgasm of any kind at that time. Plaintiff's next vague recollection was of Mr. Langrick urging her to "piss on his face," or some crude remark similar to that. Speculating, it is possible that this recollection relates to what Mr. Langrick has claimed was his surprise at experiencing what he claims was a dramatic ejaculatory orgasm. In any event, Plaintiff now believes that she was in a "blackout" state from heavy intoxication due to alcohol at the time of the alleged foreplay and orgasm.

**REQUEST FOR ADMISSION NO. 23**
Admit that you have experienced ejaculatory orgasms, both before and after May 8, 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 23:
Neither admitted nor denied. Studies regarding female orgasm or coital incontinence to this day remain hotly debated and disputed in scientific communities. Since Ms. Morrison has no recollection of the act which Ms. Langrick characterizes as "ejaculate orgasm," and since the scientific community cannot conclusively determine the character of the substance known as female ejaculate, it is literally impossible for Ms. Morrison to determine whether or not she ejaculated or urinated on Mr. Langrick. She will add that if what she did do was urinate on Mr. Langrick, she wouldn't have been the only party that night who was so intoxicated as to lose control of her bodily functions. She will add that she has emitted unknown substances through her urethra during sexual activity both before and after she is alleged to have had intoxicated and incapacitated sexual contact with Mr. Langrick – whether those substances emitted could be considered "ejaculate orgasms" or "coital incontinence" to this day remains unclear to her, based on her reading of the current scientific understanding of female ejaculation. *See, e.g.,* https://www.bbc.co.uk/bbcthree/article/544c5686-e3bc-4ac2-b4ca-f91eccefe441; https://www.ncbi.nlm.nih.gov/pubmed/23634659; https://www.independent.co.uk/life-style/health-and-families/features/the-science-behind-female-ejaculation-9987298.html.

**REQUEST FOR ADMISSION NO. 24**
Admit that you were not naked when you entered Brent Reidy's room after leaving your
bedroom on the morning of May 8, 2005.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 24:
Neither admitted nor denied. Ms. Morrison has not claimed that she was naked at the
time of the rape or attempted rape in her bed by Mr. Langrick. What she recalls and has
previously reported is that she was woken up out of either sleep or some kind of
blackout or unconsciousness by Mr. Langrick's efforts to penetrate her anus and vagina.
In that regard, she has said that she found at that time that her panties had been pulled
down but that her top was still on. When she fled to Brent Reidy's room she frankly does
not remember the extent to which she had at least pulled up her panties or hastily
thrown on any other item of clothing.


**REQUEST FOR ADMISSION NO. 25**
Admit that no witness supports your claim that you "ran" from your bedroom on the
morning of May 8, 2005.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 25:
Denied. Whatever anyone else recalls, Plaintiff's recollection is strong that she "fled"
from the room as a result of Mr. Langrick's rape or attempted rape of her while she was
asleep or perhaps blacked out or unconscious from heavy intoxication due to alcohol.
Also, Anton Hasenkampf, the roommate's boyfriend, noted to the police that he
witnessed Ms. Morrison "stumble" out of the room after exclaiming "you gotta go" to Mr.
Langrick. Therefore, it may be that what Ms. Morrison remembers as "running" actually
resembled "stumbling" according to Mr. Hasenkampf due to her heavily impaired and
incapacitated state.


**REQUEST FOR ADMISSION NO. 26**
Admit that cocaine is an illegal substance and that it was a criminal violation to possess,
distribute and/or use such a drug in May of 2005.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 26:
Admitted. But perhaps Mr. Langrick should have taken this into consideration when he
purchased or otherwise acquired the cocaine, when he snorted one or more lines of it
(according to Mr. Langrick on two occasions on the evening before he met Plaintiff for

the first time while subsequently drinking heavily), when he actually had the audacity to film his criminal activity, and when – in his drugged and drunken stupor – he left his cocaine behind after which Monica – the admitted victim of his drugged and drunken sexually-assaultive behavior – discovered the cocaine after Langrick had reluctantly departed the premises, half dressed.

