UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MONICA MORRISON,

    Plaintiff/Counterclaim-Defendant,

              v.

ROBERT LANGRICK,

    Defendant/Counterclaim-Plaintiff.

CASE NO. 1:18-cv-06127 (CBA)(RML)

---

**COUNTERCLAIM-PLAINTIFF ROBERT LANGRICK'S
MEMORANDUM OF LAW IN OPPOSITION TO COUNTERCLAIM-DEFENDANT
MONICA MORRISON'S MOTION FOR SUMMARY JUDGMENT**

Andrew C. Phillips (*pro hac vice*)
Thomas A. Clare, P.C. (*pro hac vice*)
Elizabeth M. Locke, P.C. (*pro hac vice*)
Shannon B. Timmann (*pro hac vice*)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: andy@clarelocke.com
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: shannon@clarelocke.com

Daniel A. Singer (DAS 0978)
THE LAW OFFICES OF DANIEL A. SINGER PLLC
New York, New York 10017
Telephone: (212) 569-7853
Email: dan@singerlaw.com

*Attorneys for Defendant/Counterclaim-Plaintiff Robert Langrick*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

COUNTER-STATEMENT OF THE APPLICABLE LEGAL STANDARDS ...................... 3

ARGUMENT ....................................................................................................................... 4

   I.     THERE PLAINLY IS A GENUINE DISPUTE OF MATERIAL FACT AS TO THE
   TRUTH OR FALSITY OF MS. MORRISON'S CLAIMS THAT MR. LANGRICK
   RAPED HER AND MS. MORRISON'S CREDIBILITY IS AT ISSUE ............................ 4

     A.   There Is Ample Evidence Disproving Ms. Morrison's Account That Mr. Langrick
     Invited Himself to Her Residence on a Pretext, and Corroborating Mr. Langrick's
     Account That Ms. Morrison Invited Him to Her Residence for the Purpose of Having
     an Amorous Encounter ................................................................................................... 6

     B.   There is Ample Evidence Showing That Ms. Morrison and Mr. Langrick Engaged
     in Consensual Sexual Activity in the Cupola of Panarchy House. ................................... 9

     C.   There Is Ample Evidence Proving That Mr. Langrick Did Not Sexually Assault or
     Rape Ms. Morrison While They Were in Bed Together. ................................................. 12

     D.   There Is Convincing Evidence That Ms. Morrison's Defamation of Mr. Langrick
     Was Part of a Scheme to Enrich Herself and Salvage a Foundering Writing Career by
     Portraying Herself as a Victim of Sexual Assault. .......................................................... 17

   II.    A Genuine Issue of Material Fact Exists as to Whether Ms. Morrison Published
   the Statements with the Requisite Degree of Fault. ............................................................ 19

     A.   The *Chapadeau* Standard Does Not Apply to Ms. Morrison's Statements Because
     Ms. Morrison Has Not Remotely Demonstrated That Her Accusations Are a Matter of
     Public Concern. ............................................................................................................... 21

     B.   There is Ample Evidence in the Record Demonstrating That Ms. Morrison
     Published the Statements at Issue with Gross Irresponsibility and, Indeed, With Full
     Knowledge That They Were False. ................................................................................. 23

CONCLUSION ................................................................................................................... 26

CERTIFICATE OF SERVICE ............................................................................................ 28

## **TABLE OF AUTHORITIES**

**Page(s)**

<span style="font-variant:small-caps">CASES</span>

*Albert v. Loksen*,
  239 F.3d 256 (2d Cir. 2001) ............................................................................... 22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................ 4

*Bank Melli Iran v. Pahlavi*,
  58 F.3d 1406 (9th Cir. 1995) .............................................................................. 26

*Chapadeau v. Utica Observer-Dispatch, Inc.*,
  38 N.Y.2d 196 (1975) ............................................................................. 19, 20, 21

*Curran v. Aetna Life Ins. Co.*,
  No. 13-cv-00289, 2016 WL 3843085 (S.D.N.Y. July 11, 2016) ........................... 25

*Daniels v. Kostreva*,
  No. 15-cv-3141, 2017 WL 823583 (E.D.N.Y. Jan. 12, 2017),
  *report and recommendation adopted*,
  No. 15-cv-3141, 2017 WL 519227 (E.D.N.Y. Feb. 8, 2017) ................................. 22

*Eguia v. Tompkins*,
  756 F.2d 1130 (5th Cir. 1985) ............................................................................ 25

*Genometrica Rsch. Inc. v. Gorbovitski*,
  No. 11-CV-05802, 2013 WL 394892 (E.D.N.Y. Jan. 31, 2013) ............................. 25

*Gilman v. Marsh & McLennan Cos., Inc.*,
  826 F.3d 69 (2d Cir. 2016) ................................................................................... 4

*Globecon Grp., LLC v. Hartford Fire Ins. Co.*,
  434 F.3d 165 (2d Cir. 2006) ................................................................................. 4

*Goldwater v. Ginzburg*,
  414 F.2d 324 (2d Cir. 1969) ............................................................................... 23

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989) ........................................................................................... 24

*Hayes v. N.Y. City Dep't of Corr.*,
  84 F.3d 614 (2d Cir. 1996) ................................................................................... 6

*Krauss v. Globe Int'l, Inc.*,
  251 A.D.2d 191 (N.Y. App. Div. 1998) ................................................................ 22

*Lucking v. Maier*,
No. 03-cv-1401, 2003 WL 23018787 (S.D.N.Y. Dec. 23, 2003) ............................................ 20

*Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*,
22 F. Supp. 3d 240 (S.D.N.Y. 2014) ................................................................. 23

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
875 F.3d 107 (2d Cir. 2017) ................................................................. 3, 17

*Omnipoint Commc'ns, Inc. v. Common Council of City of Peekskill*,
202 F. Supp. 2d 210 (S.D.N.Y. 2002) ................................................................. 25

*Robertson v. McCloskey*,
666 F. Supp. 241 (D.D.C. 1987) ................................................................. 5

*Rule v. Brine, Inc.*,
85 F.3d. 1002 (2d Cir. 1996) ................................................................. 3, 24

*Schiavone Constr. Co. v. Time, Inc.*,
847 F.2d 1069 (3d Cir. 1988) ................................................................. 24

*Stern v. Cosby*,
645 F. Supp. 2d 258 (S.D.N.Y. 2009) ................................................................. 5

*Time, Inc. v. Pape*,
401 U.S. 279 (1971) ................................................................. 24

*Transway Fin. Co., Inc. v. Gershon*,
92 F.R.D 777, 777-78 (E.D.N.Y. 1982) ................................................................. 5

*United States v. Letscher*,
83 F. Supp. 2d 367 (S.D.N.Y. 1999) ................................................................. 25

*Ventura v. Kyle*,
8 F. Supp. 3d 1115 (D. Minn. 2014) ................................................................. 24

*Wyler v. United States*,
725 F.2d 156 (2d Cir. 1983) ................................................................. 25

## Rules

Fed. R. Civ. P. 56 ................................................................. 8

## INTRODUCTION

Through his defamation Counterclaims, Robert Langrick seeks to finally set the record straight about the false, malicious, and defamatory story that Monica Morrison has been spreading, for years, about how in 2005 Mr. Langrick allegedly "followed" her home from a party in Hanover, New Hampshire, snuck into her bed while she was asleep, and sexually assaulted and raped her. This story was false when Ms. Morrison first concocted it to save face in front of her roommate who was angry at the disturbance caused by Ms. Morrison bringing Mr. Langrick to their home in the early morning hours for a consensual sexual encounter in a "cupola" on the roof of the house— and a thorough police investigation by experienced Hanover Police Department detectives confirmed that Ms. Morrison's story of sexual assault was controverted by percipient witnesses and her own inconsistent, implausible, and contradictory statements about what transpired.  And that false story did not get any truer when Ms. Morrison—in dire financial straits and hoping to salvage a foundering career as a writer—revived it years later in an effort to extort a settlement from Mr. Langrick and, failing that, to piggyback on the #metoo movement and build a brand for herself as a writer based on the image of a sexual assault survivor.