**REQUEST FOR ADMISSION NO. 27**
Admit that an attorney acting on your behalf demanded a financial settlement from Mr. Langrick in May 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 27:
Admits that a local "contingency-fee" attorney, engaged not by Plaintiff but by her family, wrote a single demand letter to Mr. Langrick – a letter that Plaintiff never had the opportunity even to review. To the best of Plaintiff's understanding – like every other contingency fee-lawyer in the country – the attorney's letter apparently demanded a financial settlement. However, unlike most other contingency-fee lawyers, the attorney in question appears to have dropped the case just as soon as his demand for money was rejected. Finally, it must also be noted that no other litigation or demand for a financial settlement was *ever* pursued by Ms. Morrison thereafter, at least until Ms. Morrison commenced her declaratory judgment action, under duress from Mr. Langrick.

**REQUEST FOR ADMISSION NO. 28**
Admit that on May 9, 2005 you demanded that Mr. Langrick treat you and your housemates to a dinner at a restaurant called Simon Pierce in Queechee, Vermont.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 28:
Admitted. However, the idea for that dinner as Mr. Langrick's "treat," was in fact not Ms. Morrison's but of others in Panarchy House.

**REQUEST FOR ADMISSION NO. 29**
Admit that you never told law enforcement officers that you did not consent to sexual intercourse with Mr. Langrick in the cupola of the Panarchy house.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 29:
Neither admitted nor denied. The question is misleading and proves nothing in light of Ms. Morrison's complete lack of recollection of the alleged sexual intercourse.

**REQUEST FOR ADMISSION NO. 30**
Admit that you never asked Mr. Langrick to wear a condom before you had sexual intercourse with him in the cupola of the Panarchy house on May 8, 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 30:
Plaintiff has no recollection of having sexual intercourse with Mr. Langrick, much less addressing the issue of a condom, one way or another, due to her intoxicated, heavily impaired – indeed likely blacked out – state in the cupola. In any event, and under all of the admitted circumstances, the implied point of this request for an admission is an outrageous absurdity for a 29-year-old man, who claims to have been initiating sexual intercourse with a heavily impaired 19-year-old sophomore who was essentially a stranger to him – without himself using a condom, whether or not she had asked – and is not worthy of being dignified by any further attempt to answer it.

**REQUEST FOR ADMISSION NO. 31**
Admit that on May 9, 2005 you told Mr. Langrick, Brent Reidy, Anton Hassenkampf, and Jenna Pelletier that Mr. Langrick's actions on May 8, 2005 were "more funny than anything else."

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 31:
Admits that she wrote these words in an email the day after the incident with Mr. Langrick. At the time the full scope, impact and significance of Mr. Langrick's outrageous sexual assault had not yet sunk in and Ms. Morrison was attempting to go along with the prevailing attitude among her friends and housemates to minimize and treat with sarcastic humor events that were in fact far more serious and consequential. Clearly, Mr. Langrick's admitted behavior was not, and is not, by any standard "more funny than anything else."

**REQUEST FOR ADMISSION NO. 32**
Admit that on May 12, 2005 you told Hanover Police Department Captain Frank Moran that you went looking to see if Mr. Langrick had left any belongings in the cupola so that you "could just take some stuff and have free stuff."

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 32:
Admitted. But, of course, it turned out that what Ms. Morrison found was not merely "some… free stuff." It turned out that some of what was found was evidence of Mr. Langrick's criminal behavior, for which he was later arrested and charged. And all of the "stuff" was handed over to the police in the course of their investigation.

**REQUEST FOR ADMISSION NO. 33**
Admit that your statement "we might have been talking about it," to Hanover Police Department Captain Frank Moran on May 12, 2005 refers to a conversation you had with Mr. Langrick at Bones Gate in which you suggested he go back to Panarchy house with you.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 33:
Denied as materially misleading. Here is the entire exchange:

Captain Moran:  He didn't or did he make any suggestions that you go somewhere with him, go back with him or otherwise perhaps...

Monica:  I don't think so, I mean, *we might have been talking about*, I mean, I remember specifically him discussing Frank and that's but I don't remember any of the conversation really at all.

Captain Moran:  the Anything that you can recall and I'm going to use the Dartmouth lingo which is "hooking up" anything that you can recall that would have led him to think that you were interested in him and wanted to hook up with him that night?

Monica:  I don't particularly think so.

Captain Moran: Okay, anything that he may have said to you that made you think he wanted to hook up with you that night?

Monica:  No but I don't remember any of the conversations.


**REQUEST FOR ADMISSION NO. 34**
Admit that you left the Bones Gate fraternity party on May 8, 2005 before Frank Fucile left Bones Gate.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 34:
Denied. In fact, during the investigation, on information and belief, Mr. Fucile told the police he was disappointed in himself for not staying around to make sure Ms. Morrison would be okay. Fucile also later testified that he was passed out and himself incapacitated on the bed in his dormroom right under the cupola due to his heavy drinking and that is apparently why he did not hear any noises coming from the cupola – noises that his girlfriend, Alice Johnstone, claimed to have heard.