The opening salvo of the latter scheme began with an effort to get Mr. Langrick fired from his job by calling his employer on January 2, 2018 and accusing him of following her home, sneaking into her bed, and sexually assaulting her while she slept.  This telephone call is the subject of Mr. Langrick's First Counterclaim for slander.[1]  When that did not bear immediate fruit, Ms. Morrison began posting similar statements on various websites.  On January 4, 2018, she created an account on the video sharing website Vimeo.com featuring a video of Mr. Langrick, who she

---

[1] Def. Robert Langrick's Ans., Affirmative Defenses, and Countercls. at ¶¶ 257-271 (Dec. 12, 2018) [Dkt. 14].

labelled a "rapist."  This post is the subject of Mr. Langrick's Second Counterclaim for libel.[2]  And on July 19, 2018, Ms. Morrison posted a "personal review" of Mr. Langrick on the reputation scoring website MyLife.com, in which she falsely claimed that Mr. Langrick "committed a sexual assault" and accused him of "penetrating and attempting anal sex with an unconscious woman." This post is the subject of Mr. Langrick's Third Counterclaim for libel.[3]  These efforts succeeded in getting Mr. Langrick's attention, but not in extracting any kind of hush payment.  What followed was a full-on media blitz publicizing Ms. Morrison's false claims, culminating in Ms. Morrison's now-dismissed complaint against Mr. Langrick, and Mr. Langrick's counterclaims that are the subject of Ms. Morrison's Motion for Summary Judgment.  In her January 15, 2021 Memorandum of Law in Support of Motion for Summary Judgment Dismissing the Defamation Counterclaims ("Morrison Mem."), Ms. Morrison advances two arguments which she claims entitle her to summary judgment, both of which have no merit.

*First*, Ms. Morrison asserts that summary judgment is appropriate because there is no genuine dispute of material fact as to the truth of her claims that Mr. Langrick followed her home and raped her in her bed while she was unconscious.  But as demonstrated herein and in Mr. Langrick's accompanying Responses and Objections to Monica Morrison's Local Civil Rule 56.1 Statement of Material Facts in Support of Her Motion for Summary Judgment and Counterstatement of Additional Material Facts, there absolutely is a genuine dispute of fact as to not only that broader question, but as to every supposed "undisputed" fact that Ms. Morrison relies upon in support of her Motion.  As Mr. Langrick demonstrates, while his story of an entirely consensual sexual encounter is supported by witness testimony and record evidence, Ms.

---

[2] *Id.* at ¶¶ 272-287.

[3] *Id.* at ¶¶ 288-303.

Morrison's ever-shifting version of events, along with her credibility as a witness and accuser, are very much disputed and contradicted by the evidence.

*Second*, Ms. Morrison argues that Mr. Langrick cannot meet the fault standard of showing that she published false statements about him with "gross irresponsibility." Ms. Morrison is incorrect about the applicable standard—the gross irresponsibility standard of fault only applies when the statements at issue address a matter of "public concern," and accusations of criminal conduct by one private figure against another decidedly do not—but in any event, Ms. Morrison's Motion would fail even if Mr. Langrick were a public figure and the "actual malice" standard applied. There is a wealth of evidence, particularly in the form of repeated inconsistencies, material self-contradictions, easily disprovable falsehoods, and inherently implausible allegations, from which a jury could find that Ms. Morrison's fabricated rape allegations are not merely negligent, but knowingly false. And of course, Ms. Morrison was a direct participant in the sexual activity at issue and the subsequent events—and therefore, if a jury concludes that her tale of sexual assault is false, it of course would be justified in also concluding that Ms. Morrison was negligent, grossly irresponsible, and reckless in propagating that incredibly damaging falsehood.

In sum, and as demonstrated herein, Ms. Morrison's Motion for Summary Judgment lacks merit and fails to identify any issue on which there is no genuine dispute of material fact to be resolved by the jury at trial. Therefore, Ms. Morrison's Motion should be denied.

## COUNTER-STATEMENT OF THE APPLICABLE LEGAL STANDARDS

The party moving for summary judgment "has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting *Anderson*

3

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "At the summary judgment stage, 'the judge's function is not to weight the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Globecon Grp., LLC v. Hartford Fire Ins. Co*., 434 F.3d 165 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). And in deciding a motion for summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gilman v. Marsh & McLennan Cos., Inc*., 826 F.3d 69, 73 (2d Cir. 2016).

## ARGUMENT

## I.   THERE PLAINLY IS A GENUINE DISPUTE OF MATERIAL FACT AS TO THE TRUTH OR FALSITY OF MS. MORRISON'S CLAIMS THAT MR. LANGRICK RAPED HER AND MS. MORRISON'S CREDIBILITY IS AT ISSUE.

Ms. Morrison's primary argument in support of her Motion is the claim that there is no genuine dispute of material fact as to whether the sexual encounter that took place between Mr. Langrick and Ms. Morrison was non-consensual. (Morrison Mem. at 7-14.) But as set forth in Mr. Langrick's Responses and Objections to Monica Morrison's Local Civil Rule 56.1 Statement of Material Facts in Support of Her Motion for Summary Judgment ("RSF") and Counterstatement of Additional Material Facts ("CSF"), there absolutely is a genuine dispute as to whether that sexual encounter was consensual or non-consensual, and indeed, essentially every material fact alleged by Ms. Morrison in her Opening Statement of Undisputed Material Facts, Pursuant to E.D.N.Y. Local Rule 56.1, in Support of Morrison's Motion for Summary Judgement as to All of Robert Langrick's Defamation Claims ("Morrison SUMF") is disputed by record evidence. This precludes the entry of summary judgment in Ms. Morrison's favor on the issue of the truth or falsity of her accusations that Mr. Langrick sexually assaulted her. *See* Fed. R. Civ. P. 56(a).