**REQUEST FOR ADMISSION NO. 35**
Admit that upon entering your bedroom at Panarchy house on the morning of May 8, 2005 you called out your roommate Jenna Pelletier's name to see if the room was occupied.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. Number 35:
Neither admits nor denies. It would have been typical for her to have "called out" to her roommate, who was often in their dormroom with her boyfriend, to be sure she was not intruding on their privacy. However, Ms. Morrison, in her heavily intoxicated and impaired state, has no recollection of doing so one way or another.

**REQUEST FOR ADMISSION NO. 36**
Admit that the current Dartmouth College guide to "Consent," displayed on its website at URL: https://www.dartmouth.edu/consent/sex_drugs_alcohol/index.html, lists signs of "incapacitation" as:
• "Inability to speak coherently"
• "Confusion on basic facts (day of the week, birthdate, etc.)"
• "Inability to walk unassisted"
• "Passing out"

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 36:
Admitted. But Mr. Langrick misleads the court. He fails to note the following crucial admonitions, also from the very same policy statement: (1) the four bulleted items above are clearly stated to be only "some" of the signs of incapacitation and the policy expressly states that signs of incapacitation "*include, but are not limited to*" the four items listed; and (2) also not noted by Mr. Langrick is the following statement which adds further important admonitions:

# CAN YOU GET CONSENT FROM SOMEONE WHO HAS BEEN DRINKING (OR USING OTHER DRUGS)?

Yes, you can get consent from someone who has been drinking and/or using drugs *as long as it is clear, voluntary and unambiguous*. Agreeing to have sex can only happen when it is free from undue influence and pressure. *Exploiting a person's **impairment** from the use of alcohol or other drugs is not okay under any circumstances.* If someone is incapacitated from alcohol and/or other drugs, they cannot give consent.

[N.B.: after their investigation the police found that Ms. Morrison had been "***heavily impaired due to alcohol***."]

If someone has been using alcohol and/or other drugs and you are thinking about having any kind of sexual interaction with them, it is your responsibility to check in, ask, and make sure they are okay with what is going on. If you are not totally sure they want to have sex, don't have sex. ***Even if you are intoxicated or impaired by alcohol/and or other drugs, if you are initiating sexual acts, you are still responsible for making sure the person/people want to participate in any type of sexual activity.*** (Emphasis added)

and (3) another statement of Dartmouth policy adds the most telling admonition of all, for purposes of evaluating the admitted facts of this case:

*Where alcohol or other drugs are involved, evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs affects a person's decision-making ability; awareness of consequences; ability to make informed, rational judgments; capacity to appreciate the nature and quality of the act; or level of consciousness.* **The assessment is based on objectively and reasonably apparent indications of incapacitation** *when viewed from the perspective of a sober, reasonable person.* (Emphasis added)

Based on his own admissions – both in 2005 and in his current pleadings in the case at bar – surely Mr. Langrick was ***not*** a "***sober, reasonable person***" at the time of the incident with Monica Morrison in May 2005. Moreover, he was reckless if not worse in not recognizing that.

**REQUEST FOR ADMISSION NO. 37**
Admit that on the morning of May 8, 2005 you were able to walk back from the Bones Gate party to the Panarchy house without assistance.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 37:
Denied. Ms. Morrison had been left alone by her housemates with whom she came to the Bones Gate fraternity and with whom she had planned to be escorted home. She did feel a need for we need for assistance to walk home and Mr. Langrick – who Ms. Morrison recalls was looking for Mr. Fucile, and thus was heading toward the same place in any event. *See also* Plaintiff's Response to Request for Admission No. 5.

**REQUEST FOR ADMISSION NO. 38**
Admit that you spoke coherently to your roommate Jenna Pelletier when you entered your room at the Panarchy house with Mr. Langrick on the morning of May 8, 2005.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 38:
Neither admits nor denies. Ms. Morrison, in her heavily intoxicated and impaired state, has no recollection of speaking to her roommate, whether coherently or otherwise. Moreover, in this request for an admission – as well as certain others below (Nos. xyz) – Mr. Langrick is confusingly conflating what would appear to have been two separate events. That is, the initial aborted entry into her dorm room and the return entry to her room sometime later.