Ultimately, the jury in this case will be tasked with deciding between two diametrically opposed versions of the events of May 8, 2005, as well as whether Ms. Morrison's claims that a sexual assault occurred that day is true or false. The fact that Ms. Morrison and Mr. Langrick's testimony are entirely at odds and both hotly dispute whether the sexual encounter between them was consensual is alone sufficient to create a genuine dispute. *See Stern v. Cosby*, 645 F. Supp. 2d 258, 382 (S.D.N.Y. 2009) (denying motion for summary judgment because "[i]t is for a jury—not the Court—to consider conflicting testimony, make credibility determinations, and weigh the evidence"); *Transway Fin. Co., Inc. v. Gershon*, 92 F.R.D 777, 777-78 (E.D.N.Y. 1982) (denying motion for summary judgment where "the central issue in the controversy turns on the credibility of the moving party"); *Robertson v. McCloskey*, 666 F. Supp. 241, 249 (D.D.C. 1987) (denying motion for summary judgment in a defamation case where the defendant presented "contradictory evidence and testimony" concerning the truth or falsity of the statements at issue).

But Mr. Langrick does not rest solely on the fact that he and Ms. Morrison have given competing testimony—far from it. As set forth in Mr. Langrick's Responses and Objections to Monica Morrison's Local Civil Rule 56.1 Statement of Material Facts in Support of Her Motion for Summary Judgment and Counterstatement of Additional Material Facts, and as summarized below, the record shows that Mr. Langrick's version of events is corroborated by the accounts of percipient witnesses and the findings of a thorough police investigation that took place shortly after that sexual encounter. Conversely, Ms. Morrison has repeatedly and materially shifted her story as to what transpired between the two of them that day, her version of events has been contradicted by contemporary documentation and the testimony of numerous witnesses, and she has made numerous objectively disprovable claims about the details of her and Mr. Langrick's encounter. Thus, in addition to the simple fact that there are disputes as to the material facts, Ms.

Morrison's **credibility** as a witness and accuser is fundamentally at issue in this case, and that determination is one for the jury, not the Court at summary judgment. *See Rule*, 85 F.3d at 1011 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not the court on summary judgment"); *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (internal citation omitted) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). Below, Mr. Langrick summarizes the record evidence demonstrating a genuine issue of material fact as to the truth or falsity of Ms. Morrison's claims that Mr. Langrick sexually assaulted her on May 8, 2005.

   **A. There Is Ample Evidence Disproving Ms. Morrison's Account That Mr. Langrick Invited Himself to Her Residence on a Pretext, and Corroborating Mr. Langrick's Account That Ms. Morrison Invited Him to Her Residence for the Purpose of Having an Amorous Encounter.**

First, there are hotly disputed factual issues as to how and why Ms. Morrison and Mr. Langrick wound up at her residence on May 8, 2005, and the events that led to their sexual encounter that is at issue in this case. The narrative put forward by Ms. Morrison is that the two met at a fraternity party in the early morning hours of May 8, 2005, that Mr. Langrick was predatorily making unwanted advances toward Ms. Morrison at that party, and that he subsequently tricked her into leading him back to her residence under the pretext that he planned to meet up there with her friend and housemate, Frank Fucile. (Morrison SUMF ¶¶ 10-30.) But outside of the undisputed fact that Mr. Langrick and Ms. Morrison did meet for the first time at that party, Ms. Morrison's account is wholly disputed and contradicted by record evidence. Instead, the evidence shows that Ms. Morrison—clearly recognizing that the fact that she voluntarily invited Mr. Langrick back to her bedroom in the early morning hours to "hook up" casts grave doubt on her allegation that the ensuing sexual activity was non-consensual—has

fabricated a facially implausible and factually controverted yarn that does not withstand a modicum of scrutiny.

To begin, it is undisputed that Ms. Morrison and Mr. Langrick first met during a party at the Bones Gate fraternity house in Hanover, New Hampshire while they were students at Dartmouth College—Mr. Langrick was a first-year student at the Tuck Business School and Ms. Morrison was a sophomore in the undergraduate program. (RSF ¶¶ 1-3; CSF ¶¶ 1-2.) Mr. Langrick was partnered with Ms. Morrison during a game of beer pong and recalls conversing and flirting with her while she was "touching [his] arm" and "talking closely." (RSF ¶ 18; CSF ¶¶ 2-3.) Mr. Langrick also recalls that they were "gently mocking" one another, with Ms. Morrison making fun of Mr. Langrick's beer pong skills and dyed hair, and Mr. Langrick—an English man—making fun of the fact that Ms. Morrison was studying English at an American University. (RSF ¶ 18; CSF ¶ 3.) During a subsequent interview conducted as part of the Hanover Police Department's investigation into Ms. Morrison's claim of sexual assault, a friend and housemate of Ms. Morrison's who was also at the party corroborated that Ms. Morrison and Mr. Langrick were mutually "flirting" while playing beer pong together. (RSF ¶ 19; CSF ¶ 4.) Mr. Langrick further testified that based on his observations of Ms. Morrison's behavior and activities at the party, she was not heavily intoxicated or impaired, because she was flirting, conversant, smiling, standing unassisted, and displayed impressive hand-eye coordination while playing the game. (RSF ¶¶ 8, 20, 23.)

After playing a couple rounds of beer pong with Mr. Langrick, Ms. Morrison decided she was ready to go home and, to his surprise, invited Mr. Langrick to go back with her to "Panarchy," an off-campus house where she lived. (RSF ¶¶ 18, 21, 24-25; CSF ¶ 6.) While Ms. Morrison has repeatedly claimed that Mr. Langrick somehow tricked her into inviting him back to her house

under the false pretense that he had plans to meet with up with her friend and housemate, Mr. Fucile, the record evidence flatly contradicts this claim. Mr. Langrick had never met or even heard of Mr. Fucile, and Mr. Fucile likewise testified that he did not believe he had ever even spoken to Mr. Langrick. (RSF ¶¶ 18, 21, 25, 28.) Thus, because Mr. Langrick had never met Mr. Fucile and did not even know who he was, Ms. Morrison's claim that Mr. Langrick used Mr. Fucile's name as a pretext for an invitation to Panarchy makes no sense—and a jury could very logically infer that this is a false story concocted by Ms. Morrison after the fact in an attempt to obscure the truth, which is that she voluntarily invited Mr. Langrick back to her house for the purpose of engaging in sexual activity.

In a further perpetuation of this nonsensical cover story, Ms. Morrison also continues to maintain that upon arrival at the Panarchy house, she and Mr. Langrick proceeded to search for Mr. Fucile. But again, this claim is disputed and contradicted by the evidence. Witness Alice Johnston, who shared a bedroom with Mr. Fucile at the time and was awake and sober in the early morning hours of May 8, 2005, testified during her deposition that Mr. Fucile was asleep in that bedroom when Ms. Morrison and Mr. Langrick arrived at the house, and that neither Ms. Morrison nor Mr. Langrick ever went to Mr. Fucile's bedroom to locate him. (RSF ¶ 25.) And Mr. Fucile similarly testified that he does not recall ever hearing any indication that either Ms. Morrison or Mr. Langrick tried to enter his bedroom after they returned to Panarchy house. (*Id.*)

Instead, when they arrived at Panarchy, Ms. Morrison led Mr. Langrick directly to her own bedroom. (RSF ¶ 28; CSF ¶ 7.) As they entered Ms. Morrison's bedroom, Ms. Morrison called out her roommate's name to see if the bedroom was occupied. (RSF ¶¶ 28, 30; CSF ¶ 7.) Ms. Morrison's roommate and the roommate's boyfriend, who was staying over in the bedroom that night, both corroborated this and heard Ms. Morrison tell Mr. Langrick that her roommate was

occupying the bedroom. (RSF ¶¶ 30-31; CSF ¶¶ 7-8.) Ms. Morrison then led Mr. Langrick out a window, over a sloping roof, and up to a structure on the roof called the "cupola" that the residents of the house used for amorous encounters (indeed, when they arrived, Mr. Langrick spotted a used condom wrapper on the floor). (RSF ¶ 37; CSF ¶¶ 8-10.) The roommate and her boyfriend rationally inferred, based on what they heard and saw, that Ms. Morrison had brought Mr. Langrick back to her bedroom to "hook up" and then left for the cupola with Mr. Langrick after discovering that the bedroom was occupied. (RSF ¶¶ 28, 30-31; CSF ¶ 9.)