**REQUEST FOR ADMISSION NO. 39**
Admit that you told Hanover Police Department Captain Frank Moran that you were conversing with Mr. Langrick in the cupola of the Panarchy house on the morning of May 8, 2005.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 39:
Admits only that the transcript of one of my interviews with Capt. Moran, reads as follows:

Captain Moran:  Alright, um, when he wanted to talk to you outside when you got back to Panarchy house and you brought him to um, the cupola?
Is that what you said?
Monica:  Mmm, hmm.

Captain Moran:  Do you remember any of your conversations?

Monica:  Um, no, I don't remember any of them.

Captain Moran:  Okay. Do you remember how it was that he came to be kissing you?

Monica:  No, I don't.


**REQUEST FOR ADMISSION NO. 40**
Admit that you told Frank Fucile that you were "hanging out" in the cupola with Mr. Langrick on the morning of May 8, 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 40:
Admits only that, according to the police interview transcript, Frank Fucile told Captain Moran that Ms. Morrison told Fucile the following about "hanging out:"

Fucile: Yeah, uh, well she told me that, she told me that they'd been hanging out and uh, apparently in the cupola at some point and um, that apparently late in the night, and it wasn't clear whether he, he had had stayed here or had left and come back I don't think, I don't really know which she told me actually …

**REQUEST FOR ADMISSION NO. 41**
Admit that you told Sarita Hudgins you and Mr. Langrick "made out a little bit" in the cupola of Panarchy house on the morning of May 8, 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 41:
Admits only that, according to the police interview transcript, Sarita Hudgins told Captain Moran that Ms. Morrison told Hudgins that "I [Morrison] think they made out little bit was what she told me and then she doesn't really remember spending, she doesn't really remember exactly what happened …"

**REQUEST FOR ADMISSION NO. 42**
Admit that you do not recall telling Mr. Langrick that you did not consent to sexual intercourse while in the cupola of Panarchy house on the morning of May 8, 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 42:
Admitted. But, as previously noted, Ms. Morrison – due to her "heavy impairment" – does not recall any aspect of the claimed sexual intercourse or surrounding events.

**REQUEST FOR ADMISSION NO. 43**
Admit that during your May 25, 2005 interview with Hanover Police Captain Frank Moran, you agreed: "it's possible that you had consensual sex [with Mr. Langrick] in the cupola."

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 43:
Denied. Once again, Mr. Langrick's selective quotation materially misleads. Here is the full exchange:

MORAN: You are. Um, do you recognize that it's possible that you had consensual sex in the cupola with him and just don't remember?

16

MONICA: Yeah, I, really have literally no recollection of that but I feel that if I was blacked out, it's not consensual sex.

**REQUEST FOR ADMISSION NO. 44**
Admit that after arriving to your bedroom at Panarchy house with Mr. Langrick on the morning of May 8, 2005, you asked him: "what do you want to do?"

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 44:
Neither admitted nor denied. As previously noted, I have no clear recollection of the specifics of anything I said at that time. The claim that I asked Mr. Langrick: "what do you want to do?" was made by Anton Hasenkampf, my roommate's boyfriend, in his interview with the police. Mr. Hasenkampf emphasized that he was asleep at the time they walked in. Also, in his interview Hasenkampf admitted that his sleepy recollection was "colored by" his speculative "*assum[ption]*" that Monica and Mr. Langrick were "together," in the sense that "it just *seemed like* they were both just sort of people who were going to hook up." (Emphasis added)

**REQUEST FOR ADMISSION NO. 45**
Admit that you had an orgasm while engaging in sexual activity with Mr. Langrick in the cupola of Panarchy house on the morning of May 8, 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 45:
Once again, neither admitted nor denied. See response to Request for Admission No. 22

**REQUEST FOR ADMISSION NO. 46**
Admit that you have no knowledge of Mr. Langrick ever visiting the Panarchy house before May 8, 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 46:
Admitted.

**REQUEST FOR ADMISSION NO. 47**
Admit that you were on birth control as of May 8, 2005.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 47:
Admitted.


**REQUEST FOR ADMISSION NO. 48**
Admit that you distributed cocaine to Casey Rieder on or around May 10, 2005.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 48:
Denied. At a certain point, after it became widely known in Panarchy House that Mr. Langrick had left his illegal cocaine behind, Mr. Rieder asked for it and Ms. Morrison gave it to him. It was not her possession to "distribute."