This testimony conflicts with Ms. Morrison's claims that Mr. Langrick followed her to her home and bedroom under the pretext of searching for a man Mr. Langrick did not even know. Contrary to Ms. Morrison's claims, the record fully supports Mr. Langrick's version of events, which is that Ms. Morrison voluntarily invited him to accompany her back to her home, that she brought him to her bedroom, and that, finding the bedroom to be occupied by her roommate, Ms. Morrison then led Mr. Langrick to a secluded, private room on the roof of the house for the purpose of engaging in a consensual sexual encounter.

**B. There is Ample Evidence Showing That Ms. Morrison and Mr. Langrick Engaged in Consensual Sexual Activity in the Cupola of Panarchy House.**

Second, there are heavily disputed and material factual issues as to whether the sexual activity that subsequently occurred in that cupola was consensual or non-consensual. Ms. Morrison does not now deny that the two did engage in sexual activity in the cupola—in stark contrast to her denials to police at the time that any conduct beyond consensual kissing occurred— but she claims that the sexual activity she now admits occurred could not have been consensual because she was "slipping in and out of consciousness" at the time. (MSUF ¶¶ 32-36.) But again, there is voluminous record evidence contradicting Ms. Morrison's version of events and

demonstrating that she was a lucid, active, willing, and vocal participant in the consensual foreplay and sexual intercourse that occurred in the cupola.

Mr. Langrick recalled to police at the time, and during his deposition in this case, that upon arriving in the cupola, the two disrobed, began kissing, and then Ms. Morrison began touching his penis and he then used his fingers to stimulate her vagina and clitoris. (CSF ¶¶ 12-14.) This went on for some time until Ms. Morrison achieved an orgasm which, as Mr. Langrick told police at the time, was notable and distinctive because it involved a heavy ejaculation of vaginal fluid that sprayed Mr. Langrick's face. (RSF ¶ 33; CSF ¶ 14.) Mr. Langrick commented on this to Ms. Morrison in the moment. (*Id.*) After this mutual foreplay, Mr. Langrick and Ms. Morrison then had sexual intercourse for a prolonged period of time, during which Ms. Morrison was a very vocal participant. (RSF ¶ 32-35; CSF ¶ 15.) Mr. Langrick also testified, and told police at the time, that Ms. Morrison was very much alert, awake, engaged, and actively participating in that prolonged sexual intercourse. (RSF ¶ 32; CSF ¶ 15.)

Additionally, Alice Johnston—who lived in the bedroom directly beneath the cupola—corroborated Mr. Langrick's version of events when she told police at the time that she overheard Ms. Morrison and Mr. Langrick in the cupola, and that it sounded like they were engaged in sexual intercourse for "about an hour." (CSF ¶ 16.) She described primarily hearing Ms. Morrison moaning pleasurably, "like the sound you make when you're having sex and it's like regular moaning." (*Id.*) After upwards of an hour of sexual intercourse in the cupola, as Mr. Langrick testified and told police at the time, Ms. Morrison got fully dressed, unassisted, and asked Mr. Langrick to "follow" her back through the window into her bedroom. (RSF ¶¶ 8, 32; CSF ¶ 17.) Mr. Langrick also testified that at this point, Ms. Morrison remained fully lucid and conversant, she was not stumbling or slurring her speech, and in fact, she was able to do "gymnastics" to

accomplish the difficult physical task of scrambling across the sloping roof and back into her bedroom through a window.  (RSF ¶¶ 8, 32; CSF ¶ 19.)  These observations demonstrate that Ms. Morrison was able to make informed decisions and was not incapacitated and belies Ms. Morrison's assertions in the litigation that she was "slipping in and out of consciousness" as she now claims.  (*Id.*)

In contrast to Mr. Langrick's consistent and corroborated narrative of the events in the cupola, Ms. Morrison's recounting of those events in the cupola has been wildly inconsistent and contradictory.  She claimed to Hanover police at the time that she and Mr. Langrick only engaged in kissing in the cupola, that she remained fully clothed at all times in the cupola, and that she did not have any memory of any other sexual contact occurring.  (RSF ¶ 32; CSF ¶¶ 12, 81.)  She made the same claim in her Answer and in responses to requests for admission in this case, in which she denied that *any* sexual activity other than kissing occurred and claimed to "recall[] nothing of the alleged sexual foreplay" in the cupola.  (RSF ¶ 32; CSF ¶ 81; Morrison's Ans. to Countercls. ¶¶ 57-60 [Dkt. 50]; Morrison's Resp. to Langrick's RFA No. 22 (Ex. 1).)  But then, during her deposition under oath, Ms. Morrison changed her story entirely and said that she does in fact recall engaging in "heavy petting" with Mr. Langrick in the cupola and admitted that she does specifically recall Mr. Langrick penetrating her vagina with his fingers while her jeans and underwear were removed.  (RSF ¶ 32; CSF ¶ 12.)

Additionally, Ms. Morrison's convenient (and ever-shifting) claim that she was so incapacitated that she remembers nothing from the cupola is also gravely undermined by the statement she gave to police shortly afterward, contrasted with her recent admissions in this litigation.  In her contemporaneous police interview, she admitted specifically recalling the excited utterance that Mr. Langrick made when her ejaculate sprayed his face, but she maintained the story

that no sexual activity occurred and attempted to portray this as an unprompted, vulgar comment that Mr. Langrick made "***entirely out of the blue***" while they were sitting and talking, fully clothed—and Ms. Morrison told the same nonsensical story in her pleadings in this case.  (CSF ¶ 14; Morrison's Ans. to Countercls. ¶ 112 [Dkt. 50].)  But now, in her Statement of Undisputed Material Facts, Ms. Morrison has entirely reversed course and now admits that Mr. Langrick did in fact make this comment in the context of an orgasmic "emission of fluid" by Ms. Morrison while they were engaged in "heavy petting" in the cupola.  (Morrison SUMF ¶¶ 32-33.)

### C. There Is Ample Evidence Proving That Mr. Langrick Did Not Sexually Assault or Rape Ms. Morrison While They Were in Bed Together.