**REQUEST FOR ADMISSION NO. 49**
Admit that you lied to the police in your May 25, 2005 interview when you said: "I don't use cocaine."


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 49:
Denied, as to the gist and seeming implication of this question. If Ms. Morrison indeed said the words "I don't use cocaine," that was true in the sense that she was not a frequent user of cocaine at that time. In fact, to her best recollection, she had tried cocaine on only one or two occasions before the incident with Mr. Langrick in May 2005. Ironically, it was only after the trauma Ms. Morrison experienced at the hands of Mr. Langrick, that, ironically, she became a more frequent drug user.


**REQUEST FOR ADMISSION NO. 50**
Admit that you accused Mr. Langrick of sexually assaulting three people at Panarchy house.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 50:
Admitted. Those persons were Ms. Morrison, her roommate Jenna Pelletier and her roommate's boyfriend Anton Hasenkampf.


**REQUEST FOR ADMISSION NO. 51**
Admit that before you left your bedroom on the morning of May 8, 2005 to go to Brent Reidy's room, you never told Jenna Pelletier or Anton Hassenkampf that you were in distress or in need of assistance.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 51:
Admitted. But both of them had been asleep and I was rushing out in an alarmed state. According to a statement to the police by Anton Hassenkampf, he said he saw me "stumble" out of the room, and me demanding to Mr. Langrick: "you gotta go." This was hardly an occasion to sit down and discuss what had just happened with Jenna and Anton.


**REQUEST FOR ADMISSION NO. 52**
Admit that after you got out of your bed on the morning of May 8, 2005 and before you went to Brent Reidy's room, you asked Mr. Langrick if he could "get back to Tuck okay."


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 52:
Denied. Ms. Morrison told the police she had said something like this to Mr. Langrick when they returned to her dormroom after whatever had happened in the cupola. At that time Mr. Langrick said he was "too smashed" to make it back to Tuck. So Ms. Morrison allowed him to crash in her room. But she made it clear that he was to sleep on one of the couches in her room and not in her bed. Later, Mr. Langrick somehow had made his way into her bed and sexually assaulted her while she was asleep or unconscious. And in contrast to Jenna Pelletier's recollection, Anton Hassenkampf apparently did not hear solicitous words, but reported to the police that he heard me say curt words to Mr. Langrick to the effect "you gotta go." *See also* Plaintiff's Response to Request for Admission No. 51.


**REQUEST FOR ADMISSION NO. 53**
Admit that on May 25, 2005 Hanover Police Captain Frank Moran told you: "there are a number of witnesses that do work against you and that doesn't mean they're trying to that just means that's their honest recollection of what happened, what they saw."


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 53:
Admitted.


**REQUEST FOR ADMISSION NO. 54**
Admit that on May 25, 2005, Hanover Police Department Captain Frank Moran told you that there was a "suspicion at Panarchy by some of the people that you may have [], embellished circumstances with the passage of time."

19

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 54:
Admitted.

**REQUEST FOR ADMISSION NO. 55**
Admit that on May 25, 2005 Hanover Police Department Captain Frank Moran advised you that you committed a "misdemeanor crime" by taking Mr. Langrick's property.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 55:
Admitted, but once again Mr. Langrick seriously misleads. Here are Captain Moran's actual ultimate findings:

Morrison Family Meeting
I met with Monica Morrison and her father Robert Morrison on Friday, May 27th at 08:00 at the Hanover PD.

We discussed the findings of this investigation. I reviewed the many questionable actions by Miss Morrison and [Mr. Langrick].

I informed them that no charges were being pursued against Monica.

I advised them that I intended to pursue a misdemeanor drug charge against [Mr. Langrick].

Status:
I will be seeking an arrest warrant for [Mr. Langrick] in the near future,

**REQUEST FOR ADMISSION NO. 56**
Admit that on May 25, 2005 Hanover Police Department Captain Frank Moran advised you that distributing cocaine to another person, as you did, was a class A felony.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 56:
Denied. Here is the actual exchange:

MONICA: the fact that somebody can come into my house and like do all this to me and like, I do what I choose with like the found property, there's a Class A felony pinned on me...

MORAN: That hasn't happened yet.

**REQUEST FOR ADMISSION NO. 57**
Admit that during you May 25, 2005 interview with Hanover Police Department Captain Frank Moran you acknowledged that you distributed cocaine to another individual.

PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 57:
Admitted, but only to the extent that Ms. Morrison gave – not sold – the cocaine that Mr. Langrick had acquired, possessed, used, left behind after the May 2005 incident, and was later charged criminally and arrested for.

Denies any suggestion that she "*distributed*" in the sense that she regularly handled cocaine or that she *sold* the cocaine to another individual. And notes that she was never charged by the police with any offense in relation to Mr. Langrick's cocaine.

Here is the gist of what Ms. Morrison told the police about her giving away Mr. Langrick's cocaine:

Moran:  Now tell me about the contents of the container and what became of those contents.

Monica:  Um, there was a coffee filter type thing with a substance inside that one of our friends identified to be cocaine and he uses cocaine on a regular basis and um, I gave it to him.

***

Moran:  Okay, so you didn't necessarily go looking to sell this or give this to somebody...

Monica:  No, not at all.

Moran:  So he reached out to you?

Monica:  Yes.

Moran:  Okay, so he contacted you, I heard you have something...Right. And you went and saw him and basically ended up giving him this.

Monica:  Exactly.

***

Moran: Okay, so you didn't necessarily go looking to sell this or give this to somebody...

Monica:  No, not at all.

21

Moran:  So he reached out to you?

Monica:  Yes.

Moran:  Okay, so he contacted you, I heard you have something...

Monica:  Right.

Moran:  And you went and saw him and basically ended up giving him this.

Monica.  Exactly.


**REQUEST FOR ADMISSION NO. 58**
Admit that when Mr. Langrick arrived at Panarchy house on the afternoon of Sunday, May 8, 2005, you hid his digital camera so that he would not see that you had it.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 58:
Admitted. But this was in the context of Mr. Langrick coming back to Panarchy House, with no advance notice and despite having been warned never to come back. The digital camera was ultimately turned over to the police and was found by the police to have documented Mr. Langrick's cocaine possession and use, for which he was criminally charged. Surely, it was not Ms. Morrison's responsibility to return evidence of his crime to Mr. Langrick.


**REQUEST FOR ADMISSION NO. 59**
Admit that you requested that attorney Charlie Butt[e]ry [sic] demand a monetary payment from Mr. Langrick on your behalf.


PLAINTIFF'S RESPONSE TO REQUEST FOR ADMISSION NO. 59:

Admits, on information and belief, that a local attorney by the name of Charles Buttrey was retained to commence a contingency fee action against Mr. Langrick based on his damaging and sexually-assaultive and other outrageous behavior toward Ms. Morrison during the May 2005 incident at Dartmouth. Ms. Morrison was not directly responsible for choosing or engaging said attorney. And, to the best of her recollection, she herself communicated no specific request to Mr. Buttrey for a monetary payment from Mr. Langrick. Of course, the very nature of a "contingency fee" is that it is paid out of any monetary settlement. And, as became clear, it was Mr. Buttrey who was only interested in a quick financial settlement because, on information and belief, after the rejection of

that single demand letter, Buttrey thereafter completely abandoned Ms. Morrison's case with no further litigation.

Dated:  New York, New York
           February 16, 2020

                                    HENRY R. KAUFMAN, P.C.

                                    _____/s/_____
                                    By Henry R. Kaufman
                                    *Attorneys for Plaintiff*
                                    *Monica Morrison*
                                    60 East 42nd Street, 47th Floor
                                    New York, NY 10165
                                    (212) 880-0842

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of PLAINTIFF MONICA MORRISON'S RESPONSES TO DEFENDANT ROBERT LANGRICK'S SECOND REQUESTS FOR ADMISSIONS in the above captioned matter was served on the below counsel of record on February 16, 2020, in accordance with the Rules of Civil Procedure:

Thomas A. Clare (admitted pro hac vice)
Elizabeth M. Locke (admitted pro hac vice)
Andrew C. Phillips (admitted pro hac vice)
Shannon B. Timmann (admitted pro hac vice)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: andy@clarelocke.com
Email: shannon@clarelocke.com
Daniel A. Singer (DAS 0978)
THE LAW OFFICES OF DANIEL A. SINGER PLLC
New York, New York 10017
Telephone: (212) 569-7853
Email: dan@singerlaw.com

*Attorneys for Defendant Robert Langrick*

Dated: February 16, 2020                    By: /s/ Henry R. Kaufman
                                            Henry R. Kaufman

                                            *Attorney for Plaintiff Monica Morrison*