Third, there clearly are disputed factual issues as to whether or not Mr. Langrick sexually assaulted Ms. Morrison in her bedroom after they returned from their extended sexual encounter in the cupola.  Ms. Morrison's original narrative was that after the two returned to her bedroom from the cupola, she asked Mr. Langrick to leave and then passed out in her bed.  (Compl. ¶ 370 [Dkt 1].)  In her Statement of Undisputed Material Facts, Mr. Morrison now glosses over any discussion of returning from the cupola to her bedroom with Mr. Langrick and claims that her next memory is waking up in her bed to find Mr. Langrick "attempting to penetrate her vagina and anus, which he subsequently managed to do, in whole or in part."  (Morrison SUMF ¶ 41-42.)  Ms. Morrison then claims that in response to these unwanted sexual advances by Mr. Langrick, she got out of bed, left the room and went to her friend Brent Reidy's room next door.  (Morrison SUMF ¶ 43.)  Again, Ms. Morrison's account is contradicted by the record evidence.

Mr. Langrick testified that after climbing back into the bedroom through the window, the two got into Ms. Morrison's bed together and began "canoodling," which he described as a "mutual embrace," and post-coital, "amorous cuddling."  (RSF ¶¶ 39, 43, 47; CSF ¶ 20.)  Importantly, Mr. Langrick firmly recalled that he ***did not*** have sex with Ms. Morrison or penetrate her in any way

while they shared the bed.  (RSF ¶¶ 41, 43, 47; CSF ¶ 20.)  Moreover, Mr. Langrick specifically recalled that Ms. Morrison was wearing her jeans in bed, which of course would have made any sort of genital or anal penetration by Mr. Langrick impossible.  (RSF ¶ 41; CSF ¶ 20.)  Later on in bed, Mr. Langrick testified that he remembered Ms. Morrison's roommate snapping at her and Ms. Morrison then getting up to leave the bed.  (RSF ¶¶ 39, 48; CSF ¶ 21.)

Jenna Pelletier—Ms. Morrison's roommate—and Anton Hasenkampf—her roommate's boyfriend—corroborated Mr. Langrick's recollection of getting into bed together with Ms. Morrison, because they were woken up when the two re-entered the room and Mr. Hasenkampf observed them getting into the bed together.  (CSF ¶ 22.)  They also corroborated Mr. Langrick's memory of why Ms. Morrison left the bed.  (RSF ¶¶ 41, 43; CSF ¶¶ 24-25.)  Ms. Pelletier recalls being awoken again a few minutes after Mr. Langrick and Ms. Morrison re-entered the room and was irritated by the sounds of their canoodling.  (RSF ¶ 43; CSF ¶ 23.)  She told police at the time that when she looked over to the bed, she saw "one person sitting up and the other person was moving."  (CSF ¶ 23.)  And Mr. Hasenkampf also recalled that he and Ms. Pelletier were awoken by sounds of male moaning, and that eventually Ms. Pelletier said Ms. Morrison's name once, to get her and Mr. Langrick to stop whatever they were doing; Ms. Morrison then made some sort of a response and got up and left the room.  (RSF ¶ 43; CSF ¶ 24.)  Before leaving the room, Ms. Pelletier heard Ms. Morrison calmly ask Mr. Langrick if he could "make it back to Tuck okay." (RSF ¶¶ 43-44; CSF ¶ 25.)  Ms. Morrison did not indicate to her roommate or her roommate's boyfriend—who were both in the same room just feet away—that she was in any distress or in need of any assistance.  (RSF ¶ 43; CSF ¶¶ 24-25.)  And neither saw Ms. Morrison pause to get dressed before leaving and going to sleep in a friend's room—corroborating Mr. Langrick's testimony that Ms. Morrison was clothed in the bed, and that the vaginal and anal penetration she

claims occurred would have therefore been impossible.  (*See id*.)  Ms. Pelletier, for her part, told Hanover Police Department Captain Francis Moran that based on what she had heard and observed, she did not believe that Ms. Morrison was actually sexually assaulted by Mr. Langrick. (CSF ¶ 67.)

Ms. Morrison's later claim that she awoke to Mr. Langrick penetrating her vagina and anus in bed is also flatly contradicted by what she told her friends and housemates in the following days. Ms. Morrison initially told her housemate Brent Reidy, almost immediately after the fact, that Mr. Langrick had only "dry humped" her while they were in her bed together—which, as Mr. Reidy explained, in common parlance means that there was no genital contact or penetration because at least one of the participants was clothed.  (RSF ¶ 42; CSF ¶¶ 52-53.)  She also similarly told her housemate Mr. Fucile that Mr. Langrick was just "humping her leg" in bed.  (RSF ¶ 42; CSF ¶ 54.)  And Ms. Morrison separately told her friend and housemate Sarita Hudgins that Mr. Langrick "humped her leg and that nothing really was going on in this process…."  (RSF ¶ 42; CSF ¶ 55.) Ms. Hudgins told Captain Moran of the Hanover Police Department that Ms. Morrison relayed to her that Mr. Langrick had been "humping her leg" in bed and that Ms. Morrison found this "annoying" because she "wanted to go to sleep."  (RSF ¶ 42.)

Ms. Morrison's actions in the days following the alleged assault by Mr. Langrick further bely her allegations.  Ms. Morrison has admitted to stealing Mr. Langrick's cash, expensive camera, and other belongings that he left at the house, in addition to exchanging what she described as "joking and comedial" emails with Mr. Langrick.  (CSF ¶ 47.)  In the emails, which were exchanged between Ms. Morrison, Mr. Langrick, Ms. Pelletier, and Mr. Reidy in the days following the alleged incident, Ms. Morrison and her friends demanded that Mr. Langrick take them all out for an expensive dinner as compensation for Mr. Langrick's behavior after Ms.

14

Morrison left the bedroom.  (CSF ¶¶ 38-50.)  And it was only after Mr. Langrick kept trying to push back the date of this dinner that Ms. Morrison's story about what happened changed and she decided to go to police.  (CSF ¶ 50, 56.)

Witnesses told police at the time that Ms. Morrison's shifting story did not sit well with everyone in the house.  Ms. Johnston, who overheard Ms. Morrison and Mr. Langrick having sexual intercourse in the cupola, said she was surprised and upset by Ms. Morrison's announcement that she wanted to go to the police, and that she did not think Ms. Morrison's intentions in pressing charges were "sincere."  (CSF ¶ 57.)  Ms. Johnston also said that it became "a big topic of conversation around the [Panarchy] house" because it "[didn't] seem right" or "fair" that Ms. Morrison was suddenly claiming, days later, that Mr. Langrick raped her.  (*Id.*)  And Selena Hadzibabic—another Panarchy housemate—told police that it was her impression that Ms. Morrison's story changed because she was angry that Mr. Langrick embarrassed her in front of the other residents and began talking about filing sexual assault charges against Mr. Langrick because, as Ms. Morrison told Ms. Hadzibabic, "[Mr. Langrick] shouldn't get away [with] coming in here and like peeing on my floor and disturbing my roommate and disturbing me."  (CSF ¶ 59.)  In fact, Ms. Hadzibabic and Ms. Johnston were so disturbed by their housemate's belated allegations of sexual assault that they jointly decided to write an email to Mr. Langrick—who they did not know—to warn him that he needed to "watch out" for his "new friend," Ms. Morrison.  (CSF ¶ 61.)

The results of the thorough and contemporaneous police investigation into Ms. Morrison's allegations also contradict her accusations that Mr. Langrick sexually assaulted her.  (CSF ¶¶ 63-78.)  Captain Moran—who led the investigation—testified that Hanover PD's investigation was "thorough and competent"; that he interviewed Ms. Morrison and Mr. Langrick and percipient

witnesses who lived in the Panarchy house (Jenna Pelletier, Anton Hasenkampf, Brent Reidy, Frank Fucile, Alice Johnston, Selena Hadzibabic, Sarita Hudgins, and Mr. Langrick's friend Nestor Weigand); reviewed the contemporaneous emails between Mr. Langrick, Ms. Morrison and her housemates; obtained emails via a search warrant; visited the cupola and Panarchy house; and took photographs. (CSF ¶ 64-65.) During Captain Moran's second interview with Ms. Morrison— which took place after the above-noted witness interviews and review of contemporaneous communications—he explained to Ms. Morrison that the inconsistencies and contradictions in her story precluded any probable cause for an arrest, let alone prosecution, of Mr. Langrick for sexual assault. (CSF ¶ 69.) Among other things, Captain Moran related to Ms. Morrison that:

- The email correspondence Ms. Morrison and her friends exchanged with Mr. Langrick in the days after the alleged incident, was "friendly" and could be interpreted by people as attempted "extortion";

- Ms. Pelletier's statements during her interview about what she heard when Ms. Morrison and Mr. Langrick first entered the bedroom could "be interpreted as… more or less an indication to hook up between [Ms. Morrison] and [Mr. Langrick]";

- Ms. Johnston's statements during her police interview about the noises she overheard from the cupola, which sounded like consensual sex to her;

- Witnesses he interviewed suggested that Ms. Morrison was embellishing her allegations with the passage of time;

- Ms. Morrison's initial claims to witnesses at the time that Mr. Langrick had only humped her leg in bed;

- Witnesses indicated that they were suspicious of Ms. Morrison's claims, and believed that Ms. Morrison and Mr. Langrick had a "drunken hook up" which resulted "in a mixed recollection" by Ms. Morrison; and

- Ms. Morrison's theft of Mr. Langrick's belongings.

(CSF ¶¶ 70-76.) Captain Moran concluded by telling Ms. Morrison: "I think the problem we have with your case is that there are a number of witnesses that do work against you and that doesn't mean that they're trying to, that just means that that's their honest recollection of what happened, what they saw." (CSF ¶ 77.)

Of course, this evidence contradicts Ms. Morrison's claims in her pleadings and Motion that the police declined to charge Mr. Langrick because they found Ms. Morrison was "heavily intoxicated." In fact, the police made no "finding" of fact or law that Ms. Morrison was heavily intoxicated on the night in question. Instead, she has mischaracterized Captain Moran's ***comment*** about Ms. Morrison claiming to have been "heavily intoxicated" as an official finding in the investigation. (RSF ¶ 8.) Captain Moran was not a percipient witness to Ms. Morrison's level of intoxication, and the police never tested the amount of alcohol in her system on May 8, 2005; instead, Captain Moran was noting that Ms. Morrison had claimed she was "heavily intoxicated," and he based this statement solely off of Ms. Morrison's own claims during her interview. (*Id.*) Ultimately, Captain Moran testified that he did not have probable cause to arrest Mr. Langrick, much less charge him with sexual assault. (CSF ¶ 78.)

The results of the thorough and competent police investigation alone are enough to show that a genuine issue of material fact exists as to the falsity of Ms. Morrison's claims. Therefore, when viewed in a light most favorable to Mr. Langrick, the overwhelming amount of evidence, even outside of this investigation, that contradicts Ms. Morrison's claims and casts grave doubt on her credibility, is more than enough for a jury to reasonably conclude that Ms. Morrison's allegations of sexual assault and rape are false, and summary judgment is improper. *See Nick's Garage*, 875 F.3d at 113-14.

**D. There Is Convincing Evidence That Ms. Morrison's Defamation of Mr. Langrick Was Part of a Scheme to Enrich Herself and Salvage a Foundering Writing Career by Portraying Herself as a Victim of Sexual Assault.**

Finally, there is substantial evidence that Ms. Morrison's false statements that are at issue in this case were the opening salvo in, and part and parcel of, a carefully crafted scheme by Ms. Morrison to build a brand for herself as a survivor of sexual assault, in the hopes of obtaining

17

publicity that would rescue a failing writing career and garner her a lucrative book deal.  In her deposition, Ms. Morrison testified that, since she was a child, she has aspired to have a career as a writer, but that since graduating from college, she has only made between $10,000 and $20,100 for her writing.  (CSF ¶¶ 84-85.)  Ms. Morrison also testified that in the timeframe in which the defamatory statements at issue were made, she was not doing well financially and was delinquent on her student loan payments until she received a $300,000 settlement payment from a former employer based on claims that "she was subjected to sexual harassment in a hostile work environment."  (CSF ¶¶ 88-89.)  After receiving this settlement payment, Ms. Morrison testified that she was able to take to time off from salaried employment to focus on her writing and was essentially living off the settlement payment for at least a year and half, though she no longer has any money from the settlement.  (CSF ¶ 90.)  In August 2018, shortly after placing the phone call to Mr. Langrick's employer in which she accused him of sexually assaulting her—and receiving a subsequent cease and desist letter from Mr. Langrick's counsel—Ms. Morrison created a blog on the website medium.com and published a post titled "Someone Really Doesn't Want You to Read This," in which she referenced the letter from Mr. Langrick's attorney.  (CSF ¶ 92.)  Her blog post specifically noted that "there was no offer of money in exchange for her silence," noted that other #metoo accusers have received such payments or been paid small sums to publish their accounts and stated that she believed her story "was worth more than that."  (CSF ¶¶ 92-93.)

Thus began a whirlwind of websites and blog posts in which Ms. Morrison sought to position her personal brand as that of a courageous sexual assault survivor finding her voice through writing.  In addition to this blog, Ms. Morrison started her own website called "Ms. Universe," and launched an associated Facebook page for this new personal brand.  (CSF ¶ 94.)  Tellingly, on her website Ms. Morrison wrote about a forthcoming "economic justice project"

related to her "advocacy" that she called "Rape on the Blockchain," and she invited "venture capitalists" to contact her about providing funding for this business.  (*Id*.)

Moreover, Ms. Morrison has been very open about the fact that she is currently writing a book about her allegations against Mr. Langrick, that she hopes will be very "lucrative" for her. (CSF ¶¶ 93-96.)  In fact, after filing since-dismissed declaratory judgment claims against Mr. Langrick, Ms. Morrison texted her friend Sarita Hudgins, saying that while she didn't currently have the money for her counsel to represent her "all the way to conclusion," in this case, and "court is a gamble," she hoped her lawsuit would help her "to get a lucrative book deal and use the [lawsuit] in the book and in the writing."  (CSF ¶ 96.)  And Ms. Hudgins testified in her deposition that Ms. Morrison believed she could secure a lucrative book deal based on her allegations against Mr. Langrick because the alleged incident occurred at an Ivy League school and because Mr. Langrick is a "finance guy," and "people like to vilify people in finance."  (CSF ¶ 97.)

In sum, Ms. Morrison's assertion that there is no genuine dispute of material fact as to the truth or falsity of her statements accusing Mr. Langrick of sexually assaulting her is entirely meritless.  This issue could not be more disputed.  And while Mr. Langrick certainly believes that the vast weight of the evidence supports his version of events, the only question at this stage is whether there are issues of disputed fact to be resolved by a jury.  There plainly are, and therefore Ms. Morrison's Motion should be denied.

## II. A Genuine Issue of Material Fact Exists as to Whether Ms. Morrison Published the Statements with the Requisite Degree of Fault.

Ms. Morrison has also failed to demonstrate that she is entitled to summary judgment on the issue of fault.  Ms. Morrison argument relies on the precedent established in *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196 (1975), which holds that where the content of defamatory publications by a media defendant "is arguably within the sphere of legitimate public

concern, which is reasonably related to matters warranting public exposition," *id.* at 199, a private plaintiff may only recover if he can "establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Id.* Ms. Morrison seemingly contends that this gross negligence standard applies to her statements and argues that Mr. Langrick is incapable of demonstrating that she was at least grossly negligent in publishing her false and defamatory allegations against Mr. Langrick. But, outside of her bare and conclusory statements relating to the *Chapadeau* case and its progeny, Ms. Morrison has befuddlingly failed to explain ***why*** the *Chapadeau* gross negligence standard applies to this case, much less cite to any facts that would support such an argument. (Morrison Mem. at 15-16.)

The *Chapadeau* standard does not apply to Ms. Morrison's statements and, because Mr. Langrick is a private figure, he is only required to show that Ms. Morrison was negligent in publishing her false and defamatory statements. *See Lucking v. Maier*, No. 03-cv-1401, 2003 WL 23018787, at *7 (S.D.N.Y. Dec. 23, 2003) (under New York law of defamation, the element of fault for a private plaintiff only requires a showing of negligence on the part of the defendant). But even if Ms. Morrison's statements were related to a matter of public concern and Mr. Langrick were required to prove Ms. Morrison acted with gross negligence, Ms. Morrison has still not demonstrated that she is entitled to summary judgment. As set forth below, there is ample evidence in the record from which a jury could find that Ms. Morrison published the statements at issue with ***actual knowledge of their falsity***, and therefore Ms. Morrison has failed to demonstrate that there is no genuine dispute of material fact on the issue of fault, regardless of which fault standard applies to the statements at issue.

**A.  The *Chapadeau* Standard Does Not Apply to Ms. Morrison's Statements Because Ms. Morrison Has Not Remotely Demonstrated That Her Accusations Are a Matter of Public Concern.**

In *Chapadeau,* the court considered under what basis a media publisher of defamatory falsehoods about a private individual could be held liable.  38 N.Y.2d at 199.  The Court ultimately held that where the content of an article falls within "the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition," a private plaintiff may only recover damages for the defamatory material upon a showing that the publisher "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."  *Id.*

The plaintiff in *Chapadeau* was a public-school teacher who had been arrested for possession of heroin and a hypodermic needle, and a local newspaper reporting on the arrest falsely claimed that the plaintiff was arrested at a party where drugs and alcohol were found.  *Id.* at 197. The *Chapadeau* court found that the challenged publication fell within the sphere of legitimate public concern, because as a public-school teacher, the plaintiff was highly influential with the community youth and the article reported on his involvement with heroin, which the court described as an "oft-cited menace" to youths.  *Id.* at 200.  The court affirmed summary judgment in favor of the media defendant after finding that the plaintiff could not demonstrate that the media defendant was grossly negligent, because the statements were published after the writer consulted two "authoritative sources" and after the article had been checked by at least two people other than the writer, and that was "hardly indicative of gross irresponsibility."  *Id.*

While courts in New York have occasionally expanded the *Chapadeau* "gross irresponsibility" standard to cases involving non-media defendants, Ms. Morrison makes no effort here to explain how she can meet the threshold requirement of showing that her false rape

allegations are a matter of "public concern."  Here, unlike in *Chapedeau* and its progeny, both Ms. Morrison and Mr. Langrick plainly are private individuals, and the statements at issue are accusations by Ms. Morrison that Mr. Langrick committed a personal crime against her, fifteen years ago, while both were university students.  And one of the statements at issue—Count I— was not even made in any kind of public forum, but rather was made directly by Ms. Morrison in a telephone call to Mr. Langrick's then-employer.  (CSF ¶¶ 99-100.)  If one private individual's accusation that another private individual committed an assault against her many years ago is a matter of "public concern" then that legal standard has no meaning, and it is difficult to imagine ***any*** defamatory statements that could not be so characterized.  Unsurprisingly, New York law does not support that absurd result.  *See Krauss v. Globe Int'l, Inc*., 251 A.D.2d 191, 194 (N.Y. App. Div. 1998) (rejecting defamation defendant's argument that an accusation plaintiff liaised with a prostitute was subject to the *Chapadeau* standard because "plaintiff's sex life … cannot be considered to be within the sphere of legitimate public concern.").

Instead, because Mr. Langrick and Ms. Morrison are both private individuals and her accusations of sexual assault are plainly not a matter of public concern, Mr. Langrick need only show that Ms. Morrison was negligent in publishing her false and defamatory statements.  *Daniels v. Kostreva*, No. 15-cv-3141, 2017 WL 823583, at *6 (E.D.N.Y. Jan. 12, 2017), *report and recommendation adopted*, No. 15-cv-3141, 2017 WL 519227 (E.D.N.Y. Feb. 8, 2017) ("Where the defamed plaintiff is a private individual, and the defamatory content is a matter of private concern, as opposed to statements concerning a public figure and a matter of public concern, the private 'plaintiff in such circumstances need show only that [the] defendant [was] negligent in publishing the [statement].'") (quoting *Albert v. Loksen*, 239 F.3d 256, 270 (2d Cir. 2001)).

**B. There is Ample Evidence in the Record Demonstrating That Ms. Morrison Published the Statements at Issue with Gross Irresponsibility and, Indeed, With Full Knowledge That They Were False.**

Ultimately, even if the Court were to hold that Ms. Morrison's accusations were a matter of public concern and that the governing fault standard is "gross irresponsibility" rather than "negligence," Ms. Morrison is still not entitled to summary judgment on fault because there is ample evidence in the record from which a jury could find that she acted not only irresponsibly, but that she intentionally made false accusations of sexual assault with full knowledge that those accusations were false.  As set forth herein and in Mr. Langrick's Responses and Objections to Monica Morrison's Local Civil Rule 56.1 Statement of Material Facts in Support of Her Motion For Summary Judgment and Counterstatement of Additional Material Facts, there is an overwhelming amount of evidence in the record demonstrating that Ms. Morrison knew that her sexual encounter with Mr. Langrick was entirely consensual but that she knowingly claimed otherwise, and that her story and claims as far as what she does or does not recall have shifted materially with every retelling.  This evidence is sufficient for a jury to find not only negligence, but gross irresponsibility and, indeed, actual malice.  *See Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) (knowing falsehoods rise to a level of fault "[b]eyond gross irresponsibility"); *Goldwater v. Ginzburg*, 414 F.2d 324, 336 (2d Cir. 1969) (the fault standard of actual malice is satisfied where the defendant made the statements at issue with knowledge of falsity or a reckless disregard for the truth).

Where, as here, there is so much evidence calling into question Ms. Morrison's credibility and so many contradictions in her tale of sexual assault, a jury could easily and reasonably find that Ms. Morrison made these false accusations with knowledge of falsity and/or a reckless disregard for the truth.  *See, e.g.*, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668

23

(1989) (a plaintiff is entitled to prove actual malice through the accumulation of circumstantial evidence suggesting knowledge of falsity or reckless disregard for the truth); *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1090 (3d Cir. 1988) ("Therefore, objective circumstantial evidence can suffice to demonstrate actual malice. Such circumstantial evidence can override defendants' protestations of good faith and honest belief that the report was true").  Given the evidence contradicting Mr. Morrison's tale of sexual assault and the evidence demonstrating that she made these false statements knowingly, Ms. Morrison's heavily disputed denial that she did so is an insufficient basis on which to grant summary judgment in her favor on the issue of fault. *See Brine* 85 F.3d. at 1011 ("Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment.").  And, unlike a case in which a media defendant has published a second-hand account of distant events, Mr. Morrison was a ***direct participant*** in the disputed events at issue.  Thus, if the jury finds that Ms. Morrison's claim of sexual assault is false, then the jury reasonably and necessarily may conclude that Ms. Morrison fabricated that claim of sexual assault with knowledge that it was false.  *See, e.g., Time, Inc. v. Pape*, 401 U.S. 279, 285 (1971) (noting that "when the alleged libel purports to be an eyewitness or other direct account of events," actual malice can be "reasonably inferred" by a finding that the statement at issue was false); *Ventura v. Kyle,* 8 F. Supp. 3d 1115, 1121-22 (D. Minn. 2014) (where defendant in a defamation case claimed to have been involved in a bar fight with a former Minnesota governor, a jury could find actual malice if it found falsity because "[i]f [plaintiff] proves *that* statement was false—that is, if a jury does not believe [defendant] punched [plaintiff]—it follows that [defendant] fabricated it.").

## III.   MS. MORRISON'S COUNSEL'S AFFADAVIT IS IMPROPER AND IRRELEVANT IN THE CONTEXT OF A MOTION FOR SUMMARY JUDGMENT.

Finally, Mr. Langrick notes that Ms. Morrison has attempted to support her Motion and Memorandum with an immaterial, 22-page affidavit from her counsel, Henry Kaufman. (January 15, 2021 Aff. of Henry R. Kaufman in Supp. of Counter-Defendant Mot. for Summary Judgment.) Within the Affidavit, Mr. Kaufman improperly rehashes the legal arguments in Ms. Morrison's Memorandum, expresses his own opinions, interpretations, and arguments with respect to plainly disputed facts, generally mischaracterizes the evidence in the record, and does so with virtually no citation to any actual record evidence. This affidavit is entirely improper and should be disregarded.

In the context of a motion for summary judgment, attorney affidavits are permissible only for the limited purpose of putting relevant documents before the court or setting forth the procedural history of the case. *United States v. Letsche*r, 83 F. Supp. 2d 367, 381 (S.D.N.Y. 1999). It is well-settled that attorney affidavits are "not to advance factual averments or legal arguments." *Curran v. Aetna Life Ins. Co*., No. 13-cv-00289, 2016 WL 3843085, at *8 (S.D.N.Y. July 11, 2016) (internal quotations omitted); *Genometrica Rsch. Inc. v. Gorbovitski*, No. 11-CV-05802, 2013 WL 394892, at *4 (E.D.N.Y. Jan. 31, 2013) (holding that the court will not consider any legal arguments contained in attorney declarations because inclusion of legal arguments in declarations is improper). Courts have repeatedly held that affidavits such as Mr. Kaufman's are entitled to no weight at summary judgment because Mr. Kaufman's opinions and interpretations of the facts are not cognizable factual evidence based on first-hand, personal knowledge of any material facts. *See Wyler v. United States*, 725 F.2d 156 (2d Cir. 1983); *Omnipoint Commc'ns, Inc. v. Common Council of City of Peekskill*, 202 F. Supp. 2d 210, 213 (S.D.N.Y. 2002); *Eguia v. Tompkins*, 756 F.2d 1130, 1136 (5th Cir. 1985) (holding that the district court should not have considered an attorney affidavit submitted in support of summary judgment and noting, "[w]e

25

cannot condone the use of such an improper affidavit"); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412-13 (9th Cir. 1995) (a similar argumentative attorney affidavit submitted at summary judgment was "entitled to no weight because the declarant did not have personal knowledge.").

Additionally, because almost none of the "facts" set forth in Mr. Kaufman's extraneous affidavit are supported by citation to record evidence, nor are any of Mr. Kaufman's averments even referenced in Ms. Morrison's Statement of Undisputed Facts, the affidavit also runs afoul of this Court's rules regarding how factual material in support of a motion for summary judgment must be presented. *See* Local Rule 56.1 (the material facts on which summary judgment is sought must be set forth in the Local Rule 56.1 statement and each fact must be followed by citation to admissible evidence). Because Mr. Kaufman's affidavit does not even purport to be based on his first-hand knowledge and merely includes rehashed legal arguments and his own interpretation of the disputed facts (of which he has no personal knowledge) it has no place in the context of a motion for summary judgment and should be disregarded as irrelevant and improper.

## CONCLUSION

For the foregoing reasons, Defendant-Counterclaimant Robert Langrick respectfully requests that the Court deny Plaintiff Monica Morrison's January 15, 2021 Motion for Summary Judgment Dismissing the Counterclaims.

Dated: March 15, 2021                    Respectfully Submitted,

                                         */s/ Andrew C. Phillips*

Andrew C. Phillips (pro hac vice)
Thomas A. Clare, P.C. (pro hac vice)
Elizabeth M. Locke, P.C. (pro hac vice)
Shannon B. Timmann (pro hac vice)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: andy@clarelocke.com
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: shannon@clarelocke.com

Daniel A. Singer (DAS 0978)
THE LAW OFFICES OF DANIEL A. SINGER PLLC
New York, New York 10017
Telephone: (212) 569-7853
Email: dan@singerlaw.com

*Attorneys for Defendant-Counterclaimant*
*Robert Langrick*

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew C. Phillips, an attorney with Clare Locke LLP, hereby certify that on March 15,

2021 a copy of the foregoing document was served on all counsel of record via email.

<u>/s/ Andrew C. Phillips</u>
Andrew C. Phillips
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
(202) 628-7404
andy@clarelocke.com
